# 25-2763

## United States Court of Appeals
*for the*
## Second Circuit

EDWARD SKOLARUS, JOSHUA CAIN, YAFFA LAWSON, JAMES SMALL, CASSANDRA ARNOLD, STEVEN TORTOLANI, and MICHAEL KATZMAN, on behalf of themselves and all others similarly situated,

*Plaintiffs-Appellants,*

– v. –

BLOOMBERG, L.P. and BLOOMBERG INDEX SERVICES, LTD.,

*Defendants-Appellees.*

On Appeal from the United States District Court for the Southern District of New York, Case No. 1:24-cv-04375

**JOINT APPENDIX**
**VOLUME 1: JA 1 – JA 296**

**LIEFF CABRASER HEIMANN & BERNSTEIN, LLP**
Roger N. Heller
275 Battery Street, 29th Floor
San Francisco, CA 94111
Telephone: (415) 956-1000
Facsimile: (415) 956-1006
rheller@lchb.com

Avery S. Halfon
Jahi J. Liburd
250 Hudson Street, 8th Floor
New York, NY 10013
Telephone: (212) 355-9500
Facsimile: (212) 355-9592
ahalfon@lchb.com
jliburd@lchb.com

*Counsel for Plaintiffs-Appellants*

**PAUL LLP**
Richard M. Paul III
Michael L. Schrag
Megan M. Duffield
600 Broadway Boulevard, Suite 600
Kansas City, Missouri 64105
Telephone: (816) 984-8100
Facsimile: (816) 984-8101
Rick@PaulLLP.com
Michael@PaulLLP.com
Megan@PaulLLP.com

**HENNELLY & GROSSFELD LLP**
Michael G. King
10900 Wilshire Blvd., Suite 400
Los Angeles, CA 90024
Telephone: (310) 305-2100
Facsimile: (310) 305-2116
mking@hgla.com

**JOINT APPENDIX**
**VOLUME 1: JA 1 – JA 296**

**Complete Table of Contents**


| **Document Description** | **Dkt. No.** | **Page No.** |
|---|---|---|
| **VOLUME 1: JA 1 – JA 296** | | |
| Amended Class Action Complaint | 28 | JA 1 |
| Declaration of Dana M. Seshens in Support of Defendants' Motion to Dismiss | 38 | JA 76 |
| Debt Obligation Order by the Public Utilities Commission of Texas Approving the Issuance of Electric Reliability Council of Texas Recovery Bonds at Issue (Exhibit A to Seshens Declaration) | 38-1 | JA 79 |
| Financing Order by Public Utilities Commission of California Approving the Issuance of Southern California Edison's Recovery Bonds at Issue (Exhibit B to Seshens Declaration) | 38-2 | JA 164 |
| **VOLUME 2: JA 297 – JA 457** | | |
| Financing Order by the Public Utilities Commission of California Approving the Issuance of Pacific Gas and Electric Company's Series 2022-A Recovery Bonds at Issue (Exhibit C to Seshens Declaration) | 38-3 | JA 297 |
| **VOLUME 3: JA 458 – JA 744** | | |
| Financing Order by the Public Utilities Commission of California Approving the Issuance of Pacific Gas and Electric Company's Series 2024-A Recovery Bonds at Issue (Exhibit D to Seshens Declaration) | 38-4 | JA 458 |
| Issuance Advice Letter from Electric Reliability Council of Texas to Public Utilities Commission of Texas (Exhibit E to Seshens Declaration) | 38-5 | JA 626 |
| Issuance Advice Letter from Southern California Edison to Public Utilities Commission of California (Exhibit F to Seshens Declaration) | 38-6 | JA 652 |
| Issuance Advice Letter from Pacific Gas and Electric Company to Public Utilities Commission of California Regarding Series 2022-A Recovery Bonds (Exhibit G to Seshens Declaration) | 38-7 | JA 700 |

| Document Description | Dkt. No. | Page No. |
|---|---|---|
| **VOLUME 4: JA 745 – JA 1021** | | |
| Issuance Advice Letter from Pacific Gas and Electric Company to Public Utilities Commission of California Regarding Series 2024-A Recovery Bonds (Exhibit H to Seshens Declaration) | 38-8 | JA 745 |
| Bloomberg Fixed Income Index Methodology (Exhibit I to Seshens Declaration) | 38-9 | JA 791 |
| SEC Asset-Backed Securities Compliance and Disclosure Interpretations (Exhibit J to Seshens Declaration) | 38-10 | JA 903 |
| Redline reflecting changes between original Complaint (ECF No. 1) and Amended Complaint (ECF No. 28) (Exhibit K to Seshens Declaration) | 38-11 | JA 921 |
| Declaration of Richard M. Paul III in Support of Plaintiffs' Opposition to Defendants' Motion to Dismiss | 47 | JA 1010 |
| National Association of Regulatory Utility Commissioners "Resolution on Urging Clarification of Utility Recovery Bond Classification by the SEC to Lower the Cost to Energy Customers," dated November 13, 2024 (Exhibit A to Paul Declaration) | 47-1 | JA 1013 |
| Governors' Letter to the U.S. Securities and Exchange Commission Chairman, dated September 10, 2024 (Exhibit B to Paul Declaration) | 47-2 | JA 1017 |
| **VOLUME 5: JA 1022 – JA 1239** | | |
| Debt Obligation Order by the Public Utilities Commission of Texas Approving the Issuance of Electric Reliability Council of Texas Recovery Bonds at Issue (Exhibit C to Paul Declaration) | 47-3 | JA 1022 |
| Financing Order by Public Utilities Commission of California Approving the Issuance of Southern California Edison's Recovery Bonds at Issue (Exhibit D to Paul Declaration) | 47-4 | JA 1107 |
| **VOLUME 6: JA 1240 – JA 1400** | | |
| Financing Order by the Public Utilities Commission of California Approving the Issuance of Pacific Gas and Electric Company's Series 2022-A Recovery Bonds at Issue (Exhibit E to Paul Declaration) | 47-5 | JA 1240 |

| Document Description | Dkt. No. | Page No. |
|---|---|---|
| **VOLUME 7: JA 1401 – JA 1573** | | |
| Financing Order by the Public Utilities Commission of California Approving the Issuance of Pacific Gas and Electric Company's Series 2024-A Recovery Bonds at Issue (Exhibit F to Paul Declaration) | 47-6 | JA 1401 |
| Defendants' Letter to District Court Regarding Supplemental Authority Issued by the U.S. Securities and Exchange Commission in Further Support of the Motion to Dismiss | 51 | JA 1569 |
| Plaintiffs' Letter in Response to Defendants' Letter Regarding Supplemental Authority | 52 | JA 1572 |

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| EDWARD SKOLARUS, JOSHUA CAIN, YAFFA LAWSON, JAMES SMALL, CASSANDRA ARNOLD, STEVEN TORTOLANI, and MICHAEL KATZMAN, on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>BLOOMBERG, L.P. and BLOOMBERG INDEX SERVICES, LTD.,<br><br>Defendants. | CASE NO. 1:24-cv-04375-ALC<br><br>**AMENDED CLASS ACTION COMPLAINT** |

Plaintiffs Edward Skolarus, Joshua Cain, Yaffa Lawson, James Small, Cassandra Arnold, Steven Tortolani, and Michael Katzman, individually and on behalf of all others similarly situated, for their claims against defendants Bloomberg, L.P. and Bloomberg Index Services, Ltd. (collectively, "Bloomberg") allege the following based on personal knowledge as to Plaintiffs and Plaintiffs' own acts, and on information and belief as to all other matters based on the investigation conducted by and through Plaintiffs' attorneys:

## SUMMARY OF DISPUTE

1. Utility companies issue Recovery Bonds to fund large infrastructure projects. Investors, mostly large institutions, buy Recovery Bonds and electricity customers repay the bond amounts plus interest via monthly charges on their bills, separate from and on top of the rates they pay for electricity. The interest rate on a Recovery Bond is set by the market based in part on how the bonds are, or will be, classified in bond indices. Bloomberg is the dominant indexing company in the $40 trillion U.S. fixed-income market and is responsible for indexing Recovery Bonds. Bloomberg's classification impacts the market price of Recovery Bonds.

2. In mid-2022, Bloomberg intentionally or negligently misclassified utility Recovery Bonds, causing millions of electricity consumers to pay higher interest charges. This case involves four Recovery Bond issuances by California utilities Pacific Gas & Electric ("PG&E") and Southern California Edison ("SCE") and Texas utility the Electric Reliability Council of Texas ("ERCOT"): (1) PG&E Senior Secured Recovery Bonds, Series 2022-A (Nov. 2022; $983 million); (2) SCE Senior Secured Recovery Bonds, Series 2023-A (Apr. 2023; $775 million); (3) ERCOT Texas Stabilization Subchapter N Bonds (June 2022; $2.1 billion); and (4) PG&E Senior Secured Recovery Bonds, Series 2024-A (Aug. 2024; $1.42 billion). Together, these three utility companies provide electricity to most electricity customers in California and Texas, and Bloomberg's misclassification of these four Recovery Bonds resulted in higher costs for millions of Californians and Texans.

3. Before 2022, Bloomberg had correctly classified Recovery Bonds as corporate bonds based, in part, on the fact that the bond proceeds further the utilities' business and by law the bonds are repaid by electricity customers via monthly charges on their bills and thus carry little if any risk. So long as the utility continues to provide electricity service, utility customers repay the bonds. But in 2022, Bloomberg caved to requests from its institutional investor clients that wanted a higher return on Recovery Bonds as more of these bonds were coming to market. These investors are some of Bloomberg's largest customers in both defendant BISL's indexing business and defendant Bloomberg, L.P.'s more lucrative financial data terminal business. Although nothing changed to make these bonds any riskier or otherwise materially different, Bloomberg disregarded its own indexing standards and the law by reclassifying Recovery Bonds from corporate bonds to asset-backed securities (ABS). Bloomberg knew that reclassifying the

bonds to ABS would increase the perceived risk of the bonds, shrink the pool of investors allowed to purchase them, and cause the interest rates to be higher.

4. Bloomberg's reclassification and related conduct leading up to same improperly increased the monthly electric utility payments for over 50 million people in California and Texas[1] for the next approximately twenty years by manipulating the interest rate that it knew would be passed on to and paid by California and Texas utility customers. Bloomberg reclassified Recovery Bonds as "ABS" even though Recovery Bonds lack most characteristics of ABS. Indeed, in 2007, the SEC stated that Recovery Bonds are not asset-backed securities, and Bloomberg's own data team still identifies them as corporate bonds. This lawsuit seeks to hold Bloomberg accountable for the increased payments it caused, and will continue to cause, California and Texas electricity customers to incur.

5. This type of market manipulation is not new. Before the 2012 LIBOR scandal, markets, regulators, and the public believed that the LIBOR (London Inter-bank Offered Rate) interest rate was a fact-based, fair, and objective financial benchmark. The LIBOR scandal showed it was not. The few institutions that controlled LIBOR manipulated the interest rate to benefit themselves and their biggest customers. The LIBOR financial benchmark manipulation caused billions of dollars to be shifted, not based on facts, rules, regulations, or objective measures, but on the subjective whim of the institutions controlling the benchmark.

---

[1] https://www.pge.com/en/about/company-information/company-profile.html (PG&E "provides natural gas and electric service to approximately 16 million people throughout a 70,000-square-mile service area in northern and central California."); https://www.edisoncareers.com/about-sce/ (SCE "proudly serve[s] approximately 15 million people in a 50,000-square-mile service area within Central, Coastal and Southern California."); https://www.ercot.com/about (ERCOT "manages the flow of electric power to more than 27 million Texas customers -- representing about 90 percent of the state's electric load.")

6. Since the LIBOR scandal broke, largely to regain the trust of the markets and regulators (and delay government regulation), financial benchmark creators established objective, transparent, rules-based standards and promised to abide by these standards, vowing not to subjectively manipulate benchmarks to benefit themselves or their customers.

7. Benchmark creators are regulated in the European Union, United Kingdom, South Korea, Japan, Singapore, and Australia, but have avoided regulation in the United States. For years, Bloomberg has both publicly and through its membership in IOSCO[2] or IIA[3] said it would follow their objective, transparent, and rules-based principles, including for its activities here in the U.S.[4] Bloomberg's pledge is particularly vital to the Recovery Bond market where many interconnected market participants including electricity customers who are captive market participants, required by law to pay Recovery Bond interest payments at the rate as priced in the capital markets rely on objective indexing.

---

[2] The International Organization of Securities Commissions ("IOSCO") promulgated its Principles for Financial Benchmarks after the LIBOR financial benchmark manipulation came to light and "raised concerns over the fragility of [benchmarks] – in terms of both their integrity and their continuity of provision - that has the potential to undermine market confidence potentially harming both investors and the real economy." https://www.iosco.org/library/pubdocs/pdf/IOSCOPD415.pdf.

[3] The Index Industry Association ("IIA") is the global trade association for the index industry established in 2012 (about the time the LIBOR scandal broke). https://www.indexindustry.org/ ("The IIA's mandate is to educate investors on the attributes and role of indexes within the investment process … and to push for industry standards of best practice, independence and transparency."); *see also* https://www.indexindustry.org/insights/dan-draper-chairman-of-iia-on-transparency-independence-and-integrity-as-the-bedrocks-of-indexing/ ("The IIA and its members recognize their important contributions to and role in the broader financial ecosystem and will continue to uphold the highest standards of integrity and transparency in our industry to promote sustainable global financial markets…."). Bloomberg Index Service's former CEO and Bloomberg LP's Global Head of Indices, Steve Berkley, is a member of IIA's Leadership Team.

[4] *See* https://www.bloomberg.com/professional/products/indices/resources/regulation/#benchmark-regulation-details (Bloomberg "was authorized by the UK's Financial Conduct Authority [FCA] to conduct benchmark administration under the BMR. BISL may be found on the FCA's register….").

8. In addition, Bloomberg has published its own Bloomberg Fixed Income Index Methodology (herein, the "Methodology") detailing how it "objectively" and "transparently" makes "rules-based" decisions using "best practices," "good governance," and conflict of interest principles. Largely to forestall regulation, Bloomberg has represented that it will not act arbitrarily and will not manipulate any financial benchmarks to benefit itself or its customers.

9. Bloomberg portrays itself as an honest umpire for the fixed-income market – it is supposed to call "balls and strikes" based on facts and rules.

10. Over the last decade, index investing has grown significantly, which has increased the power of financial benchmark creators generally, and of Bloomberg particularly. As the stakes have grown, so have the incentives to manipulate financial benchmarks.

11. Bloomberg is by far the most important benchmark creator for the U.S. fixed-income market. Bloomberg's fixed-income benchmarks in the bond market are even more influential than the Dow Jones/S&P indices are in the stock market (which has several index providers). Thus, Bloomberg's index classification decisions powerfully impact pricing in the Recovery Bond market, which heightens the need for objective, transparent, rules-based decisions and magnifies the potential harm of manipulative misclassification.

12. Together, the Bloomberg Defendants constitute a "triple threat" in the fixed-income market: dominant index provider, data provider (Bloomberg terminals), and price reporting service. In the fixed-income market – where securities are sometimes more obscure, trade less frequently, and where information overall is scarcer compared to the equities market – Bloomberg is the dominant source of information for what a bond is (index administration), what it is worth (price reporting), and what is happening with it (data). The fixed-income market depends on Bloomberg's accuracy and objectivity.

13. From 2016, when it acquired the fixed-income indexes from Barclays, through mid-2022, both Bloomberg, L.P. and Bloomberg Index Services, Ltd. consistently classified Recovery Bonds as corporate bonds. Other index providers, governmental financial regulators, and self-regulatory institutions (including the FASB, FINRA, and the EU) also confirmed that Recovery Bonds were corporate bonds. Recovery Bonds' prospectuses likewise routinely say they are not ABS and the issuer is not an asset-backed issuer. Thus, there was widespread consensus that Recovery Bonds were corporate bonds, not ABS.

14. Recovery Bonds are intentionally structured to meet the criteria of corporate bonds – part of a large, diverse universe of bonds that are permitted investments of most institutional investors and thus offer lower rates.

15. Recovery Bonds are a booming business. In 2022, new issuances of Recovery Bond issuances were about $20 billion. Another $7 billion were issued in 2023. As the Recovery Bond market has grown, so did the financial incentives to misclassify Recovery Bonds.

16. In mid-2022, after years of publicly agreeing to adhere to objective, transparent, and rules-based principles, and during a six-week span when $6 billion of new Recovery Bonds were issued, Bloomberg reclassified Recovery Bonds. Departing from its own standards and Methodology and the collective wisdom of issuers, underwriters, independent professional organizations, and even its own data personnel, Bloomberg re-classified Recovery Bonds from corporate bonds to ABS, which are a more complex, riskier, and less widely purchased type of security. Bloomberg made the change based not on any actual change to the structure or risk factors of the bonds, but instead at the request of some its largest institutional clients that stood to benefit greatly from the change. Because many institutional investors' investment policies preclude them from investing in ABS, and because ABS are perceived as a riskier investment

with a less extensive secondary market than corporate bonds, the market for ABS is much smaller and commands higher interest rates compared to corporate bonds of the same rating. Because of Bloomberg's reclassification, Bloomberg's customers that participated in the asset-backed market could buy AAA-rated Recovery Bonds, virtually guaranteed to be paid off by California and Texas electricity consumers, and benefit from higher interest returns than they would have received if Bloomberg had left them classified as corporate bonds.

17. Bloomberg's classification change – including the timing, process, and substance – was contrary to its own "Methodology," policies, and practices, and violated U.S., EU, and U.K. law as well as IOSCO Principles and IIA standards. Instead of being objective and transparent about its decision, Bloomberg acted subjectively to benefit its large institutional-investor clients and obfuscated and/or misstated facts and its decision-making process.

18. Tellingly, Bloomberg's own data group still recognizes that Recovery Bonds are corporate bonds; on Bloomberg's terminals, Recovery Bonds continue to have a corporate ticker symbol ("CORP").

19. Bloomberg's conduct alleged herein has harmed, and for years will continue to harm, Plaintiffs and class members in the form of increased interest payments on their electricity bills. With respect to the four Recovery Bonds at issue here, Bloomberg's conduct will cause the vast majority of electricity consumers in California and Texas to pay hundreds of millions of dollars in additional interest over the life of the bonds.

20. Bloomberg knew that its reclassification scheme violated the law, industry standards, and its own Methodology. Bloomberg also knew that its misclassification of Recovery Bonds and related conduct leading up to same would improperly inflate the bond repayment interest charges assessed each month on the SCE, PG&E, and ERCOT customers' utility bills.

21. Plaintiffs bring this class action on behalf of themselves and the other electricity customers of SCE, PG&E, and ERCOT who have been charged, and will continue to be charged, higher Recovery Bond interest charges as a result of Bloomberg's misconduct. Plaintiffs, on behalf of themselves and the proposed classes, seek legal and/or equitable relief for the higher monthly payments they have been and will be required to pay, including requiring Bloomberg to pay for their harm to date and to fund utility bill credits sufficient to offset these higher monthly payments through the life of the Recovery Bonds at issue, and enjoining Bloomberg from engaging in the misconduct alleged herein going forward.

## JURISDICTION AND VENUE

22. This Court has subject matter jurisdiction over this case under 28 U.S.C. § 1332(d)(2) because members of each of the classes are citizens of different states from the Defendants and the matter in controversy exceeds $5,000,000 exclusive of interest and costs. Plaintiffs are citizens of California and Texas. Defendants are citizens of New York and the United Kingdom. Therefore, diversity of citizenship exists under 28 U.S.C. § 1332(d)(2)(A). None of the exceptions to CAFA jurisdiction applies, and the total number of members of each of the proposed classes is greater than 100. 28 U.S.C. § 1332(d)(5)(B).

23. Venue is proper under 28 U.S.C. § 1391(a)(3). Defendants are subject to personal jurisdiction in this District. Defendants conduct business in this District, including selling various products and services to residents of this District. Defendant Bloomberg, L.P. is headquartered in this District. Further, a substantial portion of the events or omissions giving rise to the claims asserted herein occurred in a variety of locations, including but not limited to in this District. The location of each officer and employee of Defendants when they engaged in acts alleged herein is not known.

24. In connection with the acts, conduct, and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to United States mail, interstate telephone communications, and the facilities of the national securities exchange.

## PARTIES

25. Plaintiff Edward Skolarus is a resident of Manhattan Beach, California. Since before June 2022, and continuing to the present, Plaintiff Skolarus has been a customer of SCE electrical service. Plaintiff Skolarus expects to remain a resident of the area served by SCE electrical service, and to remain a customer of SCE electrical service, for the foreseeable future. Plaintiff Skolarus has paid and will continue to pay more in recovery bond interest charges each month because of Defendants' wrongful actions alleged herein. Non-party SCE supplies electric energy to 15 million people in central, coastal and southern California. SCE is a wholly owned subsidiary of Edison International.

26. Plaintiff Joshua Cain is a resident of Lancaster, California. Since before June 2022, Plaintiff Cain has been a customer of SCE electrical service. Plaintiff Cain expects to remain a resident of the area served by SCE electrical service, and to remain a customer of SCE electrical service, for the foreseeable future. Plaintiff Cain has paid and will continue to pay more in recovery bond interest charges each month because of Defendants' wrongful actions alleged herein.

27. Plaintiff Yaffa Lawson is a resident of Hemet, California. Since before June 2022, Plaintiff Lawson has been a customer of SCE electrical service. Plaintiff Lawson expects to remain a resident of the area served by SCE electrical service, and to remain a customer of SCE electrical service, for the foreseeable future. Plaintiff Lawson has paid and will continue to pay

more in recovery bond interest charges each month because of Defendants' wrongful actions alleged herein.

28. Plaintiff James Small is a resident of Los Altos, California. Since before June 2022, and continuing to the present, Plaintiff Small has been a customer of PG&E electrical service. Plaintiff Small expects to remain a resident of the area served by PG&E electrical service, and to remain a customer of PG&E electrical service, for the foreseeable future. Plaintiff Small has paid and will continue to pay more in recovery bond interest charges each month because of Defendants' wrongful actions alleged herein. Non-party PG&E provides natural gas and electric service to approximately 16 million people throughout a 70,000-square-mile service area in northern and central California.

29. Plaintiff Cassandra Arnold is a resident of Oakland, California. Since before June 2022, and continuing to the present, Plaintiff Arnold has been a customer of PG&E electrical service. Plaintiff Arnold expects to remain a resident of the area served by PG&E electrical service, and to remain a customer of PG&E electrical service, for the foreseeable future. Plaintiff Arnold has paid and will continue to pay more in recovery bond interest charges each month because of Defendants' wrongful actions alleged herein.

30. Plaintiff Steven Tortolani is a resident of Dallas, Texas. Since before June 2022, and continuing to the present, Plaintiff Tortolani has been a customer of ERCOT electrical service and of PowerNext, a downstream retail electricity provider in the ERCOT system. Plaintiff Tortolani expects to remain a resident of the area served by ERCOT electric service, and to remain a customer of ERCOT electrical service, for the foreseeable future. Plaintiff Tortolani has paid and will continue to pay more in recovery bond interest charges each month because of Defendants' wrongful actions alleged herein. Non-party ERCOT manages the flow of electric

power to more than 27 million Texas customers, representing about 90 percent of the state's electric load.

31. Plaintiff Michael Katzman is a resident of Austin, Texas. Since before June 2022, and continuing to the present, Plaintiff Katzman has been a customer of ERCOT electrical service and of Austin Energy, a downstream retail electricity provider in the ERCOT system. Plaintiff Katzman expects to remain a resident of the area served by ERCOT electric service, and to remain a customer of ERCOT electrical service, for the foreseeable future. Plaintiff Katzman has paid and will continue to pay more in recovery bond interest charges each month because of Defendants' wrongful actions alleged herein.

32. Defendant Bloomberg L.P. is a privately held financial, software, data, and media company headquartered in New York City. Bloomberg L.P. has approximately 176 locations and nearly 20,000 employees, including offices and employees in California and Texas. Bloomberg L.P. provides financial software tools and enterprise applications such as analytics and equity trading platform, data and index services, and news to financial companies and organizations through the Bloomberg Terminal (via its Bloomberg Professional Service), its core revenue-generating product.

33. Defendant Bloomberg Index Services Limited ("BISL") was formed in connection with Bloomberg L.P.'s 2016 acquisition of Barclays's index business (Barclays Risk Analytics and Index Solutions Ltd. (BRAIS)). BISL is a wholly owned subsidiary of Bloomberg L.P. BISL is a private limited company, limited by shares, domiciled and incorporated in the United Kingdom. BISL has branches in the United States (as well as Japan and Singapore) and conducts business throughout the United States, including in New York. This Complaint refers to Defendants Bloomberg L.P. and BISL collectively as "Defendants" or "Bloomberg."

34. Plaintiffs are informed and believe and thereon allege that at all times herein, each of the Defendants, or their agent, servant, employee, lessee, licensee, assignee, and/or successor-in-interest, was acting within the purpose and scope of said agency, service, employment, bailment, lease, license, assignment, and/or interest, and with the consent, commission, and knowledge of their co-defendant.

35. Unless otherwise indicated, each Defendant is the agent, co-conspirator, joint venturer, partner, and/or employee of the other Defendant and, as alleged, has been acting within the course and scope of said agency, conspiracy, joint venture, partnership and/or employment, with the knowledge and/or consent of the co-defendant. Moreover, Plaintiffs are informed and believe and thereon allege that each Defendant has authorized and/or ratified the wrongful activities of the other Defendant.

36. Plaintiffs are informed and believe, and thereon allege, that BISL and Bloomberg, L.P. are alter egos in that they have a unity of interests and overlapping ownership, officers, and managers such that the separate personalities of the entities do not exist, and if the acts of each entity are treated as those of separate businesses, an inequitable result will follow. This includes, without limitation, that the conduct of each Defendant concerning and related to the classification of Recovery Bonds in BISL's indexes as described herein was done with the knowledge and consent of, in conjunction with, and/or at the behest of each other Defendant. Further, the wrongful conduct alleged herein was done by Defendants' officers, directors, and/or managing agents, several of which serve in such capacities for both Defendant entities.

## CLASS ACTION ALLEGATIONS

37. Plaintiffs bring this action as a class action under Federal Rules of Civil Procedure 23(a), (b)(2), and (b)(3) on behalf of the following three classes:

a. SCE Class: All past, current, and future customers of SCE electricity service who, since April 2023, have paid and/or will continue to pay one or more monthly recovery bond charges related to the recovery bond(s) known as SCE Senior Secured Recovery Bonds, Series 2023-A (issued April 2023).

b. PG&E Class: All past, current, and future customers of PG&E electricity service who, since November 2022, have paid and/or will pay or continue to pay one or more monthly recovery bond charges related to: (a) the recovery bond(s) known as PG&E Senior Secured Recovery Bonds, Series 2022-A (issued November 2022) and/or (b) the recovery bond(s) known as PG&E Senior Secured Recovery Bonds, Series 2024-A (issued Aug. 2024).

c. ERCOT Class: All past, current, and future customers of ERCOT electricity service who, since June 2022, have paid and/or will continue to pay one or more monthly recovery bond charges related to the recovery bond(s) known as ERCOT Texas Stabilization Subchapter N Bonds (issued June 2022).

38. The requirements of Federal Rule of Civil Procedure 23(a) and 23(b) are satisfied.

39. Numerosity: The members of each of the classes are so numerous and geographically dispersed that joinder of all members is impracticable. While the exact number of can be ascertained through discovery, there are already millions of electricity customers of each of SCE, PG&E, and ERCOT that have paid recovery bond charges for the Recovery Bonds at issue during the class period.

40. Commonality and Predominance: Common questions of law and fact exist as to Plaintiffs and the classes, and those questions predominate over any questions, if any, solely affecting individual class members. The common questions include but are not limited to:

- whether Defendants' conduct alleged herein violated the common law, including negligence, intentional interference with contractual

relationship, tortious interference with contract, intentional interference with prospective economic advantage, and/or negligent interference with prospective economic advantage;

- whether Defendants' conduct alleged herein violated California's Unfair Competition Law, Cal. Bus. & Prof. Code § 17200 *et seq.*;
- whether Defendants' conduct alleged herein was willful and intentional;
- whether Plaintiffs and the other members of the classes have sustained damages and, if so, what is the proper measure of damages; and
- whether injunctive and/or other equitable relief are appropriate.

41. Typicality: Plaintiffs' claims are typical of the claims of the members of the classes. Plaintiffs' claims and those of the classes arise out of the same course of conduct by Defendants and are based on the same legal theories.

42. Adequacy: Plaintiffs will fairly and adequately protect the interests of the members of the classes. Plaintiffs have retained counsel competent and experienced in class and other complex litigation. Plaintiffs have no interests antagonistic to or in conflict with those of the classes.

43. Superiority: A class action is superior to all other available methods for the fair and efficient adjudication of this controversy. Joinder of all members is impracticable. Further, the damages suffered by individual class members is relatively small. The expense and burden of individual litigation make it impracticable, if not impossible, for members of the classes to individually redress the wrongs done to them. Plaintiffs do not foresee any difficulty in the management of this action as a class action.

44. This action should be maintained as a class action for the additional reason that the risks of separate actions by individual class members would create a risk of: (a) inconsistent or varying adjudications with respect to individual class members that would establish incompatible standards of conduct for Defendants; and/or (b) adjudications with respect to

individual class members would, as a practical matter, be dispositive of the interests of other class members not party to the adjudication or would substantially impair or impeded their ability to protect their interests.

45. Defendants have acted or refused to act on grounds generally applicable to the classes, thereby making appropriate final injunctive or declaratory relief.

## GENERAL FACTUAL ALLEGATIONS

### I. The LIBOR Scandal Revealed the Need for Objective Indexing Standards

46. In 2012, the LIBOR scandal revealed that one of the world's most influential benchmark interest rates was not objectively determined but had been manipulated by various banks for years. A "benchmark" is a standard that investors use to measure the performance of securities, such as equities and fixed-income assets.

47. An "index" is a collection of stocks or fixed-income assets with certain common characteristics that reflect the market as a whole or a particular industry or market segment.

48. Index providers are important participants in the interconnected modern global financial market. Corporations (including utilities), investors, financial institutions, fund managers, regulators, and analysts use and rely on indexes for a number of purposes, including to: identify investments that meet their eligible/permitted investment criteria; monitor the performance of the market (or a segment of it); compare, as a benchmark, the performance of their own portfolio; and, as with the LIBOR index, determine the proper interest rate to charge for a loan.

49. The LIBOR interest rate benchmark was determined by reference to interest rates submitted by participating banks. The LIBOR rate was considered an objective standard and was used to determine everything from the interest rates that large corporations paid for loans to the rates that consumers paid for mortgages. In 2012, it was discovered that traders at the

participating banks had been submitting artificially low or high interest rates to increase profits for themselves and/or their biggest customers.

50. The LIBOR benchmark manipulation caused financial contracts to be mispriced throughout the world, including billions of dollars of mortgages, corporate fundraising, and derivative trades.

51. The LIBOR scandal changed the index landscape in multiple respects. Among other things, it opened the eyes of regulators to potential conflicts of interest and the financial impact an indexer can have. And, it relatedly opened regulators' eyes to the need for appropriate protections to prevent index manipulation. The LIBOR scandal also made regulators aware of the size and breadth of the index provider industry.

52. In response to the LIBOR scandal, the world's two leading organizations that create standards for financial benchmarks – IOSCO and IIA – both promulgated objective, transparent, rules-based standards to prevent their members from subjectively manipulating benchmarks. Government regulators around the globe, including the regulators that enforce the EU's Benchmarks Regulation ("BMR") and the United Kingdom's Financial Services and Markets Act 2000 ("FSMA"), which govern Bloomberg's index business, rely on benchmark administrators' adherence to IOSCO principles in their regulatory oversight processes.

53. IOSCO promulgated its Principles for Financial Benchmarks after the LIBOR scandal came to light and "raised concerns over the fragility of [benchmarks] - in terms of both their integrity and their continuity of provision - that has the potential to undermine market confidence potentially harming both investors and the real economy." https://www.iosco.org/library/pubdocs/pdf/IOSCOPD415.pdf.

54. IOSCO says there are "broad, generic risks to the credibility of Benchmarks arising from vulnerabilities in the Benchmarks' Methodology, transparency and governance arrangements…these risks arise from incentives stemming from conflicts of interests, which may be amplified when Expert Judgement is used in Benchmark determinations…there may be conflicts of interests in and incentives to manipulate the determination process where the Submitters are also Market Participants with stakes in the level of the Benchmarks. Furthermore, there may be other conflicts of interests and opportunities for manipulative conduct created by the possibility of voluntary and/or selective Submissions, the varied composition of Submitters, and discretion in the selection of data to be submitted...[or] submitting false or misleading data or by attempting to influence personnel [] responsible for the exercise of Expert Judgment." https://www.iosco.org/library/pubdocs/pdf/IOSCOPD415.pdf (pp. 3-4).

55. Index providers must adhere to IOSCO principles, and they frequently use major accounting firms to audit their compliance.

56. With respect to the IIA, it states: "Index providers create, maintain, and govern the calculation and maintenance of an index and its methodology." "[I]ndex providers serve a central and pivotal role in facilitating market access and investment democratization."

57. IIA's members, all of which are index providers, promise to adhere to the following "truths" about indexes - that they "measure market activities, not create or distort them," are "transparent," and "operate according to industry-standard methodology and best practices." https://www.indexindustry.org/advocacy/ ("The IIA and its members have led the industry to adopt the highest standards. IIA members are required to adhere to the IIA Best Practices, IOSCO Principles, and local regulations.").

58. IIA's Best Practices say that index providers "shall take appropriate steps to identify and address conflicts of interest … establish clear boundaries between index calculation [] and other business/commercial functional areas … [and] ensure that personal interests or business connections do not compromise the [index provider's] performance of its functions…." IIA's Best Practices also say that index providers "shall ensure that its indices are calculated in accordance with its methodologies … [and] establish policies and procedures to ensure that its indices can be calculated on a consistent, regular, and timely basis…." https://www.indexindustry.org/iia-best-practice-guidelines/.

## II. <u>The Increasing Power of Index Providers</u>

59. In 2022, the SEC noted that "The role of index providers … has grown in size and scope in recent years, significantly changing the face of the asset management industry … [and] also rais[ing] potential concerns about investor protection and market risk…. Index providers compile, create the methodology for, sponsor, administer, and/or license market indexes. They typically determine the particular 'market' (which may be a sector or other group of securities) that the index measures, the index constituents that measure that market, and the weightings that each constituent receives…. These activities leave room for significant discretion—for example, an index provider typically has the ability to make changes to the index by adding or dropping particular constituents (i.e., index reconstitution)…." https://www.govinfo.gov/content/pkg/FR-2022-06-22/pdf/2022-13307.pdf.

60. With discretion comes responsibility. Index providers say their decisions to include or exclude certain stocks, bonds, or countries are rules-based, driven by impartial analysis of the size, liquidity, and overall "investability" of respective markets. "Investors' decisions to invest in the market are significantly guided by [index providers'] decisions,

whether they put you in the index or do not put you in the index. They do control the fates of companies' and countries' access to capital markets." *Id.*

61. Bloomberg has a dominant market position in the fixed-income index universe. Bloomberg claims its indices are "the market standard for fixed income investors … are the most widely used fixed income and inflation-linked benchmarks and are an integral part of the active and passive global portfolio management processes…. [Bloomberg] has continually been recognized as the top index provider." (Methodology, p.5.) Bloomberg's dominant position in this area gives it the power not only to add or drop particular bonds, but (of particular relevance to this action) to dictate how bonds will be classified.

**III. <u>With Increasing Power Comes Increasing Risk of Manipulation</u>**

62. Experts have commented on the increasing power of benchmark creators and the danger of manipulating the market. One explains:

> "[T]he rise of passive investing raises concerns that index providers may have too much control over the market. Index providers often make key decisions about the makeup of indices, yet they are not regulated within the United States. Although index providers publish a great deal of methodology documents on their websites, they are not as easily accessible as the disclosures that funds must provide, nor are they presented in a uniform manner that is easier for investors to understand. The lack of regulatory oversight for index providers can lead to a number of negative results. Investors may lack transparency about the indices that their funds invest in; the indices themselves may be subject to market manipulation; and index providers' decisions to reclassify economies into either frontier, developed, or emerging markets categories can affect public perception or investor access to a country's economy.[5]

63. Manipulation of an index can happen in a number of ways, for example excluding a security from an index (making it less marketable), or classifying it as ABS (a more complex

---

[5] McCarthy, Jenna, Benchmarking the World: A Proposal for Regulatory Oversight of Stock Market Index Providers (Mar. 1, 2018), available at SSRN: https://ssrn.com/abstract=3150659.

investment with a smaller investor base) versus a corporate bond (an investment with a broad investor base).

64. In an unregulated market, an index provider operating subjectively can manipulate the market by misclassifying a less complex and highly rated investment as a higher-risk and/or more complex type of investment, thereby allowing its customers to limit competition for that investment and obtain a higher return than they would receive if the investment was correctly classified.

65. Some investors have an incentive to persuade the index provider to reclassify an investment to limit competition. For example, fewer investors are willing or permitted to purchase bonds classified as ABS because they are perceived as riskier and less liquid investments. Misclassifying Recovery Bonds as asset-backed securities allows certain Bloomberg customers to receive a higher return on an investment that is relatively less complex and low-risk.

66. U.S. regulators are looking into index providers and the potential for conflicts and resulting manipulation. In 2022, the SEC announced it was preparing to investigate index providers over alleged conflicts of interest. As one commentator remarked:

> The issue is rising in significance given the explosive growth of passive investment vehicles, most notably index funds, that seek to replicate the performance of various market indexes…"The choice to include or not include a [security]…is subject to very little oversight, and it raises potential conflicts of interest that have never been addressed by financial regulators." … "Trillions of dollars are tied to the performance of indexes, yet it's not always clear how indexes are constructed or governed. Investors who depend on indexes for their retirement or their children's education deserve to know how their money is being invested and that the investment is in their best interest."[6]

---

[6] M. Kolakowski, SEC May Investigate Index Providers (Investopedia 1/31/22) https://www.investopedia.com/sec-may-investigate-index-providers-5217593.

## IV. Bloomberg's Power and Influence Over Fixed-Income Indexing and Its Purported Standards

67. "For nearly fifty years, [Bloomberg's (formerly called Barclays until Bloomberg acquired the business in 2016)] indices have been the market standard for fixed income investors…are the ***most widely used*** fixed income and inflation-linked benchmarks and are an ***integral part*** of the active and passive global portfolio management processes…. [Bloomberg] has continually been recognized as ***the top index provider***." (Methodology, pp. 2-5) (emphasis added)

68. Bloomberg is the most important and powerful index provider for the $40 trillion U.S. fixed income market. As a member of IIA, Bloomberg represents that it adheres to principles of independence and transparency and upholds standards of integrity.

69. For example, Bloomberg has said that it makes indexing decisions using an objective, transparent, fact-based "Methodology" and "best practices," "determined by clearly defined, published eligibility criteria," and "continually monitored and reviewed [] through a formal governance process." Bloomberg further represents that it "evaluates all publicly available information … to assign the most appropriate classification" whether doing an initial methodology decision or an annual review. (Methodology, pp. 12, 20-21).

70. In addition, Bloomberg says that it may use "expert judgment," and when it does so it "undertakes to be consistent in its application, with recourse to written procedures outlined in this Methodology and internal procedures manuals … [and] also ***maintains and enforces a code of ethics to prevent conflicts of interest from inappropriately influencing index construction***...." (Methodology, p. 105) (emphasis added).

71. Bloomberg's Methodology is consistent with its promise to adhere to the EU's BMR and IOSCO Principles that "represent a fair and practical standard" that "provides

confidence to market participants regarding the reliability, transparency and openness of our index decisions."[7] Bloomberg similarly says that its Methodology is consistent with IIA's Best Practices.

72. Bloomberg's "code of ethics," "good governance," "best practices," and asserted adherence to IOSCO Principles and IIA's Best Practices prohibit it from being "inappropriately influenc[ed]" by the opinions of financially-interested customers – e.g., customers advocating for a bond to be indexed one way so that it would result in more money for those customers. The EU's BMR and UK's FSMA similarly proscribe such improper influence.

73. Bloomberg has thus repeatedly represented that it is a fair and principled judge when making index decisions and does not classify bonds subjectively or allow self-interested customers to influence its decisions.

## V. Recovery Bonds

74. Recovery Bonds are sold by electric utility companies to "recover" the costs of large, often one-time, expenses.

75. Recovery Bonds have been described as "unusually secure." One analyst stated, "If you want something that's rock solid, where you don't have too much to worry about over long periods, there's really nothing else . . . There's the credit protection, there's the absence of political interference, there's the obligation of all ratepayers, and finally there's this superior return over long time periods."[8] Recovery Bonds are backed by state laws guaranteeing that payments will continue even if the utilities go bankrupt.

---

[7] Nov. 6, 2015 Bloomberg Article https://www.prnewswire.com/news-releases/bloomberg-confirms-alignment-of-key-indices-with-the-international-organization-of-securities-commissions-iosco-principles-for-financial-benchmarks-300174200.html.

[8] 9/29/22 Insurance Journal Article – Intensifying Storms are Fueling a Record $17 Billion Bond Barrage -- https://www.insurancejournal.com/news/national/2022/09/29/687228.htm.

76. In a May 2022 article, Bloomberg described Recovery Bonds as follows:

> "Money managers scouring the credit markets for yield are being ***seduced*** by a relatively rare type of security -- so-called recovery bonds -- for their ***attractive spreads, duration and safety… investors are eating them up***. Utility giant PG&E Corp. recently issued $3.6 billion of recovery bonds [in May 2022] -- aimed at recouping costs caused by the wildfires that ravaged California in 2017 -- in a deal that has ***both structured and corporate investors jostling for orders***…. ***For corporate investors***, who usually do not play in structured products, ***the appeal is even greater*** given the high-quality AAA ratings of the notes which is not often seen in the corporate world.[9]

## VI. Bloomberg Reclassifies Recovery Bonds in 2022

77. From 2016 (when it acquired Barclays) until 2021, Bloomberg appears to have followed IOSCO Principles, IIA's Best Practices, EU's BMR, and its own Methodology in deciding that Recovery Bonds were corporate bonds, not ABS.

78. In 2022, however, at a time when Recovery Bond issuances had increased significantly and were projected to remain at elevated levels in the coming years, Bloomberg received requests from some of its biggest institutional investor customers to reclassify Recovery Bonds from corporate to ABS. Bloomberg knew that such reclassification would inaccurately signal that Recovery Bonds were risky, and that reclassification would limit competition for the bonds because the investment guidelines for many institutional investors prohibit purchasing asset-backed securities. Moreover, the secondary market for asset-backed securities is significantly smaller than that for corporate bonds. Thus, Bloomberg knew that reclassification would allow some of its large investor customers who are permitted to participate in the market for asset-backed securities to buy more Recovery Bonds and at a higher rate.

---

[9] 5/6/22 Bloomberg Article by Carmen Arroyo - https://www.bloomberg.com/news/articles/2022-05-06/structured-weekly-investors-bet-big-on-recovery-bonds (emphasis added).

79. The Bloomberg customers seeking a change in Bloomberg's classification of Recovery Bonds were significant customers of both Defendant BISL and its parent company, Defendant Bloomberg L.P., which sells Bloomberg Terminals that drive the majority of Bloomberg L.P.'s profits. Under its own Methodology, Bloomberg is supposed to prevent such conflicts of interest from inappropriately influencing index classification decisions.

80. As Bloomberg knew, the requests to reclassify Recovery Bonds in this manner were not driven by legitimate doubt or disagreement about the proper classification of these bonds or by a desire to solve any index problem or improve index customers' experience. Bloomberg knew that its investor-customers were asking Bloomberg to reclassify Recovery Bonds because it would allow them to purchase more bonds at a higher rate of return. Bloomberg knew that these Recovery Bonds were properly classified as corporate bonds and that an ABS classification of these bonds would be inaccurate and inappropriate. Bloomberg also knew that if it acceded to its large customers' requests to make the change, it would result in higher monthly charges to millions of electricity customers in California and Texas, who are captive participants in this interconnected Recovery Bond market, meaning they are obligated to repay recovery bonds and lack the option to not participate. Bloomberg knew that the only proper response to these requests was to reject them. Instead, it betrayed its obligation to act objectively and reclassified Recovery Bonds as ABS.

## VII. <u>SCE's Recovery Bonds</u>

81. To finance certain costs and expenses related to catastrophic wildfires, including fire risk mitigation capital expenditures, SCE (through wholly owned subsidiaries) issued Recovery Bonds. One wholly owned subsidiary of SCE, SCE Recovery Funding LLC, issued

three series of Recovery Bonds: Series 2021-A ($337,783,000), 2022-A ($533,265,000), and 2023-A ($775,419,000).[10]

82. To service these bonds, SCE collects, and will continue to collect, recovery bond charges through its customers' monthly electricity bills (including those of Plaintiffs Skolarus, Cain, and Lawson), separate from and on top of the rates customers pay for utility service. Those payments by SCE electricity customers are remitted to the bond trustee who will service bond principal and interest payments for the benefit of bondholders.[11]

83. Two of the SCE Recovery Bonds series discussed above (Series 2021-A and 2022-A) were issued before Bloomberg's tortious actions began and are not at issue in this lawsuit. One SCE Recovery Bond series (Series 2023-A) was issued ***after*** Bloomberg's tortious actions began and is at issue in this lawsuit.

84. Before 2022, Bloomberg indexed all Recovery Bonds as corporate bonds, including the SCE Series 2021-A and Series 2022-A Recovery Bonds discussed above. SCE's Series 2021-A and Series 2022-A Recovery Bonds were priced (i.e., the interest rate set by the market was) only slightly higher than other contemporaneous comparable corporate bonds.

85. By contrast, SCE's Series 2023-A Recovery Bonds, issued ***after*** Bloomberg's tortious conduct, were priced at a significantly higher spread[12] above other contemporaneous comparable corporate bonds than would have been the case but for Bloomberg's tortious

---

[10] SCE Recovery Funding LLC, https://www.edison.com/investors/financial-reports-information/debt-preferred-information/securitizations.

[11] Moody's Investment Service, Second Party Opinion – SCE Recovery Funding LLC's Series 2023-A Assigned SQS2 Sustainability Quality Score, at https://s3.amazonaws.com/cms.ipressroom.com/406/files/202304/20230412-spo-series-2023a.pdf.

[12] "Spread" refers to the difference (i.e., delta) between the Recovery Bonds' interest rates and the interest rates for contemporaneous comparable corporate bonds.

conduct. There were no material differences between the SCE Series 2021-A and Series 2022-A Recovery Bond issuances, which Bloomberg classified as corporate bonds, and the SCE Series 2023-A Recovery Bond issuances, which Bloomberg classified as ABS, that warranted Bloomberg classifying these bonds differently.

86. By their terms, all three series of the SCE Recovery Bonds, including the third series (the one at issue here), will be paid off by SCE electricity customers (including Plaintiffs Skolarus, Cain, and Lawson), and future SCE customers, through their monthly contractual payments to SCE.

87. All of the SCE Recovery Bonds described above, including the 2023 series at issue in this case, were labeled, marketed, and sold as corporate bonds by the issuer (a subsidiary of SCE), its parent SCE, and underwriters. The prospectus for each series explicitly states: "Neither we nor the depositor is an asset-backed issuer and ***the bonds are not asset-backed securities*** as such terms are defined by the SEC in governing regulations Item 1101 of Regulation AB." (emphasis added).[13]

88. All of the SCE Recovery Bonds described above, including the 2023 series at issue in this case, have a true-up mechanism that, when combined with the state's pledge of non-interference with the bondholder's right to be paid, effectively eliminates (for all practical purposes) any risk of default by making current and future electricity customers jointly and severally liable for the payments. If an SCE customer does not pay and/or moves out of the

[13] ($775,419,000 Senior Secured Recovery Bonds, Series 2023-A, Prospectus, p.5, at https://s3.amazonaws.com/cms.ipressroom.com/406/files/202305/series-2023a-prospectus-final.pdf.

jurisdiction, existing and future customers will be apportioned and charged the unpaid amounts until full payment is made.[14]

## VIII. PG&E's Recovery Bonds

89. PG&E sold Recovery Bonds to recover the costs expended to repair and replace equipment damaged by the 2017 California wildfires.

90. PG&E formed two wholly owned subsidiaries that each issued two series of Recovery Bonds, five in total, to recover the costs expended to repair and replace equipment damaged by California wildfires. One wholly owned subsidiary is PG&E Recovery Funding LLC. That subsidiary issued $860 million of Recovery Bonds in May 2021 (the Series 2021-A Recovery Bonds), issued another $983 million of Recovery Bonds in November 2022 (the Series 2022-A Recovery Bonds, at issue in this action), and issued another $1.42 billion of Recovery Bonds in August 2024 (the Series 2024-A Recovery Bonds, also at issue in this action).The other wholly owned subsidiary is PG&E Wildfire Recovery Fund LLC. That subsidiary issued $3.6 billion of Recovery Bonds in May 2022 (the Series 2022-A Rate Neutral Recovery Bonds) and issued another $3.9 billion of Recovery Bonds in July 2022 (the Series 2022-B Rate Neutral Recovery Bonds). In all, these five series of PG&E Recovery Bonds totaled over $10.7 billion.

91. The May 2021 Series 2021-A Recovery Bonds and the May 2022 Series 2022-A Rate Neutral Recovery Bonds were issued before Bloomberg's tortious conduct alleged herein began.

92. The November 2022 Series 2022-A Recovery Bonds, the August 2024 Series 2024-A Recovery Bonds, and the July 2022 Series 2022-B Rate Neutral Recovery Bonds were

[14] $775,419,000 Senior Secured Recovery Bonds, Series 2023-A, Prospectus, pp. 44, 56, at https://s3.amazonaws.com/cms.ipressroom.com/406/files/202305/series-2023a-prospectus-final.pdf.

issued after Bloomberg's tortious conduct began, and were priced (i.e., the interest rates set by the market were) at significantly higher spreads above other contemporaneous comparable corporate bonds than would have been the case but for Bloomberg's tortious conduct.

93. All five of these PG&E Recovery Bonds shared the characteristics of a corporate bond.

94. To service all of the above-described PG&E Recovery Bonds, PG&E collects and will continue to collect, recovery bond charges through its customers' monthly electricity bills (including those of Plaintiffs Small and Arnold), separate from and on top of the rates they pay for utility service. Those payments by PG&E electricity customers are remitted to the bond trustee who will service bond principal and interest payments for the benefit of bondholders.

95. So long as PG&E is providing electricity (which it is required to do), by their terms, the PG&E Recovery Bonds will be paid off by PG&E electricity consumers (including Plaintiffs Small and Arnold), and future PG&E customers, through their monthly contractual payments to PG&E. That is true of the three bonds issued by PG&E Recovery Funding LLC (the Series 2021-A Recovery Bonds, not at issue in this case, as well as the two PG&E bonds at issue here, the Series 2022-A and 2024-A Recovery Bonds ). The two bonds issued by PG&E Wildfire Recovery Funding LLC (the Series 2022-A Rate Neutral Recovery Bonds and the Series 2022-B Rate Neutral Recovery Bonds) are likewise billed to and paid by PG&E electricity consumers, however there is a customer credit trust, funded by PG&E, from which a dollar-for-dollar offsetting credit (i.e., offsetting the charges for these two particular bonds only) is applied to the customer's monthly bills, making these two particular PG&E bonds essentially cost-neutral to PG&E customers. These bonds are not at issue in this case.

96. The PG&E Recovery Bonds at issue in this case are the PG&E Senior Secured Recovery Bonds, Series 2022-A (Nov. 2022 $983 million) and PG&E Senior Secured Recovery Bonds, Series 2024-A (Aug. 2024 $1.4 billion), which were both issued after Bloomberg's tortious conduct began and which do not have any offsetting bill credit. All five series of PG&E Recovery Bonds described above (including the PG&E Recovery Bonds at issue in this case) were labeled, marketed, and sold as corporate bonds by the issuer (a subsidiary of PG&E), its parent PG&E, and underwriters. All five series of the PG&E Recovery Bonds described above (including the PG&E Recovery Bonds at issue in this case) have a true-up mechanism that, when combined with the state's pledge of non-interference with the bondholder's right to be paid, effectively eliminates, for all practical purposes, any risk of default by making current and future electricity consumers jointly and severally liable for the payments. If a PG&E customer does not pay and/or moves out of the jurisdiction, existing and future consumers will be apportioned and charged the unpaid amounts until full payment is made.[15]

## IX. ERCOT's Recovery Bonds

97. ERCOT is one of the nation's largest electric utilities, responsible for managing the flow of electric power to more than 26 million Texas customers. As the Independent System Operator for the ERCOT power region, ERCOT schedules power on an electric grid that connects more than 52,700 miles of transmission lines and over 1,030 generation units. Electricity within the ERCOT system is ultimately delivered to consumers by downstream retail electricity providers that obtain the electricity from ERCOT via "scheduling entities."

[15] PG&E Series 2022-A Recovery Bonds Prospectus (issued November 2022), pp. 4-11 (Summary of Terms); PG&E Series 2024-A Recovery Bonds Prospectus (issued August 2024), pp. 8-26 (Summary of Terms).

98. In February 2021, Winter Storm Uri resulted in outages at many of the generation resources within the ERCOT power region, and the demand for power exceeded supply for several days during the week of the storm. This condition drove up prices in the wholesale electricity market resulting in great financial burdens to both market participants and the ultimate electric customers. As a result of these market conditions, ERCOT was unable to collect sufficient funds to fully pay certain wholesale-market participants who were due payments from ERCOT for power they produced into the ERCOT System during the storm. In response to the impact of Winter Storm Uri on the ERCOT power region, the Texas Legislature authorized the issuance of $2.1 billion in Recovery Bonds to reimburse ERCOT electricity providers and to benefit retail electricity customers who may have otherwise been invoiced for those extraordinary costs.[16]

99. To service these bonds, ERCOT and/or the downstream retail electricity providers in the ERCOT system have collected and will continue to collect recovery bond charges through its customers' monthly electricity bills (including those of Plaintiffs Tortolani and Katzman), separate from and on top of the rates they pay for utility service. Those payments by ERCOT electricity customers are remitted to the bond trustee who will service bond principal and interest payments for the benefit of bondholders.

100. ERCOT's 2022 Recovery Bonds, which were issued ***after*** Bloomberg's tortious conduct began, were priced (i.e., the interest rates set by the market were) at significantly higher spreads above other contemporaneous comparable corporate bonds than would have been the case but for Bloomberg's tortious conduct.

[16] $2,115,700,000 Texas Stabilization Subchapter N Bonds, Series 2022 Offering Memo, pp. 3-4, https://www.ercot.com/files/docs/2022/06/17/Offering%20Memorandum.pdf.

101. By the time the 2022 ERCOT Recovery Bonds were issued, Bloomberg had already publicly announced that it was "re-evaluating" whether to classify Recovery Bonds as corporate bonds or ABS (i.e., after the request for the change came in from Bloomberg's large investor customers), which sent a clear message to the market that Bloomberg would be reclassifying them as asset-backed.

102. Like the SCE and PG&E Recovery Bonds described above, the 2022 ERCOT Recovery Bonds shared the characteristics of a corporate bond.

103. So long as ERCOT is providing electricity (which it is required to do), by their terms, the 2022 ERCOT Recovery Bonds at issue in this case will be paid off by current and future ERCOT-system customers through their monthly contractual payments, including those of Plaintiffs Tortolani and Katzman.

104. The 2022 ERCOT Recovery Bonds were labeled, marketed, and sold as corporate bonds by the issuer (a subsidiary of ERCOT), its parent ERCOT, and underwriters. The Offering Memorandum for each series explicitly states: "Neither we nor ERCOT is an asset-backed issuer and ***the Bonds are not asset-backed securities*** as such terms are defined by the SEC in governing regulations Item 1101 of Regulation AB."[17]

105. The 2022 ERCOT Recovery Bonds have a true-up mechanism that, when combined with the state's pledge of non-interference with the bondholder's right to be paid, effectively eliminates any risk of default by making current and future electricity customers jointly and severally liable for the payments. If an ERCOT customer does not pay and/or moves

[17] $2,115,700,000 Texas Stabilization Subchapter N Bonds, Series 2022 Offering Memo, pp. 17, 58 https://www.ercot.com/files/docs/2022/06/17/Offering%20Memorandum.pdf (emphasis added).

out of the jurisdiction, existing and future consumers will be apportioned and charged the unpaid amounts until full payment is made.[18]

## X. Corporate Bonds

106. "A bond is a debt obligation, like an IOU. Investors who buy corporate bonds are lending money to the company issuing the bond. In return, the company makes a legal commitment to pay interest on the principal and, in most cases, to return the principal when the bond comes due or matures." https://www.sec.gov/files/ib_corporatebonds.pdf. "Companies use the proceeds from bond sales for a wide variety of purposes, including buying new equipment … [and] refinancing debt…." https://www.sec.gov/files/ib_corporatebonds.pdf.

107. "Corporate bonds make up one of the largest components of the U.S. bond market, which is considered the largest securities market in the world." https://www.sec.gov/files/ib_corporatebonds.pdf. The U.S. corporate bond market is over $10 trillion according to the Securities Industry and Financial Markets Association (SIFMA). In contrast, the asset-backed securities market is about one-tenth that size. Further, the trading volume in corporate bonds is substantially greater than that of asset-backed securities. The corporate bond index is competitive and liquid. It has more bonds, money, investors, issuers, and transactions, than the asset-backed securities index.

## XI. Asset-Backed Securities (ABS)

108. In contrast to corporate bonds, ABS are created by buying and bundling loans – such as residential mortgage loans, commercial loans, or student loans – and creating securities backed by those assets, which are then sold to investors. Often, a bundle of loans is divided into separate securities ("tranches") with different levels of risk and returns.

---

[18] $2,115,700,000 Texas Stabilization Subchapter N Bonds, Series 2022 Offering Memo, pp. 44-45, 103-04, https://www.ercot.com/files/docs/2022/06/17/Offering%20Memorandum.pdf.

https://www.sec.gov/spotlight/dodd-frank/assetbackedsecurities.shtml; *see also* 15 U.S.C. § 78c(a)(79) ("The term "asset-backed security"— (A) means a fixed-income or other security collateralized by any type of self-liquidating financial asset (including a loan, a lease, a mortgage, or a secured or unsecured receivable) that allows the holder of the security to receive payments that depend primarily on cash flow from the asset…").

109. Payment on an ABS depends primarily on the cash flows generated by the assets in the underlying pool and other rights designed to ensure timely payment, such as excess spread, subordination, over-collateralization, liquidity facilities, guarantees or other features generally known as credit enhancements. ABS and ABS issuers differ from corporate securities and operating companies. In offering ABS, there is generally no business or management to describe. The issuer is simply a pass-through. *See* https://www.federalregister.gov/documents/2005/01/07/05-53/asset-backed-securities#citation-27-p1507.[19]

## XII. The Correct Classification for Recovery Bonds Is "Corporate", Not "ABS"

110. Recovery Bonds' prospectuses typically expressly state that they are "not" ABS and that the issuers are "not" asset-backed issuers, which is accurate for all Recovery Bonds (including all the Recovery Bonds at issue here), whether or not this explicit statement is in the corresponding prospectus (it is for the Recovery Bonds at issue here).

111. Recovery Bonds are fundamentally different from ABS.

[19] Under Regulation AB, the basic definition of "asset-backed security" is "a security that is primarily serviced by the cash flows of a discrete pool of receivables or other financial assets, either fixed or revolving, that by their terms convert into cash within a finite time period, plus any rights or other assets designed to assure the servicing or timely distributions of proceeds to the securityholders…" https://www.federalregister.gov/documents/2005/01/07/05-53/asset-backed-securities#citation-27-p1507.

112. ABS are individual, private loan contracts (for mortgages, autos, etc.) bundled together to create securities.

113. The underlying loan contract rights supporting ABS are tangible property rights, that is, financial assets that can be sold. ABS' underlying contractual rights are accounts receivable pooled together that have attached legal rights allowing them to be sold and securitized.

114. Because some individual borrowers on the loans can (and do) default, ABS are issued with provisions to account for the credit risk, such as:

a. Excess spread;

b. Over collateralization – that is, providing collateral that is worth more than the amount of the loan;

c. Credit tiering (senior/subordinated "tranching") – that is, dividing the pool of loans into lower-risk (less likely to default, paying a lower interest rate) and higher risk (more likely to default, paying a higher interest rate); and/or

d. Third party guarantees.

115. Recovery Bonds, in contrast, are issued pursuant to legislative enactments that give utilities the right to issue bonds to raise money from capital markets to fund infrastructure projects related to their electricity provision business. By law, the utilities are permitted to charge electricity customers amounts sufficient to repay the bond principal and market-generated interest rate. The state government pledges never to interfere with the ability to bill and collect these charges, meaning the bond and interest repayments are essentially guaranteed. Recovery bonds are secured by intangible property rights authorizing the utility to bill electricity customers (current and future) for the amounts needed to service these bonds, which are priced and

purchased in the capital markets. Repayment is guaranteed as long as the utility provides electricity, all but a certainty for SCE, PG&E, and ERCOT, which all enjoy a monopoly or quasi-monopoly in providing consumer electricity service in their respective territories/systems.

116. Unlike ABS, Recovery Bonds are issued without over-collateralization or credit tiering ("tranching") because there is virtually no risk of non-payment. There are no financial assets in the subsidiary, no receivables or other characteristics of ABS to default, but rather a legislative mandate and a true-up mechanism effectively making the electricity customers jointly and severally liable for the bond payments (if one customer does not pay, that amount is "trued-up" and apportioned to the remaining customers until it is paid). The risk of PG&E, SCE, or ERCOT ceasing electrical service in their respective regions is close to zero.

117. The Recovery Bonds' series trust structure further disqualifies the utilities from being an asset-backed issuer and the bonds from being properly classified as asset-backed securities under the law. *See* Sections 1101(b) and (c) of Regulation AB. For example, as allowed by the Wildfire Financing Law and as stated in the prospectus for the PG&E Recovery Bonds: "The issuing entity may issue additional recovery bonds…secured by additional recovery property…." (PG&E Series 2022-A Recovery Bonds Prospectus, issued November 2022, p. 4-11, Summary of Terms). One entity issuing two sets of bonds, with the ability to issue more bonds depending on corporate need, is consistent with corporate bonds and inconsistent with ABS classification.

118. ABS are generally bundles of past loan transactions – e.g., specific individuals who already borrowed money and promised to repay (for mortgages, autos, etc.) under signed contracts, whereas Recovery Bonds do not have this characteristic.

119. ABS and Recovery Bonds also fundamentally differ in how the bond payments are made. ABS are based on underwritten individuals' abilities to repay money they borrowed under individually, agreed-upon loan contracts that are bundled together. ABS can underperform if the individual borrowers are unable to repay the loans.

120. Recovery Bonds, in contrast, are based on statutory edicts authorizing utilities to issue bonds with market-determined interest rates and charge electricity customers amounts to repay the bonds plus interest. The electricity customers are effectively forced participants in the recovery bond market as they are jointly and severally liable for the bond payments, i.e., if people move away or otherwise don't pay, the remaining electricity customers will pay more until the bonds are fully repaid. Recovery Bonds involve no underwriting, no loan contracts, and virtually no risk of defaults or underperformance.

121. Further, Recovery Bonds are paid off the same way that other (i.e., non-recovery) corporate bonds are paid off – customer revenue. The only way the Recovery Bonds at issue in this case will not be paid is if PG&E, SCE and ERCOT cease delivering electricity to customers in their territories/system.

122. For ABS, the individuals who borrowed money (mortgages, autos, etc.) pay from wherever they reside; there is no territorial restriction.

123. Recovery Bonds, in contrast, are territorially defined by the utilities' boundaries. Recovery Bonds are paid by virtually everyone within the utilities' boundaries/system (i.e., everyone that receives electricity from the utility with limited exceptions) until the bonds are ultimately paid off.

124. ABS are based on identified individuals' past loan transactions – known people who borrowed and will pay known amounts (for mortgages, autos, etc.), whose credit is known

(through underwriting), and whose ability to pay back underlies the bonds' ratings (AAA, AA, etc.).

125. Recovery Bonds, on the other hand, will be paid by people who are (at least partially) unknown at the time they are issued. Payments will be made by current and future electricity customers over the approximate 20-plus year life of the bonds through their monthly contractual payments to their utilities; people who leave the utility's territory/system will stop paying and people who move in will start paying.

## XIII. Regulators Have Stated That Recovery Bonds Are Corporate Bonds

### A. SEC

126. The Securities and Exchange Commission (SEC) is the independent federal agency created by Congress in 1934 to enforce the laws against market manipulation, protect investors, maintain fair and orderly functioning of the securities market, and facilitate capital formation. The SEC sets forth reporting standards and regulations for public companies.

127. In 2007, the SEC issued a "no-action letter" and interpretation that a Recovery Bond (using the same series trust structure as used by the Recovery Bonds at issue here) was not an ABS. *See* https://www.sec.gov/divisions/corpfin/cf-noaction/2007/mpef091907-1101.htm ("the Bonds are not asset-backed securities within the meaning of Item 1101 of Regulation AB") and incoming letter https://www.sec.gov/divisions/corpfin/cf-noaction/2007/mpef090707-1101-incoming.pdf.

### B. FASB

128. The Financial Accounting Standards Board (FASB), formed in 1973, is a private independent nonprofit standard-setting body whose primary purpose is to establish and improve Generally Accepted Accounting Principles (GAAP) within the United States in the public's interest. FASB establishes accounting and financial reporting standards for public and private

companies and nonprofit organizations in the United States, enabling investors and analysts to better compare the financial statements of multiple companies within a common sector or industry. "FASB's mission is to create and improve financial accounting practices for credible and accurate information to investors and other users. Also, it is mandated to educate stakeholders on how to comprehend and implement accounting standards effectively."[20]

129. The SEC recognizes FASB as the accounting standard-setter for public companies.

130. FASB issues Statements designed to set standard sound accounting principles.

131. FASB Statement 125 provides accounting and reporting standards for transfers and servicing of financial assets and extinguishment of liabilities. FASB's guide to interpretation of Statement 125 provides that Recovery Bonds are distinguishable from ABS because Recovery Bonds "are not financial assets [of the type that would support ABS] because they are imposed on ratepayers by a state government or its regulatory commission and, thus…not a financial asset [of the type that would support an ABS]."[21]

### C. <u>FINRA</u>

132. "The Financial Industry Regulatory Authority (FINRA) is an independent, nongovernmental organization that writes and enforces the rules governing registered brokers

---

[20] Accounting Standard (Corporate Finance Institute 12/7/22) https://corporatefinanceinstitute.com/resources/accounting/accounting-standard/.

[21] FASB, Q&A 125—A Guide to Implementation of Statement 125 on Accounting for Transfers and Servicing of Financial Assets and Extinguishments of Liabilities: Questions and Answers (Third Edition 10/99), available at https://dart.deloitte.com/USDART/pdf/2728724e-3f34-11e6-95db-538fd992e5a8. FASB Statement 140 (Amended 2010) superseded Statement 125, but is consistent in distinguishing ABS from Recovery Bonds, *see* FASB Statement of Accounting Standard No. 140 (2010), App. A, ¶73, available at https://fasb.org/Page/ShowPdf?path=aop_fas140.pdf&title=FAS+140+%28AS+AMENDED%29&acceptedDisclaimer=true&Submit=.

and broker-dealer firms in the United States. Its stated mission is 'to safeguard the investing public against fraud and bad practices.'"[22]

133. "FINRA is authorized by Congress to protect America's investors by making sure the broker-dealer industry operates fairly and honestly. [FINRA] oversee[s] more than 624,000 brokers across the country—and analyze[s] billions of daily market events." FINRA is dedicated to protecting investors and safeguarding market integrity in a manner that facilitates vibrant capital markets, to ensure that everyone can participate in the market with confidence, and that every securities product advertisement used is "truthful, and not misleading."[23]

134. FINRA's TRACE system provides real-time market information. FINRA's TRACE system lists Recovery Bonds as corporate bonds.

135. Further, FINRA has taken no action against the underwriters and brokers who assist in authoring Recovery Bond prospectuses (which as described above routinely explicitly state that the bonds are not ABS) and in marketing and selling Recovery Bonds as corporate bonds.

**D. <u>The EU</u>**

136. The EU is an international organization comprising 27 European countries and governing common economic, social, and security policies. The EU regulates "securitisations" (the EU terminology for ABS), including through the European Securitization Rules.

137. The EU does not consider Recovery Bonds securitisations (i.e., ASB).

138. Notably, PG&E itself, the issuing entity for the PG&E Recovery Bonds at issue in this case, and its underwriters all agreed that these PG&E Recovery Bonds are not ABS Bonds or

[22] L. Manning, Financial Industry Regulatory Authority (FINRA) Definition (Investopedia 6/11/22), available at https://www.investopedia.com/terms/f/finra.asp.

[23] FINRA, About FINRA, available at https://www.finra.org/about.

securitisations. For example, as explained in a 2022 Prospectus for PG&E's Recovery Bonds: "The issuing entity and PG&E do not believe that the recovery bonds fall within the definition of a 'securitisation' for purposes of the EU Securitization Regulation or the UK Securitization Regulation as there is no tranching of credit risk associated with exposures under the transactions described in this prospectus. Therefore, the issuing entity and PG&E believe such transactions are not subject to the European Securitization Rules or the UK Securitization Rules." ($3.9B Senior Secured Recovery Bonds, Series 2022-B, PG&E Wildfire Recovery Bonds Prospectus, p. 48; *see also* PG&E Series 2024-A Recovery Bonds Prospectus (issued August 2024), p. 50, https://s1.q4cdn.com/880135780/files/doc_downloads/2024/RecoveryFunding/08/series-2024-a-senior-secured-recovery-bond-prospectus.pdf.)

**XIV. <u>Other Financial Institutions Agree Recovery Bonds Are Corporate Bonds.</u>**

139. Other financial institutions likewise agree that Recovery Bonds are corporate bonds. For example, the "Duke Energy Florida Project Finance LLC" Recovery Bonds were classified as "corporate/ utility" bonds by the Citi and Merrill Lynch/Bank of America Fixed Income Index.

140. Vanguard likewise agrees that Recovery Bonds are corporate bonds. Vanguard recently bought Recovery Bonds and listed them in its holdings as corporate bonds. In particular, Vanguard's Semi-Annual Bond Fund Reports lists PG&E's May 2022 Recovery Bonds as "Corporate – Utility" bonds, not ABS. (8/31/22 Annual Report of Vanguard Corporate Bond Index Funds, pp. 55, 89). In 2023, after Bloomberg's reclassification, Vanguard continued to list PG&E's May 2022 Recovery Bonds as "Corporate – Utility" bonds, not ABS. (See 2/28/23 Semiannual Report of Vanguard Corporate Bond Index Funds, p. 52; 1/31/24 Annual Report of Vanguard Corporate Bond Funds, p. 29). And before Bloomberg acquired it in 2016,

Barclays's fixed income indexes (the dominant benchmarks in the bond market at the time) likewise classified Recovery Bonds as corporate bonds.

## XV. **From 2016 to Mid-2022, Bloomberg Itself Agreed that Recovery Bonds Are Corporate Bonds**

141. From the time it purchased the Barclays indexes in 2016, until mid-2022, Bloomberg consistently classified Recovery Bonds as corporate bonds. For example, every year (at year-end, annual index reviews from 2016 through 2021), Bloomberg confirmed that Duke Energy Florida Project Finance Recovery Bonds were corporate bonds and included them in its corporate/utilities index.

142. Whenever new Recovery Bonds were issued during the 2016 to mid-2022 time period, Bloomberg classified them as corporate bonds. For example, in 2021, two Recovery Bonds were issued: a PG&E $400 million Recovery Bond and a Duke Energy $350 million Recovery Bond. Bloomberg classified both as corporate bonds.

143. And in the first half of 2022, more Recovery Bonds were issued and Bloomberg classified them, too, as corporate bonds. Specifically, in February 2022, SCE issued $700 million in Recovery Bonds and Bloomberg classified them as corporate bonds.

144. In February 2022, another $200 million Recovery Bond was issued and Bloomberg again classified it as a corporate bond. In May 2022, PG&E issued almost $3.5 billion in new Recovery Bonds and Bloomberg classified all of those bonds as corporate bonds.

145. Thus, including both initial classifications and annual reviews, Bloomberg consistently classified Recovery Bonds as corporate bonds between 2016 and mid-2022.

146. There are no material differences between, for example, the 2021-2022 Recovery Bonds that Bloomberg classified as corporate bonds, and the Recovery Bonds at issue in this

case, which Bloomberg classified as ABS, that would justify classifying them differently. To the contrary, they all shared the characteristics of corporate bonds.

## XVI. Bloomberg's Own Data Group Still Identifies Recovery Bonds as Corporate Bonds

147. Bloomberg's data group reviews almost every bond issued and makes an internal determination about how to identify them.

148. Like Bloomberg's index group, Bloomberg's data group consistently identified Recovery Bonds as corporate bonds from 2016 to mid-2022. Unlike Bloomberg's index group, however, Bloomberg's data group did not change that identification to ABS, in mid-2022 or since.

149. On Bloomberg's terminals, Recovery Bonds continue to be identified as corporate bonds, including all of the SCE, PG&E, and ERCOT Recovery Bonds at issue in this case. For example, the November 2022 $983 million PG&E Recovery Bond, issued after Bloomberg index group's reclassification, continues to appear in Bloomberg's data terminal as a corporate bond with a "CORP" ticker symbol. The same is true of the other PG&E, SCE, and ERCOT Recovery Bonds at issue in this case.

## XVII. Bloomberg's Mid-Year 2022 "Review" and Reversal Violated the Law, Recognized Standards, and Bloomberg's Own Policies and Practices

### A. Bloomberg's June 8, 2022 Announcement of Classification Review

150. During a six-week period in June and July 2022, two Recovery Bonds were set to be issued totaling $6 billion – more than what had been issued between 2016-2021 combined.

151. Between June and August 2022, Bloomberg made multiple announcements pertinent to this case.

152. Bloomberg's first such announcement was made just days before the $2.1 billion ERCOT Recovery Bond at issue in this case was priced and issued.

153. On June 8, 2022, Bloomberg announced a highly unusual mid-year "review" regarding Recovery Bonds – which Bloomberg described as a "review of the classification of recovery bonds and their treatment with regards to their membership in the corporate vs ABS index."[24]

154. Bloomberg's Methodology sets forth five potential reasons for conducting a mid-year "review" and/or changing a bond's index classification. Two reasons are "extreme market events and/or material changes to the applicable underlying market interests…." (Methodology, p. 105). In the case of Recovery Bonds in 2022, there were no qualifying "extreme market events" or "material changes." In fact, Bloomberg did not say or suggest, in its June 8, 2022 announcement or at any time, that there were any such "extreme" events or "material changes."

155. The remaining three potential reasons in Bloomberg's Methodology for conducting a mid-year "review" and/or changing a bond's indexing classification are corporate, government, or business changes.[25] None of those reasons occurred or applied with respect to Recovery Bonds in 2022. Nor did Bloomberg identify any of these as an impetus for its 2022 mid-year "review" or its ultimate decision to reclassify Recovery Bonds at that time.

156. In short, none of the five stated reasons in Bloomberg's own Methodology for a mid-year review or classification change were present when Bloomberg announced in mid-2022 that it was reviewing the classification of Recovery Bonds. Instead, Bloomberg's stated reason

[24] Bloomberg, Index Announcement, available at https://saberpartners.com/wp-content/uploads/2023/01/Bloomberg-BISL-Recovery-Bond-Reclassification-Index-Announcements-June-July-August-2022.pdf.

[25] Bloomberg says a bond's "[s]ector classification can change due to various factors: Corporate Actions … such as merger, acquisition, or spin-off … Change in Government Ownership … may result from a decrease or increase in a government's ownership stake … Evolution of Business Lines … If the business lines of a corporate entity shift, it could be reclassified to reflect its new peer group." (Methodology, pp. 20-21).

for this mid-year "review" was a purported conflict between Recovery Bonds' "language" (saying they are "not asset-backed securities") and "structure" (saying they are "not guaranteed by the Corp parent (e.g., PG&E)").

157. There was no such conflict and no legitimate reason for the "review" at all, let alone a sudden, mid-year review.

158. Bloomberg's June 8 Announcement stated:

> The Bloomberg Index team is opening a formal review of the classification of recovery bonds and their treatment with regards to their membership in the corporate vs ABS index.
>
> Since February 2021, a number of deals containing recovery bonds have been issued. These bonds are currently classified as Corporate on the Bloomberg terminal and in the fixed income indices. These deals were brought to the market by the underwriters as corporate deals. There is language in some of the deal documentation along the lines of
>
> 'Neither the issuing entity nor the depositor is an asset-backed issuer and the recovery bonds are not asset-backed securities as such terms are defined by the SEC in governing regulations Item 1101 of Regulation AB.'
>
> The structure of these deals allows that investors have no recourse to the Corp parent in the event of default. They are not guaranteed by the Corp parent (eg:PG&E) but are backed by the recovery property.
>
> In light of the above, the Bloomberg index team is formally opening its index governance review of the Classification of these bonds as corporate vs ABS.

(June 8, 2022 Bloomberg Fixed Income Indices Index Announcement "Recovery Bonds Classification Consultation: Corp vs ABS").

159. The purported conflict between Recovery Bonds' "language" and "structure" was (and is) non-existent. The "language" mentioned in Bloomberg's announcement simply says, correctly, that Recovery Bonds are not ABS. The "structure" mentioned – no parent guarantee –

is not what differentiates corporate bonds from ABS. Corporate bonds are not defined by the presence or absence of a parent guarantee. There are corporate bonds with and without a parent's guarantee. Indeed, the absence of a parent's guarantee was consistently true for Recovery Bonds before Bloomberg's mid-2022 "review" (i.e., for years). For example, PG&E issued approximately $3.5 billion in Recovery Bonds with no parent guarantee the month before Bloomberg's June 2022 announcement—and Bloomberg classified those bonds as corporate bonds.

160. There was nothing new warranting a sudden, mid-year "review" or index reclassification. Both the "language" and "structure" of Recovery Bonds had remained materially the same for years.

161. Bloomberg's stated reason for the mid-year "review" was pretextual, negligent, reckless, and/or knowingly false when made. On information and belief, the real reason for the "review" was that Bloomberg institutional investor customers (including some of Bloomberg's largest customers) asked Bloomberg to re-classify Recovery Bonds—to take them out of the corporate index and put them into the ABS index—so those customers would earn hundreds of millions of dollars more in interest.

162. Caving to requests from these investor customers, Bloomberg initiated a pretextual "review" process and reclassified Recovery Bonds as ABS.

163. In addition to violating its own substantive policies, Bloomberg's "review" violated Bloomberg's own procedural policies and practices as well. When deciding whether to change a bond's classification or make other changes to its indexes, Bloomberg says it "will set forth the rationale for any proposed changes as well as the timeframe and process for responses

… [and] affected stakeholders [] input will be solicited." (Methodology, p. 105). Bloomberg did none of these things with respect to the reclassification at issue in this case.

164. Bloomberg did not "set forth the rationale for any proposed changes." The purported "conflict" between "language" and "structure" was not a rationale (no such conflict existed) and the language and structure of Recovery Bonds had remained effectively unchanged for some 15 years.

165. Nor did Bloomberg set forth a "timeframe" for responses. The June 8 Announcement omitted mention of any such timeframe, saying only:

> Please forward your feedback on the above along with any additional suggestions or thoughts to your regional index team or email indexhelp@bloomberg.net. This feedback will be considered by Bloomberg's internal index governance committee, and Bloomberg will decide unilaterally whether, and how, to respond to any feedback, comment, or recommendation that results from the review process. A formal announcement regarding the outcome of the governance review will be made at the conclusion of the process.

166. Bloomberg's announcement never said when responses were due or when Bloomberg would decide. Nor did Bloomberg ever provide that information before it announced the reclassification formally on August 1, 2022.

167. Nor did Bloomberg "solicit" input from affected stakeholders, other than certain institutional investors that include its largest customers. Bloomberg's process was inconsistent with best practices, IOSCO Principles, and the "code of ethics to prevent conflicts of interest from inappropriately influencing index construction … including the use of expert judgment." (Methodology, p. 107; Nov. 6, 2015 Bloomberg Article https://www.bloomberg.com/company/press/bloomberg-confirms-alignment-of-key-indices-with-the-international-organization-of-securities-commissions-iosco-principles-for-financial-benchmarks/)).

168. Moreover, on information and belief, Bloomberg's announcements about its mid-year "review" appeared only on the Bloomberg Terminal (which requires a subscription at approximately $25,000/year). The announcements did not appear in any publicly accessible forum, including on Bloomberg's website www.Bloomberg.com. Thus, essentially, only those with a Bloomberg Terminal, like underwriters and potential investors in Recovery Bonds, had access to the announcements.

169. Bloomberg issued no press release or other public announcement. Bloomberg knows (and can readily ascertain) the identities of Recovery Bond issuers (i.e., the utilities) and their financial consultants and could have solicited input from them on the subject but did not do so because those entities were likely to support maintaining the corporate bond classification.

170. Bloomberg's June 8, 2022 announcement identified particular Recovery Bonds including bonds from PG&E and SCE. On information and belief, Bloomberg did not directly "solicit" input from these or other utilities that issue Recovery Bonds. In short, Bloomberg solicited input from one side (its largest customers who planned to purchase Recovery Bonds and asked Bloomberg to change to an ABS classification so they could receive higher interest returns) and did not solicit input from others who would meet Bloomberg's own definition of stakeholders.

171. Bloomberg had a conflict of interest. Bloomberg violated the law (including without limitation the EU's BMR that governs BISL's conduct), its own policies, IOSCO Principles, and best practices because it did not solicit input from "stakeholders" likely to oppose reclassification. The "review" was a sham and the reclassification a fait accompli. Through the sham "review" process, Bloomberg stacked the deck on stakeholders' responses and used that as a pretense to justify, conceal, and obfuscate its misconduct.

**B. <u>Bloomberg's July 7, 2022 Announcement</u>**

172. Bloomberg's second announcement was made just weeks before the July 2022 $3.9 billion PG&E Recovery Bond (which is not part of this case because it is cost-neutral to customers) was priced and issued.

173. On July 7, 2022, Bloomberg released a second announcement entitled "Index Technical Note" "Recovery Bonds Classification Consultation Update." This second announcement had the same defects, and false pretext, as the prior (June 8, 2022) announcement.

174. The July announcement stated:

> On June 8, Bloomberg Index Services Limited (BISL) opened a formal review of the classification of recovery bonds ***(otherwise known as "stranded cost"*** or "rate reduction" ***bonds)*** and their classification with respect to BISL's corporate and ABS indices."
>
> This consultation will not affect the initial classification of new recovery bonds that come to market while the consultation period[26] is ongoing; ***such as the PG&E Wildfire Recovery deal issued on July 6, which will be classified as Corporate***. The classification of recovery bonds within the fixed income indices ***remains under review and is subject to future changes*** as BISL completes the consultation. (emphasis added).

175. This second announcement mentioned PG&E (as did the June 2022 announcement) and PG&E's July 2022 $3.9 billion Recovery Bond by name, which Bloomberg stated had "issued on July 6."[27] Like its June 2022 announcement, Bloomberg's July 7, 2022 announcement was designed to signal to the market that Recovery Bonds would be classified as

[26] In this announcement, Bloomberg mentioned a "consultation period" without saying what that period was (e.g., no timeframe, no deadline).

[27] In fact, PG&E's $3.9 billion Recovery Bond had not yet issued at the time of Bloomberg's July 7, 2022 announcement. Nor had that bond been priced by that time. The prospectus for this PG&E Recovery Bond was dated July 13, 2022 and it was issued on July 20, 2022.

ABS with a higher perceived risk and to discourage investors who cannot invest in ABS from buying these bonds, and to thus increase the interest rate that would be set for these bonds.

176. Bloomberg's July 7, 2022 announcement also violated Bloomberg's own long-standing policy of not commenting on a bond or disclosing how it will be classified before it is issued.[28] Bloomberg's announcement did both.

177. Bloomberg's second announcement also re-characterized the process. The first (June 2022) announcement stated the Bloomberg index team was doing a "review" (alternatively calling it a "formal review" or a "governance review"). The second (July 2022) announcement characterized the process as a "consultation," reinforcing that the "stakeholders" with whom Bloomberg was consulting would be influencing the decision and reinforcing the signal that Bloomberg would be reclassifying Recovery Bonds as ABS.

178. Moreover, the second announcement stated that Recovery Bonds were "known as 'stranded cost'" bonds – which garner high interest rates because of their risk.

179. Neither Recovery Bond issuers nor Recovery Bonds themselves have anything in their structure or documentation that uses the terms "stranded costs."

180. Bloomberg nevertheless publicly announced that Recovery Bonds were known as "stranded cost" ABS almost one month before Bloomberg's formal reclassification decision was announced, signaling to the market that it had already decided to reclassify Recovery Bonds as ABS. Recovery Bonds, including those at issue here, are in fact safer investments than ABS, including "stranded cost" ABS.

---

[28] *See* Bloomberg's Methodology, p. 21 n.25 ("Due to potential uncertainty and complications surrounding corporate actions, changes to classifications for index purposes take effect ***after the close of transaction*** rather than following the announcement.") (emphasis added).

### C. Bloomberg's Actions Caused Interest Rates to Increase on Recovery Bonds

181. Bloomberg made the June and July 2022 announcements to send a clear signal to the market, in advance of the then-upcoming ERCOT and PG&E Recovery Bond issuances, that Bloomberg would be reclassifying Recovery Bonds as ABS The timing of the announcements was intended to increase the interest rate on Recovery Bonds issued even before formal reclassification.

182. Bloomberg's June and July 2022 announcements had the intended effect of inflating the interest electricity customers paid. Before Bloomberg's announcements, Recovery Bonds were usually priced (i.e., the interest rates set by the market were) modestly higher than contemporaneous comparable corporate bonds.

183. By contrast, just days after Bloomberg's June 8, 2022 announcement, the $2.1 billion 2022 ERCOT Recovery Bond—one of the Recovery Bonds at issue in this case—was issued and priced at significantly higher spreads above other contemporaneous comparable corporate bonds

184. Likewise, within two weeks of Bloomberg's second (July 7, 2022) announcement, PG&E's $3.9 billion 2002 Recovery Bond (not at issue because it is cost-neutral to the customers) was issued and priced at significantly higher spreads above other contemporaneous comparable corporate bonds. Bloomberg's June and July 2022 announcements signaled it was going to reclassify Recovery Bonds as ABS, causing higher interest rates on this Recovery Bond than would have been the case but for Bloomberg's misconduct.

185. Bloomberg's conduct leading up to its formal reclassification, including its June 2022 announcement, thus has and will result in millions of Texas electricity customers collectively paying hundreds of millions of dollars more in interest over the life of the bonds.

186. Before formally announcing it was reclassifying Recovery Bonds as ABS, and after it formalized its reclassification, Bloomberg was well aware of who would be harmed (including millions of everyday Texas and California consumers), and that the harm those consumers would suffer would be enormous.

**D. Bloomberg's August 1, 2022 Announcement**

187. After signaling to the market in June and July 2022 that it would be making the reclassification, on August 1, 2022, Bloomberg formally announced that it was, in fact, "reclassify[ing]" Recovery Bonds as "stranded cost" ABS.

188. Bloomberg's August 1st announcement said:

> Following the end of the consultation period, [***Bloomberg***] ***has decided*** these securities are ***better aligned with an ABS classification*** and will ***reclassify them to the ABS -> Stranded Cost*** category…. This result was supported by a ***significant majority*** of respondents to the consultation. (8/1/22 "Recovery Bonds Classification Consultation Update") (emphasis added).

189. Bloomberg's Methodology states that, when deciding whether to change a bond's classification, Bloomberg is to "set forth the rationale" for any changes. (Methodology, p. 105). Bloomberg did not do so with respect to its reclassification of Recovery Bonds. Indeed, Bloomberg has never provided any rationale or explanation of how Recovery Bonds "better align" with an ABS classification, why it was changing the classification of these bonds that it had applied since acquiring Barclays's indexing business in 2016, or how its reclassification can be reconciled with the views of regulators, including the FASB, FINRA, the EU, and other index providers that treat Recovery Bonds as corporate bonds.

190. When reviewing a bond's classification, Bloomberg's "Methodology" provides that Bloomberg will "evaluate[] all publicly available information [] to assign the most appropriate classification." (Methodology, p. 21). In reclassifying Recovery Bonds as ABS in

mid-2022, Bloomberg did not say what information it evaluated or how any such information supported or favored this change of course (other than referencing the "stakeholders' responses" discussed herein).

191. Bloomberg claims that its indexes are "constructed … in an objective manner," "determined by clearly defined, published eligibility criteria," and "continually monitored and reviewed [] through a formal governance process." (Methodology, p. 12). However, Bloomberg failed to provide an objective reason for the Recovery Bond reclassification. In fact, the reclassification was subjective and not based on "clearly defined, published eligibility criteria." Nor was it monitored or reviewed through a "formal governance process." Bloomberg's reclassification was made in bad faith for the purpose of increasing interest to be earned by its large institutional investor customers.

192. Further, while Bloomberg vows to exercise "expert judgment" in making classification decisions, with respect to reclassifying Recovery Bonds, Bloomberg violated its own policies regarding the exercise of such "judgment." Bloomberg did not explain how its decision was "consistent" with its prior decisions, complied with "written procedures" (none were mentioned) or complied with its "code of ethics to prevent conflicts of interest." (Methodology, p. 107).

193. Instead of explaining how its reclassification was objective, rules-based, rational, consistent, or ethical, Bloomberg simply said that the reclassification was supported by an informal study of market participants. But under Bloomberg's own Methodology, and under, *inter alia*, IOSCO Principles and IIA's Best Practices, the self-interested wishes of investors are not a valid reason to reclassify. Bloomberg is supposed to be an objective "umpire" for the fixed

income market and is not supposed to reconsider decisions because self-interested parties ask for a change.

194. Ironically, the very same month Bloomberg subjectively reclassified Recovery Bonds as ABS, the IIA (of which Bloomberg is a member) sent a letter to the SEC emphasizing the importance of ***objectivity*** in indexing classification:

> "Indices are designed to measure specified markets ***objectively***…. If indices were created or maintained as the index provider or another actor wished, as opposed to in accordance with specified rules and methodologies, an index may present inaccurate or inconsistent information, which would ultimately undermine investors' ability to make informed decisions, as well as the index's, and the index provider's, market credibility. Thus, when constructing or rebalancing an index … it is a mechanical process where all of the securities that satisfy the pre-established rules for the index are included…." (8/16/22 IIA letter to SEC, https://www.indexindustry.org/wp-content/uploads/IIA-Response-to-Comment-Request-Final-Signed.pdf) (emphasis added).

195. Stakeholders' self-interested responses cannot be considered under the EU's BMR, any "code of ethics," or "best practices" unless and until they are reviewed (and culled) for conflicts of interest. In other words, if input was sought at all, stakeholders who stood to make hundreds of millions of dollars more from an ABS classification should have been excluded from consideration under any reasonable approach.

196. In soliciting input as part of its 2022 "consultation" on this issue, Bloomberg failed to properly cull for conflicts of interest.

197. Bloomberg's reclassification not only was inconsistent with the views and statements of regulators like the FASB, FINRA, and Bloomberg's own data department, it also violated the EU's BMR, U.K.'s Financial Services and Markets Act 2000 (FSMA), U.K Public General Acts 2000, chapter 8, and the U.S.'s Investment Advisor's Act of 1940, 15 U.S.C. §§ 80b-1–b-21 (the "IAA").

198. Bloomberg also violated the IAA when it responded to customer requests and reclassified Recovery Bonds, moving them from its corporate index to its small, "single-purpose," "stranded-cost" ABS index. Bloomberg acted as an "investment advisor" under the IAA without registering and without accounting for conflicts of interests. Bloomberg's "stranded-cost" ABS index is not designed to track the general market, the bonds are subjectively selected by Bloomberg, and Bloomberg subjectively (and erroneously) included Recovery Bonds in that index in response to its large customers' requests.

199. Bloomberg also violated the U.K.'s FSMA, which aims to increase market integrity, promote healthy competition, and protect customers. On information and belief, Bloomberg violated the FSMA when it responded to customer requests and reclassified Recovery Bonds because its actions constituted investment advice activities without authorization and without accounting for conflicts of interests. (FMSA, pt. 19-20.) (FMSA, pt. 1H; section 102A(2-4).).

200. Bloomberg knew that changing Recovery Bonds' index classification from corporate bonds to asset-backed securities, as it did in 2022, would inaccurately signal that the bonds were riskier than they actually are. The reclassification would also significantly limit the universe of potential buyers (including because a far smaller universe of investors can invest in asset-backed securities, and there is a much less extensive secondary market for asset-backed securities) and thus limit competition, decrease liquidity, and increase the interest rates set for these bonds in the capital markets, resulting in higher investment returns for the investors and higher monthly recovery bond interest charges for the electricity customers (including Plaintiffs and other California and Texas consumers).

201. Before formally announcing its reclassification, Bloomberg was reminded of these effects. After its large investor customers requested that Bloomberg reclassify Recovery Bonds as asset-backed securities, Bloomberg solicited input from institutional investors, ostensibly for the purpose of helping guide Bloomberg's decision as to whether to reclassify. Some of the respondents explicitly noted to Bloomberg that reclassifying Recovery Bonds as asset-backed securities would significantly limit the pool of investors who could purchase these bonds.

202. Bloomberg's announcements, and index misclassification of Recovery Bonds as ABS, have already caused millions of dollars in damages to SCE, PG&E, and ERCOT electricity customers in the form of higher monthly recovery bond interest payments. Moreover, absent appropriate equitable relief, Bloomberg's conduct will continue to cause substantial damages to California and Texas electricity customers for years to come.

## CAUSES OF ACTION

### FIRST CLAIM FOR RELIEF
### INTENTIONAL INTERFERENCE WITH CONTRACTUAL RELATIONS
### (on behalf of the SCE Class and PG&E Class)

203. Plaintiffs incorporate all the above paragraphs as though fully set forth herein.

204. This cause of action is brought by Plaintiffs Skolarus, Cain, and Lawson, on behalf of themselves and the SCE Class, and by Plaintiffs Small and Arnold on behalf of themselves and the PG&E Class.

205. By its conduct alleged herein, Bloomberg intentionally interfered with the contracts between SCE and PG&E, on the one hand, and those utilities' electricity customers (i.e., Plaintiffs Skolarus, Cain, Lawson, and the SCE Class, and Plaintiffs Small, Arnold, and the PG&E Class, respectively) on the other hand, as those contracts relate to monthly payment for electricity service including Recovery Bond repayment charges.

206. Plaintiff Skolarus, Cain, Lawson, and the SCE Class have contracts with SCE that are valid and enforceable. These contracts were entered into in California between citizens of California to govern the provision of electricity within California and are governed by California law.

207. Plaintiff Small, Arnold, and the PG&E Class have contracts with PG&E that are valid and enforceable. These contracts were entered into in California between citizens of California to govern the provision of electricity within California and are governed by California law.

208. Bloomberg knew that SCE had these contracts with California electricity customers like Plaintiffs Skolarus, Cain, Lawson the SCE Class. Bloomberg also knew that PG&E had these contracts with California electricity customers like Small, Arnold, and the PG&E Class.

209. As alleged herein, Bloomberg disrupted and interfered, in California, with these California contracts.

210. As Bloomberg had intended, Bloomberg's misconduct alleged herein made performance under these contracts more expensive, burdensome, and difficult for Plaintiffs Skolarus, Cain, Lawson, and the SCE Class, and for Plaintiffs Small, Arnold, and the PG&E Class. Bloomberg's conduct required, and will continue to require, Plaintiffs Skolarus, Cain, Lawson, and the SCE Class, and Plaintiffs Small, Arnold, and the PG&E Class to pay higher payments each month, higher than they would have to pay but for Bloomberg's misconduct.

211. Bloomberg intentionally engaged in the misconduct alleged herein to cause the interest rates and corresponding Recovery Bond interest charges, borne by Plaintiffs Skolarus,

Cain, Lawson, and the SCE Class, and Plaintiffs Small, Arnold, and the PG&E Class, to be higher than they would have been but for Bloomberg's misconduct.

212. Bloomberg intended to make, and knew that its conduct alleged herein would make or was substantially certain to cause, the performance of these contracts to be more expensive, burdensome, and difficult for Plaintiffs Skolarus, Cain, Lawson, and the SCE Class, and Plaintiffs Small, Arnold, and the PG&E Class.

213. Plaintiffs Skolarus, Cain, Lawson, and the SCE Class, and Plaintiffs Small, Arnold, and the PG&E Class have suffered damages, and they will continue to suffer damages throughout the lives of the SCE and PG&E Recovery Bonds at issue in this case, in the form of higher recovery bond interest charges, as a result of Bloomberg's unlawful interference alleged herein.

214. Bloomberg's misconduct alleged herein was a substantial factor and the proximate cause in causing Plaintiffs Skolarus, Cain, Lawson, and the SCE Class's harm, and Plaintiffs Small, Arnold, and the PG&E Class's harm. That harm was a foreseeable result of Bloomberg's interference alleged herein. Absent Bloomberg's misconduct alleged herein, that harm would not have occurred.

215. Plaintiffs Skolarus, Cain, and Lawson (on behalf of themselves and the SCE Class), and Plaintiffs Small and Arnold (on behalf of themselves and the PG&E Class), seek damages, injunctive relief, and the establishment of a trust or other account to be funded by Bloomberg to offset future damages.

216. Bloomberg acted with oppression and malice in engaging in its misconduct alleged herein. Bloomberg's misconduct alleged herein was willful, intentional, and knowing. Punitive damages are properly awarded here.

217. On information and belief, Bloomberg's misconduct alleged herein was authorized, approved, and/or ratified by its officers, directors, and/or managing agents such that the corporate entities themselves acted with willfulness, intent, oppression, and malice, and punitive damages are properly awarded against these corporations.

218. Plaintiffs Skolarus, Cain, Lawson, and the SCE Class, and Plaintiffs Small, Arnold, and the PG&E Class, further seek an award of attorneys' fees and costs under Cal. Code Civ. Proc. § 1021.5.

## SECOND CLAIM FOR RELIEF
## TORTIOUS INTERFERENCE WITH A CONTRACT
## (on behalf of the ERCOT class)

219. Plaintiffs incorporate all the above paragraphs as though fully set forth herein.

220. This cause of action is brought by Plaintiffs Tortolani and Katzman on behalf of themselves and the ERCOT Class.

221. By its conduct alleged herein, Bloomberg tortiously and intentionally interfered with the contracts between ERCOT and the downstream retail electricity providers in the ERCOT system, on the one hand, and the electricity customers in ERCOT's system (i.e., Plaintiffs Tortolani, Katzman, and the ERCOT Class) on the other hand, as those contracts relate to payment for electricity service including Recovery Bond repayment charges.

222. Plaintiffs Tortolani, Katzman, and the ERCOT Class have contracts with ERCOT and the downstream electricity providers in the ERCOT system that are valid and enforceable. These contracts were entered into in Texas between citizens of Texas to govern the provision of electricity within Texas and are governed by Texas law.

223. Bloomberg knew that ERCOT and the downstream electricity providers in the ERCOT system had these contracts with Texas electricity customers like Plaintiffs Tortolani, Katzman, and the ERCOT Class.

224. As alleged herein, Bloomberg disrupted and interfered, in Texas, with these Texas contracts.

225. As Bloomberg had intended, Bloomberg's misconduct alleged herein made performance under these contracts more expensive, burdensome, and difficult for Plaintiffs Tortolani, Katzman, and the ERCOT Class. Bloomberg's conduct required, and will continue to require, Plaintiffs Tortolani, Katzman, and the ERCOT Class to pay higher payments each month, higher than they would have to pay but for Bloomberg's misconduct.

226. Bloomberg willfully and intentionally engaged in the misconduct alleged herein to cause the interest rates and corresponding Recovery Bond interest charges, borne by Plaintiffs Tortolani, Katzman, and the ERCOT Class members, to be higher than they would have been but for Bloomberg's misconduct.

227. Bloomberg intended to make, and knew that its conduct alleged herein would make or was substantially certain to cause, Plaintiffs Tortolani, Katzman, and the ERCOT Class members' performance of their contracts more expensive, burdensome, and difficult.

228. Plaintiffs Tortolani, Katzman, and the other members of the ERCOT Class have suffered damages, and they will continue to suffer damages throughout the life of the ERCOT Recovery Bond at issue in this case, in the form of higher recovery bond interest charges, as a result of Bloomberg's tortious and intentional interference alleged herein.

229. Bloomberg's misconduct alleged herein was a substantial factor and the proximate cause in causing Plaintiffs Tortolani, Katzman and the ERCOT Class members' harm. That harm was a foreseeable result of Bloomberg's interference alleged herein. Absent Bloomberg's misconduct alleged herein, that harm would not have occurred.

230. Plaintiffs Tortolani and Katzman, on behalf of themselves and the ERCOT Class, seek damages, injunctive relief, and the establishment of a trust or other account to be funded by Bloomberg to offset future damages.

231. Bloomberg acted with oppression and malice in engaging in its misconduct alleged herein. Bloomberg's misconduct alleged herein was willful, intentional, and knowing. Punitive damages are properly awarded here.

232. On information and belief, Bloomberg's misconduct alleged herein was authorized, approved, and/or ratified by its officers, directors, and/or managing agents such that the corporate entities themselves acted with willfulness, intent, oppression, and malice, and punitive damages are properly awarded against these corporations.

**THIRD CLAIM FOR RELIEF**
**INTENTIONAL INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE**
**(on behalf of the SCE Class and PG&E Class)**

233. Plaintiffs incorporate all the above paragraphs as though fully set forth herein.

234. Bloomberg intentionally interfered with the economic relationships between Plaintiffs and other members of the SCE Class and PG&E Class, on the one hand, and SCE and PG&E, on the other hand, related to payment for electricity service including Recovery Bonds repayment charges.

235. Plaintiffs and the members of the SCE Class and PG&E Class were and are in economic relationships with SCE and PG&E that are and continue to be probable and likely to result in economic benefits to the Plaintiffs and members of the Classes.

236. The economic relationships between Plaintiffs and the members of the Classes and SCE and PG&E, respectively, are valid and ongoing. The economic relationships with SCE and PG&E were entered into in California between citizens of California to govern the provision of electricity within California and are governed by California law.

237. Bloomberg knew that each of these utilities had these economic relationships with California electricity customers, and Bloomberg knew that each of these economic relationships were likely to result in prospective economic benefits for California electricity customers, including Plaintiffs and the proposed Classes.

238. As alleged herein, Bloomberg disrupted and interfered in California with these California economic relationships and prospective economic benefits.

239. Bloomberg intended to disrupt these economic relationships and interfere with these prospective economic benefits for Plaintiffs and members of the Classes, including by making Plaintiffs and members of the Classes pay hundreds of millions of dollars more, collectively, than they would be required to pay but for Bloomberg's misconduct.

240. The economic relationships and prospective economic benefits for Plaintiffs and the Classes have been disrupted and interfered with. Plaintiffs and the members of the Classes have suffered and will continue to suffer harm throughout the life of the Recovery Bonds at issue in this case, including without limitation by having to each pay more than they would have (i.e., higher recovery bond interest charges) but for Bloomberg's unlawful interference.

241. Bloomberg willfully and intentionally engaged in the misconduct alleged herein to cause the interest rates and corresponding Recovery Bond interest charges, borne by Plaintiffs and the proposed Class members, to be higher than they would have been but for Bloomberg's misconduct.

242. Bloomberg intended to interfere with the prospective economic benefits for Plaintiffs and the SCE and PG&E Classes.

243. Bloomberg knew that such interference with Plaintiffs' and the other members of the Classes' prospective economic benefits was certain or substantially certain to occur as a result of Bloomberg's misconduct alleged herein.

244. Bloomberg's misconduct was a substantial factor and the proximate cause in causing Plaintiffs' and the members of the Classes' harm. Plaintiffs and the members of the Classes have been and will continue to be damaged in amounts according to proof. That harm was a foreseeable result of Bloomberg's interference. Absent Bloomberg's misconduct alleged herein, that harm would not have occurred.

245. Plaintiffs, on behalf of themselves and the SCE and PG&E Classes, seek damages, injunctive relief, and the establishment of a trust or other account to be funded by Bloomberg to offset future damages.

246. Bloomberg's misconduct alleged herein was unfair, in violation of its own published statements, in violation of applicable and acknowledged guidelines and standards (including those of regulators and entities and organizations that oversee the industry), and contrary to law, ethics, and common decency. Bloomberg's conduct was wrongful.

247. On information and belief, Bloomberg acted with oppression and malice such that punitive damages are properly awarded here.

248. On information and belief, Bloomberg's misconduct here was authorized, approved, and/or ratified by its officers, directors, and/or managing agents such that the corporate entities themselves acted with oppression and malice and punitive damages are properly awarded against these corporations.

249. Plaintiffs Skolarus, Cain, Lawson, and the SCE Class, and Plaintiffs Small, Arnold, and the PG&E Class, further seek an award of attorneys' fees and costs under Cal. Code Civ. Proc. § 1021.5.

**FOURTH CLAIM FOR RELIEF**
**NEGLIGENCE**
**(on behalf of the ERCOT Class)**

250. Plaintiffs incorporate all the above paragraphs as though fully set forth herein.

251. This cause of action is brought by Plaintiffs Tortolani and Katzman on behalf of themselves and the ERCOT Class.

252. Bloomberg owed a duty of at least reasonable care to Plaintiffs Tortolani, Katzman, and members of the ERCOT Class with respect to the timing, manner, scope, and substance of its actions alleged herein, including its statements and indexing classifications related to Recovery Bonds. The duty is based, *inter alia*, on the fact that Bloomberg and ERCOT class members are part of the interconnected market for Recovery Bonds. Bloomberg is in a position of uniquely heavy influence in the market. Bloomberg made public representations that it would objectively and transparently make the most appropriate indexing classifications and would prevent conflicts of interest from inappropriately influencing its indexing decisions, creating a reasonable expectation that it would do so. Bloomberg knew that its statements and actions about Recovery Bonds would impact the Recovery Bond market and increase interest rates on such bonds. Bloomberg knew that its statements and decisions in this market would have a financial impact on electricity customers (including specifically the Texas electricity customers in the ERCOT Class), who are particularly captive participants in this interconnected Recovery Bond market in that electricity customers do not have the option to not participate in the market, but must pay the cost resulting from the market interest rate of Recovery Bonds. Thus, it was foreseeable (and was in fact foreseen and intended by Bloomberg) that ERCOT electricity

customers would be financially harmed by Bloomberg's statements and actions regarding Recovery Bonds. There is a close connection between Bloomberg's statements and actions regarding Recovery Bond classification and the injuries ERCOT Class Members suffered. Obligating Bloomberg to adhere to its own standards of objectivity and avoidance of conflict of interests related to Recovery Bond indexing is feasible, particularly given that Bloomberg has a detailed Methodology to do just that. Allowing electricity customers to hold Bloomberg accountable for failures to adhere to these objective standards when it manipulates the Recovery Bond market due to conflicts of interest advances the sound public policy of deterring future harm. Bloomberg's position of power in this interconnected Recovery Bond market (particularly relative to electricity customers) creates an unreasonable risk that manipulation in Recovery Bond indexing (i.e. failing to adhere to objective standards and being influenced by conflicts of interest) would cause electricity customers financial harm, meaning Bloomberg owes Texas electricity customers a reasonable duty of care in this interconnected Recovery Bond market.

253. Bloomberg breached its duty by acts and omissions including but not limited to:

a. Announcing its 2022 review/consultation based on subjective criteria and influenced by conflicts of interest, which sent a clear signal to the market in advance of the ERCOT bond issuance at issue in this case;

b. Instituting a bogus review/consultation over the reclassification which was not based on objective criteria or processes in its own Methodology;

c. Distributing misleading information as to the reason for the mid-year review/consultation;

d. Distributing misleading information as to their largest customers' input on reclassification;

e. Failing to properly utilize or consider stakeholders' views and failing to account for conflicts of interest;

f. Identifying customer opinion influenced by conflicts of interest, and not legal objective standards, as the only relevant metric for classification; and

g. Improperly reclassifying Recovery Bonds with knowledge that the reclassification would cause higher interest rates to apply to the bonds and increase costs for electricity customers.

254. Bloomberg's negligence proximately caused, and will continue to cause, harm to Plaintiffs Tortolani, Katzman, and other members of the ERCOT Class, in the form of higher recovery bond interest charges.

255. The damages suffered by Plaintiffs Tortolani, Katzman, and other members of the ERCOT Class would not have occurred without Bloomberg's negligence.

256. Plaintiffs Tortolani and Katzman, on behalf of themselves and the ERCOT Class, seek damages, injunctive relief, and the establishment of a trust or other account to be funded by Bloomberg to offset future damages.

257. Bloomberg's actions and omissions, when viewed objectively from Bloomberg's viewpoint at the time of the actions and omissions, involved an extreme degree of risk, considering the probability and magnitude of the potential harm to others. Bloomberg had actual, subjective awareness of the risk, but acted with a conscious disregard for the rights, safety, or welfare of others. Punitive damages are thus warranted.

## FIFTH CLAIM FOR RELIEF
## NEGLIGENCE
## (on behalf of the SCE Class and PG&E Class)

258. Plaintiffs incorporate all the above paragraphs as though fully set forth herein.

259. This cause of action is brought by Plaintiffs Skolarus, Cain, and Lawson on behalf of themselves and the SCE Class, and by Plaintiffs Small and Arnold on behalf of themselves and the PG&E Class.

260. Bloomberg owed a duty of at least reasonable care to Plaintiffs Skolarus, Cain, Lawson, and the SCE Class, and Plaintiffs Small, Arnold, and the PG&E Class, with respect to the timing, manner, scope, and substance of its actions alleged herein, including its statements and indexing classifications related to Recovery Bonds. The duty is based, *inter alia*, on the fact that Bloomberg and SCE and PG&E class members are part of the interconnected market for Recovery Bonds. Bloomberg is in a position of uniquely heavy influence in the market. Bloomberg made public representations that it would objectively and transparently make the most appropriate indexing classifications and would prevent conflicts of interest from inappropriately influencing its indexing decisions, creating a reasonable expectation that it would do so. Bloomberg knew that its statements and actions about Recovery Bonds would impact the Recovery Bond market and increase interest rates on such bonds. Bloomberg knew that its statements and decisions in this market would have a financial impact on electricity customers (including specifically the California electricity customers in the SCE and PG&E Classes), who are particularly captive participants in this interconnected Recovery Bond market in that electricity customers do not have the option to not participate in the market, but must pay the cost resulting from the market interest rate of Recovery Bonds. Thus it was foreseeable (and was in fact foreseen and intended by Bloomberg) that SCE and PG&E electricity customers would be financially harmed by Bloomberg's improper reclassification of Recovery Bonds. There is a close connection between Bloomberg's misclassification and the injuries SCE Class Members and PG&E Class Members suffered. Obligating Bloomberg to adhere to its own standards of

objectivity and avoidance of conflict of interests related to Recovery Bond indexing is feasible, particularly given that Bloomberg has a detailed Methodology to do just that. Allowing electricity customers to hold Bloomberg accountable for failures to adhere to these objective standards when it manipulates the Recovery Bond market due to conflicts of interest advances the sound public policy of deterring future harm within Bloomberg's control. Bloomberg's position of power in this interconnected Recovery Bond market (particularly relative to electricity customers) creates an unreasonable risk that manipulation in Recovery Bond indexing (i.e. failing to adhere to objective standards and being influenced by conflicts of interest) would cause electricity customers financial harm, meaning Bloomberg owes California electricity customers a reasonable duty of care in this interconnected Recovery Bond market. Bloomberg breached its duty by acts and omissions including but not limited to:

a. Announcing its 2022 review/consultation based on subjective criteria and influenced by conflicts of interest which sent a clear signal to the market in advance of the SCE and PG&E bond issuances at issue in this case;

b. Instituting a bogus review/consultation over the reclassification which was not based on objective criteria or processes in its own Methodology;

c. Distributing misleading information as to the reason for the mid-year review/consultation;

d. Distributing misleading information as to their largest customers' input on reclassification;

e. Failing to utilize or consider the majority of stakeholders' views and failing to account for conflicts of interest;

f. Identifying customer opinion influenced by conflicts of interest, and not legal objective standards, as the only relevant metric for classification; and

g. Improperly reclassifying Recovery Bonds with knowledge that the reclassification would cause higher interest rates to apply to the bonds and increase costs for electricity customers.

261. Bloomberg's negligence proximately caused, and will continue to cause, harm to Plaintiffs Skolarus, Cain, Lawson, and the SCE Class, and Plaintiffs Small, Arnold, and the PG&E Class, in the form of higher recovery bond interest charges.

262. The damages suffered by Plaintiffs Skolarus, Cain, Lawson, and the SCE Class, and Plaintiffs Small, Arnold, and the PG&E Class, would not have occurred without Bloomberg's negligence.

263. Plaintiffs Skolarus, Cain, and Lawson, on behalf of themselves and the SCE Class, and Plaintiffs Small and Arnold, on behalf of themselves and the PG&E Class, seek damages, injunctive relief, and the establishment of a trust or other account to be funded by Bloomberg to offset future damages.

264. Bloomberg's actions and omissions, when viewed objectively from Bloomberg's viewpoint at the time of the actions and omissions, involved an extreme degree of risk, considering the probability and magnitude of the potential harm to others. Bloomberg had actual, subjective awareness of the risk, but acted with a conscious disregard for the rights, safety, or welfare of others. Punitive damages are thus warranted.

## SIXTH CLAIM FOR RELIEF
## NEGLIGENT INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE
## (on behalf of the SCE Class and PG&E Class)

265. Plaintiffs incorporate all the above paragraphs as though fully set forth herein, including but not limited to the allegations of their Fifth Claim for Relief.

266. Bloomberg negligently interfered with the economic relationships between Plaintiffs and the members of the Classes, on the one hand, and SCE and PG&E, on the other hand, related to the payment for electricity service including Recovery Bonds repayment charges.

267. Plaintiffs and the members of the SCE Class and PG&E Class were and are in economic relationships with SCE and PG&E that are and continue to be probable and likely to result in economic benefits to the Plaintiffs and members of the Classes.

268. The economic relationships between Plaintiffs and the members of the Classes and SCE and PG&E, respectively, are valid and ongoing. The economic relationships with SCE and PG&E were entered into in California between citizens of California to govern the provision of electricity within California, and are governed by California law.

269. Bloomberg knew that each of these utilities had these economic relationships with California electricity customers, and Bloomberg knew that each of these economic relationships were likely to result in prospective economic benefits for California electricity customers, including Plaintiffs and the proposed Classes.

270. Bloomberg owed a duty to Plaintiffs and the members of the Classes to objectively and fairly make decisions impacting the cost of Recovery Bonds paid by Plaintiffs and other Class members, *inter alia*, because: Bloomberg was in a unique position of power in indexing the Recovery Bonds and influencing the interest rates for same; because Bloomberg through its own statements and conduct publicly committed to make indexing decisions objectively and fairly, without inappropriate influence from conflicts of interest; because of laws, regulations, and Bloomberg's own Methodology, policies, and practices; because Plaintiffs and Class members are captive electricity customers who do not have the option to not participate in

the market, but must pay the cost resulting from the market interest rate of Recovery Bonds; and because it was foreseeable by Bloomberg (indeed was foreseen and intended by Bloomberg) that its conduct alleged herein would harm Plaintiffs and the members of the Classes in the form of increased payments.

271. As alleged herein, Bloomberg disrupted and interfered in California with these California economic relationships and prospective economic benefits.

272. Bloomberg knew or should have known that these economic relationships would be disrupted and made more expensive and difficult for Plaintiffs and the members of the Classes, and that the prospective economic benefits to Plaintiffs and the members of the Classes would be interfered with, if Bloomberg's classification decision was not made with reasonable care.

273. Bloomberg was negligent, failed to act with reasonable care, and acted wrongfully. Bloomberg's conduct alleged herein breached its duties to Plaintiffs and other Class members.

274. Bloomberg's misconduct alleged herein was unfair, in violation of its own published statements, in violation of applicable and acknowledged guidelines and standards (including those of regulators and entities and organizations that oversee the industry), and contrary to law, ethics, and common decency. Bloomberg's conduct was wrongful.

275. Bloomberg's negligent, unreasonable, and wrongful classification decision has foreseeably disrupted and continues to disrupt Plaintiffs' and the members of the Classes' economic relationships and prospective economic benefits, requiring them to collectively pay hundreds of millions of dollars more in recovery bond interest charges than they would have but for Bloomberg's negligent interference.

276. Bloomberg's negligent, unreasonable, and wrongful conduct was a substantial factor and the proximate cause in disrupting Plaintiffs' and the members of the Classes' economic relationships and prospective economic benefits, and causing (and continuing to cause) Plaintiffs' and the members of the Classes' harm. That harm was a foreseeable result of Bloomberg's interference. Absent Bloomberg's misconduct alleged herein, that harm would not have occurred.

277. As a result of Bloomberg's negligent interference, Plaintiffs and the other Class members lost, and will continue to lose, part of the economic benefits or advantage they had reasonably expected from their economic relationships with their respective utilities.

278. Plaintiffs, on behalf of themselves and the SCE and PG&E Classes, seek damages, injunctive relief, and the establishment of a trust or other account to be funded by Bloomberg to offset future damages.

279. Plaintiffs Skolarus, Cain, Lawson, and the SCE Class, and Plaintiffs Small, Arnold, and the PG&E Class, further seek an award of attorneys' fees and costs under Cal. Code Civ. Proc. § 1021.5.

## SEVENTH CLAIM FOR RELIEF
## VIOLATION OF CALIFORNIA BUSINESS & PROFESSIONS CODE §17200
## (on behalf of the SCE Class and PG&E Class)

280. Plaintiffs incorporate all the above paragraphs as though fully set forth herein.

281. This cause of action is brought by Plaintiffs Skolarus, Cain, and Lawson on behalf of the SCE Class, and by Plaintiffs Small and Arnold on behalf of the PG&E Class.

282. Bloomberg's conduct described herein violates the "unfair" and "unlawful" prongs of California's Unfair Competition Law (the "UCL"), codified at California Business and Professions Code §§ 17200, et seq.

283. By its conduct alleged herein, Bloomberg has violated the "unfair" prong of the UCL, including without limitation by: (a) unfairly and incorrectly reclassifying Recovery Bonds (including the California SCE and PG&E Recovery Bonds at issue in this case) as ABS to increase the interest to be earned by its large institutional-investor customers at the expense of California electricity customers; and (b) trying to justify, conceal, and obfuscate such misconduct through a sham "review" or "consultation" process. Bloomberg had and used a lopsided level of power to increase Recovery Bond interest rates paid by captive Plaintiffs and Class members, who have no choice but to continue to pay the added costs imposed by Bloomberg's actions so long as they continue live in the California areas serviced by SCE and PG&E. Plaintiffs and the proposed Classes—constituting the majority of Californians—were powerless to evade the harm caused by Bloomberg's actions.

284. Bloomberg's conduct alleged herein is immoral, unethical, oppressive, unscrupulous, unconscionable, and substantially injurious to Plaintiffs Skolarus, Cain, Lawson, and the SCE Class, and Plaintiffs Small, Arnold, and the PG&E Class. There is no utility to Bloomberg's conduct, and even if there were any utility, it would be significantly outweighed by the gravity of the harm caused by Bloomberg's conduct alleged herein.

285. Bloomberg's conduct alleged herein also violates California public policy, including as such policy is reflected in Cal. Civ. Code §§ 1709-1710, and California common law.

286. By its conduct alleged herein, Bloomberg has also violated the "unlawful" prong of the UCL, including by intentionally interfering with contractual relationships, and intentionally and/or negligently interfering with prospective economic benefits, in violation of

California common law as alleged above, and by violating regulations and other applicable governmental and organizational rules and standards as alleged herein.

287. By its conduct alleged herein, Bloomberg has benefited itself, including benefits flowing from having increased the interest rates earned by its large institutional investor customers at their request.

288. Bloomberg's misconduct alleged herein was unfair, in violation of its own published statements, in violation of applicable and acknowledged guidelines and standards (including those of regulators and entities and organizations that oversee the industry), and contrary to law, ethics, and common decency. Bloomberg's conduct was wrongful.

289. As a direct and proximate result of Bloomberg's unfair and unlawful conduct, Plaintiffs Skolarus, Cain, Lawson, and the SCE Class, and Plaintiffs Small, Arnold, and the PG&E Class, lost money and have lost other property and benefits in which they have a vested interest, including additional monthly payment amounts (i.e., in the form of higher recovery bond interest charges) they have paid, and will continue to have to pay, as a result of Bloomberg's misconduct alleged herein.

290. Corresponding to Plaintiffs' and the Classes' losses and future losses, Bloomberg has benefitted and will continue to benefit from its violations of the UCL as alleged herein.

291. Plaintiffs Skolarus, Cain, Lawson, and the SCE Class, and Plaintiffs Small, Arnold, and the PG&E Class, seek an order granting restitution, and ordering the establishment of a constructive trust or other account to be funded by Bloomberg to offset future harm.

292. Bloomberg's conduct has caused substantial injury to Plaintiffs Skolarus, Cain, Lawson, and the SCE Class, and Plaintiffs Small, Arnold, and the PG&E Class. Bloomberg's conduct is ongoing and will continue absent a permanent injunction. Accordingly, Plaintiffs

Skolarus, Cain, Lawson, and the SCE Class, and Plaintiffs Small, Arnold, and the PG&E Class, seek an order enjoining Bloomberg from continuing its misconduct alleged herein, including prohibiting Bloomberg from misclassifying Recovery Bonds.

293. Plaintiffs Skolarus, Cain, Lawson, and the SCE Class, and Plaintiffs Small, Arnold, and the PG&E Class lack an adequate remedy at law to recover or fully recover relief, including the requested injunctive relief, pursuant to this cause of action. To the extent required this claim is pled in the alternative.

294. Plaintiffs Skolarus, Cain, Lawson, and the SCE Class, and Plaintiffs Small, Arnold, and the PG&E Class, further seek an award of attorneys' fees and costs under Cal. Code Civ. Proc. § 1021.5.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray for relief and judgment, as follows:

a. Determining that this action is a proper class action, and certifying the Classes, designating Plaintiffs as class representatives, and designating their counsel as Class Counsel under Rule 23 of the Federal Rules of Civil Procedure;

b. Awarding compensatory damages in favor of Plaintiffs and the Classes against all Defendants, jointly and severally, for all damages sustained and that they will sustain as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

c. Awarding Plaintiffs and the Classes restitution;

d. Awarding Plaintiffs and the Classes their costs and expenses incurred in this action, including attorneys' fees and expenses and expert fees;

e. Ordering the establishment of a constructive trust or other account to be funded by Defendants to offset harm and future harm to Plaintiffs and the Classes;

f. Awarding equitable/injunctive relief, as the Court may deem just and proper;

g. Awarding punitive damages against Defendants to each of the Classes;

h. Awarding pre-judgment and post-judgment interest; and

i. Such other and further relief as the Court may deem just and proper.

**JURY TRIAL DEMANDED**

Plaintiffs, on behalf of themselves and each of the classes, hereby demand a trial by jury.

DATED: September 26, 2024

Respectfully submitted,

*/s/ Sahil S. Koul*

Sahil S. Koul (NY Bar No. 5932439)
PAUL LLP
15 Crest Wood Circle
Pittsford, New York 14534
Telephone: (917) 484-0608
Sahil@PaulLLP.com

Richard M. Paul III (*pro hac vice*)
Michael Schrag (*pro hac vice*)
PAUL LLP
601 Walnut Street, Suite 300
Kansas City, Missouri 64106
Telephone: (816) 984-8100
Facsimile: (816) 984-8101
Rick@PaulLLP.com
Michael@PaulLLP.com

Roger N. Heller (*pro hac vice*)
LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
275 Battery Street, 29th Floor
San Francisco, CA 94111
Telephone: (415) 956-1000
Facsimile: (415) 956-1006
rheller@lchb.com

Avery S. Halfon (NY Bar No. 5418017)
Jahi J. Liburd (NY Bar No. 6015812)
250 Hudson Street, 8th Floor
New York, NY 10013
Telephone: (212) 355-9500
Facsimile: (212) 355-9592
ahalfon@lchb.com
jliburd@lchb.com

Michael G. King (*pro hac vice*)
HENNELLY & GROSSFELD LLP
10900 Wilshire Blvd.
Suite 400
Los Angeles, CA 90024
Telephone: 310-305-2100
Facsimile: 310-305-2116
mking@hgla.com

*Attorneys for Plaintiffs and the Proposed Classes*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| EDWARD SKOLARUS, JOSHUA CAIN, YAFFA LAWSON, JAMES SMALL, CASSANDRA ARNOLD, STEVEN TORTOLANI, and MICHAEL KATZMAN, on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>BLOOMBERG, L.P. and BLOOMBERG INDEX SERVICES, LTD.,<br><br>Defendants. | Case No. 1:24-cv-04375 (ALC) |

**DECLARATION OF DANA M. SESHENS IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS PLAINTIFFS' AMENDED COMPLAINT**

Dana M. Seshens, pursuant to 28 U.S.C. § 1746, hereby declares:

1. I am an attorney admitted to practice before this Court, and I am a partner of the law firm Davis Polk & Wardwell LLP, counsel for Defendants Bloomberg L.P. and Bloomberg Index Services, Ltd. in the above-captioned matter. I respectfully submit this Declaration in support of Defendants' Motion to Dismiss Plaintiffs' Amended Complaint.

2. Attached hereto as Exhibit A is a true and correct copy of a Debt Obligation Order issued by the Public Utility Commission of Texas approving Electric Reliability Council of Texas, Inc.'s ("ERCOT") application to issue ERCOT Stabilization Subchapter N Bonds, dated October 13, 2021 and available at https://interchange.puc.texas.gov/Documents/52322_312_1159396.pdf.

3. Attached hereto as Exhibit B is a true and correct copy of a Financing Order issued by the Public Utilities Commission of the State of California approving Southern California Edison Company's ("SCE") application to issue SCE Recovery Bonds Series 2023-A, dated March 1, 2023 and available at https://docs.cpuc.ca.gov/PublishedDocs/Published/G000/M502/K956/502956389.pdf.

4. Attached hereto as Exhibit C is a true and correct copy of a Financing Order issued by the Public Utilities Commission of the State of California approving Pacific Gas and Electric Company's ("PG&E") application to issue PG&E Recovery Bonds Series 2022-A, dated August 5, 2022 and available at https://docs.cpuc.ca.gov/PublishedDocs/Published/G000/M496/K418/496418010.pdf.

5. Attached hereto as Exhibit D is a true and correct copy of a Financing Order issued by the Public Utilities Commission of the State of California approving PG&E's application to issue PG&E Recovery Bonds, Series 2024-A, dated February 16, 2024 and available at https://docs.cpuc.ca.gov/PublishedDocs/Published/G000/M525/K523/525523608.pdf.

6. Attached hereto as Exhibit E is a true and correct copy of an issuance advice letter from ERCOT to the Public Utility Commission of Texas regarding ERCOT Stabilization Subchapter N Bonds, dated June 9, 2022 and available at https://www.ercot.com/files/docs/2022/06/17/FinalIssuanceAdviceLetterSubchapterN.pdf.

7. Attached hereto as Exhibit F is a true and correct copy of an issuance advice letter from SCE to the Public Utilities Commission of the State of California regarding SCE Recovery Bonds Series 2023-A, dated April 20, 2023 and available at https://download.edison.com/406/files/202305/series-2023a-issuance-advice-letter.pdf.

8. Attached hereto as Exhibit G is a true and correct copy of an issuance advice letter from PG&E to the Public Utilities Commission of the State of California regarding PG&E Recovery Bonds Series 2022-A, dated November 21, 2022 and available at https://s1.q4cdn.com/880135780/files/doc_downloads/2023/03/09/pge-al-6769-e.pdf.

9. Attached hereto as Exhibit H is a true and correct copy of an issuance advice letter from PG&E to the Public Utilities Commission of the State of California regarding PG&E Recovery Bonds, Series 2024-A, dated July 25, 2024 and available at https://s1.q4cdn.com/880135780/files/doc_downloads/2024/RecoveryFunding/08/advice-letter-7336.pdf.

10. Attached hereto as Exhibit I is a true and correct copy of the Bloomberg Fixed Income Index Methodology, dated August 24, 2021 and available at https://saberpartners.com/wp-content/uploads/2023/01/Bloomberg-Index-Publications-Fixed-Income-Index-Methodology-HL.pdf.

11. Attached hereto as Exhibit J is a true and correct copy of a Compliance and Disclosure Interpretation titled "Asset-Backed Securities" issued by the U.S. Securities and Exchange Commission, dated July 31, 2024 and available at https://www.sec.gov/rules-regulations/staff-guidance/compliance-disclosure-interpretations/asset-backed-securities.

12. Attached hereto as Exhibit K is a true and correct copy of a redline comparing Plaintiffs' Complaint (ECF No. 1) to Plaintiffs' Amended Complaint (ECF No. 28).

I declare under penalty of perjury that the foregoing is true and correct.

Dated: New York, New York
December 6, 2024

By: /s/ *Dana M. Seshens*
Dana M. Seshens

# EXHIBIT A

Control Number: 52322

Item Number: 312

**PUC DOCKET NO. 52322**

| | | |
|---|---|---|
| **APPLICATION OF ELECTRIC RELIABILITY COUNCIL OF TEXAS, INC. FOR A DEBT OBLIGATION ORDER PURSUANT TO CHAPTER 39, SUBCHAPTER N, OF THE PUBLIC UTILITY REGULATORY ACT** | § § § § § § | **PUBLIC UTILITY COMMISSION OF TEXAS** |

# DEBT OBLIGATION ORDER

This Order addresses the application of Electric Reliability Council of Texas, Inc. (ERCOT) for a debt obligation order under section 39.653 of the Public Utility Regulatory Act (PURA).[1] In its application, ERCOT seeks Commission approval of a debt financing mechanism to pay for the uplift balance and reasonable costs to implement this Order. ERCOT proposed that bonds be issued through a special purpose entity and the proceeds used to pay the uplift balance and that it be allowed to assess uplift charges to pay for the bonds.

An agreement resolving many issues in this matter was filed after the Commission held a hearing on the merits of the application. All parties that filed testimony signed the agreement and no party opposes the agreement. The parties agreed on issues related to opting out, allocating the uplift balance, and distributing the proceeds of the financing.

As discussed in this Order, the Commission finds that ERCOT's application, as modified by the agreement and this Order, should be approved and that the debt financing mechanism approved in this Order meets all applicable requirements of PURA.

In this Order the Commission approves the mechanisms that allow the uplift balance to be determined, the amount of the financing proceeds to be distributed, and the documentation and calculations required to determine these amounts. The Commission also approves the mechanisms to calculate and assess uplift charges to repay the uplift balance and other amounts necessary to implement this Order and the financing mechanism established by this Order.

This Order also ensures that uplift charges are nonbypassable and establishes mechanisms to ensure that uplift charges are reviewed and adjusted on a quarterly basis to ensure sufficient

---

[1] Tex. Util. Code §§ 11.001–66.016. (PURA)

amounts of revenue are available to make timely payments of debt service and other required amounts related to the debt obligation.

This Order approves ERCOT's proposal to issue bonds through a special purpose entity to finance the uplift balance providing security of uplift property and the use of credit enhancements to minimize uplift charges.

This Order also approves the securitization of uplift charges and the creation of uplift property.

The Commission also establishes certain criteria in this Order that must be met for the approvals and authorizations granted in this Order to become effective. Further, this Order requires specified documents and other information be filed with the Commission so that it can ensure compliance with this Order.

This Order does not relieve or excuse any entity from paying amounts that it may owe to ERCOT.

## I. DISCUSSION

### A. Background

In February 2021, Winter Storm Uri resulted in outages at many of the generation resources within the ERCOT region, and the demand for power exceeded supply for several days during the week of the storm. The inadequate supply of power required that load be involuntarily shed to protect the integrity of the ERCOT grid, and many Texans lost power for extended periods that week. This condition also drove up prices in the wholesale electricity market causing a number of market participants, many of whom represented load-serving entities, to default on their payment obligations under the ERCOT Nodal Protocols. As a result of these payment defaults, ERCOT was unable to collect sufficient funds to fully pay certain wholesale-market participants who were due payments from ERCOT for power they produced during the storm.

To address these problems, the Texas Legislature enacted two bills that authorized financing mechanisms to provide funds to help ERCOT and market participants meet their obligations. One bill added subchapters M and N to chapter 39 of PURA and each provided

authority for a financing mechanism to address different aspects of the financial problem.[2] The other bill added subchapter D to chapter 41 of PURA to provide a financial mechanism for electric cooperatives to address the cooperatives' extraordinary costs.[3] The Commission concludes that all of the mechanisms authorized by these two bills must be considered together to have a proper understanding of these mechanisms and the goals of the Legislature in authorizing these mechanisms. The Commission further concludes that the mechanisms authorized by these two bills must be considered together to decide whether the standards set out in PURA §§ 39.651-39.664 (subchapter N of chapter 39) have been met.

The Legislature found that the use of the debt financing mechanism authorized in subchapter N "will allow wholesale[-]market participants who were assessed extraordinary uplift charges due to consumption during the period of emergency to pay those charges over a longer period of time, alleviating liquidity issues and reducing the risk of additional defaults in the wholesale market."[4] The Legislature also found that authorizing financing under subchapter N serves the public purpose of stabilizing the wholesale electricity market in the ERCOT region.[5] The Commission concludes that the debt financing mechanism approved in this Order meets these goals of the Legislature.

Further, to approve the debt financing mechanism addressed in this Order, the Commission must find that the financing will support the financial integrity of the wholesale market and is necessary to protect the public interest, considering the impacts on both wholesale-market participants and retail customers.[6] As discussed in this Order, the mechanism proposed by ERCOT in its application, as modified by the agreement and this Order, meet these important policy standards and provide significant benefits to both wholesale-market participants and retail customers.

---

[2] Act of May 30, 2021, 87th Leg., R.S., ch. 908 (HB 4492), §§2-5, 2021 Tex. Gen. Laws ___ (codified at PURA §§ 39.601–.609 (subchapter M) and PURA §§ 39.651–.664 (subchapter N)).

[3] Act of May 28, 2021, 87th Leg., R.S., ch. 950 (SB 1580), §§1-3, 2021 Tex. Gen. Laws ___ (codified at PURA §§ 41.151–.163).

[4] PURA § 39.651(b)

[5] *Id.* § 39.651(c).

[6] *Id* § 39.653(a).

### B. Subchapter N

The financial mechanisms authorized in subchapter N are meant to address two specific types of charges: reliability deployment price adder charges and ancillary services costs in excess of the Commission's system-wide offer cap, but only to the extent that these two charges were uplifted to load-serving entities on a load-ratio-share basis due to energy consumption during a specified period: the period of emergency, which is defined as the period beginning at 12:01 a.m. on February 12, 2021 and ending at 11:59 p.m. on February 20, 2021.[7] These charges, which were uplifted after the period of emergency for consumption during the period of emergency, are referenced as qualifying costs in this Order.

These qualifying costs in an amount not to exceed $2.1 billion make up the uplift balance, which is defined as an amount of money of not more than $2.1 billion that represents amounts uplifted to load-serving entities on a load-ratio-share basis due to energy consumption during the period of emergency for qualifying costs excluding amounts securitized under subchapter D of chapter 41 of PURA.[8] The uplift balance does not include amounts that were part of the prevailing settlement point price during the period of emergency.[9] Uplift charges will be assessed to load-serving entities to pay the uplift balance and the reasonable costs incurred by a state agency or ERCOT to implement a debt obligation order issued under subchapter N, including the cost of retiring or refunding existing debt.[10]

The Legislature provided three avenues to address the uplift balance: a debt obligation order under PURA § 39.653, commission-authorized financing under PURA § 39.654, or any other financial mechanism that meets the requirements of subchapter N to accomplish the purposes of that subchapter under PURA § 39.655. However, ERCOT was directed by the Legislature to file an application for a debt obligation order under PURA § 39.653 by July 16, 2021,[11] and it did so.

---

[7] PURA § 39.652(3).

[8] *Id* § 652(4).

[9] *Id*

[10] *Id.* § 39.652(5).

[11] Act of May 30, 2021, 87th Leg , R.S., ch. 908 (HB 4492), § 6, 2021 Tex. Gen. Laws ___.

Subchapter N provides several benefits and protections for the financing of the uplift balance. One of these benefits is that transactions involving the transfer and ownership of uplift property and the receipt of uplift charges are exempt from state and local income, sales, franchise, gross receipts, and other taxes or similar charges.[12] Other benefits are discussed immediately below.

**1. Uplift property**

The rights and interests of ERCOT, or a successor, under a debt obligation order, including the right to impose, collect, and receive uplift charges are only contract rights until they are first transferred or pledged in connection with the issuance of debt obligations.[13] After a transfer or pledge, the rights and interest become uplift property.[14] Uplift property is a present property right for purposes of contracts concerning the sale or pledge of property, even though the imposition and collection of uplift charges depends on further acts of ERCOT, or others, that have not yet occurred.[15] Further, a debt obligation order remains in effect and the uplift property continues to exist for the same period as the pledge of the state described by PURA § 39.663.[16] In addition, all revenues and collections resulting from uplift charges constitute proceeds only of the uplift property arising from the debt obligation order.[17]

**2. Pledge of the state**

Debt obligations issued under a debt obligation order, including any bonds, are not a debt or obligation of the state of Texas and are not a charge on the state's full faith and credit or taxing power.[18] The state pledges, however, for the benefit and protection of financing parties and ERCOT that it will not take or permit any action that would impair the value of uplift property, or reduce, alter, or impair the uplift charges to be imposed, collected, and remitted to financing parties, until the principal, interest and premium, and any other charges incurred and contracts to

---

[12] PURA § 39.658.

[13] *Id.* § 39.662(a).

[14] *Id*

[15] *Id* § 39.662(b).

[16] *Id.*

[17] *Id.* § 39.662(c).

[18] *Id.* § 39.663.

be performed in connection with the related debt obligations have been paid and performed in full.[19] Any party issuing a debt obligation under a debt obligation order is authorized to include this pledge in any documentation relating to the obligation.[20]

### 3. Other authority and requirements

The commission is authorized to use any enforcement mechanism established by chapters 15 or 39 of PURA, including revocation of certification by the commission, against any entity that fails to remit excess receipts from the uplift-balance financing as required by PURA § 39.653(e), or otherwise misappropriates or misuses amounts received from the uplift-balance financing.[21]

In addition, a load-serving entity that receives proceeds from the uplift-balance financing must return an amount of the proceeds equal to any amount of money received by the entity due to litigation seeking judicial review of pricing or uplift actions taken by the Commission or ERCOT in connection with the period of emergency.[22]

## C. Debt Obligation Order

This Order addresses the application of ERCOT for a debt financing order under PURA §39.653 to establish a financing mechanism to allow for payment of the uplift balance. As previously mentioned, to issue a debt financing order, the Commission must find that the proposed financing will support the financial integrity of the wholesale market and is necessary to protect the public interest, after considering the impacts on both wholesale-market participants and retail customers.[23] The Commission must issue a debt obligation order no later than 90 days after ERCOT files its application for the order.[24]

### 1. Contents of Order

A debt obligation order must state the uplift balance, state the period over which uplift charges must be assessed, and provide a process for remitting the financing of the uplift balance

---

[19] PURA § 39.663.

[20] *Id.*

[21] *Id* § 39.661.

[22] *Id.* § 39.664

[23] *Id.* § 39.653(a).

[24] *Id.* § 39.653(f)

to load-serving entities who were exposed to the qualifying costs included in the uplift balance that includes a requirement that the load-serving entities submit documentation of their exposure.[25] The order must also include a requirement that a load-serving entity that receives excess proceeds from the financing—proceeds from the financing that exceed that entity's actual exposure—notify ERCOT and remit the excess receipts.[26]

A debt obligation order must include terms ensuring that the imposition and collection of uplift charges authorized by the order are nonbypassable, except for entities that opt out of uplift charges.[27] However, as discussed below, other entities are exempted from the imposition and collection of uplift charges. In addition, the order must authorize ERCOT to establish appropriate fees and other methods for pursuing amounts owed from entities that exit the wholesale market.[28]

The Commission also recognizes that the Legislature has directed the Commission to require all market participants to fully and promptly pay to ERCOT all amounts owed to ERCOT.[29] And ERCOT is required to report to the Commission if a market participant does not make those payments.[30] Further, the Commission and ERCOT are directed to pursue collections of those amounts owing to ERCOT to reduce the costs that would otherwise be borne by other market participants or their customers.[31]

**2. Effect of Order**

A debt obligation order becomes effective in accordance with its terms and the order, together with the uplift charges authorized in the order, and is irrevocable and not subject to reduction, impairment, or adjustment by further action of the Commission after it takes effect.[32] However, the Commission may refinance any debt obligations created by an order under this subchapter if the Commission determines that the refinancing is in the public interest and otherwise

---

[25] PURA § 39.653(b).

[26] *Id.* § 39.653(e).

[27] *Id.* § 39.656(1).

[28] *Id.* § 39.656(2).

[29] *Id.* § 39.159(a) (as added by Act of May 30,2021, 87th Leg., R.S , ch 908 (HB 4492), § 4).

[30] *Id* § 39.159(b).

[31] *Id.* § 39.159(c).

[32] *Id.* § 39.653(f)

meets the requirements of this subchapter.[33] In addition, a debt obligation order is not subject to rehearing by the commission and is subject to an expedited judicial review process.[34] Further, a debt obligation is a nonrecourse debt secured solely by the uplift charges explicitly assessed to repay the obligation.[35] The independent organization's obligations authorized under this section do not create personal liability for the independent organization.[36]

### 3. Uplift Charges

Uplift charges are the amounts assessed to load-serving entities to repay amounts financed under subchapter N to pay the uplift balance and reasonable costs incurred by a state agency—which includes the Commission—or ERCOT to implement a debt obligation order under PURA §§ 39.653, 39.654, or 39.655, including the cost of retiring or refunding existing debt.[37]

Uplift charges must be assessed on all load-serving entities, excluding those that opt out of uplift charges,[38] but including load serving entities that enter the market after a debt obligation order is issued.[39] Uplift charges must be assessed on a load-ratio-share basis, which may be translated to a kilowatt-hour charge.[40] Uplift charges must also be assessed on load serving entities that enter the market after a debt obligation order is issued.[41] The imposition and collection of uplift charges authorized in a debt obligation order are nonbypassable except for entities that opt out of uplift charges.[42] Further, a debt obligation order must require that uplift charges are reviewed and adjusted at least annually, beginning not later than 45 days after the anniversary date of the issuance of a debt obligation.[43] The true-up mechanism must correct over- and under-

---

[33] PURA § 39.653(f).

[34] *Id.* § 39.653(g).

[35] *Id.* § 39.653(h).

[36] *Id.*

[37] *Id* § 39.652(5).

[38] *Id.* § 39.653(c).

[39] *Id.*

[40] *Id.* § 39.653(c).

[41] *Id*

[42] *Id* § 39.656(a).

[43] *Id.* § 39.657(1).

collections of uplift charges and ensure the recovery of amounts sufficient to timely pay for the debt service and other required amounts for the debt obligation.[44]

Other law provides that certain market participants are excepted from the requirement to pay uplift charges: ERCOT may not reduce payments to or uplift short-paid amounts to a municipally owned utility that becomes subject to the jurisdiction of ERCOT on or after May 29, 2021 and before December 30, 2021 related to a default on a payment obligation by a market participant that occurred before May 29, 2021.[45]

### 4. Opt-out process

The Commission is required to develop a one-time process that allows municipally owned utilities, electric cooperatives, river authorities, a retail electric provider that has the same corporate parent as each of the provider's customers, a retail electric provider that is an affiliate of each of the provider's customers, and transmission-voltage customers served by a retail electric provider to opt out of the uplift charges by paying in full all invoices owed for usage during the period of emergency.[46] Load-serving entities and transmission-voltage customers that opt out under this subsection must not receive any proceeds from the uplift financing.

While the opt-out process is not required to be established in a debt obligation order, the Commission concluded that it was necessary to establish that process here to allow the most timely and effective process for financing the uplift balance.

## II. DESCRIPTION OF PROPOSED TRANSACTIONS

A description of the transactions proposed by ERCOT is contained in its application and the filing package submitted as part of the application. A brief summary of the proposed transaction is provided in this section. A more detailed description is included in the finding of fact in this Order.

To facilitate the proposed financing, ERCOT proposed that one or more special purpose funding entities (BondCo) be created. ERCOT will transfer the rights to impose, collect, and

---

[44] PURA § 39.657(2).

[45] *Id* § 39.151(j-1).

[46] *Id* § 39.653(d)

receive uplift charges along with the other rights arising under to this Order. Upon transfer, these rights will become uplift property. BondCo will issue subchapter N bonds and will transfer the net proceeds from the sale of the subchapter N bonds to ERCOT in consideration for the transfer of the uplift property. If ERCOT determines it to be necessary to achieve the lowest overall uplift charges consistent with market conditions and the terms of this Order, ERCOT may cause BondCo to be organized and managed in a manner designed to maintain BondCo as a bankruptcy-remote entity that would not be affected by the bankruptcy of ERCOT, or any other affiliates of ERCOT, or any of their respective successors. ERCOT may also cause BondCo to have at least one independent manager whose approval will be required for certain major actions or organizational changes by BondCo. ERCOT may organize BondCo so that it may issue more than one series of debt under conditions specified in the BondCo organizational documents.

The subchapter N bonds will be issued in accordance with an indenture and administered by an indenture trustee. The subchapter N bonds will be secured by and payable solely out of the uplift property created under this Order and other collateral described in ERCOT's application. That collateral will be pledged to the indenture trustee for the benefit of the holders of the subchapter N bonds and to secure payment of the uplift balance.

The servicer of the subchapter N bonds will collect the uplift charges and remit those amounts to the indenture Trustee on behalf of BondCo. The servicer will be responsible for making any required or allowed true ups of the uplift charges. If the servicer defaults on its obligations under the servicing agreement, the indenture trustee may appoint a successor servicer. ERCOT will act as the initial servicer for the subchapter N bonds.

Uplift charges will be calculated to ensure the collection of an amount sufficient to service the principal, interest, and related charges for the subchapter N bonds incurred to implement this Order. Uplift charges will be allocated among qualified scheduling entities representing load-serving entities on a load-ratio-share basis, including load-serving entities who enter the market after a debt obligation order has been issued, but excluding the load-serving entities that opt-out in accordance with this Order. The uplift charges will be calculated, assessed and charged in the manner described in this Order. In addition to the proposed annual true up required by PURA § 39.657, ERCOT proposed interim true ups as may be required and performed as necessary to ensure that the amount collected from uplift charges is sufficient to service the subchapter N bonds.

This Commission, however, modifies the proposed true-up mechanism in this Order. The methodology for making true ups and allocation adjustments and the circumstances under which each will be made are described in more detail in the findings of fact in this Order.

ERCOT's proposed structure for the uplift charges is designed to provide substantially level annual debt-service and revenue requirements over the life of the bond issue, which will not exceed 30 years.

ERCOT seeks authority to pay out of the proceeds of the subchapter N bonds, the reasonable implementation costs incurred to implement this Order, including upfront costs associated with the issuance of the subchapter N bonds in accordance with this Order. As proposed, upfront costs may include (a) the cost of original issue discount, credit enhancements and other arrangements to enhance marketability, (b) the cost of ERCOT's financial advisor, (c) United States Securities and Exchange Commission registration fees, underwriters' fees, rating agency fees, attorneys' fees, (d) any costs incurred by ERCOT, including costs related to the establishment and maintenance of BondCo, and (e) any costs incurred by ERCOT if this Order is appealed. The draft issuance advice letter will reflect the estimated upfront costs to be paid from the proceeds of the subchapter N bonds. The amount of such upfront costs will be updated in the issuance advice letter to reflect more current information available to ERCOT prior to the issuance of the subchapter N bonds.

BondCo may, through uplift charges, cover the ongoing costs of maintaining and servicing subchapter N bonds as those are a cost to repay amounts financed under Subchapter N as authorized by this Order. The draft issuance advice letter will reflect the estimated ongoing costs of servicing and administering each series subchapter N bonds authorized in this Order. The amount of such ongoing costs will be updated in the final issuance advice letter to reflect more current information available to ERCOT prior to the issuance of the subchapter N bonds.

## III. Findings of Fact

The Commission makes the following findings of fact.

## A. Procedural History

***Identification of Applicant and Background***

1. ERCOT manages the flow of electric power to more than 26 million Texas customers representing about 90 percent of the state's electric load. As the independent system operator for the region, ERCOT schedules power on an electric grid that connects more than 46,500 miles of transmission lines and more than 710 generation units. It also performs financial settlement for the competitive wholesale bulk-power market and administers retail switching for 8 million premises in competitive choice areas. ERCOT is a membership-based 501(c)(4) nonprofit corporation, governed by a board of directors and subject to oversight by the Commission and the Texas Legislature. Its members include consumers, cooperatives, generators, power marketers, retail electric providers, investor-owned electric utilities, transmission and distribution providers and municipally owned electric utilities.

2. ERCOT acts as the central counterparty for all transactions settled in the ERCOT wholesale market, meaning that ERCOT is the sole seller to each buyer and ERCOT is the sole buyer from each seller. It is essential for ERCOT to maintain revenue neutrality in serving this function. ERCOT generates no profit, but instead acts as a clearinghouse through which funds are exchanged between buyers and sellers in the ERCOT market. In its role as the central counterparty, ERCOT only financially transacts with market participants registered with ERCOT as a QSE or a Congestion Revenue Rights ("CRR") account holder. ERCOT does not transact directly with load-serving entities. A QSE representing one or more load-serving entities is responsible for communicating with ERCOT on behalf of the load-serving entities. Under the ERCOT Nodal Protocols, the QSE is also responsible for settling payments and charges with ERCOT on behalf of its load-serving entities.

***Application***

3. On July 16, 2021, ERCOT filed an application for a debt obligation order under PURA § 39.653 to approve the uplift balance of up to $2.1 billion, approve the assessment and collection of uplift charges to all load-serving entities (except as expressly exempted under PURA), securitize the uplift charges, and cause the issuance of subchapter N bonds to

finance the uplift balance in a principal amount equal to the securitizable amount. The application includes exhibits, schedules, attachments and testimony.

***Notice of Application***

4. ERCOT provided notice of its application to load-serving entities through ERCOT's existing communication platforms on July 19, 2021.

5. ERCOT provided proof of notice through a filing on July 19, 2021.

6. In Order No. 2 filed on July 29, 2021, the administrative law judge found that ERCOT's notice was reasonable.

***Compliance Proceeding***

7. In its application, ERCOT requested that the Commission open a separate compliance proceeding in which load-serving entities may submit appropriate documentation evidencing their exposure to qualifying costs and the Commission would determine the amount of each load-serving entity's allocation of amounts for the recovery of qualifying costs,

8. On July 28, 2021, Docket No. 52364[47] was opened as a proceeding in which load-serving entities may document their exposure to qualifying costs and submit their election to opt out.

9. The Commission, by Order Severing Issues dated August 19, 2021, determined that Docket No. 52364, will be used as a repository for documentation both of exposure to costs included in the uplift balance and of opt-outs under PURA § 39.653(d) and verification of amounts in that documentation and severed those matters out of this docket and into Docket No. 52364.

10. The Commission also decided that it would address in this docket the process for determining exposure to costs included in the uplift balance, including the documentation required; the process for opting out of uplift charges under PURA § 39.653(d), including the documentation required; and the process for allocating subchapter N bond proceeds if

[47] *Proceeding for Eligible Entities to File an Opt Out Pursuant to PURA § 39.653(d) and for Load-serving Entities to File Documentation of Exposure to Costs Pursuant to the Debt Obligation Order in Docket No. 52322*, Docket No. 52364 (pending).

the amount of the total uplift exposure exceeds the statutory cap of $2.1 billion for the uplift balance.

***Intervenors***

11. The following parties requested and were granted intervention: AEP Energy Partners, Inc.; Ambit Texas, LLC; AP Gas & Electric (TX), LLC d/b/a APG&E; Avangrid Renewables, LLC; BP Energy Company; Calpine Corporation; Citigroup Energy Inc.; City of Austin d/b/a Austin Energy; City of Denton; City of Garland; City of Georgetown; City of Lubbock; City of Seguin; Coalition of Competitive Retail Electric Providers; DC Energy Texas, LLC; East Texas Electric Cooperative, Inc.; EDF Energy Services, LLC; Energy Trading Institute; Engie Resources LLC and Engie Energy Marketing NA, Inc.; ERCOT; Exelon Generation Company, LLC; Fulcrum Energy d/b/a Amigo Energy, Tara Energy, and Hudson Energy Services, LLC; Gexa Energy LP; Golden Spread Electric Cooperative, Inc.; Just Energy Texas, LP; NRG Energy, Inc.; Lower Colorado River Authority and LCRA WSC Energy; Luminant Energy Company, LLC; Luminant ET Services Company, LLC; Morgan Stanley Capital Group, Inc.; Office of Public Utility Counsel; Rayburn Country Electric Cooperative, Inc.; Shell Energy North America (US), L.P.; South Texas Electric Cooperative, Inc.; Southern Federal Power LLC; Tenaska Power Services Co., TPS 1, TPS II, TPS III, TPS IV, Tenaska TOPS REP LP, TOPS 1, TOPS 5, TOPS 6, and TOPS 7; Texas Industrial Energy Consumers; Texas Retail Energy LLC; Texpo Power LP; TriEagle Energy LP, TXU Energy Retail Company, LLC; Value Based Brands LLC d/b/a 4Change Energy, Express Energy and Veteran Energy; Vitol Inc.; and 174 Power Global Retail Texas, LLC. Commission Staff also participated in the proceeding.

***Testimony***

12. The following parties filed testimony in this docket: Calpine Corporation; Coalition of Competitive Retail Electric Providers; Commission Staff; ERCOT; Exelon Generation Company, LLC; Just Energy; NRG Energy, Inc.; Rayburn Country Electric Cooperative, Inc.; Texas Industrial Energy Consumers; and TXU LSEs and Luminant Energy (TXU Energy Retail Company, Ambit Texas, Luminant ET Services Company, Trieagle Energy, Value Based Brands, and Luminant Energy Company).

13. ERCOT filed rebuttal testimony on August 20, 2021.

***Hearing***

14. The Commission held a hearing on ERCOT's application on August 24-25, 2021.

15. Post-hearing briefs were filed on September 1, 2021.

16. Reply briefs were filed on September 8, 2021.

17. On September 8, 2021, Brazos Electric Power Cooperative, Inc. filed a letter stating that it had filed a voluntary petition for relief under chapter 11 of the United States Bankruptcy Code and that, because the amounts ERCOT claims are due are within the jurisdiction of the federal bankruptcy court, Brazos should be considered opted out for purposes of this docket and the resulting financing and should not be allocated proceeds from the financing or uplift charges.

18. In Order No. 8 filed on September 24, 2021, the administrative law judge directed that the transcript of the hearing be corrected.

***Agreement***

19. On September 16, 2021, Commission Staff filed a letter stating that an agreement on certain issues had been reached.

20. On September 20, 2021, a nonunanimous agreement that resolved certain issues between the parties that are signatories to the agreement was filed.

21. The parties that entered into the agreement are listed on attachment A of the agreement (the signatories).

22. ERCOT, the Texas Industrial Energy Consumers, and Rayburn Country electric Cooperative only joined in certain paragraphs of the agreement as detailed in the agreement but do not oppose any portion of the agreement.

23. No party opposes the agreement.

24. The agreement provides that subsequent to the execution of the agreement, supporting testimony would be filed in this docket that would include an agreed form of notice to transmission-voltage customers regarding the opt-out notice, and an agreed form for transmission-voltage customers to opt out, and that the supporting testimony would address agreed deadlines for REPs to provide notice to their transmission-voltage customers

regarding the opt-out process and for transmission-voltage customers to file the agreed form to opt out.

25. On September 24, 2021, the testimony of Michael Carter in support of the agreement was filed on behalf of the signatories.

26. On September 28, 2021, the testimony of Carrie Bivens in support of the agreement was filed.

27. On September 28, 2021, the testimony of Kenan Ögelman in support of the agreement was filed.

## B. Costs and Amount to be Securitized

### 1. Uplift balance

28. The agreement provides a comprehensive methodology to calculate the total exposure of each load-serving entity to qualifying costs, adjusted for any transmission-voltage customers served by that load-serving entity.

29. The uplift balance under the agreed methodology is $2.1 billion.

30. The agreed methodology is appropriate to determine the amount of the uplift balance.

### 2. Opt out of uplift charges

31. The agreement provides that any load-serving entity or transmission-voltage customer that is eligible to opt out of the uplift charges must declare its status no later than the deadline set by the Commission using the procedures set forth in paragraphs 3-7 of the agreement.

***Opt out of transmission-level customers***

32. The agreement provides that each retail electric provider (REP) must provide notice to transmission-voltage customers served by that REP regarding the process to opt out, and each transmission-voltage customer that is eligible and chooses to opt out must make a filing in Docket No. 52364 indicating it is opting out by the deadline identified by the Commission. A REP may make this filing on behalf of a transmission voltage customer if the customer provides written authorization for the REP to do so.

33. The testimony of Carrie Bivens provides the deadline for REPs to send notice to transmission-voltage customers served by that REP regarding the process to opt out as 15 calendar days after the date this Order is signed.

34. The testimony of Ms. Bivens also provides the deadline for entities that have not opted out under this agreement to file in Docket No. 52364 a notice of election to opt out as 45 calendar days after the date of this Order.

35. The testimony of Michael Carter provides a form by which each REP serving eligible transmission-level customers must notify the customer as attachment MC-S-2 to the testimony and states that such notice must be provided within 15 calendar days of the date the Order is signed.

36. The 15-day deadline to provide notice of the opt out procedure to transmission-level customers and the 45-day deadline for a transmission-level customer, or its REP, to file a notice of opt in Docket No. 52364 are an appropriate time to provide such notices.

37. The form provided as attachment MC-S-2 is appropriate notice to provide to eligible transmission-level customers.

***Opt out under the agreement***

38. The agreement provides that all electric cooperatives and municipally owned utilities may opt out of receiving securitization proceeds and being subject to the associated uplift charges subject to the requirements of chapter 39, subchapter N of PURA, resulting in ERCOT not assessing uplift charges to any current or future load served by electric cooperatives and municipally owned utilities that have opted out.

39. The agreement provides that all electric cooperatives, including their member cooperatives, who are parties to this proceeding and included on attachment B of the agreement are statutorily qualified to opt out and have opted out of receiving securitization proceeds and being assessed uplift charges pursuant to Chapter 39, Subchapter N of PURA.

40. The electric cooperatives, including their member cooperatives, identified on attachment B of the agreement have opted out of uplift charges.

41. The agreement provides that municipally owned utilities that are parties to this proceeding are statutorily qualified to opt out and have opted out of receiving securitization proceeds and being assessed uplift charges under Chapter 39, Subchapter N of PURA.

42. The municipally owned utilities listed on attachment B of the agreement have opted out of uplift charges.

43. The agreement provides that other load-serving entities that are parties to this proceeding, as reflected on attachment B to the agreement, and that are statutorily qualified to opt out (as a REP that has the same corporate parent as or as an affiliate to each of the REP's customers) have opted out of receiving securitization proceeds and being assessed uplift charges pursuant to Chapter 39, Subchapter N of PURA.

44. Texas Retail Energy has opted out of uplift charges.

45. The agreement provides that the Order should acknowledge that, without waiving any statutory exemption, the load-serving entities included on attachment B are opting out and need not take further action in this or any other proceeding to effectuate their removal from this securitization and from being subject to the associated uplift charges.

46. The City of Georgetown, who is a municipally owned utility and is a party to this proceeding, did not opt out of uplift charges under the agreement.

***Opt out in Docket No. 52364***

47. The signatories agree that, for the City of Georgetown and all load-serving entities eligible to opt out who are not parties to this proceeding and who are not member cooperatives of a party to this proceeding, the Commission's order in this proceeding will require such load-serving entities to submit the following information to effectuate their opt out in Docket No. 52364: (1) the LSE's legal name; (2) name and contact information of the load-serving entity's authorized representative at ERCOT; (3) the specific eligibility category for opting out under PURA § 39.653(d); (4) the load-serving entity's Data Universal Numbering System (DUNS) number; (5) the name of the load-serving entity's QSE and that QSE's DUNS number; and (6) confirmation by the load-serving entity or the load-serving entity's QSE that the load-serving entity is in bankruptcy or has no amounts owing to ERCOT for usage during the period of emergency; and that for all non-opt-in-entity

(NOIE) load-serving entities that effectuate an opt out in Docket No. 52364, ERCOT will not assess uplift charges to any current or future load served by the NOIE load-serving entities.

48. The testimony of Carrie Bivens provides the deadline for entities that have not opted out under this agreement to file in Docket No. 52364 a notice of election to opt out as 45 calendar days after the date of this Order.

49. The 45-day deadline for load-serving entities to file a notice of opt in Docket No. 52364 is an appropriate amount of time for such notices.

50. The information required in the agreement for the City of Georgetown and all load-serving entities eligible to opt out who are not parties to this proceeding and who are not member cooperatives of a party to this proceeding is the appropriate information needed for such an entity to opt out of uplift charges in Docket No. 52364.

***Maintaining opt-out status***

51. It is necessary and appropriate that a REP that opts out of uplift charges not gain an undue market advantage by changing the option under which it is certificated at the time it opts out by precluding such opt-out REP from amending its certification to allow service under a different option.

52. Any REP that opts out of uplift charges should not be precluded from forming a new entity to enter the market and obtain a REP certificate under any available option, but that new entity will not have opt-out status.

**3. Uplift Balance and Distribution of Proceeds**

53. The agreement describes the mechanism to determine the amount of proceeds a load-serving entity will receive of the $2.1 billion of proceeds resulting from the financing of the uplift balance.

54. The agreement provides that up to $2.1 billion in securitization proceeds will be allocated to load-serving entities that have not opted out on a load-ratio-share basis using the methodology described and set out in attachment C to the agreement.

55. The agreement provides that the allocation provided for in the agreement and the described methodology in attachment C to the agreement is consistent with the requirements set out in PURA § 39.653 and ensures that eligible entities that opt-out through this agreement or in Docket No. 52364, or that are ineligible to receive subchapter N proceeds, will not be allocated any portion of the securitization proceeds and will not be subject to any uplift charges contemplated under Chapter 39, Subchapter N of PURA.

***Affiliate status of REPs***

56. The agreement provides that the affiliate status of each REP that is a party or represented by a party in this proceeding is properly reflected in attachment C to the agreement, that any REP that is not represented by a party to this proceeding must propose any changes to its resource affiliate status (unaffiliated REP or affiliate REP) no later than the deadline set by the Commission in either this docket or in Docket No. 52364, and that a REP s resource affiliate status will be used to determine the category for which the REP will be allocated funds from the opt-out pool, as described in attachment C to the agreement.

57. The testimony of Carrie Bivens provided the deadline for REPs that are not represented by a party to this proceeding must propose any changes to its resource affiliate status as 30 calendar days after the date this order is signed.

58. The 30-day deadline for REPs that are not represented by a party to this proceeding to propose any changes to its resource affiliate status is appropriate.

***Amount and distribution of financing proceeds***

59. The agreement provides that the amount of proceeds a load-serving entity will receive will be based on a final calculation provided by ERCOT in Docket No. 52364 using the methodology described in attachment C of the agreement, reflecting actual opt outs of load-serving entities and transmission-voltage customers opt outs as approved in Docket No. 52364.

    a. Each REP that is eligible and chooses to receive financing proceeds authorized by this Order will provide ERCOT with the interval-level settlement meter data for each of its transmission-voltage customers, including associated ESIDs, that have opted out.

b. ERCOT will aggregate that interval-level meter data for each REP, adjust for transmission losses and unaccounted-for-energy, and provide the market-wide aggregated data to the parties in Docket No. 52364.

c. ERCOT will calculate the load-ratio share for each load-serving entity as set out in step 1 in attachment C to the agreement and provide the calculation in Docket No. 52364.

d. For each eligible load-serving entity, ERCOT will provide a calculation of total exposure, total exposure adjusted for transmission-voltage-customer opt-outs, and load-ratio share, in accordance with the methodology set forth in attachment C to the agreement and provide the calculations in Docket No. 52364. Each eligible load-serving entity will verify the calculation of its total exposure provided by ERCOT in Docket No. 52364 no later than the deadline established by the Commission.

e. ERCOT will then perform the calculation of the proceeds allocation under the terms of the agreement in accordance with the steps described in attachment C to the agreement. ERCOT will provide documentation of the calculation in Docket No. 52364.

60. The calculation of the load-ratio share for each load-serving entity will use data found in the ERCOT settlement extracts.

61. ERCOT can perform the calculations set out in paragraph 10 of the agreement and attachment C to the agreement.

62. Attachment C to the agreement identifies defaulted REPs that have been removed from the market, direct-current ties, and other entities ineligible to receive proceeds.

63. The methodology in the agreement to determine the amount of financing proceeds each eligible load-serving entity will receive provides those load-serving entities an appropriate amount of the subchapter N bond proceeds.

64. The testimony of Carrie Bivens provides the deadline for ERCOT to file its calculation of total exposure, total exposure adjusted for transmission-voltage-customer opt-outs, and load-ratio share as 55 calendar days from the date of this Order.

65. Ms. Bivens testimony also provides the deadline for each eligible load-serving entity to verify the calculation of its total exposure as 70 calendar days from the date of this Order.

66. The 55-day deadline for ERCOT to provide its calculations and the 70-day deadline for load-serving entities to verify ERCOT's calculation are appropriate amounts of time for these actions.

67. The uplift balance will be the amount, not to exceed $2.1 billion, that results from using the methodology in the agreement as detailed in the testimony of Michael Carter.

68. The methods detailed in the agreement and the testimonies of Michael Carter and Carrie Bivens are appropriate for determining the amount of subchapter N bond proceeds that should be distributed to load-serving entities that have not opted out or are not eligible to receive such proceeds.

69. The agreed methodology will provide a higher proportion of the subchapter N bond proceeds to those load-serving entities that have a higher risk of liquidity issues.

70. The agreed methodology will ensure that each participating load-serving entity will receive at least 50% of its adjusted total exposure and the higher-risk load-serving entities will receive 100%.

71. The agreed methodology will ensure a lower-risk, prompt, and efficient distribution of subchapter N bond proceeds that will help stabilize the financial position of the load-serving entities and therefore the ERCOT market.

72. By including the pass through of subchapter N bond proceeds or an adjustment of invoices, the agreed methodology further reduces the risk of additional defaults and further financial strain on the ERCOT market.

73. By improving the financial position and lowering the risks of market participants, the ERCOT market will be in a stronger and more stable financial position.

74. The public interest will be served by use of the agreed methodology to distribute subchapter N bond proceeds.

***Securitization Proceeds***

75. The signatories agreed that each load-serving entity that receives securitization proceeds must (1) provide a refund to customers for any ancillary-service costs in excess of the system-wide offer cap or reliability-deployment-price-adder (RDPA) charges that were

passed through and have been paid by the load-serving entity's customers, and (2) adjust customer invoices to remove ancillary-service costs in excess of the system-wide offer cap or RDPA charges that were passed through but have not been paid by the load-serving entity's customers. If a load-serving entity is not allocated 100% of its total exposure, any refunds or adjustments to invoices will be made in an amount that is not less than an amount that is proportionate to the percentage of the load-serving entity's total exposure that was allocated to that load-serving entity. Each load-serving entity that receives securitization proceeds is not required to pass through those proceeds for any ancillary-service costs in excess of the system-wide offer cap or RDPA charges that could have been passed through under a customer' s terms of service and were not, and the load-serving entity will not hold the customer responsible for payment of those ancillary-service costs or RDPA charges.

76. The procedures specified in the agreement for entities that receive securitization proceeds are necessary and appropriate to ensure that the purposes of this Order are met.

**4. Upfront Costs and Ongoing Costs**

77. ERCOT has requested authorization to finance and pay for its upfront costs from the proceeds of the subchapter N bonds in accordance with this Order.

78. Upfront costs include (a) the cost of original issue discount, credit enhancements and other arrangements to enhance marketability; (b) the cost of ERCOT's financial advisor; (c) United States Securities and Exchange Commission registration fees, underwriters' fees, rating agency fees, and attorneys' fees; (d) any costs incurred by ERCOT, including costs related to the establishment and maintenance of BondCo; (e) any other costs incurred by ERCOT in connection with the implementation of this Order; and (f) any costs incurred by ERCOT if this Order is appealed.

79. The actual upfront costs to be paid from the proceeds of the subchapter N bonds will not be known until the subchapter N bonds are issued.

80. The form issuance advice letter contains sections for the estimated upfront costs to be paid from the proceeds of the subchapter N bonds. ERCOT's best estimate of the upfront costs associated with the issuance of each series of subchapter N bonds is to be specified in the

form issuance advice letter attached to this Order to be delivered by ERCOT in connection with the issuance of such series of subchapter N bonds.

81. ERCOT will update the amount of such upfront costs in the issuance advice letter to reflect more current information available to ERCOT prior to the issuance of the subchapter N bonds.

82. The Commission may incur costs for advisors, legal fees, or other expenses related to this Order and such cost are necessary and appropriate to include in upfront costs to ensure that the Commission may properly exercise its role in the issuance of subchapter N bonds.

83. ERCOT has requested authorization to recover reasonable ongoing costs of maintaining and servicing subchapter N bonds through uplift charges, as provided in this Order.

84. Ongoing costs are a cost to repay amounts financed under Subchapter N as authorized by this Order.

85. The actual ongoing costs of administering and servicing the subchapter N bonds will not be known until the subchapter N bonds are issued.

86. The form issuance advice letter attached to this Order contains sections for the estimated ongoing costs to be paid from the assessment of uplift charges.

87. The amount of ongoing costs will be updated in the issuance advice letter to reflect more current information available to ERCOT prior to the issuance of the subchapter N bonds.

88. ERCOT's best estimate of the ongoing costs associated with the issuance of each series of subchapter N bonds is to be specified in the issuance advice letter delivered by ERCOT in connection with the issuance of such series of subchapter N bonds.

89. The financing of upfront costs to be paid from the proceeds of the subchapter N bonds, as well as the assessment of uplift charges for the payment of ongoing costs associated with the subchapter N bonds as described in this Order are reasonable and necessary in connection with the implementation of this Order.

**5. Amounts to be Securitized**

90. ERCOT has requested authority to securitize uplift charges and cause the issuance of subchapter N bonds to finance an amount consisting of the following items: (a) the uplift

balance in an amount of up to $2.1 billion, plus (b) the upfront costs associated with the issuance of the subchapter N bonds. This amount is referenced in this Order as the securitizable amount.

91. It is necessary and appropriate to authorize ERCOT to cause subchapter N bonds to be issued in an aggregate principal amount not to exceed the securitizable amount, subject to the issuance-advice-letter process described in this Order.

92. The issuance of subchapter N bonds as provided in this Order is necessary and appropriate to support the financial integrity of the wholesale market and to protect the public interest considering the impact on both wholesale-market participants and retail customers.

93. Entry of this Order will allow load-serving entities that were assessed extraordinary uplift charges due to consumption during the period of emergency to pay those charges over a longer period of time, alleviating liquidity issues and reducing the risk of additional defaults in the wholesale market.

**6. Issuance Advice Letter**

94. Under ERCOT's proposed financing, ERCOT will submit a draft issuance advice letter in the form attached to this Order as attachment A to Commission Staff for review not later than two weeks prior to the expected date of the commencement of marketing or sale of each series of subchapter N bonds.

95. No later than one week after receipt of the draft issuance advice letter, Commission staff will provide ERCOT comments and recommendations regarding the adequacy of the information provided.

96. Because the actual structure and pricing of the subchapter N bonds will not be known at the time this Order is issued, following determination of the final terms of the subchapter N bonds and prior to issuance of the subchapter N bonds, ERCOT will file with the Commission for each series of subchapter N bonds issued, and no later than 24 hours after the pricing of that series of subchapter N bonds, a final issuance advice letter.

97. The form issuance advice letter contains sections for the estimated upfront costs to be paid from the proceeds of the subchapter N bonds.

98. Within 60 days of issuance of the subchapter N bonds, ERCOT will submit to the Commission a final accounting of the total upfront costs with respect to such issuance.

99. The issuance advice letter will report the actual dollar amount of the initial uplift charges and other information specific to the subchapter N bonds issued.

100. All amounts in the issuance advice letter that require computation will be computed using the mathematical formulas contained in the form of the issuance advice letter.

101. Commission Staff may request revisions to the draft issuance advice letter as necessary to ensure that the requirements of PURA and this Order have been met.

102. The initial uplift charges and the final terms of the subchapter N bonds set forth in the issuance advice letter will become effective on the date of issuance of the subchapter N bonds, which will not occur prior to the fifth business day after pricing unless prior to noon on the fourth business day after pricing the Commission issues an order finding that the proposed issuance does not comply with the requirements of PURA or this Order.

103. If the actual upfront costs payable from the proceeds of the subchapter N bonds as indicated in ERCOT's issuance advice letter are less than the upfront costs included in the amount allocated from the proceeds of the subchapter N bonds, the periodic billing requirement, for the first quarterly true-up adjustment will be reduced by the amount of such unused funds, together with interest, if any, earned on the investment of such funds.

104. If the actual upfront costs payable from the proceeds of the subchapter N bonds as indicated in ERCOT's issuance advice letter are more than the upfront costs included in the amount allocated from the proceeds of the subchapter N bonds, the periodic billing requirement for the first quarterly true-up adjustment will be increased by the amount necessary for the payment of such excess costs.

105. The completion and filing of an issuance advice letter in the form attached to this Order as attachment A, including the certification from ERCOT, is necessary and appropriate to ensure that any securitization actually undertaken by ERCOT complies with the terms of this Order.

106. The certification statement contained in ERCOT's certification letter will be worded identically to the statement in the form of the issuance advice letter attached to this Order. Other aspects of the certification letter may be modified to describe the particulars of the subchapter N bonds and the actions that were taken during the transaction.

## C. Structure of the Proposed Financing

### 1. BondCo

***Creation and Structure***

107. ERCOT proposed to create one or more special purpose funding entities (each of which is referred to as BondCo) as a Delaware limited liability company with ERCOT as its sole member.

108. BondCo will be formed for the limited purpose of (a) imposing, collecting and receiving uplift charges and acquiring uplift property and related assets to support its obligations under the subchapter N bonds, (b) issuing subchapter N bonds in one or more series, and (c) performing other activities relating thereto or otherwise authorized by this Order.

109. BondCo will not have authority to engage in any other activities and will have no assets other than as contemplated in this Order and related assets to support its obligations under the subchapter N bonds. Obligations relating to the subchapter N bonds will be BondCo's only significant liabilities.

110. If ERCOT determines it to be necessary to achieve the lowest overall uplift charges consistent with market conditions, ERCOT may cause BondCo to be organized and managed in a manner designed to achieve the objective of maintaining BondCo as a bankruptcy-remote entity that would not be affected by the bankruptcy of ERCOT or any other affiliates of ERCOT or any of their respective successors.

111. ERCOT may also cause BondCo to have at least one independent manager whose approval will be required for certain major actions or organizational changes by BondCo.

112. BondCo may also be restricted from amending the provisions of the organizational documents that relate to bankruptcy-remoteness of BondCo without the consent of the independent manager.

113. BondCo may also be restricted from instituting bankruptcy or insolvency proceedings or from consenting to the institution of bankruptcy or insolvency proceedings against it, or to dissolve, liquidate, consolidate, convert, or merge without the consent of the independent manager.

114. Other restrictions to facilitate bankruptcy-remoteness may also be included in the organizational documents of BondCo, as applicable under rating agency considerations.

***Capital of BondCo***

115. The initial capital of BondCo will be a nominal amount of $100. If necessary to maintain status as a bankruptcy remote entity or to preserve ERCOT's status as an exempt 501(c)(4) organization under applicable federal tax and securities laws, with respect to any issuance of subchapter N bonds and to ensure the characterization of the bonds as debt for federal tax purposes, then, as a condition to the issuance of subchapter N bonds, BondCo will secure the minimum capital as may be required in accordance with such laws and regulations then in effect.

116. As a condition to accepting any issuance advice letter relating to any issuance of subchapter N bonds in a public or private offering, the Commission may require such documentation, opinions, or other assurances as may be reasonably necessary to ensure that the applicable capitalization requirements have been met.

***Issuance of Bonds***

117. Concurrently with the issuance of any of the subchapter N bonds, ERCOT will transfer and assign to BondCo all of ERCOT's rights under this Order related to the amount of subchapter N bonds to be issued by BondCo, including rights to impose, collect, and receive uplift charges approved in this Order. After the transfer, BondCo will have all of the right, title, and interest of ERCOT in the uplift property arising under this Order that is related to the amount of subchapter N bonds issued by BondCo.

118. For each series of subchapter N bonds consisting of one or more tranches, BondCo will pledge to the indenture trustee, as collateral for payment of the subchapter N bonds, the uplift property, including BondCo's right to receive the uplift charges as and when collected, and certain other collateral described in ERCOT's application.

***Commission Findings***

119. The use and proposed structure of BondCo and the limitations related to its organization and management are necessary and appropriate to minimize risks related to the proposed financing transactions and to minimize the uplift charges.

120. It is necessary and appropriate that ERCOT structure BondCo in the manner that will result in lowest overall uplift charges consistent with market conditions at the time of pricing and with the terms of this Order.

**2. Credit Enhancement and Arrangements to Enhance Marketability**

121. ERCOT requested approval to use additional forms of credit enhancement—including letters of credit, reserve accounts, surety bonds, or guarantees—and other mechanisms designed to promote the credit quality and marketability of the subchapter N bonds if the benefits of such arrangements exceed their cost.

122. ERCOT also asked that the costs of any credit enhancements as well as the costs of arrangements to enhance marketability be included in the amount of upfront costs to be securitized.

123. Except for the collection account and its subaccounts required for security by the indenture, if the use of original issue discount, credit enhancements, or other arrangements is proposed by ERCOT, ERCOT will provide the Commission's designated representative copies of all cost-benefit analyses performed by or for ERCOT that support the request to use such arrangements.

124. ERCOT's proposed use of credit enhancements and arrangements to enhance marketability is customary and is necessary and appropriate to provide the best credit quality and marketability of the subchapter N bonds, provided that ERCOT certifies that the enhancements or arrangements provide benefits greater than their cost and that such certifications are agreed to by the Commission's designated representative.

**3. Uplift Property**

125. PURA § 39.662(a) states that the rights to impose, collect, and receive the uplift charges approved in this Order along with the other rights arising pursuant to this Order will become uplift property upon the transfer of such rights by ERCOT to BondCo.

126. If subchapter N bonds are issued in more than one series, then the uplift property transferred as a result of each issuance will be only those rights associated with that portion of the uplift property securitized by such issuance.

127. The rights to impose, collect and receive uplift charges along with the other rights arising under this Order as they relate to any portion of the total amount authorized to be securitized that remains unsecuritized will remain with ERCOT and shall not become uplift property unless and until transferred to a BondCo in connection with a subsequent issuance of subchapter N bonds.

128. Uplift property and all other collateral will be held and administered by the indenture trustee in accordance with the indenture, as described in ERCOT's application. This structure is customary for securitized debt and pledged collateral and is necessary and appropriate to ensure that the lowest uplift charges will be achieved.

**4. Servicer and Servicing Agreement**

129. ERCOT proposes to execute a servicing agreement with BondCo. The servicing agreement may be amended, renewed or replaced by another servicing agreement.

130. The entity responsible for carrying out the servicing obligations under any servicing agreement is the servicer.

131. ERCOT will be the initial servicer but may be succeeded as servicer by another entity under certain circumstances detailed in the servicing agreement and as authorized by the Commission in accordance with this Order.

132. A replacement servicer will not begin providing service until the date the Commission approves the appointment and the servicing fee of such replacement servicer.

133. Under the servicing agreement, the servicer is required to impose and collect the applicable uplift charges for the benefit and account of BondCo, to make the periodic true-up adjustments of uplift charges required or allowed by this Order, and to account for and remit the applicable uplift charges to or for the account of BondCo in accordance with the remittance procedures contained in the servicing agreement without any charge, deduction or surcharge of any kind, other than the servicing fee specified in the servicing agreement.

134. Under the terms of the servicing agreement, if any servicer fails to perform its servicing obligations in any material respect, the indenture trustee acting under the indenture to be entered into in connection with the issuance of the subchapter N bonds, or the indenture trustee's designee, may, or, upon the instruction of the requisite percentage of holders of the outstanding amount of subchapter N bonds, will appoint an alternate party to replace the defaulting servicer, in which case the replacement servicer will perform the obligations of the servicer under the servicing agreement.

135. The obligations of the servicer under the servicing agreement and the circumstances under which an alternate servicer may be appointed will be fully described in the servicing agreement.

136. The rights of BondCo under the servicing agreement will be included in the collateral pledged to the indenture trustee under the indenture for the benefit of holders of the subchapter N bonds.

137. The servicing agreement negotiated as part of any financing under this Order will contain a recital clause that the Commission, or its attorney, may enforce the servicing agreement for the benefit of Texas wholesale-market participants or their customers to the extent permitted by law.

138. The servicing agreement negotiated as part of this securitization will include a provision that ERCOT indemnify the Commission in connection with any increase in servicing fees that become payable as a result of a default resulting from ERCOT's willful misconduct, bad faith or negligence in performance of its duties or observance of its covenants under the servicing agreement.

139. The obligations to continue to provide service and to collect and account for uplift charges will be binding upon ERCOT and its successors.

140. The servicing arrangements described in this Order are reasonable and are necessary and appropriate to reduce risk associated with the proposed financing, result in lower uplift charges, and support the financial integrity of the wholesale market and are necessary to protect the public interest.

**5. Subchapter N Bonds**

141. BondCo will issue and sell subchapter N bonds in one or more series, and each series may be issued in one or more tranches.

142. The legal final maturity date of any series of subchapter N bonds will not exceed 30 years from the date of issuance of the first series of subchapter N bonds. The legal final maturity date of each series and tranche within a series and amounts in each series will be finally determined by ERCOT and the Commission's designated representative, consistent with market conditions, at the time the subchapter N bonds are priced, but subject to ultimate Commission review through the issuance advice letter process.

143. ERCOT will retain sole discretion regarding whether or when to assign, sell, or otherwise transfer any rights concerning uplift property arising under this Order, or to cause the issuance of any subchapter N bonds authorized in this Order, subject to the right of the Commission to find that the proposed issuance does not comply with the requirements of PURA and this Order.

144. BondCo will issue the subchapter N bonds on or after the fifth business day after pricing of the subchapter N bonds unless, prior to noon on the fourth business day following pricing of the bonds, the Commission issues an order finding that the proposed issuance does not comply with the requirements of PURA and this Order.

145. The Commission finds that the proposed structure—providing substantially level annual debt service and revenue requirements over the expected life of the subchapter N bonds—is in the public interest and should be used. This structure is reasonable and should be approved, provided that the issuance advice letter demonstrates that all of the statutory requirements are met.

**6. Security for the Subchapter N Bonds**

146. The payment of the subchapter N bonds and related charges authorized by this Order will be secured solely by uplift charges explicitly assessed to repay the subchapter N bonds and related costs as described in the application.

147. Each series of the subchapter N bonds will be issued pursuant to an indenture administered by the indenture trustee.

148. The indenture will include provisions for a collection account for the series and subaccounts for the collection and administration of the uplift charges and payment or funding of the principal and interest on the subchapter N bonds and other costs, including ongoing fees and expenses, in connection with the subchapter N bonds.

***Collection Account***

149. Under the indenture, BondCo will establish a collection account as a trust account to be held by the indenture trustee as collateral to ensure the payment of the principal, interest, and other costs approved in this Order related to the subchapter N bonds in full and on a timely basis.

150. The collection account will include a general subaccount, a capital subaccount, and an excess funds subaccount, and may include other subaccounts.

***(a) The General Subaccount***

151. The indenture trustee will deposit the uplift charges remitted by the servicer to the indenture trustee for the account of BondCo into one or more segregated trust accounts and allocate the amount of those remittances to the general subaccount. The indenture trustee will on a periodic basis apply moneys in this subaccount to pay expenses of BondCo, to pay principal and interest on the subchapter N bonds, and to meet the funding requirements of the other subaccounts.

152. The funds in the general subaccount will be invested by the indenture trustee in short-term high-quality investments, and such funds, including, to the extent necessary, investment earnings, will be applied by the indenture trustee to pay principal and interest on the subchapter N bonds and all other components of the periodic payment requirement in accordance with the terms of the indenture and this Order.

***(b) The Capital Subaccount***

153. If in connection with the issuance of any series of subchapter N bonds, ERCOT determines it to be necessary to establish capital reserves to achieve the lowest overall financing cost, ERCOT may make a capital contribution to BondCo for that series, which BondCo will deposit into the capital subaccount.

154. The amount of the capital contribution is expected to be not less than the required percentage of the original principal amount of each series of subchapter N bonds, as determined under applicable tax and securities laws and regulations and applicable rating agency considerations.

155. The capital subaccount will serve as collateral to ensure timely payment of principal and interest on the subchapter N bonds and all other components of the periodic payment requirement.

156. Any funds drawn from the capital account to pay these amounts due to a shortfall in the uplift-charge remittances will be replenished through future uplift-charge remittances.

157. The funds in this subaccount will be invested by the indenture trustee in short-term high-quality investments, and such funds, including investment earnings, will be used by the indenture trustee to pay principal and interest on the subchapter N bonds and all other components of the periodic payment requirement.

158. Upon payment of the principal amount of all subchapter N bonds and the discharge of all obligations that may be paid by use of uplift charges, all amounts in the capital subaccount, including any investment earnings, will be released to BondCo for further remittance to ERCOT.

159. Investment earnings in the capital subaccount may be released earlier in accordance with the indenture.

160. The capital contribution to BondCo will be funded by ERCOT, in an amount upfront and also over time, if beneficial for the debt treatment of the transaction for federal tax purposes.

161. To ensure that wholesale-market participants receive the appropriate benefit from the securitization approved in this Order, the proceeds from the sale of the subchapter N bonds will not be applied towards this capital contribution.

162. Because ERCOT funds the capital subaccount, it is appropriate that ERCOT receive the investment earnings earned through the indenture trustee's investment of that capital from time to time.

***(c) The Excess Funds Subaccount***

163. The excess-funds subaccount will hold any uplift-charge remittances and investment earnings on the collection account, other than earnings attributable to the capital subaccount and released under the terms of the indenture, in excess of the amounts needed to pay current principal and interest on the subchapter N bonds and to pay other periodic payment requirements, including, but not limited to, replenishing the capital subaccount.

164. Any balance in or allocated to the excess-funds subaccount on a true-up adjustment date will be subtracted from the periodic billing requirement for purposes of the true-up adjustment.

165. The money in this subaccount will be invested by the indenture trustee in short-term high-quality, investments, and such money, including investment earnings thereon, will be used by the indenture trustee to pay principal and interest on the subchapter N bonds and other periodic payment requirements.

***(d) Other Subaccounts***

166. Other credit enhancements in the form of subaccounts may be utilized for any issuance of subchapter N bonds. For example, ERCOT does not propose use of an over-collateralization subaccount. If ERCOT subsequently determines, however, that use of an over-collateralization subaccount or other subaccounts are necessary to obtain the highest possible ratings or will otherwise increase the benefits of the securitization, ERCOT may implement such subaccounts to reduce uplift charges.

**7. General Provisions**

167. The collection account and the subaccounts described above are intended to provide for full and timely payment of scheduled principal and interest on the subchapter N bonds and all other components of the periodic payment requirement.

168. If the amount of uplift charges remitted to the general subaccount is insufficient to make all scheduled payments of principal and interest on the subchapter N bonds and to make payment on all the other components of the periodic payment requirement, the excess funds subaccount and the capital subaccount will be drawn down, in that order, to make those payments.

169. Any deficiency in the capital subaccount because of such withdrawals must be replenished to the capital subaccount on a periodic basis through the true-up process.

170. Additional accounts and subaccounts may be necessary to segregate amounts received from various sources (e.g., amounts received from wholesale-market participants), or to be used for specified purposes. Such accounts will be administered and utilized as set forth in the servicing agreement and the indenture.

171. Upon the maturity of the subchapter N bonds and the discharge of all obligations in respect thereof, remaining amounts in the collection account, other than amounts that were in the capital subaccount, will be released to BondCo and equivalent amounts will be credited by ERCOT to load-serving entities consistent with this Order.

172. The use of a collection account and its subaccounts in the manner proposed by ERCOT is customary and is reasonable, necessary, and appropriate to lower risks associated with the financing and ensure that the lowest uplift charges under Subchapter N will be achieved.

**8. Uplift Charges – Allocation, Collection, Nonbypassability**

173. ERCOT seeks authorization to allocate and collect from qualified scheduling entities (QSEs) representing load-serving entities within the ERCOT wholesale market, in the manner provided in this Order, uplift charges in an amount sufficient to ensure the recovery of amounts expected to be necessary to timely provide all payments of debt service and other required amounts and charges in connection with the subchapter N bonds approved in this Order.

174. It is necessary and appropriate that uplift charges are in a sufficient amount to pay principal and interest, or deposits to sinking funds in respect of principal and interest, on the subchapter N bonds and any other amounts due in connection with the subchapter N bonds, including ongoing fees and expenses and amounts required to be deposited in or allocated to any collection account or subaccount, trustee indemnities, payments due in connection with any expenses incurred by the indenture trustee or the servicer to enforce bondholder rights and other payments that may be required in accordance with the waterfall payments set forth in the indenture, during the period for which such uplift charges are to be in effect.

175. It is necessary and appropriate that uplift charges are sufficient to ensure the recovery of amounts necessary to timely provide all payments of debt service and other required amounts and charges in connection with the subchapter N bonds.

176. It is necessary and appropriate for ERCOT to recover the ongoing costs associated with servicing and administering subchapter N bonds through uplift charges because those servicing and administrative costs are a cost to repay amounts financed under Subchapter N, are necessary and unavoidable costs of financing the subchapter N bonds under PURA and are needed to ensure that the necessary costs to service the subchapter N bonds will be covered.

177. The uplift charges must be assessed on all load-serving entities in accordance with this Order, including wholesale-market participants who are in default but still participating in the wholesale market, and wholesale-market participants who enter the market after this Order is issued.

178. Uplift charges may be based on periodically updated transaction data to prevent wholesale-market participants from engaging in behavior designed to avoid the uplift charges.

179. ERCOT proposed that the subchapter N bonds have a legal final payment date of not more than 30 years from the date of the first issuance of subchapter N bonds. However, amounts assessed during such 30-year period may still need to be recovered after the final payment date.

180. It is appropriate and necessary that amounts assessed before a legal final payment date be collected even after the final payment date.

181. The initial uplift charges will be implemented no sooner than the first month following the initial issuance of the subchapter N bonds.

***Assessment to QSEs***

182. ERCOT proposed that uplift charges be assessed to all QSEs that represent load-serving entities on a load-ratio-share basis, including the load of load-serving entities entering the market after the implementation of this Order, but excluding the load of load-serving entities who have opted-out of uplift charges as provided by this this Order. Load-serving

entities who have not opted out of uplift charges, are ineligible to receive subchapter N proceeds, or are exempt from uplift charges are referred to in this Order as obligated LSEs.

183. ERCOT proposed creating a new daily settlement invoice for uplift charges. Uplift charges will be assessed and collected in accordance with the billing and collection standards for wholesale-market participants as set forth in the ERCOT Nodal Protocols, as the same may be modified from time to time.

184. It is appropriate and necessary for ERCOT to develop and adopt new nodal-protocol provisions governing the assessment and collection of uplift charges.

***Uplift-Charges Assessment Methodology***

185. The servicer will assess uplift charges to each QSE that represents one or more obligated LSEs based on the load-ratio share of the obligated LSEs represented by the QSE. Because the load-ratio share of individual obligated LSEs will change daily based upon actual load and as obligated LSEs enter and exit the market from time to time, ERCOT proposed that the load-ratio share used to assess uplift charges to QSEs be updated on a daily basis based upon on the actual load. The methodology to be utilized by the servicer for the assessment of uplift charges is referenced in this Order as the uplift-charges assessment methodology and is set forth immediately below:

a. The servicer will determine the periodic billing requirement that must be billed for any given period. The periodic billing requirement will be updated at least annually, and on an interim basis from time to time in accordance with the true-up procedures described in this Order.

b. The servicer will amortize the periodic billing requirement daily for the given period. This amount is referenced in this Order as the daily amortization amount.

c. The servicer will assess the daily amortization amount to each QSE as a daily charge, based upon the initial settlement data for the load-ratio share of each obligated LSE represented by the QSE.

186. The periodic payment requirement is the required periodic payment for a given period (i.e., annually, semi-annually, or quarterly) due under the subchapter N bonds. Each periodic

payment requirement includes (a) the principal amortization of the subchapter N bonds in accordance with the expected amortization schedule, including deficiencies of previously scheduled principal for any reason; (b) periodic interest on the subchapter N bonds, including any accrued and unpaid interest; and (c) ongoing costs consisting of the servicing fee, rating agencies' fees, trustee fees, legal and accounting fees, and other ongoing fees and expenses.

187. The initial periodic payment requirement for the subchapter N bonds issued under this Order will be updated in the issuance advice letter.

188. The periodic billing requirement is the aggregate dollar amount of uplift charges that must be billed during a given period (i.e., annually, semi-annually, or quarterly) so that the uplift-charge collections are sufficient to meet the sum of all periodic payment requirements for that period, and also taking into account (a) forecast usage data for the period; (b) forecast uncollectibles for the period; (c) forecast lags in collection of billed uplift charges for the period; and (d) total potential exposure.

189. ERCOT requested that each QSE representing one or more obligated LSEs be required to post collateral to ERCOT—to be held and managed by ERCOT—in an amount equal to four months of its projected uplift charges and that, if an obligated LSE exits the market prior to the amortization of the uplift balance debt, that ERCOT will retain the collateral held for the QSE that represents that obligated LSE to the extent necessary to account for unpaid uplift charges.

190. If any QSE representing the interests of any obligated LSE defaults on or disputes the payment of any uplift charges, then ERCOT, or any subsequent holder of the uplift property, will be entitled to exercise any remedies and take any action in accordance with PURA, Commission Substantive Rules, a Commission Order, or the ERCOT Nodal Protocols then in effect.

191. Two months of projected uplift charges for each obligated LSE is the appropriate amount of collateral that ERCOT may require QSEs representing obligated LSEs to post with ERCOT.

192. The billing and collection standards, uplift-charges assessment methodology, remedies, and other procedures described in this Order are reasonable, necessary, and appropriate for the assessment and collection of uplift charges sufficient to support the timely payment of principal and interest on the subchapter N bonds and any other amounts due in connection with the subchapter N bonds, to lower risks associated with the collection of uplift charges, to lower subchapter N bonds charges, to support the financial integrity of the wholesale market, and to protect the public interest.

193. It is appropriate and necessary for ERCOT to develop and adopt new ERCOT Nodal Protocol provisions to the extent necessary to prevent wholesale market participants from engaging in behavior designed to avoid uplift charges, including leaving and reentering the market.

**9. Mandatory True Up of Uplift Charges**

194. PURA § 39.657 states that a debt obligation order must include a mechanism requiring that uplift charges be reviewed and adjusted at least annually, to correct any under-collections or over-collections during the preceding 12 months and ensure the expected recovery of amounts sufficient to timely provide all payments of debt service and other required amounts and charges in connection with the debt obligation order.

195. It is reasonable and necessary that uplift charges be reviewed and adjusted each quarter following the closing of any series of bonds as provided in this Order.

196. With respect to any series of subchapter N bonds, ERCOT proposed that uplift charges be reviewed and adjusted using the true-up procedure described and reference in this Order as the standard true-up procedure. The servicer will make adjustment filings related to each quarterly true up with the Commission within 45 days of the true up.

197. The servicer will be required to provide a quarterly true-up calculation until the scheduled maturity of the subchapter N bonds, and if that calculation projects under-collections of uplift charges, then the servicer will implement a true-up adjustment in accordance with the standard true-up procedure.

198. A quarterly true up will provide additional certainty in the collection of funds to repay the subchapter N bonds and is the appropriate frequency for true-up calculations.

199. A fixed amount of uplift charges will be allocated each day to the QSEs representing the interests of obligated LSEs on a load-ratio-share basis and the collection of uplift charges will not vary significantly because a fixed amount will be collected each day regardless of day-to-day changes in the volume of load. ERCOT recommended the adoption of true-up adjustments based upon cumulative differences, regardless of the reason, between the periodic payment requirement, including scheduled principal and interest payments on the subchapter N bonds, and the amount of uplift-charge remittances to the indenture trustee. Adjustments will consider, among other things, the following:

a. any increases or decreases in the periodic payment requirement, including any unanticipated ongoing costs relating to the administration and maintenance of the subchapter N bonds;

b. any changes to the ERCOT Nodal Protocols or procedures relating to the forecasting of projected loads, uncollectibles, and delinquencies, including declines in collection from any ERCOT customer class;

c. any changes to the ERCOT Nodal Protocols relating to its allocation methodology for the collection of uplift charges, to the extent permitted under this Order; and

d. any changes to the ERCOT Nodal Protocols or procedures relating to the collection of uplift charges from QSEs, to the extent permitted under this Order.

***Standard True-up Procedure***

200. For each quarterly true-up calculation described in this Order, the servicer will make true-up adjustments using the standard true-up procedure as follows:

a. With respect to each quarterly true up,

1) calculate under-collections or over-collections from the preceding true-up period by subtracting the previous period's uplift charges revenues collected from the periodic billing requirement determined for the same period;

2) estimate any anticipated under-collections or over-collections for the current or upcoming true-up period;

3) calculate the periodic billing requirement for the upcoming true-up period, taking into account the total amount of prior and anticipated over-collection and under-collection amounts described in steps (1) and (2) above and calculate the daily amortization amount for the periodic billing requirement; and

4) assess the updated daily amortization amount to each QSE in accordance with the uplift-charges assessment methodology.

b. With respect to any interim true-up period,

1) calculate under-collections for the interim period by subtracting the interim period's uplift charges revenues collected from the periodic billing requirement determined for the same period;

2) estimate any anticipated under-collections for the remaining interim period;

3) calculate the periodic billing requirement for the remaining interim period, taking into account the total amount of prior and anticipated under-collection amounts described in steps (1) and (2) above and calculate the daily amortization amount for the periodic billing requirement; and

4) assess the updated daily amortization amount to each QSE in accordance with the uplift-charges assessment methodology, with the foregoing subject to the procedures described in the final issuance advice letter.

**10. Optional- and Mandatory-Interim True Up of Uplift Charges**

201. In addition to mandatory quarterly true-up adjustments approved in this Order, ERCOT proposed that interim-optional true-up adjustments may be made by the servicer more frequently at any time during the term of the subchapter N bonds to correct any projected under-collection, as provided in this Order, to assure timely payment of subchapter N bonds based on rating agency and bondholder considerations.

202. ERCOT also proposed that the servicer make mandatory-interim true-up adjustments on a more frequent basis as needed (a) if the servicer forecasts that the uplift-charge collections will be insufficient to make all scheduled payments of principal, interest, and other amounts

in respect of the subchapter N bonds on a timely basis during the current or next succeeding payment period; or (b) to replenish any draws upon the capital subaccount.

203. In the event of an interim-optional or mandatory-interim true up, the interim true-up adjustment will be filed not less than 15 days prior to the first billing cycle of the month in which the revised daily amortization amount will be in effect.

**11. Additional True-Up Provisions**

204. The true-up-adjustment filing will contain the servicer's calculation of the true-up adjustment to the uplift charges.

205. The Commission will have 15 days after the date of a true-up-adjustment filing to confirm that the servicer's adjustment complies with PURA and this Order.

206. Any true-up adjustment filed with the Commission will be effective on its proposed effective date, which will be not less than 15 days after filing.

207. Any necessary corrections to the true-up adjustment will be made in future true-up adjustment filings.

208. Any interim true up may take into account the periodic payment requirement for the next succeeding twelve 12 months if required by the servicing agreement.

209. The mandatory true up, the optional interim true up, and the mandatory interim true up, and the true-up procedures contained in this Order are reasonable and appropriate to ensure that the collection of uplift charges arising from the uplift property will be sufficient to timely pay principal and interest on the subchapter N bonds and any other amounts due in connection with the subchapter N bonds, will lower risks associated with the collection of uplift charges, will result in lower subchapter N bonds charges and to support the financial integrity of the wholesale market, and is necessary to protect the public interest.

**12. Designated Representative**

210. To ensure that the structuring and pricing of the subchapter N bonds result in the lowest uplift charges consistent with market conditions and the terms of this Order, it is necessary and appropriate for the Commission or its designated representative to have a decision-making role co-equal with ERCOT with respect to the structuring and pricing of the

subchapter N bonds and that all matters related to the structuring and pricing of the subchapter N bonds shall be determined through a joint decision of ERCOT and the Commission or its designated representative. The Commission's participation will ensure that the structuring and pricing of the subchapter N bonds result in a balance between obtaining the lowest uplift charges and expediting the funding of the uplift balance consistent with market conditions and the terms of this Order.

211. It is necessary and appropriate that the Commission or its designated representative have an opportunity to participate fully and in advance in all plans and decisions relating to the structuring, marketing, and pricing of the subchapter N bonds and that the Commission or its designated representative be provided timely information as necessary to allow it to participate in a timely manner, including, but not limited to, information prepared for the benefit of rating agencies and information prepared for use in marketing the subchapter N bonds to investors.

212. It is necessary and appropriate that the Commission or its designated representative require a certificate from ERCOT, for which ERCOT will rely on a certificate from any lead book-running underwriters, confirming that the structuring, marketing, and pricing of the subchapter N bonds resulted in the lowest uplift charges consistent with market conditions, the marketing plan, and the terms of this Order.

213. ERCOT expects the following transaction documents to be executed in connection with each series of subchapter N bonds issued under this Order: an administration agreement, indenture, limited-liability-company agreement, uplift-property servicing agreement, and uplift-property purchase and sale agreement. It is necessary and appropriate that the Commission's designated representative be afforded an opportunity to review and comment on these documents before they are finalized, and that the final versions are consistent with this Order. It is also necessary and appropriate for the Commission to exercise its oversight responsibilities and for the final version of these transaction be filed with the Commission.

**13. Lowest Uplift Charges**

214. PURA § 39.651(e) states that the Commission must ensure that the structuring and pricing of the Subchapter N bonds result in the lowest uplift charges consistent with market

conditions and the terms of this Order and that in making this determination any present value calculation must use a discount rate equal to the proposed interest rate on the bonds.

215. The debt financing mechanism approved by this Order achieves the goals established by the Legislature and will help stabilize the wholesale electric market.

216. Financing the uplift balance in the manner approved in this Order will support the financial integrity of the wholesale market and is necessary to protect the public interest, considering the impacts on both wholesale-market participants and retail customers.

217. When evaluating uplift charges, any present value calculation must use a discount rate equal to the proposed interest rate on the financings.

218. The financing structure approved by this Order, including the securitization of uplift charges and the initial issuance of subchapter N bonds, will result in the lowest uplift charges consistent with market conditions.

219. ERCOT has proposed a transaction structure that is expected to include, but is not limited to,

a. the use of BondCo as issuer of the subchapter N bonds, limiting the risks to subchapter N bonds holders of any adverse impact resulting from a bankruptcy proceeding of its parent or any affiliate;

b. the right to impose and collect uplift charges that are nonbypassable and which must be trued-up at least annually, but may be required to be trued-up more frequently under certain circumstances, to assure the timely payment of the debt service and other ongoing costs;

c. to maintain BondCo's status as a bankruptcy remote entity or to preserve ERCOT's status as an exempt 501(c)(4) organization under applicable federal tax and securities laws with respect to any issuance of subchapter N bonds, then as a condition to such issuance, BondCo will secure the minimum capital as may be required in accordance with such laws and regulations then in effect;

d. benefits for federal income tax purposes including, (1) the transfer of the rights under this Order to BondCo not resulting in gross income to ERCOT and the future revenues

under the uplift charges being included in ERCOT gross income under its usual method of accounting, (2) the issuance of the subchapter N bonds and the transfer of the proceeds of the subchapter N bonds to ERCOT not resulting in gross income to ERCOT, and (3) the subchapter N bonds constituting obligations of ERCOT;

e. other features to meet requirements to obtain debt treatment for federal tax purposes, and also to satisfy the requirements of applicable securities laws and regulations;

f. marketing the subchapter N bonds using proven underwriting and marketing processes, through which market conditions and investors' preferences with regard to the timing of the issuance, the terms and conditions, related maturities, and other aspects of the structuring and pricing shall be determined, evaluated and factored into the structuring and pricing of the subchapter N bonds; and

g. furnishing timely information to the Commission's designated representative to allow the Commission through the issuance advice letter process to ensure that the structuring and pricing of the subchapter N bonds result in the lowest uplift charges consistent with market conditions and the terms of this Order.

220. ERCOT's proposed transaction structure, as modified by this Order, is necessary and appropriate to ensure that the structuring and pricing of the subchapter N bonds will result in the lowest uplift charges consistent with market conditions and this Order.

### D. Use of Net Proceeds

221. Upon issuing the subchapter N bonds, BondCo will transfer the net proceeds from the sale of the subchapter N bonds to ERCOT to be remitted to QSEs representing one or more load-serving entities for the recovery of qualifying costs as determined by this Order.

222. Each QSE that receives proceeds from ERCOT for the recovery qualifying costs is obligated to remit such amounts to each load-serving entity whom it represents in the amounts required by this Order.

223. Each load-serving entity that receives proceeds from the subchapter N bonds will be required to use the proceeds solely to fulfill payment obligations directly related to

qualifying costs and refunding qualifying costs to retail customers who have paid or otherwise would be obligated to pay such costs.

224. Any load-serving entity that receives any portion of the net proceeds of subchapter N bonds that exceed the entity's actual qualifying costs will be required to immediately notify ERCOT and remit any such excess receipts back to ERCOT and any such excess receipts received by ERCOT must be credited against the uplift balance to reduce the remaining uplift charges.

225. The Commission concludes that the steps for the allocation of net proceeds from the sale of subchapter N bonds for the payment of the uplift balance to QSEs representing the interests of qualifying load-serving entities as described in this Order are reasonable, necessary, and appropriate to ensure that the net proceeds of the subchapter N bonds will be used solely for the purposes described in Subchapter N.

## IV. Conclusions of Law

The Commission makes the following conclusions of law.

1. ERCOT is the independent organization as defined in PURA § 39.652(1).

2. ERCOT was required to file an application for a debt obligation order under PURA § 39.653 by July 16, 2021.

3. The Commission has jurisdiction and authority over ERCOT's application for a debt obligation order under PURA § 39.653.

4. The Commission has authority to approve this debt obligation order under PURA §§ 39.651–39.664.

5. This debt obligation order contains all of the elements required by PURA §§ 39.651–39.664

6. This Order does not relieve or excuse any entity from paying amounts that it may owe to ERCOT.

7. Notice of ERCOT's application was provided in compliance with applicable law, through ERCOT's standard form of communication with load-serving entities.

8. Financing the uplift balance in the manner provided by this Order fulfills the purposes of PURA § 39.651 by (1) allowing wholesale-market participants who were assessed extraordinary uplift charges due to consumption during the period of emergency to pay those charges over a longer period of time, alleviating liquidity issues and reducing the risk of additional defaults in the wholesale market, and (2) allowing the Commission to stabilize the wholesale electricity market in the ERCOT power region.

9. The issuance advice letter submission process contemplated in this Order for each series of subchapter N bonds satisfies the requirements of PURA § 39.651(e), prescribing that the Commission shall ensure that the structuring and pricing of the subchapter N bonds results in the lowest uplift charges consistent with market conditions and the terms of this Order.

10. The financing mechanism contemplated in this Order, including the securitization of uplift charges and issuance of subchapter N bonds, satisfies the requirements of PURA § 39.653(a), prescribing that the financing will support the financial integrity of the wholesale market and is necessary to protect the public interest, considering the impacts on both wholesale-market participants and retail customers.

11. This Order adequately details the uplift balance to be recovered and financed as required by PURA § 39.653(b)(1).

12. The financing of upfront costs to be paid from the proceeds of the subchapter N bonds as described in this Order are costs of implementing this Order as described in PURA § 39.652(5).

13. The ongoing costs associated with administering subchapter N bonds as described in this Order are costs of implementing this Order as described in PURA § 39.652(5)..

14. The period over which uplift charges approved by this Order may be assessed to repay the subchapter N bonds complies with the requirement in PURA § 39.653(b)(2) that the period not exceed 30 years.

15. PURA § 39.653(b)(2) does not preclude the servicer from recovering uplift charges attributable to service rendered during the 30-year period but remaining unpaid at the end of the 30-year period.

16. The processes approved in this Order for determining the amount of qualifying costs attributable to qualifying load-serving entities and for remitting the net proceeds of the subchapter N bonds for the payment of approved qualifying costs in conformance with the agreement and this Order satisfy the requirements of PURA § 39.653(b)(3).

17. This Order ensures that the net proceeds of the subchapter N bonds must be used solely for the purposes of financing qualifying costs as required by PURA § 39.651(d).

18. Amounts that are required to be paid to the servicer as uplift charges under this Order are uplift charges as defined in PURA § 39.652(5).

19. The processes in this Order pertaining to the assessment and collection of uplift charges and pertaining to the true up of uplift charges satisfy the requirements of PURA § 39.653(c).

20. Any QSE representing one or more load-serving entities is responsible for paying and settling uplift charges with ERCOT on behalf of its load-serving entities.

21. The process established in the agreement and this Order for allowing qualifying load-serving entities to opt-out of the uplift charges satisfies the requirements of PURA § 39.653(d).

22. PURA § 39.653 does not apply to Brazos and it is not eligible to receive proceeds from the uplift financing and is deemed to have opted-out under PURA § 39.653(d).

23. The requirement in this Order that any load-serving must return proceeds from the subchapter N bonds in excess of the load-serving entities actual qualifying costs satisfies the requirements of PURA § 39.653(e).

24. The subchapter N bonds authorized to be issued under this Order and PURA § 39.653 are a nonrecourse debt secured solely by the uplift property created by this Order, including the uplift charges explicitly assessed to repay the subchapter N bonds.

25. The subchapter N bonds authorized to be issued under this Order and PURA § 39.653 do not create a personal liability for ERCOT.

26. This Order ensures that the imposition and collection of uplift charges authorized in this Order are nonbypassable as required by PURA § 39.656.

27. The authority granted ERCOT in this Order to establish appropriate fees and other amounts for pursuing amounts owed from QSEs and obligated LSEs satisfies PURA § 39.656.

28. The mechanisms for the true up of uplift charges approved in this Order satisfy the requirements of PURA § 39.657.

29. PURA § 39.662 prescribes that the rights and interests of ERCOT or its successor under this Order, including the right to impose, collect and receive the uplift charges authorized in this Order, are assignable and become uplift property when they are first transferred to BondCo.

30. The rights, interests and property conveyed to BondCo in any purchase and sale agreement or related bill of sale, including the irrevocable right to impose, collect and receive uplift charges and the revenues and collections from uplift charges are uplift property within the meaning of PURA § 39.662.

31. PURA § 39.662(b) prescribes that all uplift property created under this Order constitutes a present property right for purposes of contracts concerning the sale or pledge of property, even though the imposition and collection of the uplift charges depends on further acts by ERCOT or others that have not yet occurred

32. PURA § 39.662(c) prescribes that all revenues and collections resulting from the uplift charges assessed under this Order constitute proceeds only of the uplift property arising from this Order.

33. Upon the transfer by ERCOT of uplift property to a BondCo, the BondCo will have all of the rights, title, and interest of ERCOT with respect to such uplift property including the right to impose, collect and receive the uplift charges authorized by this Order.

34. PURA § 39.658 prescribes that the transactions involving the transfer and ownership of uplift property and the receipt of uplift charges to BondCo as contemplated in this Order are exempt from state and local income, sales, franchise, gross receipts, and other taxes or similar charges.

35. The holders of the subchapter N bonds and the indenture trustee are each financing parties within the meaning of PURA § 39.663.

36. BondCo may issue subchapter N bonds in accordance with this Order.

37. The subchapter N bonds issued under this Order are debt obligations within the meaning of PURA § 39.651(a) and the subchapter N bonds and holders thereof are entitled to all of the protections provided under subchapter N of chapter 39 of PURA.

38. If and when ERCOT transfers to a BondCo the right to impose, collect, and receive the uplift charges and to issue the subchapter N bonds, the servicer may recover the uplift charges associated with such uplift property only for the benefit of BondCo and the holders of the subchapter N bonds in accordance with the servicing agreement.

39. As provided by PURA § 39.663, the subchapter N bonds authorized by this Order are not a debt or obligation of the State of Texas and are not a charge on its full faith and credit or taxing power.

40. Through PURA § 39.663, the state of Texas has pledged for the benefit and protection of all financing parties and ERCOT, that it shall not take or permit any action that would impair the value of uplift property, or reduce, alter, or impair the uplift charges to be imposed, collected, and remitted to financing parties, until the principal, interest and premium, and any other charges incurred and contracts to be performed in connection with the related subchapter N bonds have been paid and performed in full.

41. PURA § 39.663 authorizes BondCo, in issuing subchapter N bonds, to include the state's pledge in any documentation relating to the subchapter N bonds.

42. This Order remains in full force and effect and unabated notwithstanding the bankruptcy of ERCOT, its successors, or assignees.

43. This Order is an order approving ERCOT's application for a debt obligation order under PURA § 39.653, and is irrevocable and not subject to reduction, impairment or adjustment by further action of the Commission, as prescribed by PURA § 39.653(f), and the finality of this Order is not impaired in any manner by the participation of the Commission through its designated representative in any decisions related to issuance of the subchapter N bonds or by the Commission's review of or issuance of an order related to the issuance advice letter required to be filed with the Commission by this Order.

44. The uplift charges authorized in this Order are irrevocable and not subject to reduction, impairment, or adjustment by further action of the Commission, as prescribed by PURA §39.653(f).

45. This Order is a debt obligation order under PURA § 39.653 and under subsection (g) is not subject to rehearing by the Commission.

46. This Order is not subject to review or appeal except as expressly permitted under PURA § 39.653(g).

47. Any review of this Order on appeal is limited solely to the record before the Commission and briefs to the court and is limited to whether this Order conforms to the constitution and laws of this State and the United States and is within the authority of the Commission under PURA.

48. This Order meets the requirements for a debt obligation order under Subchapter N of Chapter 39 of PURA.

49. PURA § 39.659 prescribes that, effective on the date the first subchapter N bonds are issued under this Order, if any provision in PURA is held to be invalid or is invalidated, superseded, replaced, repealed, or expires for any reason, that occurrence will not affect the validity or continuation of Subchapter N or any other provision of PURA that is relevant to the issuance, administration, payment, retirement, or refunding of the subchapter N bonds or to any actions of ERCOT, its successors, an assignee, a collection agent, or a financing party, which shall remain in full force and effect.

50. An electric cooperative, including an electric cooperative that elects to receive offsets, does not become subject to rate regulation by the Commission and receipt of offsets does not affect the applicability of PURA Chapter 41 to an electric cooperative.

51. The electric cooperatives identified in attachment B to the agreement are eligible to opt out of receiving securitization proceeds and being assessed uplift charges.

52. The municipally owned utilities identified in attachment B to the agreement are eligible to opt out of receiving securitization proceeds and being assessed uplift charges.

53. Texas Retail Energy, LLC, identified in attachment B to the agreement, is eligible to opt out of receiving securitization proceeds and being assessed uplift charges.

54. The methodology for distributing subchapter N bond proceeds in attachment C of the agreement meet the requirements and objective of PURA §§ 39.651 through 39.664.

55. Entities described in attachment C to the agreement as ineligible to receive proceeds from the subchapter N bonds are not liable to pay uplift charges.

## V. Ordering Paragraphs

In accordance with these findings of fact and conclusions of law, the Commission issues the following orders.

### A. Approval

***Approval of Application***

1. The application of ERCOT for the issuance of a debt obligation order under PURA § 39.653, as modified by the agreement and this Order, is approved.

***Uplift Balance***

2. The uplift balance in the amount of up to $2.1 billion, to be calculated as provided in this Order, is hereby approved.

***Uplift Charges***

3. The assessment and collection of uplift charges to QSEs representing the interests of obligated LSEs on a load-ratio-share basis as provided for in this Order is hereby approved in an amount sufficient to ensure the expected recovery of amounts necessary to timely provide all payments of debt service and other required amounts and charges in connection

with the subchapter N bonds, as provided in this Order. The initial billing of uplift charges is to commence no sooner than the first month following the initial issuance of subchapter N bonds.

***Subchapter N Bonds***

4. ERCOT is authorized in accordance with this Order to issue subchapter N bonds in one or more series, in an aggregate principal amount not to exceed the securitizable amount.

5. This Order constitutes Commission approval, if necessary, under PURA § 39.151(d-2) for ERCOT to obtain debt financing.

***Authority to Securitize***

6. ERCOT is authorized in accordance with this Order to securitize uplift charges corresponding to the securitizable amount, to cause the issuance of subchapter N bonds in an aggregate amount not to exceed the securitizable amount and create uplift property to be pledged and assigned by ERCOT as collateral and a source of repayment for the subchapter N bonds.

***Provision of Information***

7. ERCOT shall take all necessary steps to ensure that the Commission or its designated representative is provided sufficient and timely information to allow the Commission or its designated representative to fully participate in and exercise its decision-making authority over the proposed financing as provided in this Order.

***Issuance Advice Letter***

8. For each series of subchapter N bonds issued, ERCOT must submit a draft issuance advice letter to Commission Staff for review not later than two weeks prior to the expected date of commencement of marketing the subchapter N bonds.

9. Unless Commission Staff elected to act sooner, within one week after receipt of the draft issuance advice letter, Commission staff shall provide ERCOT comments and recommendations regarding the adequacy of the information provided.

10. Not later than the end of the first business day after the pricing of the subchapter N bonds and prior to the issuance of the subchapter N bonds, ERCOT, in consultation with the Commission acting through its designated representative, must file with the Commission

an issuance advice letter in substantially the form of the issuance advice letter attached as attachment A to this Order.

11. As part of the issuance advice letter, ERCOT, through an officer of ERCOT, must provide a certification worded identically to the statement in the form of issuance advice letter attached as attachment A to this Order.

12. The issuance advice letter must be completed, evidencing the actual dollar amount of the uplift charges and other information specific to the subchapter N bonds to be issued, and must certify to the Commission that the structure and pricing of that series results in the lowest uplift charges consistent with market conditions at the time that the subchapter N bonds are priced and with the terms set out in this Order.

13. If original issue discount, additional credit enhancements, or arrangements to enhance marketability are used, the issuance advice letter must include certification that the original issue discount, additional credit enhancements, or other arrangements are reasonably expected to provide benefits as required by this Order.

14. All amounts entered on the issuance advice letter that require computation must be computed using the mathematical formulas contained in the form of the issuance advice letter in attachment A to this Order.

15. Electronic spreadsheets with the formulas supporting the schedules contained in the issuance advice letter must be included with the issuance advice letter.

16. The Commission must review and determine whether the issuance advice letter is in compliance with PURA, this Order, and the specific requirements that are contained in the issuance advice letter.

17. The initial uplift charges and the final terms of the subchapter N bonds set forth in the issuance advice letter must become effective on the date of issuance of the subchapter N bonds, which must not occur prior to the fifth business day after pricing, unless prior to noon on the fourth business day after pricing the Commission issues an order finding that the proposed issuance does not comply with the requirements of PURA and this Order.

## B. Uplift Charges

***Imposition and Collection***

18. ERCOT is authorized to impose uplift charges on, and the servicer is authorized to assess and collect uplift charges from, all QSEs representing the interests of obligated LSEs defined in this Order and in accordance with the procedures described in this Order.

19. ERCOT must develop and adopt new provisions for the ERCOT Nodal Protocols governing the assessment and collection of uplift charges, consistent with this debt obligation order.

***Opt Out Procedure—Cooperatives***

20. Each electric cooperative that intervened in this docket and its member cooperatives that opted out of the uplift charges under the agreement must not receive any of the subchapter N bond proceeds and is not required to take any further action to opt out.

***Opt Out Procedure—Municipally Owned Utilities***

21. Each municipally owned utility that intervened in this docket and that opted out of the uplift charges under the agreement must not receive any of the subchapter N bond proceeds and is not required to take any further action to opt out.

***Opt Out Procedure—Other LSEs***

22. Texas Retail Energy, LLC, which opted out of the uplift charges under the agreement, must not receive any of the subchapter N bond proceeds and is not required to take any further action to opt out.

***Opt Out Procedure—Transmission Level Customers***

23. Each REP that is serving eligible transmission-level customers must provide notice to each such customer using the form attached as exhibit MC-S-2 to the testimony of Michael Carter within 15 calendar days of the date this Order is signed. The notice must also include a copy of the notice form attached as exhibit MC-S-3 to the testimony of Michael Carter and each transmission-level customer that elects to opt out must file that form (MC-S-3) in Docket No. 52364 within 45 calendar days of the date this Order is signed.

***Opt Out Procedure—Other Load Serving Entities***

24. The City of Georgetown and all load-serving entities eligible to opt out that are not parties to this docket electing to opt out shall file in Docket No. 52364 the information specified in paragraph 7 of the agreement.

***Opt Out Procedure—Effect***

25. Any load-serving entity or other entity that under the agreement has opted out or is ineligible to receive subchapter N bond proceeds and any load-serving entity that opts out by complying with the Commission's opt out process specified in this Order must not be assessed any uplift charges and must not receive any subchapter N bond proceeds.

***Uplift Charges—Entities Not Assessed***

26. Any load-serving entity that under the agreement has opted out of uplift charges, any entity that under the agreement is ineligible to receive proceeds from the subchapter N bonds, any load-serving entity that opts out of uplift charges in Docket No. 52364, the City of Lubbock, and any entity that meets the requirements of PURA 39.159 (as added by Act of May 28, 2021, 87th Leg., R.S., ch. 950 (SB 1580), §§1-3) must not be assessed uplift charges.

***Uplift Charge Remittance Procedures***

27. Uplift charges shall be billed to and collected from QSEs representing one or more obligated LSEs in accordance with existing ERCOT Nodal Protocols and the new protocol provisions to be created consistent with this Order.

***Collector of Uplift Charges***

28. The servicer of the subchapter N bonds must bill QSEs or any other entity, which, under the terms of this Order, are required to remit uplift charges, for the uplift charges attributable to obligated LSEs they represent.

***Collection Period***

29. The uplift charges related to a series of subchapter N bonds must be designed to be assessed over the scheduled life of the subchapter N bonds, which may not exceed 30 years from the date of issuance of the first series of subchapter N bonds. However, amounts remaining

unpaid after this 30-year period may be recovered but only to the extent that the charges are attributable to uplift charges allocable to the 30-year period.

***Allocation***

30. ERCOT must allocate the uplift charges to each QSE that represents one or more obligated LSEs as described in this Order.

***Nonbypassability***

31. The imposition and collection of all uplift charges authorized in this Order must be nonbypassable to all QSEs representing the interests of obligated LSEs within the ERCOT power region. All QSEs must remit, consistent with this Order, the uplift charges collected from its obligated LSEs. All QSEs must pay uplift charges on behalf of its obligated LSEs whose interests they represent.

***Rights and Remedies***

32. The servicer is authorized to exercise all of the rights, remedies, and other methods for pursuing collection of uplift charges from QSEs and obligated LSEs. ERCOT, or any subsequent holder of the uplift property, must exercise any such remedies and take any action in accordance with PURA, Commission Rules, a Commission Order, or the ERCOT Nodal Protocols then in effect.

***True Ups***

33. True ups of the uplift charges must be undertaken and conducted in accordance with the mechanisms described in this Order on a quarterly basis. If subchapter N bonds are issued in more than one series, then each series must be subject to separate true-up adjustments in accordance with PURA and this Order, provided, however, that more than one series may be trued-up in a single proceeding.

## C. Subchapter N Bonds

***Issuance***

34. ERCOT is authorized through one or more BondCos to issue one or more series of subchapter N bonds in an aggregate principal amount not to exceed the securitizable amount, as specified in this Order. The subchapter N bonds must be denominated in United States dollars.

***Upfront Costs***

35. ERCOT is authorized, as part of the securitizable amount, to finance and pay for upfront costs from the proceeds of the subchapter N bonds in accordance with the terms of this Order.

***Ongoing Costs***

36. ERCOT must recover its actual ongoing costs through uplift charges in accordance with the terms of this Order.

***Refinancing***

37. ERCOT is authorized to refinance a portion or all of any prior series of subchapter N bonds. Any such refinancing bonds may be offered for sale in public or private markets consistent with market conditions that will result in the lowest uplift charges consistent with then-existing market conditions and the terms of this Order.

38. ERCOT is not required to apply for a subsequent order for any refinancing of subchapter N bonds; however, the authority and approval granted in this Order is effective as to any such refinancing only upon ERCOT filing with the Commission a separate issuance advice letter for that issuance demonstrating compliance of that issuance with the provisions of this Order.

39. **Collateral.** All uplift property must be held and administered by the indenture trustee pursuant to the indenture as described in ERCOT's application. BondCo must establish a collection account with the indenture trustee as described in this Order.

40. Upon payment of the principal amount of all subchapter N bonds authorized in this Order and the discharge of all obligations in respect thereof all amounts in the collection account, including investment earnings, other than amounts in the capital subaccount, must be released by the indenture trustee to BondCo for distribution in accordance with this Order.

41. ERCOT must, through a filing, notify the Commission within 30 days after the date that these funds are eligible to be released of the amount of such funds available for crediting to the benefit of wholesale-market participants.

***Distribution Following Repayment***

42. Following repayment of the subchapter N bonds authorized in this Order and release of the funds held by the indenture trustee, the servicer, on behalf of BondCo, must distribute to ERCOT, the final balance of the general, excess funds, and all other subaccounts other than amounts that were in the capital subaccount, whether such balance is attributable to principal amounts deposited in such subaccounts or to interest thereon, remaining after all other uplift balance have been paid.

43. The amounts must be distributed to the QSEs representing each Obligated LSE that paid uplift charges during the last 12 months that the uplift charges were in effect.

44. BondCo or its successor in interest to the uplift property must, to the extent the capital subaccount is not depleted below its original amount, also distribute to QSEs representing the interests of obligated LSEs any subsequently collected uplift charges.

45. The amount paid to each wholesale-market participant must be determined by multiplying the total amount available for distribution by a fraction, the numerator of which is the total uplift charges paid by the wholesale-market participant during the last 12 months uplift charges were in effect and the denominator of which is the total uplift charges paid by all QSEs representing the interests of obligated LSEs during the last 12 months the uplift charges were in effect.

***Funding of Capital Subaccount***

46. The capital contribution by ERCOT to be deposited into the capital subaccount must, with respect to each BondCo and series of subchapter N bonds, be funded by ERCOT and not from the proceeds of the sale of subchapter N bonds. Such capital may be contributed at the issuance of each series of subchapter N bonds or, consistent with applicable tax and securities laws and regulations, periodically during the term of each series of subchapter N bonds.

47. Upon payment of the principal amount of all subchapter N bonds and the discharge of all obligations in respect thereof, all amounts in the capital subaccount, including investment earnings, must be released to BondCo for payment to ERCOT.

48. Investment earnings in this subaccount and authorized return on capital contributions in excess of 0.50%, or such greater amount of capital as is required by applicable tax and securities laws and regulations, of the original principal amount of the subchapter N bonds, if any, may be released earlier in accordance with the indenture.

***Original Issue Discount; Credit Enhancement***

49. ERCOT may provide original issue discount or provide for various forms of credit enhancement, including letters of credit, an over-collateralization subaccount or other reserve accounts, surety bonds, and other mechanisms designed to promote the credit quality or marketability of the subchapter N bonds to the extent not prohibited by this Order.

50. Except for the collection account or its subaccounts, the decision to use such arrangements to enhance credit or promote marketability must be made in conjunction with the Commission acting through its designated representative.

51. ERCOT may not enter into an interest rate swap, currency hedge, or interest rate hedging arrangement.

52. ERCOT may include the costs of original issue discount, credit enhancements or other arrangements to promote credit quality or marketability as upfront costs or ongoing costs (as appropriate) only if ERCOT certifies that such arrangements are reasonably expected to provide benefits greater than their cost and such certifications are agreed with by the Commission designated representative.

53. ERCOT must not be required to enter any arrangements to promote credit quality or marketability unless all related costs and liabilities can be included in as upfront costs or ongoing costs.

54. ERCOT and the Commission designated representative must evaluate the relative benefits of the arrangements in the same way that benefits are quantified under the quantifiable benefits test.

***Life of Bonds***

55. The legal final maturity of the subchapter N bonds authorized by this Order must not exceed 30 years.

***Amortization Schedule***

56. The Commission approves, and the subchapter N bonds must be structured to provide, uplift charges that are designed to produce substantially level annual debt service over the expected life of the subchapter N bonds and utilize consistent allocation factors, subject to modification in accordance with the true-up mechanisms adopted in this Order.

***Commission Participation in Bond Issuance***

57. The Commission, acting through its designated representative, may participate directly with ERCOT in negotiations regarding the structuring, pricing, and marketing of subchapter N bonds, and must have equal rights with ERCOT to approve or disapprove the proposed structuring, pricing, and marketing of the subchapter N bonds.

58. The Commission's designated representative must have the right to participate fully and in advance regarding all aspects of the structuring, pricing, and marketing of the subchapter N bonds and must be provided timely information that is necessary to fulfill its obligation to the Commission; and all parties must be notified of the designated representative's role.

59. The Commission directs its designated representative to advise the Commission of any proposal that does not comply in any material respect with the criteria established in this Order and to promptly inform ERCOT and the Commission of any items that, in the designated representative's opinion, are not reasonable.

60. Nothing in this Order precludes issuance of the subchapter N bonds through a competitive bid offering or private placement if ERCOT and the Commission's designated representative agree that ERCOT should do so.

61. The Commission's designated representative must notify ERCOT and the Commission no later than 12:00 p.m. on the second business day after the Commission's receipt of the issuance advice letter for each series of subchapter N bonds whether the structuring, marketing, and pricing of that series of subchapter N bonds comply with the criteria established in this Order.

***Use of BondCo***

62. ERCOT must use BondCo, a special purpose entity, as proposed in its application in conjunction with the issuance of a series of subchapter N bonds authorized under this Order.

63. BondCo must be funded with an amount of capital that is sufficient for BondCo to carry out its intended functions and to avoid the possibility that ERCOT would have to extend funds to BondCo in a manner that could jeopardize the bankruptcy remoteness of BondCo.

64. ERCOT may create more than one BondCo in which event, the rights, structure, and restrictions described in this Order with respect to BondCo would be applicable to each purchaser of uplift property to the extent of the uplift property sold to it and the subchapter N bonds issued by it.

## D. Servicing

***Servicing Agreement***

65. The Commission authorizes ERCOT to enter into the servicing agreement with BondCo and to perform the servicing duties approved in this Order.

66. In its capacity as initial servicer of the uplift property, ERCOT is authorized to calculate, bill and collect for the account of BondCo, the uplift charges initially authorized in this Order, as adjusted from time to time to meet the periodic payment requirements as provided in this Order and to make such filings and take such other actions as are required or permitted by this Order in connection with the true ups described in this Order.

67. The servicer must collect servicing fees in accordance with the provisions of the servicing agreement, provided that the annual servicing fee payable to ERCOT while it is serving as servicer, or to any other servicer affiliated with ERCOT, must not at any time exceed the amount described in the applicable issuance advice letter.

68. The servicing agreement must also include a provision that ERCOT must indemnify the Commission in connection with any increase in servicing fees that become payable as a result of a default resulting from ERCOT's willful misconduct, bad faith, or negligence in performance of its duties or observance of its covenants under the servicing agreement.

***Administration Agreement***

69. The Commission authorizes ERCOT to enter into an administration agreement with each BondCo to provide services relating to the administration of the subchapter N bonds.

70. The fee charged by ERCOT as administrator under that agreement must not exceed the amount described in the applicable issuance advice letter, plus reimbursable third-party costs.

***Replacement of Servicer***

71. Upon the occurrence of an event of default under the servicing agreement relating to the servicer's performance of its servicing functions with respect to the uplift charges, the financing parties may seek to replace ERCOT, or any subsequent servicer, as the servicer in accordance with the terms of the servicing agreement.

72. If the servicing fee of the replacement servicer exceeds the amount described in the applicable issuance advice letter, the replacement servicer must not begin providing service until the date the Commission approves the appointment of such replacement servicer or, if the Commission does not act to either approve or disapprove the appointment, the date which is 45 days after notice of appointment of the replacement servicer is provided to the Commission.

73. No entity may replace ERCOT as the servicer in any of its servicing functions with respect to the uplift charges and the uplift property authorized by this Order if the replacement would cause any of the then current credit ratings of the subchapter N bonds to be suspended, withdrawn, or downgraded.

***Amendment of Agreements***

74. The parties to the servicing agreement, administration agreement, indenture, and uplift-property sale or assignment agreement may amend the terms of such agreements; provided, however, that no amendment to any such agreement will result in an increase of the ongoing costs without the approval of the Commission.

75. Any amendment that does not increase the ongoing costs does not require prior Commission authorization to be effective.

76. Any amendment to any agreement that may have the effect of increasing ongoing costs must be provided by BondCo to the Commission along with a statement as to the possible effect of the amendment on the ongoing costs, and the amendment must become effective on the later of the date proposed by the parties to the amendment or 31 days after such submission to the Commission, unless the Commission issues an order disapproving the amendment within 30 day after the submission.

77. **Collection Terms** The servicer must remit collections of the uplift charges to BondCo or the indenture trustee for BondCo's account in accordance with the terms of the servicing agreement.

### E. Structure of the Securitization

78. ERCOT must structure the financing as proposed in ERCOT's application and, as modified, described in this Order.

### F. Docket No. 52364

79. Docket No. 52364 must be used by qualifying load-serving entities that have not opted out under the agreement and transmission-voltage customers to submit a notice of election to opt out, which must contain the information required by this Order.

80. ERCOT must make the calculations required in attachment C to the agreement using data in the ERCOT settlement extracts and file those calculations in Docket No. 52364 in the time specified in this Order.

81. Each load-serving entity must file its verification in Docket No. 52364 in the time specified in this Order.

82. Any REP that is not represented by a party in this docket must file its proposed change to its resource affiliate status in Docket No. 52364 in the time specified in this Order.

### G. Use of Net Proceeds

***Remittance of Qualifying Costs***

83. The net proceeds from the sale of any subchapter N bonds issued under this Order must be used solely for the purpose of financing qualifying costs. Upon the issuance of subchapter N bonds, BondCo must transfer the net proceeds from the sale of the subchapter N bonds

to ERCOT to be remitted to QSEs representing one or more load-serving entities for the recovery of qualifying costs determined in accordance with this Order.

***Adjustments to Customer Invoices***

84. All load-serving entities that receive offsets to specific uplift charges from ERCOT under this Order must adjust customer invoices to reflect the offsets for any charges that were or would otherwise be passed through to customers under the terms of service with the load-serving entity, including by providing a refund for any offset charges that were previously paid as specified in this Order.

***Return of Excess Receipts***

85. Each load-serving entity that receives any portion of the net proceeds of the subchapter N bonds must use the net proceeds of subchapter N bonds solely to fulfill payment obligations directly related to qualifying costs and refunding qualifying costs to retail customers who have paid or otherwise would be obligated to pay such costs. Any load-serving entity that receives any portion of the net proceeds of subchapter N bonds that exceeds the entity's actual qualifying costs must immediately notify ERCOT and remit any Excess Receipts back to ERCOT. Any Excess Receipts received by ERCOT or any subsequent servicing entity must be credited against the uplift balance to reduce the remaining uplift charges, apart from the subchapter N bonds.

***Legal Actions Involving Pricing or Uplift Action***

86. Any load-serving entity that receives any portion of the net proceeds of the subchapter N bonds pursuant to this Order must return an amount of the proceeds equal to any money received by the load-serving entity due to litigation seeking judicial review of pricing or uplift action taken by the Commission or ERCOT in connection with the Period of Emergency, regardless of whether the load-serving entity was a party to the litigation that resulted in the load-serving entity receiving money.

***Enforcement by the Commission***

87. Commission Staff may use any enforcement mechanism established by chapters 15 or 39 of PURA, including revocation of certification by the Commission, against any entity that

fails to remit Excess Receipts back to ERCOT or otherwise misappropriates or misuses amounts received from the proceeds of the subchapter N bonds.

## H. Miscellaneous Provisions

***Continuing Issuance Right***

88. The authority granted ERCOT in this Order to cause the issuance of subchapter N bonds in one or more series in accordance with this Order commences the date of this Order and ends 24 months following the later of (a) the date on which this Order becomes final and no longer subject to any appeal or (b) the date on which any other regulatory approvals necessary to issue the subchapter N bonds are obtained and no longer subject to any appeal. If at any time during the 24-month effective period of this Order there is a severe disruption in the financial markets of the United States, the 24-month effective period is automatically extended to a date that is the sum of the number of days of the period of disruption and 90 days.

***Internal Revenue Service Private Letter or Other Rulings***

89. ERCOT is not required by this Order to obtain a ruling from the IRS; however, if it elects to do so, then upon receipt, ERCOT must promptly deliver to the Commission a copy of each private letter or other ruling issued by the IRS with respect to the proposed transaction, the subchapter N bonds or any other matter related thereto. ERCOT must also include a copy of every such ruling by the IRS it has received as an attachment to each issuance advice letter required to be filed by this Order. ERCOT may cause subchapter N bonds to be issued without a private letter ruling from the IRS only if it obtains an opinion of tax counsel sufficient to support the issuance of the bonds.

***Binding on Successors***

90. ERCOT, any successor to ERCOT, and any other entity responsible for billing and collecting uplift charges on behalf of BondCo, must comply with this Order. In this paragraph, a successor means any entity that succeeds by any means whatsoever to any interest or obligation of its predecessor or transferor, including by way of bankruptcy, reorganization or other insolvency proceeding, merger, division, consolidation, conversion, assignment, sale, transfer, lease, management contract, pledge or other security, by operation of law or otherwise.

***Flexibility***

91. Subject to compliance with the requirements of this Order, ERCOT and BondCo must be afforded flexibility in establishing the terms and conditions of the subchapter N bonds, including the final structure of BondCo, repayment schedules, term, payment dates, collateral, credit enhancement, required debt service, reserves, interest rates, use of original issue discount, hedges, indices and other financing costs and the ability of ERCOT, at its option, to cause one or more series of subchapter N bonds to be issued or to create more than one BondCo for purposes of issuing such subchapter N bonds.

***Effectiveness of Order***

92. This Order is effective upon issuance and is not subject to rehearing by the Commission. Notwithstanding the foregoing, no uplift property is created hereunder, and ERCOT is not authorized to impose, collect, and receive uplift charges, until the transfer of ERCOT's rights hereunder to BondCo in conjunction with the issuance of the subchapter N bonds.

***Regulatory Approvals***

93. All regulatory approvals within the jurisdiction of the Commission that are necessary for the financing of the uplift charges associated with the uplift balance that is the subject of the application, and all related transactions contemplated in the application, are granted.

***Effect***

94. ERCOT and the servicer are directed to take all actions as are required to effectuate the transactions approved in this Order, subject to compliance with the criteria established in this Order.

***Additional Items***

95. The agreement filed on September 20, 2021, the testimony of Michael Carter filed on September 24, 2021, and the testimonies of Carrie Bivens and Kenan Ögelman filed on September 28, 2021 are admitted into evidence.

96. ERCOT must file a copy of the administrative agreement, indenture, limited liability company agreement, servicing agreement, purchase and sale agreements and any agreement it or BondCo enter into in relation to the debt financing mechanism approved in this Order, including any amendments to such agreements. ERCOT must also file a copy

of all true-up calculations and any adjustments made to the uplift charge and any other document that the Commission requests or orders.

97. All filings required by this ordering paragraph must be filed in Project No. 52710, *Compliance Filing for Docket No. 52322 (Application of Electric Reliability Council of Texas, Inc. for a Debt Obligation Order Pursuant to Chapter 39, Subchapter N, of the Public Utility Regulatory Act.*

98. To the extent necessary to prevent wholesale market participants from engaging in behavior designed to avoid uplift charges, including leaving and reentering the market, ERCOT must develop and adopt new provisions for the ERCOT Nodal Protocols.

99. The Commission denies all other motions, requests for entry of specific findings of fact and conclusions of law, and any other requests for general or specific relief not expressly granted in this Order.

**Signed at Austin, Texas the 13th day of October 2021.**

**PUBLIC UTILITY COMMISSION OF TEXAS**

**WILL MCADAMS, COMMISSIONER**

**LORI COBOS, COMMISSIONER**

**JIMMY GLOTFELTY, COMMISSIONER**

W2013
q:\cadm\orders\final\52000\52322 doo.docx

**ATTACHMENT A**

**FORM OF ISSUANCE ADVICE LETTER**

(*appears on immediately following page*)

# FORM OF ISSUANCE ADVICE LETTER

**[________, 2021]**

**Docket No.________________p**

**THE PUBLIC UTILITY COMMISSION OF TEXAS**

**SUBJECT: ISSUANCE ADVICE LETTER FOR SUBCHAPTER N BONDS**

Pursuant to this Debt Obligation Order adopted in Application of Electric Reliability Council of Texas, Inc. for a debt obligation order, Docket No. ________(the "Debt Obligation Order"), the Electric Reliability Council of Texas, Inc., ("Applicant") hereby submits, no later than twenty-four hours after the pricing of this series of Subchapter N Bonds, the information referenced below. This Issuance Advice Letter is for the [BondCo] Subchapter N Bonds series [________], tranches [ ]. Any capitalized terms not defined in this letter shall have the meanings ascribed to them in this Debt Obligation Order.

**PURPOSE**

This filing establishes the following:

(a) the total amount of the Securitizable Amount being financed;
(b) confirmation of compliance with issuance standards;
(c) the actual terms and structure of the Subchapter N Bonds being issued;
(d) the initial Uplift Charges; and
(e) the identification of the BondCo.

**SECURITIZABLE AMOUNT BEING FINANCED**

The total amount of the Securitizable Amount being financed is presented in Attachment 1.

## COMPLIANCE WITH ISSUANCE STANDARDS

This Debt Obligation Order requires Applicant to confirm, using the methodology approved therein, that the actual terms of the Subchapter N Bonds result in compliance with the standards set forth in this Debt Obligation Order. These standards are:

1. The financing of the Securitizable Amount shall support the financial integrity of the wholesale market and is necessary to protect the public interest.

1. ERCOT shall recover the Uplift Charges by collecting from and allocating among Load-Serving Entities the Uplift Charges on a load ratio share basis.

2. The Uplift Charges shall be assessed on all Load-Serving Entities on a load ratio share basis, including Load-Serving Entities who enter the market after the Debt Obligation Order is issued, but excluding the load of entities that opt out in accordance with PURA § 39.653(d).

3. ERCOT shall not reduce payments to or uplift short-paid amounts to a municipally owned utility that becomes subject to ERCOT's jurisdiction on or after May 29, 2021 and before December 30, 2021, related to a default on a payment obligation by a market participant that occurred before May 29, 2021.

4. The present value calculation, if any, uses a discount rate equal to the proposed interest rate on the debt obligations.

5. The Subchapter N Bonds shall be issued in one or more series comprised of one or more tranches having target final maturities of __ years and legal final maturities not exceeding thirty (30) years from the date of issuance of such series;

6. The Subchapter N Bonds may be issued with an original issue discount, additional credit enhancements, or arrangements to enhance marketability provided that the Applicant provides sufficient information to the Commission's designated represented to evaluate the relevant benefits of such arrangements and certifies that such arrangements are reasonably expected to provide benefits greater than their costs.

7. The structuring and pricing of the Subchapter N Bonds is certified by the Applicant to result in the lowest Uplift Charges consistent with market conditions and the terms set out in this Debt Obligation Order.

**ACTUAL TERMS OF ISSUANCE**

Subchapter N Bonds Series: ____________________
Subchapter N Bonds Issuer: [Bondco]
Trustee: _______________
Closing Date: _______________, 2021
Bond Ratings: ___________
Amount Issued: $[____]
Subchapter N Bonds Upfront Costs: See Attachment [_____], Schedule [_____].
Subchapter N Bonds Ongoing Costs: See Attachment [_____], Schedule [_____].

| Tranche | Coupon Rate | Expected Final Payment | Legal Final Maturity |
|---|---|---|---|
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

| | |
|---|---|
| Effective Annual Weighted Average Interest Rate of Subchapter N Bonds | [______]% |
| Life of Series | ______ years |
| Weighted Average Life of Series | ______ years |
| Call Provisions (including premium, if any) | Attachment __, Schedule __ |
| Target Amortization Schedule | Attachment __, Schedule __ |
| Target Final Payment Dates | Attachment __, Schedule __ |
| Legal Final Maturity Dates | Attachment __, Schedule __ |
| Payment to Investors | Semiannually, Beginning ______, 202_ |
| Initial annual Servicing Fee as a percent of the original Subchapter N Bonds principal balance | [_____]% |

**INITIAL UPLIFT CHARGE**

Table I below shows the current assumptions for each of the variables used in the calculation of the initial Uplift Charges.

| **TABLE I** | |
|---|---|
| **Input Values for Initial Uplift Charges** | |
| Applicable period: from ____________ to __________________________ | |
| Forecasted Uplift Charges for the applicable period: | |
| Debt service for applicable period: | |
| Percent of Uplift Charges expected to be charged-off: | |
| Forecasted Uplift Charges billed and collected for applicable period: | |
| Forecasted annual ongoing expenses (excluding bond principal and interest): | |
| Current Subchapter N Bond outstanding balance: | |
| Target Subchapter N Bond outstanding balance as of __/__/__: | |
| Total Periodic Billing Requirement for applicable period: | |

Based on the foregoing, the initial Uplift Charges to Qualified Scheduling Entities representing Load Serving Entities are as follows:

**IDENTIFICATION OF SPE**

The owner of the Uplift Property will be: ________________ [BondCo].

**EFFECTIVE DATE**

In accordance with the Debt Obligation Order, the Uplift Charges shall be automatically effective upon issuance of Subchapter N Bonds.

**NOTICE**

Copies of this filing are being furnished to the parties on the attached service list. Notice to the public is hereby given by filing and keeping this filing open for public inspection at Applicant's corporate headquarters.

**AUTHORIZED OFFICER**

This undersigned is an officer of Applicant and authorized to deliver this Issuance of Advice Letter on behalf of Applicant.

Respectfully submitted,

ERCOT

By: ______________________________
Name: ____________________________
Title: ____________________________

**ATTACHMENT 1**
**SCHEDULE A**

**CALCULATION OF SECURITIZABLE AMOUNT FINANCED**

| | |
|---|---|
| Amounts uplifted to Load-Serving Entities on a load ratio share basis due to energy consumption during the Period of Emergency for Reliability Deployment Price Adder Charges. | $____________ |
| Amounts uplifted to Load-Serving Entities on a load ratio share basis due to energy consumption during the Period of Emergency for Ancillary Service Charges. | $____________ |
| Reasonable costs incurred by ERCOT to implement a debt obligation. | $____________ |
| **TOTAL SECURITIZABLE AMOUNT** | $____________ |

**ATTACHMENT 1**
**SCHEDULE B**
**PROJECTED UPFRONT COSTS**

| | |
|---|---|
| Underwriters' Fees | $ |
| Company's/Issuer's Counsel and Underwriters' Counsel Legal Fees & Expenses | $ |
| Commission's Financial Advisor's Fees, Legal Fees & Expenses | $ |
| ERCOT Financial Advisor Fees & Expenses | $ |
| Printing/Edgarizing Expenses | $ |
| SEC Registration Fee | $ |
| Securitization Proceeding Expenses | $ |
| Rating Agency Fees | $ |
| ERCOT Non-legal Financing Proceeding Costs/Expenses | $ |
| ERCOT Miscellaneous Administrative Costs | $ |
| Accountant's Fees | $ |
| Servicer's Set-Up Costs | $ |
| Trustee's/Trustee Counsel's Fees & Expenses | $ |
| BondCo Set-Up Costs | $ |
| Debt Retirement Transaction Costs | $ |
| Costs of Paying Down Equity | $ |
| Original Issue Discount | $ |
| **TOTAL PROJECTED UPFRONT COSTS FINANCED** | $ |

Note: Any difference between the projected upfront costs financed and the actual upfront costs incurred shall be resolved through the true-up process described in this Debt Obligation Order.

**ATTACHMENT 2**
**SCHEDULE A**
**SUBCHAPTER N BOND REVENUE REQUIREMENT INFORMATION**

| **SERIES ,TRANCHE** | | | | |
|---|---|---|---|---|
| Payment Date | Principal Balance | Interest | Principal | Total Payment |
| | $ | $ | $ | $ |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

| **SERIES ,TRANCHE** | | | | |
|---|---|---|---|---|
| Payment Date | Principal Balance | Interest | Principal | Total Payment |
| | $ | $ | $ | $ |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

| **SERIES ,TRANCHE** | | | | |
|---|---|---|---|---|
| Payment Date | Principal Balance | Interest | Principal | Total Payment |
| | $ | $ | $ | $ |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

**ATTACHMENT 2**
**SCHEDULE B**
**ONGOING COSTS**

| | **ANNUAL AMOUNT** |
|---|---|
| Ongoing Servicer Fees (ERCOT as Servicer) | $ |
| Administration Fees | $ |
| Accountants Fees | $ |
| Lead Underwriter Ongoing Administration Fees | $ |
| Legal Fees/Expenses for Company's/Issuer's Counsel | $ |
| Trustee's/Trustee Counsel Fees & Expenses | $ |
| Independent Managers' Fees | $ |
| Rating Agency Fees | $ |
| Printing/Edgarization Expenses | $ |
| Miscellaneous | $ |
| **TOTAL (ERCOT AS SERVICER) PROJECTED ANNUAL ONGOING COSTS** | $ |
| Ongoing Servicer Fees (Third Party as Servicer – [___]% of principal) | $ |
| Other Servicing Fees | $ |
| **TOTAL (THIRD PARTY AS SERVICER) PROJECTED ONGOING COSTS** | $ |

Note: The amounts shown for each category of operating expense on this attachment are the expected expenses for the first year of the Subchapter N Bonds. Uplift Charges shall be adjusted at least annually to reflect any changes in ongoing through the true-up process described in this Debt Obligation Order.

**ATTACHMENT 2**
**SCHEDULE C**
**CALCULATION OF UPLIFT CHARGES**

| Year | Subchapter N Bond Payments[1] | Ongoing Costs[2] | Total Nominal Uplift Charge Requirement[3] | Present Value of Uplift Charges[4] |
|---|---|---|---|---|
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

[1] From Attachment 2, Schedule A.

[2] From Attachment 2, Schedule B.

[3] Sum of Subchapter N Bond payments and ongoing costs.

**ATTACHMENT 3**
**FORM OF APPLICANT'S CERTIFICATION**

[ERCOT Letterhead}

Date: [____________], 2021

Public Utility Commission of Texas
1701 N. Congress Avenue
P.O. Box 13362
Austin, TX 78711-3326

[Commission's Financial Advisor]

Re: *Application of ERCOT for a debt obligation order,* Docket No. [_____]

ERCOT (the "Applicant") submits this Certification pursuant to Ordering Paragraph No. 7 of this Debt Obligation Order in *Application of Electric Reliability Council of Texas, Inc. for a debt obligation order,* Docket No.[_______] (the "Debt Obligation Order"). All capitalized terms not defined in this letter shall have the meanings ascribed to them in this Debt Obligation Order.

In its issuance advice letter dated [____________], 2021, the Applicant has set forth the following particulars of the Subchapter N Bonds:

Name of Subchapter N Bonds:[______________]

SPE: [BondCo]

Closing Date: [____________], 20[__]

Amount Issued: [_______]

Expected Amortization Schedule: See Attachment 2, Schedule A to the Issuance Advice Letter

Distributions to Investors (semi-annually): Weighted Average Coupon Rate: ____%

Weighted Average Yield:___%

The following actions were taken in connection with the design, marketing, structuring and pricing

of the bonds:

- [Insert actions actually taken here.]

Based upon information reasonably available to its officers, agents, and employees of Applicant, the Applicant hereby certifies that the structuring and pricing of the bonds, as described in the issuance advice letter, shall result in the lowest Uplift Charges consistent with market conditions and the terms of this Debt Obligation, all within the meaning of § 39.651 of PURA.

Respectfully submitted,

ERCOT

By: ______________________________
Name: ____________________________
Title: _____________________________

# EXHIBIT B

ALJ/PPE/nd3 **Date of Issuance 3/1/2023**

Decision 23-02-023 February 23, 2023

**BEFORE THE PUBLIC UTILITIES COMMISSION OF THE STATE OF CALIFORNIA**

| | |
|---|---|
| Third Application of Southern California Edison Company (U338E) for Authority to Issue Recovery Bonds for Certain Costs and Expenses Pursuant to Public Utilities Code Section 850 *et seq.* | Application 22-09-014 |

## FINANCING ORDER AUTHORIZING SOUTHERN CALIFORNIA EDISON COMPANY'S THIRD ISSUANCE OF RECOVERY BONDS PURSUANT TO ASSEMBLY BILL 1054

## TABLE OF CONTENTS

**Title** **Page**

FINANCING ORDER AUTHORIZING SOUTHERN CALIFORNIA EDISON COMPANY'S THIRD ISSUANCE OF RECOVERY BONDS PURSUANT TO ASSEMBLY BILL 1054 ........ 2
Summary ........ 2
1. Statutory Scheme and Southern California Edison Company's Application ........ 3
2. Procedural Background ........ 8
3. Jurisdiction ........ 11
4. SCE's Proposed Financing Order ........ 15
    4.1. SCE's Proposed Financing Order — Overview ........ 15
    4.2. SCE's Proposed Financing Order — Details ........ 20
5. Discussion ........ 40
    5.1. The Recovery Costs Sought to Be Reimbursed Are Just and Reasonable ........ 40
    5.2. The Proposed Recovery Bonds Are Just and Reasonable ........ 40
    5.3. The Proposed Recovery Bonds Are in the Public Interest ........ 42
    5.4. The Proposed Recovery Bonds Reduce Consumer Rates on a Present Value Basis to the Maximum Extent Possible Compared to Traditional Utility Financing Mechanisms, With the Modifications Adopted Herein ........ 43
    5.5. Approval to Employ a Finance Team ........ 44
6. Description and Approval of Specific Elements of the SCE Proposal, Subject to Changes ........ 47
    6.1. Over-Collateralization and Credit Enhancement ........ 47
    6.2. Upfront Financing Costs ........ 49
    6.3. Tax Questions ........ 51
    6.4. Underwriters ........ 52
    6.5. Status of Recovery Property ........ 53
    6.6. True-Up Mechanism ........ 56
    6.7. Flow Through of Benefits ........ 63
    6.8. Capital Structure Adjustments ........ 64
    6.9. Implications of Nonbypassable Charges for Departing Load ........ 65
    6.10. Billing 66
    6.11. Billing, Collecting, and Remitting the Fixed Recovery Charges ........ 67
    6.12. Periodic Reporting ........ 71
7. Fixed Recovery Charge Allocation ........ 71

8. The Required Contents of the Financing Order ....75
9. Continued Reporting Compliance ....75
10. Fees ....76
11. Irrevocable Financing Order ....77
12. SCE's Written Consent to Be Bound By Financing Order ....77
13. Rehearing and Judicial Review ....78
14. Comments on Proposed Decision ....78
15. Assignment of Proceeding ....79
Findings of Fact ....79
Conclusions of Law ....88
ORDER ....105

Table 1. Computation of Fee

Attachment 1 Cash Flow Model
Attachment 2 Form of Issuance Advice Letter
Attachment 3 Form of Routine True-Up Mechanism Advice Letter
Attachment 4 Form of Non-Routine True-Up Mechanism Advice Letter
Attachment 5 List of Estimated Upfront Financing Costs

Glossary of Terms

# FINANCING ORDER AUTHORIZING SOUTHERN CALIFORNIA EDISON COMPANY'S THIRD ISSUANCE OF RECOVERY BONDS PURSUANT TO ASSEMBLY BILL 1054

## Summary

This Financing Order grants the request by Southern California Edison Company (SCE) for authority under Assembly Bill 1054 and Public Utilities (Pub. Util.) Code Sections 850(a)(2) and 850.1 to issue Wildfire Hardening Recovery Bonds (Recovery Bonds) totaling up to approximately $772,432,000. These Recovery Bonds will finance additional authorized fire risk mitigation plan capital expenditures pursuant to Pub. Util. Code Section 8386.3(e). The Recovery Bonds will be issued by a legally separate Special Purpose Entity, which will transfer the Recovery Bonds' proceeds to SCE in exchange for the right to receive revenues to repay the Recovery Bonds' principal, interest, and related costs.

This Financing Order authorizes SCE to issue Recovery Bonds to recover approximately $730.4 million in capital expenditures and approximately $42 million in Recovery Bond related financing costs for a total authorized amount of $772,432,000. This results in a ratepayer savings of approximately $493.1 million compared to traditional utility financing mechanisms on a net present value basis. The precise amount of savings will depend on several factors that are not known at this time, such as the term and interest rate on the Recovery Bonds.

The Recovery Bonds' principal, interest, and related costs will be recovered via a surcharge called the Fixed Recovery Charge. All existing and future consumers of electricity in SCE's service territory (as described in Pub. Util. Code Section 850(b)(3) and Section 850.1(a)(2)) will be required to pay the Fixed

Recovery Charge, except for those Consumers that are exempt pursuant to Pub. Util. Code Section 850.1(i) (Exempt Fixed Recovery Charge Customer Classes). Pursuant to Pub. Util. Code Section 850.1(e), the provisions in this Financing Order authorizing the issuance of the Recovery Bonds and the recovery of Recovery Bond principal, interest, and certain other Recovery Bond-related costs from Consumers are irrevocable.

This proceeding is closed.

## 1. Statutory Scheme and Southern California Edison Company's Application

On July 12, 2019, Governor Newsom signed into law Assembly Bill (AB) 1054 (Stats. 2019, Ch. 79), which amended Public Utilities (Pub. Util.) Code Division 1, Part 1, Chapter 4, Article 5.8, commencing with § 850.[1] Article 5.8 was later amended by AB 913 (Stats. 2020, Ch. 253, Sec. 2), which amended Division 1, Part 1, Chapter 4, Article 5.8, commencing with § 850. Together, these laws authorize the issuance of recovery bonds to fund wildfire-related expenditures.

The Application of Southern California Edison Company (SCE) addresses the handling of "fire risk mitigation capital expenditures" approved by the California Public Utilities Commission (Commission) (as stated in § 8386.3(e)). In sum, the first $5 billion of such expenditures by large electrical corporations are subject to Equity Rate Base Exclusion. This is to say, these specific expenditures can be funded by Recovery Bonds that are backed by nonbypassable ratepayer

[1] All statutes referred to herein are from the Public Utilities Code unless otherwise noted.

charges (except for those enrolled in the California Alternate Rates for Energy (CARE) or Family Electric Rate Assistance (FERA) programs).[2]

In this way, § 8386.3(e) fire risk mitigation capital expenditures are not part of the utilities' equity rate base. Instead, these expenditures are funded through more favorable financing terms available through the sale of Recovery Bonds in the financial market. This is intended to reduce, to the maximum extent possible, the rates that Consumers[3] would pay for such expenditures on a net present value basis as compared to traditional utility finance mechanisms.

In order to exclude such expenditures from their rate base, § 850(a)(2) allows these utilities to request authorization to finance such expenditures, as well as wildfire-related costs and expenses, through a financing order brought pursuant to § 850.1.[4] This statute identifies the requirements for the substance, criteria and timing for processing a utility application for such a financing

[2] § 850.1(i) expressly provides that fixed recovery charges must not be imposed on CARE or FERA Consumers (*see* footnote 71 for greater detail regarding CARE).

[3] § 850(b)(3) states: "'Consumer' means any individual, governmental body, trust, business entity, or nonprofit organization that consumes electricity that has been transmitted or distributed by means of electric transmission or distribution facilities, whether those electric transmission or distribution facilities are owned by the consumer, the electrical corporation, or any other party." For purposes of this Financing Order, Consumer refers to those in SCE's Service Territory as of the date of this Financing Order.

[4] § 850(a)(2) authorizes "recovery of costs and expenses related to catastrophic wildfires, including fire risk mitigation capital expenditures identified in subdivision (e) of Section 8386.3 . . . by means of a financing order."

order.[5,6] This statute also directs the Commission to establish procedures for further such financing orders.[7]

Pursuant to § 3280(n), the Legislature has allocated 31.5 percent of the $5 billion Equity Rate Base Exclusion to SCE, yielding an SCE share of $1.575 billion (Total AB 1054 CapEx). In Decision (D.) 20-11-007 (Initial AB 1054 CapEx Financing Order), the Commission approved SCE's Application for issuance of a Financing Order for an initial series of $326,981,000 in securitization bonds for some of SCE's fire risk mitigation capital expenditures and wildfire-related costs and expenditures pursuant to its Grid Safety and Resiliency Program. The initial Recovery Bond offering closed on February 24, 2021. D.21-10-025 (Second AB 1054 CapEx Financing Order) approved the issuance of a Financing Order for $218.6 million of capital expenditures approved in SCE's 2021 General Rate Case (GRC) Track 2 (Track 2 AB 1054 CapEx) and $299 million of capital expenditures approved in Track 1 of SCE's 2021 GRC (Track 1 AB 1054 CapEx) for a total of $517,581,000 (Second AB 1054 CapEx). The second Recovery Bond offering closed on February 15, 2022 (Second AB 1054 Recovery Bond Transaction). SCE provided a summary of the Second AB 1054 Recovery Bond Transaction in Exhibit SCE-01 of SCE's instant Application.

An implication of D.20-11-007 and D.21-10-025 is that SCE's remaining authorization for wildfire-related securitization limit pursuant to § 3280(n) is

---

[5] § 850(a)(2) authorizes "recovery of costs and expenses related to catastrophic wildfires, including fire risk mitigation capital expenditures identified in subdivision (e) of Section 8386.3 . . . by means of a financing order."

[6] § 850.1(a)(1)(A).

[7] § 850.1(a)(1)(B).

now approximately $730,438,000. The wildfire-related securitization limit is exclusive of Recovery Bond-related financing costs.

In this proceeding, SCE seeks a total recovery of this remaining amount of approximately $730.4 million (Third AB 1054 CapEx), and Bond Recovery-related financing costs, comprised of the following elements:[8]

1. $215.2 million of the wildfire mitigation capital expenditures approved in D.21-08-036, SCE's GRC Track 1 Decision, related to SCE's covered conductor program and other wildfire mitigation efforts, which amounts are incremental to the GRC Track 1 costs recovered in the Second AB 1054 Recovery Bond Transaction (Track 1 AB 1054 CapEx);
2. $515.3 million approved in D.22-06-032, SCE's GRC Track 3 decision relating to amounts in excess of the 2018 GRC authorized amounts incurred in 2018-2020 (Track 3 AB 1054 CapEx). These capital expenditures relate to costs in excess of 2018 GRC authorized amounts incurred in 2018-2020 to invest in SCE's covered conductor program; expand tree remediation programs; increase overhead infrastructure inspections in High Fire Risk Areas and perform associated necessary remediations; expand vegetation management programs; and support organizational improvement for SCE's wildfire mitigation efforts; and
3. $41,994,000 in related costs, comprised of $35,259,000 in estimated Pre-Securitization Debt Financing Costs (this is the cost of the debt that SCE is incurring on the $730,438,000 Third AB 1054 CapEx until the Recovery

[8] The Third AB 1054 CapEx represents the remaining amount of first incurred fire risk mitigation capital expenditures that have been approved as just and reasonable by the Commission. Certain amounts in in the Third AB 1054 CapEx were incurred later in time than other fire risk mitigation capital expenditures that also have not been included in prior securitizations, but those earlier incurred capital expenditures have not yet been approved as just and reasonable by the Commission and are therefore not eligible under § 850 *et seq.* to be securitized.

> Bonds are sold on the financial market) and $6,735,000 in estimated securitization bond Upfront Financing Costs (the cost of everything related to issuing the Recovery Bonds).[9,10]

Consistent with financing orders authorizing Pacific Gas and Electric Company (PG&E) to issue recovery bonds that include fire risk mitigation capital expenditures characterized as Construction Work in Progress (CWIP),[11] SCE seeks to include GRC Track 1 CWIP if necessary as part of the Third AB 1054 CapEx. Consistent with the financing orders for PG&E, SCE will include CWIP only if there is less than $730,437,940 of non-CWIP Third AB 1054 CapEx at the time of issuance of the Recovery Bonds authorized pursuant to this financing order, and only after taking all practicable measures, as expeditiously as possible, to recharacterize the Third AB 1054 CapEx as rate-based expenditures.[12]

To enable such securitization, SCE seeks permission to create a wholly-owned yet legally separate subsidiary, designated as a Special Purpose Entity (SPE), as described below, or to use the SPE created to finance the Initial AB 1054 CapEx (the Existing SPE), whichever course is determined to be the most appropriate approach for the Recovery Bonds. SPEs exist solely to issue Recovery Bonds.

---

[9] The complete list of all possible costs that may be applicable in the sale of bonds is codified in Section 850(b)(4).

[10] SCE's Application proposes that the final amount of Upfront Financing Costs will be submitted for approval by the Commission pursuant to an Issuance Advice Letter.

[11] *See* D.21-06-030 at 76-77, 114 (Conclusion of Law 76) ("PG&E should take all practicable measures, as expeditiously as possible, to recharacterize AB 1054-related fire risk mitigation CWIP expenditures as rate-based expenditures. If, after taking such measures, PG&E has less than $1.19 billion of AB 1054 capital expenditures in service in rate base at the time of issuance of the Recovery Bonds, PG&E is authorized to securitize AB 1054 capital expenditures temporarily recorded as CWIP."); D.22-08-004 at 76-77, 109 (Conclusion of Law 76) (same).

[12] *Ibid.*

The Recovery Bonds would be funded by a Fixed Recovery Charge, which would be a property right. It would be sold by SCE to the SPE. It would also necessarily include a true-up advice letter mechanism, which would allow for adjustment of the Fixed Recovery Charge at least annually, and as required, to ensure that the SPE would have sufficient funds recovered to be able to pay debt service on the Recovery Bonds and ongoing financing costs.

SCE's Application is the third and final of a series of proposed securitization financing transactions for Equity Rate Base Exclusion amounts.[13] SCE submitted this Third Financing Order Application pursuant to the procedure set forth in D.20-11-007, which established the procedure for the Commission to efficiently review additional such SCE applications. SCE also requested an expedited 120-day approval of this Application.

## 2. Procedural Background

On September 28, 2022, SCE filed its Application, with Exhibits, and served its supporting Testimony.[14] The Application seeks approval of a proposed

---

[13] In its initial Financing Order Application, SCE indicated its intention to seek future financing orders to finance through securitization other § 850 *et seq.* costs and expenses, including the remainder of the Total AB 1054 CapEx.

[14] On December 12, 2022, a Joint Motion was filed for stipulated admission of evidence. The Joint Motion included attachments and a request to receive new document produced in discovery. The Joint Motion is hereby granted. The following exhibits are admitted into evidence:

Exhibit SCE-01, entitled *Policy Overview*;

Exhibit SCE-02, entitled *Background on Utility Securitization*;

Exhibit SCE-03, entitled *Transaction Overview*;

Exhibit SCE-04, entitled *Customer Benefit of the Securitization*;

Exhibit SCE-05, entitled *Taxation*;

Exhibit SCE-06, entitled *Ratemaking Mechanism and Rate Proposal*;

financing order employing the methods identified above. The Application requests Commission review of the Application on an expedited basis and a Financing Order authorizing the issuance of Recovery Bonds for the Third AB 1054 CapEx within 120 days after the filing of the Application or the soonest Commission Meeting date thereafter.

On September 29, 2022, SCE filed a Motion for an order shortening time to file responses, protests and replies to the Application. On October 17, 2022, an assigned Administrative Law Judge (ALJ) issued a Ruling granting SCE's Motion for shortened filing of responses, protests and replies to the Application: October 26, 2022, was set as the new shortened deadline to file timely responses and protests, and October 31, 2022, was set as the new shortened deadline to file a reply to the response or protest. The Ruling also set a prehearing conference (PHC) for November 4, 2022, identified a tentative schedule set of issues to be considered in the proceeding and a tentative schedule to have a decision in this proceeding determined at the Commission Meeting on February 23, 2023. Lastly, the Ruling directed the parties to file a Joint PHC Statement prior to the PHC.

On October 26, 2022, The Utility Reform Network (TURN) filed a Protest to the Application. On October 26, 2022, the Public Advocates Office of the California Public Utilities Commission (Cal Advocates) filed a Motion for party status. On October 28, 2022, a Ruling was issued granting Cal Advocates' Motion

---

Exhibit SCE-07, entitled *Witness Qualifications;*

Exhibit SCE-08, entitled *Responsive Testimony to Administrative Law Judge's Eight Questions;*

Exhibit SCE-09, entitled *SCE Response to DATA REQUEST SET TURN-SCE-001, Question Nos. 1-3 from Rulemaking 22.07-005*; and

Exhibit SCE-10, entitled *SCE Response to DATA REQUEST SET TURN-SCE-001, Question Nos. 1-3 from Application 22-09-014.*

for party status. No other protests or responses were filed. On October 31, 2022, SCE filed a Reply to TURN's Protest. On November 3, 2022, the parties filed a timely Joint PHC Statement.

On November 4, 2022, prior to the PHC, a Ruling was issued directing the parties to file responses to several questions regarding net present value in ratepayer benefit through securitization of capital expenditures. The Ruling was issued to address current economic conditions and interest rates that could affect the net present value for ratepayers as part of the securitization. The deadline for filing responses to the Ruling was set for November 8, 2022.

On November 4, 2022, the PHC was held, and it produced discussion regarding the issues of law and fact related to the Application, whether there was a need for an evidentiary hearing, the possible scope of issues and the potential schedule for the proceeding. The parties did not argue that an evidentiary hearing was necessary; and explained it was presently unknown whether intervenor testimony would be necessary. Therefore, the parties discussed proposing alternate procedural schedules depending on whether intervenor testimony was necessary.

Given the proximity of the November 4, 2022, Ruling to the PHC, the parties requested additional time at the PHC to respond to the Ruling. The parties stipulated to oral notice to modify the response times, as determined at the PHC. November 16, 2022, was the modified deadline to file responses to the Ruling, and November 23, 2022, was the modified deadline to file replies to responses.

On November 14, 2022, the Scoping Memo and Ruling (Scoping Memo) was issued. The Scoping Memo presented alternative procedural schedules depending on whether intervenor testimony was necessary. The Scoping Memo

directed the parties to file notice by November 23, 2022, regarding whether intervenor testimony was necessary.

On November 16, 2022, SCE timely filed its Response to the November 4, 2022 ALJ Ruling. No party filed a reply to SCE's Response.

On November 22, 2022, the parties sent a procedural email providing Joint Notice that intervenor testimony would not be necessary. On December 1, 2022, an ALJ Ruling was issued setting forth the final procedural schedule without intervenor testimony. The Ruling adopted the alternate procedural schedule as described in the Scoping Memo.

On December 12, 2022, SCE and TURN filed their respective Opening Briefs. On December 22, 2022, SCE filed its Reply Brief. On December 23, 2022, TURN filed its Reply Brief. On December 23, 2022, the proceeding was deemed submitted.

## 3. Jurisdiction

In this Application, SCE seeks authority to issue Recovery Bonds to finance additional fire risk mitigation plan capital expenditures authorized pursuant to Pub. Util. Code § 8386.3(e), enacted under AB 1054. AB 1054 provides that utilities may seek approval from the Commission to securitize cost and expenses related to catastrophic wildfires that are just and reasonable, in the public interest, and maximize ratepayer savings.[15] In previous financing orders, we

---

[15] § 850(a)(2) provides: "If an electrical corporation submits an application for recovery of costs and expenses related to catastrophic wildfires, including fire risk mitigation capital expenditures identified in subdivision (e) of Section 8386.3, in a proceeding to recover costs and expenses in rates and the commission finds that some or all of the costs and expenses identified in the electrical corporation's application are just and reasonable pursuant to Section 451, the electrical corporation may file an application requesting the commission to issue a financing order to authorize the recovery of those just and reasonable costs and expenses by means of a financing order, with those costs and expenses being recovered through a fixed charge pursuant

provided the relevant statutory provisions to describe the elements of securitization and the nature of our review and these are briefly summarized here for convenience only, and in case of any discrepancy the statutory language should be viewed as controlling.

To finance securitization-eligible costs and expenses, the utility must first receive Commission authority in the form of a Financing Order to issue Recovery Bonds. Included in the Financing Order is authority for the utility to recover certain costs and expenses related to the issuance of the Recovery Bonds.[16] The Recovery Bonds and the eligible costs and expenses are securitized by Recovery

to this article. This paragraph does not apply for costs and expenses incurred by the electrical corporation after December 31, 2035."

[16] § 850(b)(9) provides that "Recovery bonds" means bonds, notes, certificates of participation or beneficial interest, or other evidences of indebtedness or ownership, issued pursuant to an executed indenture or other agreement of a financing entity, the proceeds of which are used, directly or indirectly, to recover, finance, or refinance recovery costs, and that are directly or indirectly secured by, or payable from, recovery property.

Property,[17,18] which, among other things, consists of a Fixed Recovery Charge[19] (*i.e.*, nonbypassable fee) that is approved in the Financing Order.[20] The nonbypassable fee is assessed on Consumers within the utilities' distribution service territory, except for customers participating in the CARE or FERA programs.

The Fixed Recovery Charge is irrevocable[21] and funds payments to bond holders and the costs to service the bond (together, Bond Servicing Payment),

---

[17] § 850(b)(11)(A) provides that "Recovery property" means the property right created pursuant to this article, including, without limitation, the right, title, and interest of the electrical corporation or its transferee: (i) In and to the fixed recovery charges established pursuant to a financing order, including all rights to obtain adjustments to the fixed recovery charges in accordance with Section 850.1 and the financing order . . . (C) "Recovery property" shall constitute a current property right, notwithstanding the fact that the value of the property right will depend on consumers using electricity or, in those instances where consumers are customers of the electrical corporation, the electrical corporation performing certain services.

[18] § 850.1(h) provides: "Fixed recovery charges are recovery property when, and to the extent that, a financing order authorizing the fixed recovery charges has become effective in accordance with this article, and the recovery property shall thereafter continuously exist as property for all purposed, and all the rights and privileges relating to that property shall thereafter continuously exist for the period and to the extent provided in the financing order, but in any event until the recovery bonds are paid in full, including all principal, premiums, if any, and interest with the respect to the recovery bonds, and all associated financing costs are paid in full. A financing order may provide that the creation of recovery property shall be simultaneous with the sale of the recovery property to a transferee or assignee as provided in the application of the pledge of the recovery property to secure the recovery bonds."

[19] § 850(b)(7) provides that "'Fixed recovery charges' means those nonbypassable rates and other charges, including, but not limited to, distribution, connection, disconnection, and termination rates and charges, that are authorized by the commission in a financing order . . ."

[20] § 850(b)(6) provides that "Financing order" means an order of the commission adopted in accordance with this article, which shall include, without limitation, a procedure to require the expeditious approval by the commission of periodic adjustments to fixed recovery charges and to any associated fixed recovery tax amounts included in that financing order to ensure recovery of all recovery costs and the costs associated with the proposed recovery, financing, or refinancing thereof, including the costs of servicing and retiring the recovery bonds contemplated by the financing order.

[21] § 850.1(b) provides that "[t]he commission may establish in a financing order an effective mechanism that ensures recovery of recovery costs through nonbypassable fixed recovery

among other expenses related to the securitization transaction. To ensure that the Fixed Recovery Charge is sufficient to cover the Bond Servicing Payment, § 850 provides that a true-up adjustment should be performed periodically.[22]

With respect to the Commission's standard of review, § 850.1 permits the Commission to issue a Financing Order when: (1) the costs that the utility seeks to recover are just and reasonable; and (2) the issuance of the Recovery Bonds, including, without limitation, all material terms and conditions, interest rates, credit ratings, amortization redemption, and ratemaking treatment are:

A. Determined to be just and reasonable;

B. Consistent with the public interest; and

C. The issuance of recovery bonds in connection with the fixed recovery charges, would reduce, to the maximum extent possible, the utility rates on a present value basis that consumers would pay as compared to the use of traditional utility financing mechanisms.[23]

---

charges . . . . Fixed recovery charges shall be irrevocable, notwithstanding the true-up adjustment pursuant to subdivision (g)."

[22] § 850(b)(13) provides that "True-up adjustment" means an adjustment to the fixed recovery charges as they appear on customer bills that is necessary to correct for any overcollection or undercollection of the fixed recovery charges authorized by a financing order and to otherwise ensure the timely and complete payment and recovery of recovery costs over the authorized repayment term; *see also* subsection (g), which provides that "[t]he commission shall establish procedures for the expeditious processing of an application for a financing order . . . . The commission shall, in any financing order, provide for a procedure for periodic true-up adjustments to fixed recovery charges, which shall be made at least annually and may be made more frequently."

[23] § 850.1(3)(A) provides that "[f]ollowing application by an electrical corporation, the commission shall issue a financing order if the commission determines that the following conditions are satisfied: (i) The recovery cost to be reimbursed from the recovery bonds have been found to be just and reasonable pursuant to Section 451.1 or are allocated to the ratepayers pursuant to subdivision (c) of Section 451.2. (ii) The issuance of the recovery bonds, including all material terms and conditions of the recovery bonds, including, without limitation, interest rates, rating, amortization redemption, and maturity, and the imposition and collection of fixed recovery charges as set forth in an application satisfy all of the following conditions: (I) They

## 4. SCE's Proposed Financing Order

### 4.1. SCE's Proposed Financing Order — Overview

Two structural requirements apply to the issuance of the Recovery Bonds. First, an asset must be created that can be pledged to support the Recovery Bonds. AB 1054 authorizes the establishment of Recovery Property, which principally consists of the right to receive revenues from a nonbypassable electric rate component called the Fixed Recovery Charge. AB 1054 provides that the Fixed Recovery Charges will be adjusted as least annually via a Commission-approved True-Up Mechanism, so that they are consistently adjusted at a level that ensures timely recovery of amounts sufficient to pay the debt service on the Recovery Bonds and other Ongoing Financing Costs.

Second, the Recovery Property must be transferred to an entity that is bankruptcy-remote from SCE, *i.e.*, an SPE that is legally separate from SCE. This ensures that, in the event of a future SCE bankruptcy, the right to receive the Fixed Recovery Charges would not be included in SCE's bankruptcy estate, but rather would continue to be available to pay the Recovery Bonds. In other words, the transfer of the Recovery Property must be a "true sale" for bankruptcy law purposes.

SCE includes a summary of the SCE's Second AB 1054 CapEx Transaction in Exhibit SCE-01 to the Application. The Second AB 1054 CapEx transaction

---

are just and reasonable. (II) They are consistent with the public interest. (III) The recovery of recovery costs through the designation of the fixed recovery charges and any associated fixed recovery tax amounts, and the issuance of recovery bonds in connection with the fixed recovery charges, would reduce, to the maximum extent possible, the rates on a present value basis that consumers within the electrical corporation's service territory would pay as compared to the use of traditional utility financing mechanisms, which shall be calculated using the electrical corporation's corporate debt and equity in the ratio approved by the commission at the time of the financing order."

achieved net present value savings of $385.2 million compared to traditional utility financing mechanisms.

In its testimony, SCE proposes the issuance of the Recovery Bonds, in the Authorized Amount by the Financing Order, to occur as soon as practicable in the first or second quarter of 2023. SCE attached its proposed securitization Financing Order as Exhibit D-1 to its Application. SCE also provides Exhibit D-2, which shows a redline to SCE's Second AB 1054 CapEx Financing Order upon which this Application is based.

The Securitization is described more fully in SCE's Exhibits SCE-02 and SCE-03. To issue the Recovery Bonds, SCE proposes to use the Existing SPE, or to form another wholly owned but legally and fiscally independent SPE. In either case, the SPE would issue the Recovery Bonds in the Authorized Amount (*i.e.*, the Third AB 1054 CapEx plus the Pre-Securitization Debt Financing Costs, plus the Upfront Financing Costs). The Recovery Bonds are secured by the nonbypassable Fixed Recovery Charge (Recovery Property).

SCE contends that because the Recovery Property would be transferred to the legally separate and "bankruptcy-remote" SPE, the transfer of the Recovery Property is a "true sale" for bankruptcy law purposes, in the event of a future SCE bankruptcy, the Fixed Recovery Charge would not be included in SCE's bankruptcy estate (in this regard, legal counsel opinion would be created for the rating agencies to rely upon). SCE also contends that, as per § 850 *et seq.*, the Fixed Recovery Charge will be adjusted at least annually via a Commission approved True-Up Mechanism, and that this would ensure timely recovery of sufficient debt service monies.

To obtain the highest possible credit rating and thereby lower Consumer costs, SCE states that the nature of the transaction provides confidence to the

market while making monies available to SCE for the authorized capital expenditures and expenses. SCE proposes to contribute equity (or additional equity in the event the Existing SPE is utilized) to the SPE in an amount equal to at least 0.50 percent of the Recovery Bonds and transfer title to the Recovery Property. The SPE then would issue the Recovery Bonds that are secured by the Recovery Property. The Recovery Bond sale proceeds (net of Upfront Financing Costs) would then be transferred from the SPE to SCE in payment for the Recovery Property.

Regarding how the Fixed Recovery Charge would be allocated to SCE's Customers, SCE's proposal includes a specific set of calculations.[24] SCE seeks to impose Fixed Recovery Charges on all non-exempt customers based on the allocation methodology set forth in the Marginal Cost and Revenue Allocation Settlement Agreement.[25] That settlement provides for a specific allocation methodology to be applied to existing and future Commission-authorized wildfire-related revenue requirements (WRR), including wildfire-related costs to be securitized and recovered through a Fixed Recovery Charge.[26] Under this revenue allocation methodology, a special methodology and formula are applied to determine a composite weighted average allocator (Special Allocator) that combines the distribution allocator and System Average Percent (SAP) allocator

---

[24] Exhibit SCE-06.

[25] D.22-08-001 at 45 (Ordering Paragraph 1) (ordering SCE to implement terms of Marginal Cost and Revenue Allocation Settlement Agreement). (*See also* Application (A.) 20-10-012, Joint Motion of SCE and Settling Parties for Adoption of Marginal Cost and Revenue Allocation Settlement Agreement, Attachment A Marginal Cost and Revenue Allocation Settlement Agreement at 23-24 Section B(5)(j)(2) providing that "Special Allocator shall be used to establish the allocation of the securitized amount" for future wildfire-related securitizations.)

[26] *See ibid.*; *see also* D.22-08-001 at 13-15 (describing methodology for allocation of WRR).

to be applied to allocate the WRR among customer groups.[27] Furthermore, SCE proposes that once set, at the time of issuance, the allocation methodology for the bonds should remain the same for the life of the bonds, with adjustments for sales changes to collect the revenue requirement.[28] Once the Recovery Bonds are paid in full, to the extent excess costs were collected, as well as any interest earnings on those amounts, these would be returned to Consumers through a credit in future rates.[29]

Regarding the handling of the Recovery Bond sale, Exhibit SCE-02 describes the utility securitization market and explains that critical to obtaining the lowest possible interest rate for such securities sales is the credit rating assessed by rating agencies for its attendant risk.

SCE also identifies the sources of the Ongoing Financing Costs associated with the servicing of the Recovery Bonds, including servicing fees, ongoing administrative fees, bond trust fees, legal and accounting fees, rating agency fees, and SPE operating expenses (or the allocable share thereof).[30]

SCE's Exhibits SCE-02 and SCE-03 explain that at this stage, certain features of the bond structure are not finalized. For example, a preliminary bond

---

[27] The Marginal Cost and Revenue Allocation Settlement Agreement explicitly affirms that the existing revenue allocation methodologies adopted by the Commission in the Initial and Second AB 1054 CapEx Financing Orders shall be retained and unaffected by the Special Allocator methodology set forth in the settlement. (*See* A.20-10-012, Joint Motion of SCE and Settling Parties for Adoption of Marginal Cost and Revenue Allocation Settlement Agreement, Attachment A Marginal Cost and Revenue Allocation Settlement Agreement at 23 Section B(5)(j)(2)).)

[28] The potential intra-class impacts for customers that pay for distribution service through a demand charge were resolved through SCE's GRC Phase 2 proceeding and such impacts will be addressed consistent with that settlement.

[29] Exhibit SCE-03.

[30] Exhibit SCE-02 at 17-20.

structure is provided and is the basis of the customer benefit analysis, however, as noted, certain features, including maturity, the number and size of the tranches, and interest rates, until closer to the time of issuance and taking into account market conditions at that time. SCE currently expects the Recovery Bonds to have a 25-year scheduled maturity with a weighted interest rate projected to be 5.12 percent, under market conditions as of September 2022.[31] SCE proposes to continue to work with a Finance Team as it did in SCE's Second AB 1054 CapEx Transaction review process.

In its testimony, SCE proposes the highest possible credit rating for the Recovery Bonds is attained by including certain provisions in the Financing Order:

1. Confirm that the transfer of the Recovery Property from SCE to the SPE constitutes a "true sale" for bankruptcy law purposes;
2. Confirm that the True-Up Mechanism will require the Fixed Recovery Charge to be adjusted at least annually, and more frequently if necessary, to guard against collection variation (in the manner described in Exhibit SCE-03 and Exhibit SCE-06);
3. Confirm that there is "flexibility in the Financing Order to provide credit enhancement should market conditions change," which would functionally mean enabling SCE to over-collateralize the Recovery Bonds (*i.e.*, secure the Recovery Bonds with Recovery Property or other assets in an amount larger than required) based upon input from the rating agencies made at the time the Recovery Bonds are marketed;
4. Confirm that regarding the servicer's financial strength and billing and collecting experience, and anticipating an event requiring a third-party to replace SCE as the servicer,

[31] Exhibit SCE-04 at 3.

the Commission would not approve a third-party servicer without first "making a determination that the approval will not impair the credit rating of any outstanding Recovery Bonds." (Application at 19.) More specifically, SCE requests that the Commission "maintain the current creditworthiness and other requirements set forth in SCE's Electric Rules applicable to Third-Party Billers who bill and meter electric customers" (*Id*. at 19); and

5. Confirm the nonbypassability of the Fixed Recovery Charge (as mandated §§ 850(b)(7)-(8) and 850.1(b)), certain steps would be required to ensure compliance with Article 5.8 and to assure Recovery Bond investors that Recovery Bond payments will continue. More specifically, SCE requests that the Fixed Recovery Charge must be paid by all non-exempt existing or future Customers in SCE's Service Territory as it exists as of the date of the Financing Order, regardless of where the Consumer buys electricity. SCE requests that in the event of a future municipalization of SCE's facilities by an entity that does not set retail rates subject to the Commission's regulation, the Commission would ensure continued payment of Fixed Recovery Charge by placing such conditions on the Commission's approval of the transaction.[32]

### 4.2. SCE's Proposed Financing Order — Details

SCE's Application provided a complete description of the Recovery Bonds and a proposed Recovery Bond transaction structure. As discussed below, SCE acknowledges that the details of the proposed structure are subject to modification, depending upon the marketing of the Recovery Bonds and negotiations with the rating agencies that will be asked to rate the Recovery

[32] SCE cites Senate Bill (SB) 550 (2019) and §§ 851(a)-(b)(1) and 854.2(b)(1)(F), which, taken together, require the Commission's authorization for any sale or disposition of a utility's system or property (via a transaction greater than $5 million), including for any voluntary or involuntary change in ownership of assets from an electrical or gas corporation to ownership by a public entity.

Bonds. SCE proposes that the final structure and terms of the Recovery Bonds will be determined by SCE after marketing and input from the rating agencies, the Finance Team, and the underwriters, and that the final structure and terms will be described in an Issuance Advice Letter submitted to the Commission and subject to the Commission's review and ability to stop the sale for a failure to adhere to the terms of the Financing Order, *i.e.,* after notice and within four business days, the Commission may halt the sale through action of the Commission Staff.

Another element of the transaction is added by § 850.1(f), stating that the Recovery Bonds authorized by this Financing Order do not constitute a debt or liability of the State of California or any political subdivision thereof, nor do the Recovery Bonds constitute a pledge of the full faith and credit of the State or any political subdivisions. In addition, pursuant to § 850.1(f)(2), the issuance of the Recovery Bonds shall not directly, indirectly, or contingently obligate the State of California or any political subdivision thereof to levy or to pledge any form of taxation to pay any obligations associated with the Recovery Bonds or to make any appropriations for their payment. As required by § 850.1(f)(1), any Recovery Bond shall have written on it a statement to the following effect: "Neither the full faith and credit nor the taxing power of the State of California is pledged to the payment of the principal of, or interest on, this bond."

To attract a broad range of investors, SCE requests the flexibility to divide the Recovery Bonds authorized by this Financing Order into one or more series consisting of one or more tranches of bonds representing different maturities of which shall not exceed the amount authorized by this Financing Order, *i.e.,* a Third AB 1054 CapEx amount up $730.4 million and $41,994,000 in Bond-related

financing costs for a total bond issue of $772,432,000. Each tranche of each series may have a different scheduled final payment date and final legal maturity date.

The Recovery Bonds may have an initial payment period shorter or longer than other payment periods to accommodate the time-period between the close of the transaction and the implementation of the Fixed Recovery Charge in bills.[33]

In accordance with § 850 *et seq.*, SCE proposed that the Recovery Bonds would be issued by one or more SPE that is owned by SCE in a transactional structure described below.[34] The SPE could be the Existing SPE, or a newly formed SPE, whichever course is determined to be the most appropriate. The Recovery Bonds will be secured by "Recovery Property" which § 850(b)(11) defines as the right, title and interest of SCE: (i) in and to the Fixed Recovery Charges, including all rights to obtain adjustments to Fixed Recovery Charges in accordance with Article 5.8 (and this Financing Order); and (ii) to be paid the amount that is determined in this Financing Order and the proceeds thereof, and in and to all revenues, collections, claims, payments, moneys, or proceeds of or arising from the Fixed Recovery Charge.

If the Recovery Bonds are issued by the Existing SPE for this Financing Order, the Recovery Bonds would only be secured by the Recovery Property created pursuant to this Financing Order and not the Recovery Property created by the prior the Financing Order (*i.e.*, D.20-11-007).

SCE proposes to transfer the Recovery Property via a true sale and absolute transfer to an SPE that is legally separate and bankruptcy remote from

---

[33] Exhibit SCE-03.

[34] *Ibid.*

SCE. This ensures that if SCE were to enter bankruptcy, the Recovery Property will not be included in SCE's bankruptcy estate. Rather, the revenues from the Recovery Property would continue to be available to pay the debt service on the Recovery Bonds and other Ongoing Financing Costs.

The Recovery Bonds would be issued under an indenture and administered by a Bond Trustee. The Recovery Property as well as all other rights and assets of the SPE (Bond Collateral) would be pledged to the Bond Trustee for the benefit of the holders of the Recovery Bonds and to secure payment of debt service on the Recovery Bonds and other Ongoing Financing Costs; none of this Bond Collateral will be available to pay the prior Recovery Bonds if the Existing SPE is the issuer. Holders of the Recovery Bonds secured by this Bond Collateral could exercise all remedies pursuant to this security interest in the event of a default.

SCE proposes to contribute equity (or in the case the Existing SPE is the issuer, additional equity) to the SPE equal to at least 0.50 percent of the initial aggregate principal amount of each series of the Recovery Bonds. The SPE equity would be pledged as Bond Collateral to secure the Recovery Bonds and will be deposited into a capital subaccount (described below) held by the Bond Trustee. This equity contribution is a requirement of the Internal Revenue Service (IRS) in order to characterize the Recovery Bonds as obligations of SCE for Federal income tax purposes.[35]

To fund the acquisition of the Recovery Property, the SPE would issue the Recovery Bonds to investors. The proceeds (net of Upfront Financing Costs) from

[35] IRS Revenue Procedure (IRS Rev. Proc.) 2005-62.

the Recovery Bonds will be transferred from the SPE to SCE as payment of the purchase price for the Recovery Property.

SCE requests the Commission approve a Financing Order with the Recovery Bond transaction structure shown in the following diagram:

**Diagram 1.** Recovery Bond Transaction Structure




The Bond Trustee would retain all Fixed Recovery Charge collections received from SCE in a collection account and distribute these funds to make scheduled principal and interest payments on the Recovery Bonds and to pay other Ongoing Financing Costs in accordance with the Recovery Bond indenture "waterfall" provisions. SCE anticipates that the collection account would include three subaccounts: (1) a general subaccount to hold revenues and investment earnings pending application under the indenture waterfall provisions; (2) a capital subaccount to hold the equity capital contribution made by SCE; and (3) an excess funds subaccount to hold revenues and investment earnings collected in excess of amounts necessary to pay principal, interest and other Ongoing Financing Costs. The collection account may also contain additional accounts to accommodate any credit enhancements (including any over-collateralization subaccount) approved in an Issuance Advice Letter.

The Bond Trustee would invest all Fixed Recovery Charge collections in investment grade short-term debt securities that mature on or before the next Recovery Bond payment date. Any investment earnings would be retained in the collection account to pay principal, interest, or other Ongoing Financing Costs. If any funds remain in the collection account after distributions are made on a Recovery Bond payment date, they would be credited to the excess funds subaccount. These amounts in the excess funds subaccount, as well as the capital subaccount, would be available to pay principal, interest, or other Ongoing Financing Costs as they come due. Any excess monies in the excess funds subaccount would be used to offset and reduce the Fixed Recovery Charge on the next Fixed Recovery Charge adjustment date.

Upon payment in full of the Recovery Bonds and the discharge of all Ongoing Financing Costs, amounts remaining with the Bond Trustee would be distributed in the following order of priority: first, an amount equal to SCE's initial equity contribution into the capital subaccount, together with any required rate of return, would be paid to SCE. Second, all other amounts held by the Bond Trustee in any fund or account, including any over-collateralization account, would be returned to SCE. The amounts in this second category, together with any Fixed Recovery Charge revenues thereafter received by SCE, would be credited to Consumers through normal ratemaking processes.

SCE proposes that the Commission would have full access to the books and records of the SPE. SCE observes that it would not make any profit from the SPE; however, SCE seeks to receive a return on its equity contribution to the SPE equal to the weighted average interest rate on the Recovery Bonds.[36] That equity

---

[36] Exhibit SCE-03.

contribution would be deposited in the capital subaccount and the return owed to SCE would be payable as an Ongoing Financing Cost from Fixed Recovery Charge revenues after payment of debt service on the Recovery Bonds and all other Ongoing Financing Costs.[37]

In Exhibit SCE-03, SCE testified that to obtain the highest possible credit ratings for the Recovery Bonds, the SPE and the assets backing the Recovery Bonds must be legally separate from SCE's bankruptcy estate. To ensure that the SPE is legally separate and bankruptcy remote from SCE, the SPE should be authorized to: (i) include restrictions in its organizational documents limiting the activities of the SPE to the issuance of the Recovery Bonds (which could include additional Recovery Bonds issued pursuant to Article 5.8) and related activities and eliminating the SPE's ability to voluntarily file for bankruptcy; (ii) provide for the appointment of one or more independent directors to the SPE board; and (iii) provide for the payment of servicing and administration fees adequate to compensate SCE or any successor servicer for their costs of providing service.

In connection with the transaction, SCE would provide the rating agencies an opinion from its legal counsel that: (1) the transfer of the Recovery Property from SCE to the SPE constitutes a "true sale" for bankruptcy purposes; and (2) the SPE is separate from SCE and could not be substantively consolidated with SCE for bankruptcy purposes. This legal opinion would provide assurance to the rating agencies that the SPE's assets (including the Recovery Property) will not be part of SCE's bankruptcy assets, and thus not be available to SCE creditors, should SCE subsequently commence bankruptcy.

---

[37] *Ibid.*

SCE further requests the Commission to authorize the SPE to obtain additional credit enhancements to ensure repayment of the Recovery Bonds in the form of an over-collateralization subaccount if required by the Rating Agencies to receive the highest possible credit rating on the Recovery Bonds, or if the all-in cost of the Recovery Bonds with the over-collateralization would be less than without the over-collateralization. Over-collateralization is a credit enhancement technique where the value of the collateral exceeds the value of the bonds, to help ensure timely payment of investors.

The required amount of over-collateralization, if any, would be collected as an Ongoing Financing Cost payable from the Fixed Recovery Charges. Any over-collateralization costs that could be collected from Consumers in excess of total service debt on the Recovery Bonds and other Financing Costs would be the property of the SPE. Upon payment of the principal amount of all Recovery Bonds and the discharge of all Financing Costs, the increase in the value of SCE's equity interest in the SPE related to the balance in any over-collateralization subaccount or any other subaccount maintained by the SPE (other than the capital subaccount) would be returned to SCE and then credited to the Consumers through the normal ratemaking processes.

SCE also requests that the SPE be authorized to obtain Recovery Bond insurance, letters of credit, and similar credit-enhancing instruments, but only if required by the rating agencies to achieve the highest possible credit rating on the Recovery Bonds, or if the all-in cost of the Recovery Bonds with these other credit enhancements would be less than without the enhancements. In addition, Bond Collateral held by the Bond Trustee would be available as a credit enhancement.

SCE does not anticipate requiring any external credit enhancements as described above. Further, based upon current market conditions, SCE does not anticipate being required by the Rating Agencies to establish an over-collateralization subaccount. However, if an account is required, the exact amount and timing of the Fixed Recovery Charge collection necessary to fund the over-collateralization account would be determined in consultation with the Finance Team before the Recovery Bonds are issued and approved through the Issuance Advice Letter process.

As provided in § 850.1(b)(4), Financing Costs associated with the issuance and credit support of the Recovery Bonds, including without limitation, underwriting fees and expenses, legal fees and expenses (including those associated with this financing application), rating agency fees, accounting fees and expenses, company's advisory fee, servicer set-up costs, SEC registration fees, § 1904 fees, printing and EDGARizing expenses,[38] trustee/trustee counsel fees and expenses, original issue discount, any Commission costs and expenses, and other miscellaneous costs approved in this Financing Order (collectively, Upfront Financing Costs).

Upfront Financing Costs include reimbursement to SCE for amounts advanced for payment of such costs. Upfront Financing Costs may also include the costs of credit enhancements including the cost of purchasing a letter of credit or bond insurance policy if required.

[38] EDGARization is the process of converting original documents (*e.g.*, Microsoft Word, Microsoft Excel, Adobe PDF, *etc.*) into acceptable SEC format.

SCE proposes to recover the Upfront Financing Costs from the proceeds of the Recovery Bonds. SCE estimates the Upfront Financing Costs will total approximately $6.7 million.[39]

SCE estimates of the Upfront Financing Costs are subject to change, as the costs are dependent on the timing of issuance, market conditions at the time of issuance, and other events outside SCE's control, such as possible litigation, incremental legal fees resulting from protracted resolution of issues, possible review by the Commission, delays in the SEC registration process, and rating agency fee changes and requirements. When each series of the Recovery Bonds are sized and priced, Upfront Financing Costs would be updated and included in the Issuance Advice Letter. There would be a financial propriety safeguard, in that for each proposed Recovery Bond issuance, the Finance Team would analyze the Upfront Financing Costs and all other elements of the proposed Recovery Bond issuance through its review of the transaction, and the Commission would have the authority to deny SCE and/or the SPE the authority to proceed to Recovery Bond issuance if any element of the Issuance Advice Letter is not appropriate.

SCE proposes that if the estimated Upfront Financing Costs included in the Issuance Advice Letter exceed actual Upfront Financing Costs, any excess would be credited to the excess funds subaccount and used to offset the revenue requirement in the next routine Fixed Recovery Charge true-up calculation. In the event that the actual Upfront Financing Costs exceed the estimated amount included in the Issuance Advice Letter, the shortfall amount may be recovered in the next routine true-up adjustment for the Fixed Recovery Charge.

---

[39] Exhibit SCE-03.

SCE testified that the Recovery Bonds transaction will be structured to be a "Qualifying Securitization" pursuant to IRS Rev. Proc. 2005-62 to achieve two important tax objectives.[40] First, to lower overall taxes, the SPE will be treated as part of SCE for Federal income tax purposes, and not as a separate entity responsible for paying its own taxes. Second, to avoid recognition of taxable income upon receipt of a financing order that creates Recovery Property. Third, to avoid an immediate taxable gain when SCE transfers the Recovery Property to the SPE, the transfer will not be treated as a sale for Federal income tax purposes, and instead the Recovery Bonds will be treated as SCE's own debt for federal income tax purposes. As it relates to the Recovery Bond transaction, California income and franchise tax law currently conforms to U.S. federal income tax law, including but not limited to, IRS Rev. Proc. 2005-62.

SCE proposes that it be authorized to structure the Recovery Bond transaction to meet the elements of a "Qualifying Securitization" pursuant to IRS Rev. Proc. 2005-62 such that: (1) the SPE shall be a wholly owned subsidiary of SCE and capitalized with an equity interest as deemed appropriate and legally necessary by the Finance Team; (2) the Recovery Bonds shall be secured by the Recovery Property; (3) the Fixed Recovery Charge shall be nonbypassable and payable by Consumers within SCE's Service Territory; and (4) payments on the Recovery Bonds shall be on a semi-annual basis except for the initial payment period which may be shorter or longer.

In accordance with Article 5.8, the Commission may allow fixed recovery tax amounts (FRTA) for any portion of the SCE's federal and State of California income and franchise taxes associated with the Fixed Recovery Charge that is not

---

[40] *Ibid.*

approved as Financing Costs from the proceeds of the Recovery Bonds. Each series of Recovery Bonds will have its own Fixed Recovery Charges, and, to the extent applicable, FRTAs. All of the revenues from Fixed Recovery Charges will be transferred to a Bond Trustee for the benefit of the SPE, to be applied against the repayment for that series of Recovery Bonds on a *pari passu* basis.

SCE testified that it could receive a small accumulated deferred income tax savings.[41] Therefore, SCE does not contemplate the need for a separate fixed recovery tax amount (as defined in § 850(a)(8)). In accordance with D.20-11-007, SCE proposes to track these tax implications outside of the securitization using standard ratemaking mechanisms. SCE proposed using a similar approach for other securitizations, with flexibility regarding implementation of incorporating taxes into future securitizations based on the facts and circumstances specific to those transactions.

SCE proposes an allocation methodology set forth in the Marginal Cost and Revenue Allocation Settlement Agreement with respect to all non-exempt customers.[42,43] The Special Allocator methodology applicable to the WRR shall apply to allocate the Fixed Recovery Charge and shall remain the same for the

---

[41] Exhibit SCE-05.

[42] Exhibit SCE-06.

[43] D.22-08-001 at 45 (Ordering Paragraph 1) (ordering SCE to implement terms of Marginal Cost and Revenue Allocation Settlement Agreement). (*See also* A.20-10-012, Joint Motion of SCE and Settling Parties for Adoption of Marginal Cost and Revenue Allocation Settlement Agreement, Attachment A Marginal Cost and Revenue Allocation Settlement Agreement at 23-24 (Section B(5)(j)(2) providing that "Special Allocator shall be used to establish the allocation of the securitized amount" for future wildfire-related securitizations).)

life of the bonds, with adjustments for sales changes to collect the revenue requirement.[44,45]

Article 5.8 authorizes SCE to recover Recovery Bond debt service and other Ongoing Financing Costs via the Fixed Recovery Charge. As described in Exhibit SCE-06, SCE proposed a methodology to allocate Recovery Costs among Customer Classes, and to calculate and adjust the Fixed Recovery Charge. In addition to the ratemaking treatment described above, SCE will also periodically credit back to customers through SCE's Base Revenue Requirement Balancing Account (BRRBA) all periodic servicing and administration fees in excess of SCE's incremental cost of performing the servicer and administration functions until the next GRC when costs and revenues associated with the servicing fees will be included in the cost of service.

Article 5.8 mandates the Commission to create an "effective mechanism" to ensure the recovery of all Recovery Costs through the imposition of the Fixed Recovery Charge, which must be paid by all Consumers until the Recovery Bonds and all other Ongoing Financing Costs are paid in full by the SPE (pursuant to § 850.1(b)). Article 5.8 creates this "effective mechanism" because it authorizes the Commission to provide a procedure to adjust the Fixed Recovery Charge, at least annually. However, adjustments may be made more frequently to ensure timely recovery of the principal and interest on all Recovery Bonds and

---

44 *See Ibid.*; *see also* D.22-08-001 at 13-15 (describing methodology for allocation of WRR).

45 The Marginal Cost and Revenue Allocation Settlement Agreement explicitly affirms that the existing revenue allocation methodologies adopted by the Commission in the Initial and Second AB 1054 CapEx Financing Orders shall be retained and unaffected by the Special Allocator methodology set forth in the settlement. (*See* A.20-10-012, Joint Motion of SCE and Settling Parties for Adoption of Marginal Cost and Revenue Allocation Settlement Agreement, Attachment A Marginal Cost and Revenue Allocation Settlement Agreement at 23 Section B(5)(j)(2).)

all other Ongoing Financing Costs (pursuant to §§ 850.1(e) and 850.1(g)). To satisfy these statutory requirements, SCE proposes "True-Up Mechanism" Advice Letters that will allow the Fixed Recovery Charge to be adjusted: (i) annually to correct any over-collection or under-collection of the Fixed Recovery Charge; and (ii) more frequently, if necessary, to ensure that the Fixed Recovery Charge provides sufficient funds to timely pay principal and interest on the Recovery Bonds and other Ongoing Financing Costs of the Recovery Bonds.

SCE requests Commission approval to use an advice letter process to implement these periodic true-up adjustments. This approach is well-established. It was followed in connection with prior issuances of Recovery Bonds pursuant to D.20-11-007 and D.21-10-025, as well as prior Energy Recovery Bonds and Rate Reduction Bonds. It also will create efficiencies for the Commission and its staff. The Commission's authority under Article 5.8 and § 850.1(g) to authorize periodic true-up adjustments persists until the Recovery Bonds and all Ongoing Financing Costs are fully paid and discharged.

SCE, or any successor servicer, may submit annual, semi-annual and interim "Routine True-Up Mechanism Advice Letters" until the Recovery Bonds and all other Ongoing Financing Costs are paid in full. True-up adjustments to the Fixed Recovery Charge will ensure correct billing of Fixed Recovery Charges. These adjustments will correct for any over-collection or under-collection of the Fixed Recovery Charge authorized by this Financing Order and to otherwise ensure the timely provision and payment of all scheduled (or legally due) payments of principal (including, if any, prior scheduled but unpaid principal payments) and interest on the Recovery Bonds, together with the timely payment of all other Ongoing Financing Costs for each semi-annual payment period

following the effective date of the initial or adjusted Fixed Recovery Charge. This revenue requirement is referred to as the "Periodic Payment Requirement."

True-up submissions will be based upon the cumulative differences, regardless of the reason, between the Periodic Payment Requirement and the actual amount of Fixed Recovery Charge collections remitted to the Bond Trustee for the Recovery Bonds. This will result in adjustments to the Fixed Recovery Charges to correct for over-collections or under-collections.

SCE proposes to submit annual Routine True-Up Mechanism Advice Letters with a complete accounting of the historical over-collection and under-collection of the Fixed Recovery Charge at least 50 days before the annual adjustment date specified in the Issuance Advice Letter (the Fixed Recovery Charge Annual Adjustment Date) until the Recovery Bonds and all other Ongoing Financing Costs have been paid in full. These submissions are intended to ensure that the actual Fixed Recovery Charge collections are the accurate and correct amount required to repay the Recovery Bonds and all other Ongoing Financing Costs. Because these annual Routine True-Up Mechanism Advice Letters should be ministerial, SCE proposes they should be categorized as Tier 1 Advice Letters (ALs) to enable SCE's revision to the annual Routine True-Up to go into effect on the Fixed Recovery Charge annual adjustment date.

SCE requests that both Routine and Non-Routine True-Up Mechanism Advice Letters would be used to calculate a revised Fixed Recovery Charge for the Recovery Bonds. The cash flow model described in an attachment to the Application would be utilized (or a revised cash flow model as described in a Non-Routine True-Up Mechanism Advice Letter as may be applicable) that would reflect the following adjustments:

- An adjustment would be made for the amount of any funds held by the Trustee in the general subaccount or the excess funds subaccount as of a date no earlier than fifteen business days prior to the calculation date (the Calculation Cut-Off Date);
- Forecasted sales for the remainder of the current year and for the subsequent year, if applicable, to reflect SCE's most-recently approved sales forecast, as available, and SCE's pending sales forecast for any period not covered by the most recently-approved sales forecast;
- Estimated Ongoing Financing Costs would be modified to reflect actual costs;
- An adjustment would be made to reflect any change in the write-off policy;
- An adjustment would be made to reflect any change in the average days sales outstanding, including any anticipated delay or acceleration of the collection of Consumer bills; and
- An adjustment would be made to reflect Fixed Recovery Charge collections that would be received at the existing tariff rate after the Calculation Cut-Off Date.

SCE's testimony described costs and benefits associated with the Recovery Bonds that will flow through to Consumers of electricity via other ratemaking processes (as discussed in detail further below).[46]

SCE proposes to remove the securitized debt from SCE's ratemaking capital structure, as the SPE will have the legal obligation to repay the Recovery Bonds from Fixed Recovery Charge collections.[47] However, for financial reporting purposes, the securitized debt will be consolidated and recorded as a liability on SCE's consolidated financial statements. The reason for this is because

[46] Exhibits SCE-03 and SCE-06.

[47] Exhibit SCE-01.

while § 8386.3(e) requires that Total AB 1054 CapEx be excluded from SCE's "equity rate base," those accounting entries do not properly reflect SCE's debt and equity balances that finance rate base, and this issue is addressed by excluding the securitized debt from SCE's ratemaking capital structure.

In Article 5.8, §§ 850(b)(7) and 850.1(b) require that the Fixed Recovery Charge shall be nonbypassable and recovered from existing and future Consumers in SCE's Service Territory, other than Consumers in Exempt Fixed Recovery Charge Customer Classes. In addition, Consumers that reduce or cease to take transmission and distribution retail service from SCE after the date of this Financing Order, or that meet relevant criteria in applicable tariffs, should be treated as departing load (DL) Consumers using applicable tariffs for DL Consumers, including Customer Generation Departing Load Cost Responsibility Surcharge (CGDL-CRS), Transferred Municipal Departing Load (TMDL), and New Municipal Departing Load (NMDL). DL Consumers will be subject to pay the Fixed Recovery Charges. For the purpose of determining applicability of the Fixed Recovery Charges to DL customers, SCE proposes to calculate the Fixed Recovery Charges that would need to be paid using an approach that is consistent with the applicable tariff if the tariffs address the treatment of DL with respect to the fixed recovery charges relating to prior AB 1054 Financing Order(s).

In compliance with the requirements of Article 5.8 (§ 850.2), SCE proposes to act as the initial servicer for the Recovery Bonds.

The servicer would be responsible for determining Consumers' electricity usage, billing, collecting, and remitting the Fixed Recovery Charge collections to the Bond Trustee, and submitting Routine True-Up Mechanism Advice Letters and Non-Routine True-Up Mechanism Advice Letters as described above. In the

event that Consumers of electricity in SCE's Service Territory are billed by Electric Service Providers (ESP) or another utility or entity (collectively, Third-Party Billers), SCE proposes to bill these Third-Party Billers, as the case may be, for the Fixed Recovery Charge, and the Third-Party Billers will be obligated to remit Fixed Recovery Charge collections to SCE. The servicer will remit actual Fixed Recovery Charge collections, on behalf of the SPE, to the Bond Trustee.

The Bond Trustee will be responsible to make principal and interest payments to Recovery Bond investors and pay other Ongoing Financing Costs, and will hold and apply such amounts as described in the "Recovery Bond Transaction Structure" above. The servicer will remit Fixed Recovery Charge collections in accordance with the servicing agreement to the Bond Trustee. The SPE would own legal title to, and all equitable interest in, the Recovery Property, including the Fixed Recovery Charges, and SCE will be legally obligated to remit all Fixed Recovery Charge collections to the Bond Trustee.

SCE anticipates that the rating agencies will require SCE to remit actual Fixed Recovery Charges collections to the Bond Trustee. The remittance of the actual Fixed Recovery Charge would occur on a daily basis to avoid an adverse impact on the Recovery Bonds credit ratings. Accordingly, SCE expects to remit actual Fixed Recovery Charge collections to the Bond Trustee on a daily basis and within two business days of receipt to avoid an adverse impact on the Recovery Bonds credit ratings.

Over the life of the Recovery Bonds, SCE will prepare a monthly servicing report for the Bond Trustee that shows the actual Fixed Recovery Charge collections by month. The Bond Trustee (acting on behalf of the SPE) will only have a legal right to the actual amount of Fixed Recovery Charge collections.

SCE also proposes that amounts collected that represent partial payments of a Consumer's bill will be allocated between the Bond Trustee and SCE based on the ratio of the billed amount for the Fixed Recovery Charge to the total billed amount. SCE states that this reconciliation and allocation methodology is an important bankruptcy consideration in determining the true sale nature of the transaction. In the event of any default by the Servicer, the Bond Trustee (on behalf of the SPE) will be entitled to receive a reconciliation of collections and remittances (described above), including an allocation of partial payments based upon this pro-rata allocation methodology.

For as long as multiple series of Recovery Bonds are outstanding and unpaid, the Fixed Recovery Charges received should be allocated pro rata between the Bond Trustees for each series, consistent with the requirements of D.20-11-007 and D.21-10-025.

SCE proposes to charge an annual servicing fee of 0.05 percent of the initial principal Recovery Bond amount, plus out-of-pocket expenses (*e.g.*, legal fees, accounting fees), to cover SCE's incremental costs and expenses in servicing the Recovery Bonds.

In the event that SCE would fail to perform its servicing functions satisfactorily as set forth in the Servicing Agreement, or is required to discontinue its billing and collecting functions, it would be replaced by a successor servicer acceptable to the Bond Trustee, acting on behalf of the Recovery Bond holders, and approved by the Commission. SCE highlights that the credit quality and expertise in performing servicing functions will be important considerations when appointing a successor servicer to ensure the credit ratings for the Recovery Bonds are maintained. SCE's position is that the remedy of allowing the Commission to sequester the Fixed Recovery Charge in

the cases of certain events of default under the Servicing Agreement upon the application of the Bond Trustee, as permitted by § 850.3(e), will also enhance the credit quality of the Recovery Bonds. SCE will periodically credit back to customers through the BRRBA all periodic servicing and administration fees in excess of SCE's incremental cost of performing the servicer and administration functions until the next GRC when costs and revenues associated with the servicing fees will be included in the cost of service. In each base rate case, SCE will include a revenue credit of the administration and servicing fees that SCE collects as the servicer/administrator of the Recovery Bonds (to the extent not previously credited back through the BRRBA). In the base rate case, SCE will also request revenue for all costs of providing servicing and administration services. If SCE fails to provide any such credit to ratepayers will in no way affect the Recovery Property, the Fixed Recovery Charge or the rights of SCE, the Trustee and the Recovery Bondholders under the Financing Order, but could be addressed by the Commission through other proceedings.

Although SCE will act as servicer, it is possible that Third-Party Billers will bill and collect the Fixed Recovery Charges from some Consumers. If SCE's Consumers of electricity are billed by Third-Party Billers, SCE proposes to bill these Third-Party Billers for the Fixed Recovery Charge, with the Third-Party Billers being obligated to remit Fixed Recovery Charge collections to SCE. SCE would remit Fixed Recovery Charge collections to date, on behalf of the applicable SPE, to the Bond Trustee. These Third-Party Billers must meet minimum billing and collection experience standards and creditworthiness criteria. Otherwise, the rating agencies could impose additional credit enhancement requirements or assign lower credit ratings to the Recovery Bonds. Therefore, SCE requests that Third-Party Billers that bill and collect the Fixed

Recovery Charge satisfy the creditworthiness and other requirements applicable to ESPs that meter and bill electric Consumers as set forth in SCE's Electric Rule 22.P (Credit Requirements).

## 5. Discussion

### 5.1. The Recovery Costs Sought to Be Reimbursed Are Just and Reasonable

The first requirement for approval of SCE's Application is a finding that "[t]he recovery cost to be reimbursed from the recovery bonds have been found to be just and reasonable pursuant to Section 451." This requirement is set forth in § 850.1(a)(1)(A)(i). Here, that requirement is considered in light of the findings in D.21-01-012, D.21-08-036, and D.22-06-032.

SCE's Application seeks approval to issue Recovery Bonds to finance $215,168,061 in wildfire risk mitigation capital expenditures and allowances and $515,269,939 in wildfire risk mitigation capital expenditures and allowances (totaling $730,438,000) arising respectively from Track 1 and Track 3 of SCE's General Rate Case Application 19-08-013.[48] In D.21-08-036 and D.22-06-032, the Commission approved a total of $4.928 billion in capital expenditures, judging them to be just and reasonable, including the referred-to Track 1 and Track 3 expenditures sought to be recovered in the instant Application.[49]

### 5.2. The Proposed Recovery Bonds Are Just and Reasonable

The second requirement for approval of SCE's Application is a finding that "[t]he issuance of the recovery bonds, including all material terms . . . are just and reasonable." This requirement is set forth in § 850.1(a)(1)(A)(ii)(I). Here, that requirement is met through a general finding of the inherent value of Recovery

---

[48] SCE Application at 3-4 and 10-12.

[49] Exhibit SCE-01 at 3.

Bonds in this context, and a discussion of the details of the Recovery Bonds at issue will be conducted below (so as to enable a complete review of all Recovery Bond details in a single discussion section in a thorough and organized manner).[50]

"Just and reasonable" is the criterion long familiar to the Commission in its application of the standard set forth by the Legislature in § 451. In pertinent part, that statute reads as follows:

> All charges demanded or received by any public utility . . . for any product or commodity furnished . . . or any service rendered . . . shall be just and reasonable . . .
>
> Every public utility shall furnish and maintain . . . just, and reasonable service, instrumentalities, equipment, and facilities . . . as are necessary to promote the safety, health, comfort, and convenience of its patrons, employees, and the public.
>
> All rules made by a public utility affecting or pertaining to its charges or service to the public shall be just and reasonable.

Here, the broader issue concerns the Legislature directing the Commission to address the value of Recovery Bonds as compared to "traditional utility financing mechanisms," as that term is found in § 850.1(a)(1)(A)(ii)(III). While reserving the analysis of the Application's details below, we can conclude that in concept, and in consideration of the legislative mandate to enable such Recovery Bonds, the issuance of the Recovery Bonds is just and reasonable, in that it clearly works to enhance utility safety and reliability, and SCE has made a

[50] § 850.1(a)(1)(A)(ii)(I) articulates some of the aspects of the Recovery Bonds to be reviewed and considered, including "interest rates, rating, amortization redemption, and maturity, and the imposition and collection of fixed recovery charges . . ." Because these, and other Recovery Bond aspects, must be effectively reviewed under the more encompassing umbrella of § 850.1(a)(1)(A)(ii)(III), it is more logical to address all such financial issues in that section.

showing that it will reduce rates compared to traditional utility financing mechanisms.

While we will adopt an appropriate mechanism to provide for review of the specifics of the Application's proposed Recovery Bonds, we can find that the nature of the Application's proposed Recovery Bonds is just and reasonable.

### 5.3. The Proposed Recovery Bonds Are in the Public Interest

The third requirement for approval of SCE's Application is a finding that "[t]he issuance of the recovery bonds, including all material terms . . . are consistent with the public interest." This requirement is set forth in § 850.1(a)(1)(A)(ii)(II). Here, that requirement is met through a general finding of the inherent value of the Recovery Bonds in this context, and a discussion of the details of the Recovery Bonds at issue (discussed above in Section 4.2).

"Consistent with the public interest" is tantamount to a finding that a proposed transaction is in the public interest, and the Commission has considerable experience applying this test in furtherance of certain statutory provisions.[51] Applying the standards found in those provisions, the Commission can review whether proposed transactions "provide short-term and long-term economic benefits to ratepayers," "maintain the safe and reliable operation of the utility," "maintain or improve the financial condition of the . . . utility," and "maintain or improve the quality of service to public utility ratepayers."[52]

Here, the broader issue concerns the Legislature directing the Commission to address the value of Recovery Bonds as compared to "traditional utility

---

[51] The phrase "public interest" is language that appears in Sections 852-854 regarding proposed public utility transactions.

[52] Applying descriptions found in Section 854(b)(1), Section 854(b)(4), Section 854(c)(1), Section 854(c)(2), respectively.

financing mechanisms," as that term is found in § 850.1(a)(1)(A)(ii)(III). We can conclude that in concept, and in consideration of the legislative mandate to enable such Recovery Bonds, the Application is generally consistent with the public interest, in that it clearly works to provide economic benefit to ratepayers, maintain and improve the utility's safety and reliability, maintains or improves the financial condition of the utility, and maintains or improves the quality of service to the ratepayers, while reducing costs compared to traditional utility financing mechanisms, as demonstrated in the next section.

Therefore, while we will adopt an appropriate mechanism that will provide for a review of the specifics of the Application's proposed Recovery Bonds, we can find that the nature of the Application's proposed Recovery Bonds is consistent with the public interest.

### 5.4. The Proposed Recovery Bonds Reduce Consumer Rates on a Present Value Basis to the Maximum Extent Possible Compared to Traditional Utility Financing Mechanisms, With the Modifications Adopted Herein

The fourth requirement for approval of SCE's Application is a finding that "[t]he issuance of the recovery bonds, including all material terms . . . would reduce, to the maximum extent possible, the rates on a present value basis that Consumers within the electrical corporation's Service Territory would pay as compared to the use of traditional utility financing mechanisms, which shall be calculated using the electrical corporation's corporate debt and equity in the ratio approved by the commission at the time of the financing order." This requirement is set forth in § 850.1(a)(1)(A)(ii)(III).

SCE estimates that the savings to Consumers would total $493.1 million in net present value when comparing the $730.4 million Recovery Bond financing costs to the cost to Consumers when using the traditional financing approach for

SCE's rate-base financing, given SCE's current 7.68 percent Commission-authorized return on rate base.

Additionally, as described in more detail below, we are directing a Finance Team to be created and, at the appropriate time (necessarily after this Financing Order has issued), it will be responsible for review and approval of the structure of the Recovery Bonds as described in this Financing Order. The Finance Team's approval of a series of the Recovery Bonds would be evidenced by a letter from the Finance Team to SCE. Approval of the Finance Team will be required in order to meet the statutory requirement set forth in § 850.1(a)(1)(A)(ii)(III).

Accordingly, we find that SCE's proposal to issue Recovery Bonds to recover its Track 1 and Track 3 AB 1054 CapEx costs satisfies the net present value benefits requirement in § 850.1.

As noted above and as will be discussed below, the creation of a Finance Team to review the totality of the Recovery Bond processes, including costs associated with the Recovery Bonds' creation and optimization, *etc.*, as well as Recovery Bond terms, rates, and marketing, *etc.*, is an appropriate tool for the Commission to adopt in this Financing Order to ensure that that statutory requirement for Consumer rate reduction "to the maximum extent possible" is met. SCE has been transparent about the possible structures for the transaction and the marketing approaches it can use for the Recovery Bonds, and it submits that its approach will achieve the best combination of factors such as interest rate and term. We must acknowledge that not all variables can be known in this proceeding prior to the preparation and actual sale of the Recovery Bonds.

### 5.5. Approval to Employ a Finance Team

The task of ensuring the sale of a Recovery Bonds issued pursuant to this Financing Order so as to reduce rates on a present value basis to the maximum

extent possible compared to the use of traditional utility financing mechanisms requires a process that is optimized for transparency and in line with best practices. For these reasons, we approve the creation of a Finance Team.

Prior to the issuance of each series of Recovery Bonds, such Recovery Bond series and associated Recovery Bond transactions would be reviewed and approved by the Commission's Finance Team consisting of the Commission's General Counsel, the Deputy Executive Director for Energy and Climate Policy, other Commission Staff, outside bond counsel, and any other outside experts that the Finance Team deems necessary. The other outside expertise may include, for example, independent legal counsel and an independent financial advisor to assist the Finance Team in overseeing and reviewing the issuance of a series of Recovery Bonds. Any costs incurred by the Finance Team in connection with its review and approval of a series of Recovery Bonds would be treated as an Upfront Financing Cost. The purpose of the Finance Team is to provide oversight over the structuring, marketing, and pricing of each Recovery Bond transaction and to review and approve the material terms of such transaction in light of the goal to reduce rates on a present value basis to the maximum extent possible pursuant to AB 1054's directives and specifically to the § 850.1(a)(1)(A)(ii)(III) mandate.

In a pre-issuance review process, the Finance Team will have the right to review all material terms of each series of Recovery Bonds and other items the Finance Team determines are appropriate to perform its role, which may include, without limitation: (1) the underwriter and syndication group size, selection process, participants, diverse bank inclusion, allocations, and economics; (2) the structure of such a series of Recovery Bonds; (3) such series of Recovery Bonds' credit rating agency application; (4) the underwriters' preparation, marketing,

and syndication of such series of Recovery Bonds; (5) the pricing of such a series of Recovery Bonds and certifications provided by SCE and the lead underwriter(s) regarding pricing; (6) all associated Recovery Bond costs (including Upfront Financing Costs and other Financing Costs), servicing and administrative fees and associated crediting; (7) maturities; (8) reporting templates; (9) the amount of SCE's equity contribution to the related SPE; (10) overcollateralization and other credit enhancements; and (11) the initial calculation of the related Fixed Recovery Charges. The foregoing and other items may be reviewed during the entire course of the Finance Team's process.

We expect SCE will resolve material terms and structuring issues with the Finance Team prior to commencing marketing (subject to any modifications required as a result of such marketing process). This pre-issuance review process is intended to create Recovery Bonds with material terms that can meet the statutory requirements; in particular, that each series of Recovery Bonds reduce on a present value basis to the maximum extent possible, the rates that Consumers would pay as compared to the use of traditional utility financing mechanisms. The Finance Team's review will continue until the related Issuance Advice Letter becomes effective as described below. The Finance Team has the ability to be included and participate in all calls, meetings, e-mails, and other communications relating to the structuring, marketing, pricing, and issuance of each series of Recovery Bonds.

The Finance Team's pre-issuance review and approval of the material terms and structure of each series of Recovery Bonds will be evidenced by a letter from the Finance Team to SCE delivered on or before the date of the pricing of the relevant Recovery Bonds. SCE should also be required to include such letter as an attachment to the Issuance Advice Letter relating to such series of

Recovery Bonds. Such approval letter should be a condition precedent to the issuance of such series of Recovery Bonds.

However, this approach does not obviate the requirement for SCE to describe the final structure and terms of each series of Recovery Bonds in an Issuance Advice Letter submitted to the Commission and subject to the Commission Staff's review and ability to reject the Issuance Advice Letter, *i.e.*, with four business days' notice and the Commission Staff's opportunity to halt the sale. While the Finance Team will review the process by which SCE determines the final structure and terms of each series of Recovery Bonds preceding and during its marketing efforts and consultations with rating agencies, the final structure and Recovery Bonds should be described in detail in the respective Issuance Advice Letter submitted to the Commission and subject to the Commission Staff's review and ability to reject such Issuance Advice Letter, and otherwise the sale would automatically proceed.

## 6. Description and Approval of Specific Elements of the SCE Proposal, Subject to Changes

### 6.1. Over-Collateralization and Credit Enhancement

In its testimony, SCE has requested that the SPE be authorized to obtain additional credit enhancements to ensure repayment of the Recovery Bonds in the form of an over-collateralization subaccount if the rating agencies require over-collateralization to receive the highest possible credit rating on the Recovery Bonds, or if the all-in cost of the Recovery Bonds with the over-collateralization would be less than without the over-collateralization.

Over-collateralization is a credit enhancement technique in which amounts collectible in relation to a financial asset exceed the required payments on the security, ensuring timely payment. The required amount of

over-collateralization, if any, would be collected as an Ongoing Financing Cost payable from the Fixed Recovery Charges. The over-collateralization requirement, if any, would be sized based upon input from the rating agencies indicating the amount necessary to achieve the highest-possible credit ratings. Any over-collateralization that would be collected from Consumers in excess of total debt service and other Ongoing Financing Costs, and would be the property of the SPE, subject to the discussion below.

Upon payment of the principal amount of all Recovery Bonds and the discharge of all Financing Costs, the increase in the value of SCE's equity interest in the SPE related to the balance in any over-collateralization subaccount, or any other subaccount maintained by the SPE (other than the capital subaccount) shall be returned to SCE and then credited to Consumers through normal ratemaking processes.

In addition, SCE testified that the equity contribution held in the capital subaccount by the Bond Trustee would be available as a credit enhancement. SCE also requested that the SPE be authorized to obtain bond insurance, letters of credit, and similar credit-enhancing instruments, but only if required by the rating agencies to achieve the highest possible credit ratings on the Recovery Bonds, or if the all-in cost of the Recovery Bonds with these other credit enhancements would be less than without these enhancements.

SCE has testified that it does not anticipate requiring any external credit enhancements described in the preceding paragraph. Further, based upon current market conditions, SCE does not anticipate being required by the rating agencies to establish an over-collateralization subaccount, but to the extent such an account is required, the exact amount and timing of the Fixed Recovery Charge collection necessary to fund the over-collateralization account would be

determined in consultation with the Finance Team before the Recovery Bonds are issued and approved through the Issuance Advice Letter process.

In addition, SCE asserts that the Bond Collateral held by the Bond Trustee would be available as a credit enhancement. This Bond Collateral would include, as mentioned above, an equity contribution in an amount required to obtain favorable IRS tax treatment for the transaction (for example, 0.50 percent of the initial aggregate principal amount of the Recovery Bonds issued, or some analogous amount as might be approved by the Finance Team). If the equity capital is drawn upon, it may be replenished from future Fixed Recovery Charges. SCE has also requested that it be entitled to receive a return on its equity contribution, equal to the weighted average interest rate on the Recovery Bonds. This equity return is requested to be paid as an Ongoing Financing Cost from the Fixed Recovery Charge collections and would be distributed to SCE on an annual basis, after payment of debt service on the Recovery Bonds and other Ongoing Financing Costs.

We find that granting the SPE the flexibility to obtain credit enhancements as described by SCE is both appropriate and in the public interest and should be approved subject to Finance Team review and Commission review of the Issuance Advice Letter.

### 6.2. Upfront Financing Costs

As provided in § 850(b)(4), Financing Costs include costs associated with the issuance and credit support of the Recovery Bonds, including without limitation, underwriting fees and expenses, legal fees and expenses (including those associated with this financing application), rating agency fees, accounting fees and expenses, company's advisory fee, servicer set-up costs, SEC registration fees, § 1904 fees, printing and EDGARizing expenses, trustee/trustee counsel

fees and expenses, original issue discount, any Commission costs and expenses, and other miscellaneous costs approved in this Financing Order (collectively, Upfront Financing Costs). Upfront Financing Costs include reimbursement to SCE for amounts advanced for payment of such costs. Upfront Financing Costs may also include the costs of credit enhancements including the cost of purchasing a letter of credit or bond insurance policy; however, SCE does not anticipate that any such credit enhancement will be cost effective or required.

SCE has proposed to recover the Upfront Financing Costs from the proceeds of the Recovery Bonds. In Exhibit SCE-03, SCE estimates the Upfront Financing Costs to be approximately $6.7 million. A list of the Estimated Upfront Financing Costs is provided in Attachment 5 to this Financing Order.

SCE testified that its estimates of the Upfront Financing Costs are subject to change, as the costs are dependent on the timing of the issuance, market conditions at the time of issuance, and other events outside of SCE's control, such as possible litigation, incremental legal fees resulting from protracted resolution of issues, possible review by the Commission, delays in the SEC registration process, the identity of the bond issuer and rating agency fee changes and requirements. When the Recovery Bonds are sized and priced, Upfront Financing Costs would be updated and included in the Issuance Advice Letter.

In its testimony, SCE proposes that if the estimated Upfront Financing Costs included in the Issuance Advice Letter exceed actual Upfront Financing Costs, any excess would be credited to the excess funds subaccount and used to offset the revenue requirement in the next routine Fixed Recovery Charge true-up calculation. Further, in the event that the actual Upfront Financing Costs exceed the estimated amount included in the Issuance Advice Letter, the shortfall

amount may be recovered in the next routine true-up adjustment for the Fixed Recovery Charges.

We find the Upfront Financing Costs estimates reasonable and appropriate, and subject to Finance Team review and the Commission review of the Issuance Advice Letter.

### 6.3. Tax Questions

In its testimony, SCE asserts that the Recovery Bonds transaction will be structured as a "Qualifying Securitization" pursuant to IRS Rev. Proc. 2005-62 to achieve three important tax objectives. First, to lower overall taxes, the SPE will be treated as part of SCE for Federal income tax purposes, and not as a separate entity responsible for paying its own taxes. Second, this transaction structure will allow avoidance of recognition of taxable income upon the receipt of the financing order that creates the Recovery Property. Third, to avoid an immediate taxable gain when SCE transfers the Recovery Property to the SPE, the transfer will not be treated as a sale for Federal income tax purposes. Instead, SCE contends that the Recovery Bonds will be treated as SCE's own debt for Federal income tax purposes, because as materially relevant to the Recovery Bonds transaction, California income and franchise tax law currently conforms to U.S. federal income tax law, including but not limited to, IRS Rev. Proc. 2005-62.[53]

We will authorize SCE to structure the Recovery Bond transaction to meet the elements of a "Qualifying Securitization" pursuant to IRS Rev. Proc. 2005-62 such that: (1) the SPE will be a wholly owned subsidiary of SCE and capitalized with an equity interest; (2) the Recovery Bonds shall be secured by the Recovery Property; (3) the Fixed Recovery Charges shall be nonbypassable and payable by

---

[53] Exhibit SCE-03 at 28-29.

Consumers within SCE's Service Territory; and (4) payments on the Recovery Bonds shall be on a semi-annual basis except for the initial payment period which may be shorter or longer.

Article 5.8 provides that this Commission may allow FRTAs for any portion of the SCE's federal and State of California income and franchise taxes associated with the Fixed Recovery Charge and not financed from proceeds of the Recovery Bonds. SCE testified that it anticipates receiving a small accumulated deferred income tax savings.[54] Therefore, SCE does not contemplate the need for a separate fixed recovery tax amount (as defined in § 850(a)(8)). Moreover, because this accumulated deferred income tax savings will be small and may be eliminated by net cash flow deficits in later years, SCE proposes to track these tax implications outside of the securitization using standard ratemaking mechanisms. This approach was previously approved by the Commission in D.20-11-007 and D.21-10-025.

We also approve SCE's proposal to address tax implications, if any, outside of the securitization using standard ratemaking mechanisms, as addressed herein. In Exhibit SCE-03, SCE proposes to use the proceeds from the sale of the Recovery Bonds to offset the Third AB 1054 CapEx. A portion of the Third AB 1054 CapEx is currently being tracked in several wildfire mitigation memorandum accounts, with some of the costs in plant balance. We find such use consistent with Article 5.8 and approve such use.

### 6.4. Underwriters

SCE has proposed that the Recovery Bonds be sold pursuant to an underwriting agreement with one or more underwriters in a negotiated offering.

---

[54] Exhibit SCE-05.

We find that authorizing negotiated sales with additional flexibility is consistent with achieving the lowest long-term cost to Consumers and thus consistent with Article 5.8, and approve these negotiated offering and sale mechanisms, subject to this Financing Order's discussions regarding the Finance Team and Issuance Advice Letter.

In connection with the submission of each Issuance Advice Letter and the letter to be delivered by the Finance Team, SCE the lead underwriter(s) for each series of Recovery Bonds shall provide a written certificate to the Finance Team and the Commission on or before the date of the pricing of the Recovery Bonds (and shall be required to provide a bring down certificate dated as of the pricing date if such certificate is provided earlier) confirming that the issuance of the Recovery Bonds complies with: (i) this Financing Order; and (ii) all other applicable legal requirements (including all requirements of Article 5.8), and that the issuance of Recovery Bonds, would reduce, to the maximum extent possible, the rates on a present value basis that Consumers within SCE's Service Territory would pay as compared with the use of traditional utility financing mechanisms. Such certificates shall be a condition precedent to the issuance of such Recovery Bonds and all associated Commission Staff approvals. SCE may request that such certificates be provided on a confidential basis.

### 6.5. Status of Recovery Property

The recovery of all Upfront Financing Costs and Ongoing Financing Costs, as well as the initial Fixed Recovery Charges, shall automatically be approved and become effective at noon on the fourth business day after pricing unless before noon on the fourth business day after pricing the Commission rejects the Issuance Advice Letter. In this this Financing Order, the Commission approves SCE's proposal to approve the final terms and structure of each series of

Recovery Bonds, including recovery of the Upfront Financing Costs and all Ongoing Financing Costs for the life of such Recovery Bonds, as well as the initial Fixed Recovery Charges, through an Issuance Advice Letter process.

Article 5.8 authorizes SCE to recover Recovery Bond debt service and other Ongoing Financing Costs via the Fixed Recovery Charges. As described in its testimony, SCE proposes a methodology to allocate Recovery Costs among Customer Classes.[55]

In this Financing Order, we must assign a methodology to allocate costs and to calculate the Fixed Recovery Charge in a manner consistent with Article 5.8. We must authorize SCE to impose and collect the Fixed Recovery Charges in accordance with this Financing Order. We do so in accordance with SCE's proposal.

The Fixed Recovery Charges authorized here must be calculated and adjusted from time to time in a manner sufficient to ensure the timely and complete payment of principal and interest on the Recovery Bonds, together with other Ongoing Financing Costs associated with the servicing of the Recovery Bonds and supporting the operations of the SPE. Ongoing Financing Costs are defined as amounts payable to SCE as initial servicer, or any successor servicer, to service the Recovery Property; the amounts (or allocable amounts) payable to SCE as administrator of the SPE; bond trustee fees and expenses; allocated independent director fees, legal fees and expenses; accounting fees; rating agency surveillance fees; a return on SCE's equity contribution to the SPE; and, miscellaneous other costs and expenses associated with servicing of the Recovery Bonds and approved in this Financing Order. Ongoing Financing Costs also

---

[55] Exhibit SCE-06.

include any amount required to fund or replenish any reserve or over-collateralization supporting the credit of the Recovery Bonds, as well as any amounts required to replenish any drawdown of the SPE's equity contribution held in the capital subaccount.

Except for those Consumers exempt pursuant to § 850.1(i), the Fixed Recovery Charges will be paid by existing and future electric Consumers in SCE's Service Territory. Pursuant to Article 5.8, the Fixed Recovery Charges will be both irrevocable and nonbypassable, which assures Recovery Bond investors that the Fixed Recovery Charges will not be interrupted, eliminated, or avoided by Consumers in SCE's Service Territory.

To establish the initial Fixed Recovery Charges, SCE will submit an Issuance Advice Letter which should use the Cash Flow Model described in Attachment 1 (and as it may need to be revised from time to time in connection with the submission of a Non-Routine Mechanism Advice Letter), along with the most recent SCE sales forecast available prior to the pricing date for the Recovery Bonds, all in accordance with direction approved in this Financing Order.

In connection with the submission of the Issuance Advice Letter and the letter to be delivered by the Finance Team, SCE and the lead underwriter(s) for the Recovery Bonds shall provide a written certificate to the Finance Team and the Commission on or before the date of the pricing of the Recovery Bonds (and shall be required to provide a bring down certificate dated as of the pricing date if such certificate is provided earlier) confirming that the issuance of the Recovery Bonds complies with: (i) this Financing Order; and (ii) all other applicable legal requirements (including all the requirements of Article 5.8), and the issuance of Recovery Bonds would reduce, to the maximum extent possible, the rates on a present value basis that Consumers within SCE's Service Territory

would pay as compared with the traditional utility financing mechanisms. Such certificates shall be a condition precedent to the issuance of such Recovery Bonds and all associated Commission staff approvals. SCE may request that such certificates be provided on a confidential basis.

As described in Exhibit SCE-06, the Third AB 1054 CapEx expenses represents distribution infrastructure related costs and expenses that would, but for securitization, be allocated to Consumers based on the methodology described by SCE. SCE will provide Commission Staff, which may include the Finance Team, a pre-issuance proposal presented by SCE that forecasts the described Consumer allocation basis consistent with this Financing Order, based upon forecasted sales for the remainder of the then-current year and of the subsequent year, if applicable, and as available, a pending forecast for any period not covered by the most recently-approved sales forecast. The Commission will review SCE's initial Fixed Recovery Charges through the Issuance Advice Letter process.

### 6.6. True-Up Mechanism

§ 850.1(g) requires that a financing order "provide for periodic true-up adjustments to Fixed Recovery Charges, which shall be made at least annually and may be made more frequently. The electrical corporation shall submit an application with the commission to implement any true-up adjustment." SCE's proposed methodology for establishing a true-up adjustment generally adheres to this statute.

Article 5.8 requires the Commission to create an "effective mechanism" to ensure the recovery of all Recovery Costs through the imposition of the Fixed Recovery Charges, which must be paid by all Consumers until the Recovery

Bonds and all other Financing Costs are paid in full by the SPE.[56] To create this "effective mechanism," Article 5.8 authorizes the Commission to provide a procedure to make adjustments to the Fixed Recovery Charges at least annually. However, adjustments may be made more frequently, if necessary, to ensure timely recovery of the principal and interest on all Recovery Bonds and all other Ongoing Financing Costs.[57]

To satisfy these statutory requirements for a periodic true-up adjustment of the Fixed Recovery Charges, this Financing Order adopts the True-Up Mechanism proposed by SCE. This True-Up Mechanism will allow the Fixed Recovery Charges to be adjusted: (i) annually to correct any over-collection or under-collection of the Fixed Recovery Charges; and (ii) more frequently, if necessary, to ensure that the Fixed Recovery Charges provide sufficient funds to timely pay principal and interest on the Recovery Bonds and other Ongoing Financing Costs.[58]

SCE requests that the Commission approve the use of an Advice Letter process to implement these periodic true-up adjustments. This well-established approach has been used in connection with prior issuances of Energy Recovery Bonds, Rate Reduction Bonds, and in the prior AB 1054 securitization proceeding.[59] It will create efficiencies for the Commission and its Staff.

We approve and authorize the True-Up Mechanism as described in SCE's testimony and summarized below, provided that SCE's advice letters provide a complete accounting of the historical over-collection and under-collection of the

---

[56] § 850.1(b).

[57] §§ 850.1(b) and 850.1(g).

[58] *Ibid.*

[59] D.21-06-030.

Fixed Recovery Charges. For the avoidance of doubt, the Commission's authority under Article 5.8 and pursuant to § 850.1(g) to authorize periodic true-up adjustments persists until the Recovery Bonds and all Financing Costs are fully paid and discharged and does not expire like the Commission's authority to issue financing orders in the first instance under § 850.6.

SCE or any successor servicer may submit annual, semi-annual, and interim Routine True-Up Mechanism Advice Letters until the Recovery Bonds and all other Ongoing Financing Costs are paid in full. All true-up adjustments to the Fixed Recovery Charges will ensure the billing of Fixed Recovery Charges necessary to correct for any over-collection or under-collection of the Fixed Recovery Charges authorized by this Financing Order and to ensure timely payments of all scheduled (or legally due) payments of principal (including, if any, prior scheduled but unpaid principal payments), interest and other Ongoing Financing Costs for each of the two payment periods (generally six months) following the effective date of the initial or adjusted Fixed Recovery Charge. Such amounts are referred to as the Periodic Payment Requirement. A Periodic Payment should be based on the pro forma example identified as the Periodic Payment Requirement Form in Exhibit 2 of Attachment 2 (Form of Issuance Advice Letter) of this Financing Order.

True-up submissions will be based upon the cumulative differences between the Periodic Payment Requirement and the actual amount of Fixed Recovery Charge collections remitted to the Bond Trustee for the series of Recovery Bonds. This will result in adjustments to the Fixed Recovery Charges to correct for over-collections or under-collections. SCE or any successor servicer will submit annual, semi-annual, and interim Routine True-Up Mechanism

Advice Letters until the Recovery Bonds and all other Ongoing Financing Costs are paid in full.

SCE or any successor servicer should submit annual Routine True-Up Mechanism Advice Letters with a complete accounting of the historical over collection and under-collection of the Fixed Recovery Charges at least 50 days before the annual adjustment date specified in the Issuance Advice Letter (the Fixed Recovery Charge Annual Adjustment Date) until the Recovery Bonds and all other ongoing Financing Costs have been paid in full. These submissions are meant to ensure that the actual Fixed Recovery Charge collections are neither more nor less than required to repay Recovery Bond principal, interest, and all other Financing Costs.

Because the revised Fixed Recovery Charges in the annual Routine True-Up Mechanism Advice Letters should be ministerial, they may be Tier 1 ALs. These annual Routine True-Up Mechanism Advice Letters should be based on the pro forma example in Attachment 3 of this Financing Order. These advice letters are meant to ensure that the actual Fixed Recovery Charge collections are neither more nor less than required to repay Bond principal, interest, and related costs. These Tier 1 ALs are to receive a Commission Energy Division negative or affirmative response within 20 days of submission. In the absence of a Commission Energy Division negative response, SCE's, or any successor servicer's, timely revision to the Fixed Recovery Charges should automatically go into effect in accordance with the advice letter's proposed schedule.

SCE or any successor servicer must also submit semi-annual Routine True-Up Mechanism Advice Letters with a complete accounting of the historical over-collection and under-collection of the Fixed Recovery Charges. The semi-annual true-up adjustments should be used if SCE, or any successor servicer,

forecasts that Fixed Recovery Charge collections will be insufficient to make scheduled payments of Recovery Bond principal, interest, and other Financing Costs on a timely basis during the current or next succeeding payment period or to replenish any draws upon the capital subaccount. If SCE, or any successor servicer, determines a semi-annual true-up is required, SCE, or any successor servicer, should submit a semi-annual Routine True-Up Mechanism Advice Letter at least 50 days before the semi-annual adjustment date which should be six months after the Fixed Recovery Charge Annual Adjustment Date.

Because the revised Fixed Recovery Charges in the semi-annual Routine True-Up Mechanism Advice Letters should be ministerial, they may be Tier 1 ALs. These semi-annual Routine True-Up Mechanism Advice Letters should be based on the pro forma example in Attachment 3 of this Financing Order. These advice letters are meant to ensure that the actual Fixed Recovery Charge collections are neither more nor less than required to repay Bond principal, interest, and related costs. These Tier 1 ALs are to receive a Commission Energy Division negative or affirmative response within 20 days of submission. In the absence of a Commission Energy Division negative response, SCE's, or any successor servicer's, timely revision to the Fixed Recovery Charges should automatically go into effect in accordance with the advice letter's proposed schedule.

SCE or any successor servicer may also submit interim Routine True-Up Mechanism Advice Letters at such other times as SCE, or any successor servicer, deems necessary. The interim true-up adjustment would be used if SCE, or any successor servicer, forecasts that Fixed Recovery Charge collections may be insufficient to make scheduled payments of Recovery Bond principal, interest,

and other Financing Costs on a timely basis during the current or next succeeding payment period.

Because the revised Fixed Recovery Charges in the interim Routine True-Up Mechanism Advice Letters should be ministerial, they may be Tier 1 ALs. These interim Routine True-Up Mechanism Advice Letters should be based on the pro forma example in Attachment 3 of this Financing Order. These advice letters are meant to ensure that the actual Fixed Recovery Charge collections are neither more nor less than required to repay Bond principal, interest, and related costs. These Tier 1 ALs are to receive a Commission Energy Division negative or affirmative response within 20 days of submission. In the absence of a Commission Energy Division negative response, SCE's, or any successor servicer's, timely revision to the Fixed Recovery Charges should automatically go into effect in accordance with the interim Routine True-Up Mechanism Advice Letter's proposed schedule.

All Fixed Recovery Charge-related annual, semi-annual, and interim True-Up Mechanism Advice Letters would be subject to protest, review, and correction to the fullest extent allowed by § 850.1(e). However, any protest, review, and correction will be limited to the correction of mathematical errors in the Routine True-Up Mechanism Advice Letters. No protest, review or required modification to correct an error in a Routine True-Up Mechanism Advice Letter would delay its effective date, and any correction or modification which could not be made prior to the effective date would be made in the next Routine True-Up Mechanism Advice Letter.

SCE or any successor servicer may also submit Non-Routine True-Up Mechanism Advice Letters to propose revisions to the logic, structure and components of the Cash Flow Model described in Attachment 1 or as adjusted in

a subsequent Non-Routine True-Up Mechanism Advice Letter. Non-Routine True-Up Mechanism Advice Letters should be Tier 2 ALs and submitted at least 90 days before the date when the proposed changes would become effective, with the resulting changes effective on the effective date identified in the Non-Routine True-Up Mechanism Advice Letter. The Energy Division should prepare for the Commission's consideration a resolution that adopts, modifies, or rejects the proposed revisions to the Cash Flow Model. The public will have an opportunity to review and protest a Non-Routine True-Up Mechanism Advice Letter in accordance with Commission procedures to the fullest extent allowed by § 850.1(e). Absent a Commission resolution that adopts, modifies, or rejects the Non-Routine True-Up Mechanism Advice Letter, SCE, or any successor servicer, may implement the Fixed Recovery Charge adjustments proposed in a Non-Routine True-Up Mechanism Advice Letter on the effective date identified in the letter. The Non-Routine True-Up Mechanism Advice Letters should be based on the pro forma example in Attachment 4 of this Financing Order.

The Routine True-Up Mechanism Advice Letters and Non-Routine True-Up Mechanism Advice Letters should calculate a revised Fixed Recovery Charge for each series of Recovery Bonds using the initial allocation factors that will be updated to reflect any changes in sales and the Cash Flow Model described in Attachment 1 of this Financing Order or as subsequently modified in a Non-Routine True-Up Mechanism Advice Letter, as applicable.

We find the True-Up Mechanism proposed by SCE, including the Cash Flow Model, as discussed and integrated here, to be consistent with and to satisfy the requirement of Article 5.8 for an effective adjustment mechanism to ensure payment of all Recovery Costs and approve its use. In this Financing Order, we also find that the Routine True-Up Mechanism Advice Letters and

Non-Routine True-Up Mechanism Advice Letters described above constitute "applications" within the meaning of § 850.1(g) and authorize SCE to submit these Advice Letters to implement true-up adjustments to the Fixed Recovery Charges.

### 6.7. Flow Through of Benefits

As set forth in SCE's testimony, SCE has described numerous costs and benefits associated with the Recovery Bonds that will be flowed through to Consumers of electricity via other ratemaking processes. The specific costs and benefits that will be addressed in other ratemaking proceedings will be:

1. The Cost of Franchise Fees Assessed by the Cities and Counties. The Fixed Recovery Charges will be subject to franchise fees levied by cities and counties associated with the Fixed Recovery Charges. SCE proposes to record these amounts in the distribution sub-account of SCE's BRRBA for recovery from or credit to Consumers. These franchise fees will be recorded as costs of service by SCE through normal ratemaking processes;
2. The Benefit of Servicing and Administration Fees Paid to SCE. SCE will be the initial servicer for the Recovery Bonds. That means that SCE will bill, collect and remit the Fixed Recovery Charge collections from Consumers to the Bond Trustee. In addition, SCE will be the administrator for the SPE. The Bond Trustee will pay SCE for these servicing and administration services. The servicing and administration fees collected by SCE, as the servicer under the Servicing Agreement or administrator under the Administration Agreement, will be reflected in SCE's ongoing cost of such service such that any amounts in excess of SCE's incremental costs of servicing and administrating the Recovery Bonds should be returned to SCE's retail Consumers in through normal ratemaking processes. The expenses incurred by SCE or such affiliate to perform obligations under the Servicing Agreement and Administration Agreement not otherwise recovered

through the Fixed Recovery Charges will likewise be included in SCE's cost of service to be recovered by SCE through normal ratemaking processes; and

3. The Benefit of Any Surplus Funds Held by the Bond Trustee. The Bond Trustee will hold the Fixed Recovery Charge collections used to repay the Recovery Bonds and all Financing Costs. To the extent the Bond Trustee earns interest in excess of its obligations under the financing agreements, that interest will be held in the excess funds subaccount and used to reduce future Fixed Recovery Charge requirements. Upon repayment of the Recovery Bonds and all Ongoing Financing Costs, if a balance remains in the collection account, or any subaccount (other than the capital subaccount), that balance will be returned to Consumers by SCE through the normal ratemaking processes.

### 6.8. Capital Structure Adjustments

Consistent with the Commission's past decisions concerning Article 5.8 electric utility securitized bonds,[60] SCE proposes to remove all Recovery Bond securitized debt from SCE's ratemaking capital structure, as the SPE will have the legal obligation to repay the Recovery Bonds from Fixed Recovery Charge collections. In this way, the securitized debt is not to be considered SCE debt as part of its ratemaking capital structure. However, this would be done notwithstanding that, for financial reporting purposes and federal tax purposes, the securitized debt may be recorded as a liability on SCE's consolidated financial statements.

Consistent with such past decisions, these adjustments are approved as necessary for both SCE's capital structure and for these reporting and tax purposes.

---

60 *See* D.20-11-007 at 126 (Ordering Paragraph 51).

### 6.9. Implications of Nonbypassable Charges for Departing Load

As required by Article 5.8,[61] the Fixed Recovery Charges shall be nonbypassable and recovered from existing and future Consumers in SCE's Service Territory other than Consumers in Exempt Fixed Recovery Charge Customer Classes.

In addition, Consumers in SCE's Service Territory that no longer take transmission and distribution retail service, or that depart or reduce SCE service after the date of this Financing Order, or that meet relevant criteria in the applicable tariff after the date of this Financing Order, should be treated as DL customers using applicable tariffs for DL Consumers, including CGDL-CRS. DL Consumers will be subject to pay the Fixed Recovery Charges. The Fixed Recovery Charge is applicable to current SCE Consumers that become DL Consumers after the date of this Financing Order. For these DL Consumers on TMDL or NMDL schedules, SCE proposes to calculate the Fixed Recovery Charge amounts that would need to be paid, using an approach that is consistent with the method currently in place for calculation of TMDL and NMDL obligations.

We note that § 850.1(b) states that "[t]he commission may establish . . . an *effective mechanism that ensures recovery* of recovery costs through *nonbypassable fixed recovery charges* and any associated fixed recovery tax amounts *from existing and future consumers in the service territory* . . ." (emphasis added). The Commission has clearly applied these nonbypassable charges to all departing load customers in all such financing orders.[62]

---

[61] §§ 850(b)(7)-(8) and 850.1(b).

[62] *See* D.20-04-030, D.20-11-007, D.21-05-015, and D.21-10-025.

We make it clear that, in accordance with the statute, we direct the nonbypassable fixed recovery charges to apply to existing and future customers in the service territory, regardless of possible future municipalization or possible future asset transfers, other than those in Exempt Fixed Recovery Charge Customer Classes. We do this to properly apply the plain language of the statute. We also do this to ensure the confidence of potential Recovery Bond purchasers who understandably need to expect that there is an effective mechanism to ensure recovery of recovery costs through fixed recovery charges to repay the Recovery Bonds.

### 6.10. Billing

As provided by § 850.1(g), the Fixed Recovery Charge must appear on the Consumer's bill. That billing information must be provided as described below in this Financing Order. The Billing Commencement Date will be identified in the Issuance Advice Letter. SCE may structure a shorter or longer first interest payment period due to limitations in its billing system.

SCE proposes to include the Fixed Recovery Charge as a single line item for billing and accounting purposes. This line item would include the Fixed Recovery Charge relating to the Recovery Bonds issued pursuant to the D.20-11-007, D.21-10-025, the current Application, and any future securitization charges.

SCE proposes to provide Customers the following explanation of the Fixed Recovery Charge in the "Things You Should Know" section of each Consumer's bill:

> Fixed Recovery Charge: SCE has been permitted to issue bonds that enable it to recover more quickly certain costs related to preventing and mitigating catastrophic wildfires. Your bill for electric service includes a Fixed Recovery Charge

that has been approved by the CPUC to repay those bonds. The right to recover the Fixed Recovery Charge has been transferred to a separate entity (called the Special Purpose Entity) that issued the bonds and does not belong to SCE. SCE is collecting the Fixed Recovery Charge on behalf of the Special Purpose Entity.

The Commission approves the bill presentation and implementation of the Fixed Recovery Charge on Consumer Bills, as described herein.

### 6.11. Billing, Collecting, and Remitting the Fixed Recovery Charges

SCE or any successor servicer would be responsible for determining Consumers' electricity usage, billing, collecting, and remitting the Fixed Recovery Charge to the Bond Trustee, and submitting Routine True-Up Mechanism Advice Letters and Non-Routine True-Up Mechanism Advice Letters as described above. To the extent Consumers of electricity in SCE's Service Territory are billed by ESPs or another utility or entity (collectively, Third-Party Billers), SCE, or any successor servicer, will bill these Third-Party Billers, as the case may be, for the Fixed Recovery Charge, and the Third-Party Billers will be obligated to remit Fixed Recovery Charge collections to SCE.

Given recent billing system enhancements made by SCE providing for a dedicated line-item for the Fixed Recovery Charge, SCE will remit actual Fixed Recovery Charge collections, on behalf of the SPE, to the Bond Trustee. The Bond Trustee will be responsible for making principal and interest payments to Recovery Bond investors and paying other Ongoing Financing Costs, and will hold and apply such amounts as described under "Bond Transaction Structure" above. SCE, or any successor servicer, will remit Fixed Recovery Charge collections in accordance with the servicing agreement to the Bond Trustee. The SPE will own legal title to, and all equitable interest in, the Recovery Property,

including the Fixed Recovery Charge, and SCE will be legally obligated to remit all Fixed Recovery Charge collections to the Bond Trustee for the Recovery Bonds secured by such Recovery Property.

SCE expects the rating agencies to require SCE, or any successor servicer, to remit the actual Fixed Recovery Charge collections to the Bond Trustee on a daily basis to avoid an adverse impact on the Recovery Bond credit ratings. Using a dedicated, Fixed Recovery Charge line item on Consumers bills, SCE expects to remit actual Fixed Recovery Charge collections to the Bond Trustee on a daily basis and within two business days of receipt to satisfy rating agency requirements.

Over the life of the Recovery Bonds, SCE, or any successor servicer, will prepare a monthly servicing report for the Bond Trustee that shows the actual Fixed Recovery Charge collections by month. The Bond Trustee (acting on behalf of the SPE) will have a legal right to only the amount of actual Fixed Recovery Charge collections.

SCE has also proposed that amounts collected that represent partial payments of a Consumer's bill will be allocated between the Bond Trustee and SCE based on the ratio of the billed amount for the Fixed Recovery Charge to the total billed amount. SCE states that this reconciliation and allocation methodology is an important bankruptcy consideration in determining the true sale nature of the transaction.

Consistent with D.20-11-007 and D.21-10-025, so long as multiple series of Recovery Bonds issued pursuant to Article 5.8 are outstanding and unpaid, the Fixed Recovery Charge should be allocated pro rata between the Bond Trustees

for each series of Recovery Bonds. As contemplated in Article 5.8,[63] SCE will act as the initial servicer for the Recovery Bonds, and the Recovery Property and the Fixed Recovery Charge will be pledged to secure the Recovery Bonds. We find these servicing arrangements as well as the billing, collecting and remittance procedures described above to be consistent with Article 5.8 and consistent with seeking to achieve the lowest cost on the Recovery Bonds, and we approve these arrangements and procedures.

SCE has represented that in order to obtain the necessary true sale and bankruptcy opinions, the SPE must pay a servicing fee to SCE that is set at a level that constitutes fair and adequate consideration sufficient to obtain the true sale and bankruptcy opinions required for the Securitization. SCE proposes to charge an annual servicing fee of 0.05 percent of the presumed initial principal Recovery Bond amount, plus out-of-pocket expenses (*e.g.*, legal, accounting fees), to cover SCE's incremental costs and expenses in servicing the Recovery Bonds.

In this Financing Order, the Commission finds the proposed servicing fee to be reasonable subject to review by the Finance Team to examine the support and logic of this SCE charge as an annual servicing fee that is set at a level that constitutes fair and adequate consideration sufficient to obtain the true sale and bankruptcy opinions required for the Securitization.

In the event that SCE fails to perform its servicing functions satisfactorily, as set forth in the Servicing Agreement, or is required to discontinue its billing and collecting functions, a successor servicer acceptable to the Bond Trustee, acting on behalf of the Recovery Bond holders, and approved by the Commission will replace SCE. SCE is prohibited form rejecting any of the duties, obligations,

[63] §§ 850.1(b), 850.1(e), and 850.2.

or responsibilities directed by the Financing Order. If SCE fails to perform its servicing functions satisfactorily, we task the Commission's Energy Division with determining the appropriate annual fees to be paid to the new servicer, and any such fee agreement with the new servicer must be approved by the Commission through a resolution.

In the case of certain types of events resulting in of default under the Servicing Agreement upon the application of the Bond Trustee, as permitted by § 850.3(e), the Commission may sequester Fixed Recovery Charges necessary to enhance the credit quality of the Recovery Bonds.

The credit quality and expertise in performing servicing functions will be important considerations when appointing a successor servicer to ensure the credit ratings for the Recovery Bonds are maintained. Therefore, the Commission does not intend to approve a new servicer without first determining that the appointment of the selected servicer will not cause the then-current rating of any then outstanding Recovery Bonds to be withdrawn or downgraded. This will provide assurance to the rating agencies that the Recovery Bonds' rating will not be undermined in the future because of a successor servicer.

Although SCE will act as servicer, it is possible that Third-Party Billers will bill and collect the Fixed Recovery Charges from some Consumers. To the extent SCE's Consumers of electricity are billed by Third-Party Billers, SCE proposes to bill these Third-Party Billers for the Fixed Recovery Charge, with the Third-Party Billers being obligated to remit Fixed Recovery Charge collections to SCE. SCE would remit Fixed Recovery Charge collections to date, on behalf of the applicable SPE, to the Bond Trustee. These Third-Party Billers should meet minimum billing and collection experience standards and creditworthiness criteria (to seek to prevent the rating agencies from imposing additional credit

enhancement requirements or assigning lower credit ratings to the Recovery Bonds). Therefore, SCE requests that Third-Party Billers that bill and collect the Fixed Recovery Charge satisfy the creditworthiness and other requirements applicable to ESPs that meter and bill electric Consumers as set forth in SCE's Electric Rule 22.P (Credit Requirements).

### 6.12. Periodic Reporting

General Order (GO) 24-C requires utilities to submit a periodic report to the Commission that contains, among other things, the following information: (1) the amount of debt issued by the utility at the end of the period; (2) the total amount of debt outstanding at the end of the prior period; and (3) the Commission's paid and total proceeds received from debt issued during the prior period. The Commission's Financing Rule adopted in D.12-06-015 (as amended in D.12-07-003) likewise imposes certain requirements and reporting obligations in connection with the issuance of debt securities and use of swaps and hedges. SCE states that it will comply with the Financing Rule and GO 24-C with respect to the Recovery Bonds and we authorize SCE, on behalf of the SPE, to provide periodic reports pursuant to GO 24-C and the Financing Rule regarding the Recovery Bonds to the Commission Staff. Failure of SCE to comply with any such reporting requirement will not adversely affect or impair the Fixed Recovery Charges, the Recovery Property, or the payment of the Recovery Bonds and all Ongoing Financing Costs.

## 7. Fixed Recovery Charge Allocation

This Financing Order must determine the allocation of the Fixed Recovery Charge among SCE's customers. There is no statutory provision that directs the Commission's determination regarding the Customer Class allocation of the nonbypassable Fixed Recovery Charges. Therefore, we must review the relevant

facts and party positions to determine the appropriate Fixed Recovery Charge allocation. Consistent with the Initial AB 1054 Capital Expenditure Decision, we approve five aspects of the allocation.

First, some of SCE's asserted wildfire mitigation expenditures may be characterized as Construction Work in Progress (CWIP). While these are expenditures for SCE by definition of their purpose (here, for wildfire mitigation), if the work is not complete, they are normally not yet able to be moved into SCE's rate base. SCE has stated in its testimony that it will seek to move CWIP expenditures into rate base as soon as practicable.

Second, therefore, SCE should take all practicable measures, as expeditiously as possible, to recharacterize Track 1 AB 1054 CapEx CWIP expenditures as rate-based expenditures, so as to capture maximal rate-payer savings. If, after taking such measures, SCE has less than $730,437,940 million of Third AB 1054 CapEx in rate base at the time of issuance of the Recovery Bonds, SCE is authorized to finance Third AB 1054 CapEx capital expenditures temporarily recorded as CWIP.

Third, as required by Article 5.8, the Fixed Recovery Charges shall be nonbypassable and recovered from existing and future Consumers in SCE's Service Territory, other than Consumers in Exempt Fixed Recovery Charge Customer Classes.

Fourth, for Third AB 1054 CapEx, SCE proposes the allocation methodology set forth in the Marginal Cost and Revenue Allocation Settlement Agreement adopted by the Commission in D.22-08-001. Consistent with that settlement, the Special Allocator methodology applicable to WRR shall apply to allocate the Fixed Recovery Charge for the Recovery Bonds and shall remain the

same for the life of the bonds, with adjustments for sales changes to collect the revenue requirement.

Fifth, the treatment of Exempt Fixed Recovery Charge Customer Classes shall be in accord with §§ 739.1(c) and 739.12(b). § 739.1(c)(1) states that "[t]he average effective CARE discount shall not be less than 30 percent or more than 35 percent of the revenues that would have been produced for the same billed usage by non-CARE customers" and § 739.12(b) states that "[t]he FERA program discount shall be an 18 percent line-item discount applied to an eligible customer's bill calculated at the applicable rate for the billing period." Recently, Assembly Bill 205 (AB 205), among other things, amended § 739.1(c) with respect to determination of the average effective CARE discount.

In its Application, SCE asserts that the Fixed Recovery Charge would be calculated in part as follows:

> "by… excluding those consumers participating in the CARE or FERA programs, which are exempt from paying the Fixed Recovery Charge pursuant to Section 850.1(i). The shortfall resulting from this exclusion would be allocated on an equal-cents-per-kilowatt basis consistent with other public purpose programs and the methodology adopted by the Commission in the First and Second AB 1054 CapEx Financing Orders."[64]

In its testimony, SCE explains that the basis for proposing to maintain the same methodology for applying the CARE/FERA statutes regarding Recovery Bond Fixed Recovery Charges for its customers, despite the possible changes that might result from AB 205, is because "the Commission may address the broader issue of how the average effective CARE discount is impacted by AB 205, in relation to other charges including the Fixed Recovery Charges, in a separate

[64] SCE Application at 17, citing to D.20-11-007 and D.21-10-025.

proceeding that involves the relevant stakeholders."[65] In Commission Rulemaking (R.) 22-07-005, the Assigned Commissioner's Scoping Ruling expressly determined that the application of AB 205 regarding its possible impact on fixed charges, among other possible impacts of AB 205, is to be decided in that proceeding.[66] Both SCE and TURN are parties to R.22-07-005, along with several dozen other interested stakeholders.

TURN contends that this proceeding should immediately determine the impact of AB 205, despite acknowledging that R.22-07-005 is addressing AB 205's implications regarding fixed charges, such as those at issue here.[67] TURN argues that "rather than add [this proceeding's fixed charges] to the list of charges and exemptions that have to be addressed in R.22-07-005, the Commission should take steps here to prevent the Fixed Recovery Charge for this securitization from ever getting on the list."[68]

We disagree with TURN's argument that AB 205 must be interpreted and applied immediately in this proceeding for SCE's customers, rather than enable a consistent application of AB 205's possible implications for all CARE/FERA customers regarding all exemptions and discounts related to fixed charges. Assuring that all interested stakeholders have a voice in assisting the generation of a consistent application of all exemptions and discounts related to all fixed charges for all CARE/FERA customers in California is a meaningful part of why the Commission initiated Rulemaking R.22-07-005. Consequently, we find TURN's position only encourages a piecemeal approach risking inconsistent

---

[65] Exhibit SCE-06 at 12.

[66] R.22-07-005, Assigned Commissioner's Scoping Memo and Ruling (November 2, 2022) at 3-4.

[67] TURN Opening Brief at 5.

[68] TURN Opening Brief at 5.

decisions, and therefore, regarding SCE's calculation of the Fixed Recovery Charge, we direct §§ 739.1(c) and 739.12(b) to be applied here as they were in D.20-11-007 and D.21-10-025. We acknowledge that SCE may be required to adjust the methodology for calculating the average effective CARE discount based on the Commission's implementation of AB 205 in R.22-07-005.

## 8. The Required Contents of the Financing Order

The required contents of the Financing Order must encompass direction for SCE to follow in executing all steps to implement the Recovery Bonds sale with all reasonable transparency and safeguards and optimal Consumer results. The Commission has previously directed similar Financing Orders. Here, the Financing Order must be effected so as to enable a Finance Team (as determined above). Therefore, this Financing Order is directing the formation of a Finance Team, and such other conditions as are imposed herein.

## 9. Continued Reporting Compliance

The requirement for SCE to provide continued reporting compliance to the Commission is implemented by instructing SCE to provide the Commission with information regarding the results of the sale of the Recovery Bonds, and by SCE's Fixed Recovery Charge true-up efforts to inform Commission Staff, and by such additional reporting direction as is found in this Financing Order. SCE acknowledges that it must continue to provide the Commission with GO 24-C Reporting relevant to this Financing Order. To the extent necessary, the Finance Team may review and participate in the development of information to be reported.

As part of each subsequent Financing Order application pursuant to AB 1054, SCE acknowledges that it must provide the Commission with an evaluation regarding these Track 1 and Track 3 AB 1054 CapEx Recovery Bonds

proposal and the actual results of the Recovery Bonds sales effort, regarding the extent of SCE's ability to reduce, to the maximum extent possible, the rates to Consumers compared to traditional utility finance mechanisms.

**10. Fees**

Whenever the Commission authorizes a utility to issue debt, the Commission is required to charge and collect a fee in accordance with § 1904(b), which states, in relevant part, as follows:

> For a certificate authorizing an issue of bonds, or other evidences of indebtedness, two dollars ($2) for each one thousand dollars ($1,000) of the face value of the authorized issue or fraction thereof up to one million dollars ($1,000,000), one dollar ($1) for each one thousand dollars ($1,000) over one million dollars ($1,000,000) and up to ten million dollars ($10,000,000), and fifty cents ($0.50) for each one thousand dollars ($1,000) over ten million dollars ($10,000,000), with a minimum fee in any case of fifty dollars ($50). **No fee need be paid on such portion of any such issue as may be used to guarantee, take over, refund, discharge, or retire any stock, bond, note, or other evidence of indebtedness on which a fee has theretofore been paid to the commission.** (Emphasis added.)

We conclude that § 1904(b) applies to the Recovery Bonds, as there is nothing in Article 5.8 that exempts the Recovery Bonds from § 1904(b). The following table shows the calculation of the fee required by § 1904(b):

**Table 1.** Computation of Fee

| | |
|---|---|
| Recovery Bonds Authorized | $772,432,000 |
| Fee on First $1 Million | $2,000 |
| Fee on $1 Million - $10 Million | $9,000 |
| Fee on Amount Over $10 Million | $381,216 |
| **Total Fee** | **$392,216** |

SCE should remit the required fee of $392,216, which amount is subject to change based on the final principal amount of Recovery Bonds to be issued pursuant to this Financing Order as set forth in the Issuance Advice Letter, to the Commission's Fiscal Office no later than 10 days after all conditions precedent for the issuance of the Recovery Bonds have been satisfied and, in any event, prior to the first issuance of the Recovery Bonds. SCE is permitted to pay its Application fees through wire transfer, notwithstanding Rule 1.16 of the Commission's Rules of Practice and Procedure (Rules). The SPE should reimburse SCE for this fee. This fee will be an Upfront Financing Cost.

### 11. Irrevocable Financing Order

This Financing Order is irrevocable to the extent set forth in § 850.1(e). Pursuant to § 850.1(e), the State of California through this Financing Order pledges and agrees with SCE, owners of Recovery Property, the SPE(s), and holders of the Recovery Bonds, that the State shall neither limit nor alter, except with respect to the True-Up Mechanism, the Fixed Recovery Charges, the Recovery Property, this Financing Order, or any rights thereunder until the Recovery Bonds, together with the interest thereon and associated Financing Costs, are fully paid and discharged, and any associated taxes have been satisfied or, in the alternative, have been refinanced through an additional issue of Recovery Bonds. However, nothing shall preclude the limitation or alteration if and when adequate provision shall be made by law for the protection of SCE and the owners and holders of Recovery Bonds. The SPE is authorized to include this pledge and undertaking for the State in such Recovery Bonds.

### 12. SCE's Written Consent to Be Bound By Financing Order

In accordance with § 850.1(d), the Financing Order adopted herein shall become effective only after SCE files its written consent to all the terms and

conditions of this Financing Order. Within 10 days from the issuance date of this Financing Order, SCE should file and serve a written statement that provides notice of whether or not SCE consents to all terms and conditions of this Financing Order. If SCE declines to provide its consent, SCE's written statement should identify the specific terms and conditions it finds objectionable and explain why it does not consent to these terms and conditions.

## 13. Rehearing and Judicial Review

This Financing Order construes, applies, implements, and interprets the provisions of Article 5.8. Therefore, applications for rehearing and judicial review of this Financing Order are subject to §§ 1731 and 1756. These laws provide that any application for rehearing of this Financing Order must be filed within 10 days after the date of issuance of this Financing Order. The Commission must issue its decision on any application for rehearing within 210 days of the filing of the application for rehearing. Within 30 days after the Commission issues its decision denying the application for a rehearing, or, if the application was granted, then within 30 days after the Commission issues its decision on rehearing, or at least 120 days after the application for rehearing is granted if no decision on rehearing has been issued, any aggrieved party may petition for a writ of review in the court of appeal or the Supreme Court for the purpose of having the lawfulness of the Financing Order or decision on rehearing inquired into and determined. If the writ issues, it shall be made returnable at a time and place specified by court order and shall direct the Commission to certify its record in the case to the court within the time specified.

## 14. Comments on Proposed Decision

This proposed Financing Order was mailed to the parties in accordance with § 311 and comments were allowed under Rule 14.3. Comments were filed

on February 9, 2023 by SCE. No reply comments were filed. SCE's comments were non-substantive, and were essentially edits for consistency, readability, and accuracy. Most of SCE's comments were adopted. Minimal additional edits were included for further consistency and accuracy.

## 15. Assignment of Proceeding

Commissioner Darcie L. Houck is the assigned Commissioner and Jason Jungreis and Patrick Petersen are the assigned Administrative Law Judges in this proceeding.

## Findings of Fact

1. The Recovery Bonds proposed by SCE possess all of the characteristics required or authorized by Article 5.8 including:

   a. The Recovery Bonds will be secured principally by the right to receive revenues from irrevocable and nonbypassable Fixed Recovery Charges designed to provide timely and sufficient funds to pay for Recovery Bond principal, interest, and all other Financing Costs. This is the right to the Recovery Property.

   b. The proceeds of the Recovery Bonds and sale of the Recovery Property to the SPE will be used by SCE to pay or reimburse SCE for the cost of paying Recovery Costs, which includes the bond amounts and Upfront Financing Costs.

   c. SCE will not issue the Recovery Bonds. The Recovery Bonds will be issued by one or more bankruptcy remote SPEs that are: (a) formed and wholly owned by SCE; and (b) separate from SCE. The SPE will purchase the Recovery Property in an absolute transfer and true sale and own the Recovery Property, including the right to receive Fixed Recovery Charge collections.

   d. The issuance of the Recovery Bonds will result in savings to Consumers, when compared to traditional recovery methods for the $215,168,000 million of Track 1 AB 1054

CapEx and the $515,270,000 of Track 3 AB 1054 CapEx bond amounts at issue in this Application.

e. The Recovery Bonds will be issued pursuant to enacted legislation (*i.e.*, Article 5.8) that is satisfactory to SCE and to the Commission and the proposed transaction structure for issuing the recovery bonds is consistent with structure generally used in the utility sector.

2. SCE has demonstrated, using SCE's 2022 authorized rate of return of 7.68 percent, that issuance of the Recovery Bonds will reduce Consumer rates by approximately $493.1 million on a present value basis as compared to the recovery of the approximately $730.4 million Third AB 1054 CapEx bond amount approved in this Financing Order through traditional utility financing of that amount.

3. SCE has demonstrated that the recovery of the Third AB 1054 CapEx, Pre-Securitization Debt Financing Costs, and Upfront Financing Costs through the designation of Fixed Recovery Charges and the issuance of the Recovery Bonds employing the review and approval of the Finance Team, and in conformance with the requirements set forth in this Financing Order, is expected to reduce, to the maximum extent possible, the rates to Consumers on a present value basis as compared to traditional utility financing mechanisms, and the proposed recovery bond term is consistent with the estimated useful life of the underlying assets for SCE's Third AB 1054 CapEx expenditures.

4. The Recovery Bonds will be issued by the SPE, and not by SCE, and the SPE will be a wholly-owned separate subsidiary of SCE, either the existing SPE or one that will be established for the purpose of carrying out this Financing Order.

5. The purpose of the Finance Team is to provide oversight over the structuring, marketing, and pricing of the transaction and to review and approve

the material terms of the transaction in light of the goal to reduce rates on a present value basis to the maximum extent possible pursuant to AB 1054's directives.

6. The Finance Team's pre-issuance review and approval of the material terms and structure of a series of Recovery Bonds will be evidenced by a letter from the Finance Team to SCE delivered on or before the date of the pricing of the relevant Recovery Bonds. SCE will be required to include such approval letter as an attachment to the Issuance Advice Letter relating to such series of Recovery Bonds, or as a supplement to such Issuance Advice Letter. Such approval letter from the Finance Team to SCE will be a condition precedent to the issuance of such series of Recovery Bonds, as will be the certification to the Finance Team from SCE, and from the lead underwriter(s), of each Recovery Bond's final Authorized Amount, including the final calculation of the Upfront Financing Costs, for approval by the Finance Team.

7. The Commission will, through its Staff, review and approve the final terms and structure of each series of Recovery Bonds through the Issuance Advice Letter process to ensure the terms and structure are consistent with the Financing Order.

8. As provided in § 850(b)(11), the Recovery Property, which will be established by this Financing Order and further identified in the Issuance Advice Letter, includes: (i) the right, title and interest in and to the Fixed Recovery Charges, including the right to obtain adjustments of such charges as authorized in this Financing Order; and (ii) the right to be paid the Fixed Recovery Charges, as well as all revenues, collections, claims, payments, moneys, or proceeds of or arising from the Fixed Recovery Charges.

9. Pursuant to § 850.2(d), the Recovery Property established by this Financing Order will continue to exist until the date on which the Recovery Bonds and all of its associated Ongoing Financing Costs are paid in full.

10. The owners of Recovery Property are entitled to recover Fixed Recovery Charges in the aggregate amount sufficient to pay on a timely basis the principal and interest on the Recovery Bonds together with all other Financing Costs associated with the Recovery Bonds until all such costs are paid in full.

11. Fixing the interest rate of the Recovery Bonds and the full amortization term is reasonably expected to ensure the maximum possible Consumer savings.

12. Dividing the Recovery Bonds into one or two series consisting of one or more tranches of bonds representing different legal maturities, with the final number, type, and size of Recovery Bond tranches to be approved by the Finance Team, will support reducing, to the maximum extent possible, the rates on a present value basis that Consumers will pay compared to traditional utility financing mechanisms.

13. The credit quality of the Recovery Bonds will be enhanced by ordering the sequestration and payment of the Fixed Recovery Charges to the Bond Trustee for the benefit of the SPE in the event that SCE defaults on its role as servicer of the Recovery Bonds.

14. To achieve the highest possible credit ratings for the Recovery Bonds, rating agencies may require over-collateralization by the SPE.

15. The SPE will have the legal obligation to repay the Recovery Bonds from Fixed Recovery Charge collections.

16. It is reasonable for the SPE, as the owner of the Recovery Property, to pledge the Recovery Property as collateral to the Bond Trustee to secure

payments of the principal and interest on the Recovery Bond and all other Ongoing Financing Costs.

17. We accept SCE's estimates that total Upfront Financing Costs (assuming one issuance and no credit enhancements) would be approximately $6.7 million.

18. An equity contribution toward the initial principal amount of the Recovery Bonds is required in order to assure that the issuance of the Recovery Bonds will be treated as a Qualifying Securitization and obtain favorable debt-for-tax treatment for federal income tax purposes.

19. Establishment, and adjustment from time to time, of the Fixed Recovery Charges is required to ensure the collection of sufficient revenue to pay, on a timely basis and in full, the principal and interest on the Recovery Bonds as scheduled, together with all other Financing Costs.

20. Recovery of the Ongoing Financing Costs associated with servicing the Recovery Bonds and supporting the operations of the SPE, including without limitation, servicing fees, administration fees, and Bond Trustee fees, and credit enhancement costs, if required, through the Fixed Recovery Charges, is necessary in order to ensure the bankruptcy remoteness of the SPE and obtain the highest possible rating on the Recovery Bonds.

21. It is reasonable for SCE to recover the cost or credit amounts that are needed to address any federal and State of California income and franchise taxes associated with the Fixed Recovery Charges but not approved as Financing Costs to be financed from the proceeds of the Recovery Bonds, and for SCE to record these amounts in the distribution sub-account of SCE's BRRBA for recovery from or credit to Consumers.

22. The ratemaking mechanisms described in this Financing Order to determine the Fixed Recovery Charges, including the allocation of the Recovery

Costs through the Fixed Recovery Charges, the True-Up Mechanism, and submission of the Routine True-Up Mechanism Advice Letters and Non-Routine True-Up Mechanism Advice Letters pursuant thereto, are reasonable and ensure the timely payment of the Recovery Bonds and all other Ongoing Financing Costs and secure for the Recovery Bonds the highest possible credit ratings resulting in the lowest cost to Consumers.

23. Subject to the Finance Team's review and approval, it is reasonable for the Recovery Bonds to be issued using an offering through a negotiated sale with underwriters because of the complex nature of the highly structured transaction and to minimize its annual service debt costs, principal, and interest costs.

24. In its capacity as servicer, it is reasonable for SCE to be responsible for determining Consumers' electricity usage and billing, collecting, and remitting the Fixed Recovery Charges to the Bond Trustee, and submitting Routine True-Up Mechanism Advice Letters and Non-Routine True-Up Mechanism Advice Letters.

25. Subject to the review and approval of the Finance Team, it is reasonable for the Bond Trustee to pay an annual servicing fee charged by SCE, together with out-of-pocket expenses (*e.g.*, legal fees, accounting fees). Furthermore, subject to review and approval of the Commission, it is reasonable for the Bond Trustee to pay a servicing fee at a level sufficient to induce another entity to take over the servicing function from SCE should this become necessary. In the event that an unaffiliated third-party servicer takes over the servicing function from SCE, it is reasonable, subject to the review and approval of the Finance Team and the Commission, that the unaffiliated third-party servicer receives a reasonable servicing fee from the Bond Trustee. The fees and expenses incurred by SCE or such affiliate to perform obligations under the Servicing Agreement in excess of

the incremental cost of billing and collecting the Fixed Recovery Charges and servicing the Recovery Bonds will be returned to Consumers by SCE through normal ratemaking processes.

26. Subject to the review and approval of the Finance Team, it is reasonable for the Bond Trustee to pay an administration fee to support the operations of the SPE, which will have no staff. The fees and expenses incurred by SCE to perform obligations under the Administration Agreement in excess of the incremental cost of administering the SPE should be returned to Consumers by SCE through normal ratemaking processes using the BRRBA.

27. The credit quality and expertise in performing servicing functions will be important considerations should it be necessary to approve the appointment of a successor servicer in order to ensure the credit ratings for the Recovery Bonds are maintained.

28. It is reasonable that the Bond Trustee's collection account has at least three subaccounts: (i) the general subaccount to hold Fixed Recovery Charge collections; (ii) the capital subaccount to hold the capital contribution made by SCE; and (iii) the excess funds subaccount to hold investment earnings and funds collected in excess of amounts necessary to pay principal, interest, and other Ongoing Financing Costs on a Recovery Bond payment date.

29. Establishment of an over-collateralization sub-account is reasonable if required to provide credit enhancement for the Recovery Bonds and lower costs to Consumers and if such account is approved by the Finance Team pre-issuance and the Commission through the Issuance Advice Letter process.

30. §§ 850.1(e) and 850.1(g) require the Commission to adjust the Fixed Recovery Charges at least annually (and at least quarterly beginning 12 months prior to the last scheduled final payment date of the last maturing tranche of a

series of Recovery Bonds), and more frequently, if necessary, to ensure timely recovery of the amounts identified in Finding of Fact 10. The Commission's authority under Article 5.8 and pursuant to § 850.1(g) to authorize periodic true-up adjustments persists until the Recovery Bonds and all other Financing Costs are fully paid and discharged, and does not expire like the Commission's authority to issue financing orders in the first instance under § 850.6. It is therefore appropriate for SCE to submit Routine True-Up Mechanism Advice Letters and Non-Routine True-Up Mechanism Advice Letters and use an advice letter process to implement the periodic true-up adjustment described in the Application and this Financing Order, all subject to the review and approval by the Commission as set forth in this Financing Order, as these Advice Letters constitute "application[s] . . . to implement a true-up adjustment" pursuant to § 850.1(g).

31. It is possible that Third-Party Billers will bill and collect the Fixed Recovery Charges from some Consumers.

32. It is reasonable that Consumers in SCE's Service Territory that no longer take transmission or distribution retail service, or that depart or reduce SCE service after the date of this Financing Order, be treated as DL Consumers, using applicable tariffs for DL Consumers, and will be subject to pay the Fixed Recovery Charges. DL Consumers are obligated to pay Fixed Recovery Charges using applicable language under existing tariffs for DL Consumers based on an approach that is consistent with the method currently in place for recovery of nonbypassable charges.

33. §§ 851 and 854 empower the Commission to review for authorization any possible future voluntary or involuntary change in ownership of assets from an

electrical or gas corporation to a public entity (pursuant to §§ 851(a)-(b)(1) and 854.2(b)(1)(F)).

34. If a Third-Party Biller meters and bills for the Fixed Recovery Charges, SCE requires access to information on kilowatt-hour billing and usage by Consumers to provide for proper reporting to the SPE and to perform its obligations as servicer.

35. The Fixed Recovery Charges will be nonbypassable and payable by all existing and future Consumers in SCE's Service Territory as of the date of this Financing Order, except for those Consumers participating in the California Alternate Rates for Energy or Family Electric Rate Assistance programs pursuant to § 850.1(i). The Fixed Recovery Charges will appear on the electric bill of each such Consumer in SCE's Service Territory as electric charges as soon as practicable following the issuance of the first series of Recovery Bonds, but in all events no later than necessary to bill and collect funds sufficient to pay principal, interest, and Ongoing Financing Costs payable on the first payment date of the Recovery Bonds.

36. It is reasonable that, if electric Consumers in SCE's Service Territory fail to pay their electric utility bills in full, any partial payments of a Consumer's bill be allocated on a pro rata basis between the Bond Trustee and SCE based on the ratio of the billed amount for the Fixed Recovery Charges, and other rates and charges to the total billed amount, to avoid SCE favoring its own interests and to support the "bankruptcy remote" status of the SPE.

37. The Bond Trustee (acting on behalf of the SPE) will have a legal right to only the amount of actual Fixed Recovery Charge cash collections. As servicer, SCE will be legally obligated to remit Fixed Recovery Charge collections, on behalf of the SPE, to the Bond Trustee.

38. It is reasonable for SCE to request the issuance of additional Recovery Bonds through the SPE or Additional SPEs by submitting an application showing that the relevant amounts or costs are recovery costs within the meaning of § 850(a)(10) and identifying the Commission decision(s) or determination(s) regarding the reasonableness of those amounts or costs, consistent with § 850(a)(1)(A)(i).

39. The Recovery Bonds approved by this Financing Order comply with §§ 817(b)-(c) and 817(g)-(h), even if those provisions did apply.

40. It is reasonable to establish a Finance Team, as set forth in this Financing Order, for this issuance of the Recovery Bonds at issue here and for additional Recovery Bond applications.

41. The Third AB 1054 CapEx has previously been determined to be just and reasonable under § 451 and in the public interest and therefore are Recovery Costs pursuant to § 850(b)(10).

42. It is reasonable for SCE to be permitted to pay its Application fees through wire transfer, notwithstanding Rule 1.16 of the Commission's Rules of Practice and Procedure.

## Conclusions of Law

1. The Recovery Bonds and the imposition and collection of the Fixed Recovery Charge proposed by SCE in the Application and as modified in the Financing Order satisfy all the conditions established by Article 5.8. The issuance of the Recovery Bonds is just and reasonable and consistent with the public interest, because the material terms and conditions of the Recovery Bonds, as set forth in this Financing Order and with the oversight of the Finance Team, are designed in conformance with industry standards to ensure the lowest-cost, highest-rated bonds, and to provide substantial benefits to Consumers. Further,

SCE has demonstrated that the recovery of the Third AB 1054 CapEx, their related Pre-Securitization Debt Financing Costs, and the Upfront Financing Costs through the designation of Fixed Recovery Charges and the issuance of the Recovery Bonds employing the review and approval of the Finance Team, and in conformance with the requirements set forth in this Financing Order, should reduce, to the maximum extent possible, the rates to Consumers on a present value basis as compared to the use of traditional utility financing mechanisms.

2. Prior to the issuance of each series of Recovery Bonds, each Recovery Bond series and the associated Recovery Bond transaction should be reviewed and approved by the Commission's Finance Team consisting of the Commission's General Counsel, the Deputy Executive Director for Energy and Climate Policy, other Commission Staff, outside bond counsel, and any other outside experts that the Finance Team deems necessary. The other outside expertise may include, for example, independent legal counsel and an independent financial advisor to assist the Finance Team in overseeing and reviewing the issuance of a series of Recovery Bonds. Any costs incurred by the Finance Team in connection with its review and approval of a series of Recovery Bonds should be treated as an Upfront Financing Cost.

3. The Upfront Financing Costs and the estimated Ongoing Financing Costs should be reviewed and approved by the Finance Team to help ensure the Fixed Recovery Charges produce the maximum possible reduction of Consumer rate impact on a present value basis as compared to the use of traditional utility financing mechanisms.

4. As provided in § 850(b)(11), the Recovery Property, which should be established by this Financing Order and further identified in the Issuance Advice Letter, includes: (i) the right, title and interest in and to the Fixed Recovery

Charges, including the right to obtain adjustments of such charges as authorized in this Financing Order; and (ii) the right to be paid the Fixed Recovery Charges, as well as all revenues, collections, claims, payments, moneys, or proceeds of or arising from the Fixed Recovery Charges.

5. Pursuant to § 850.1(h), the Recovery Property established by this Financing Order should be created simultaneously with the sale of such Recovery Property to the SPE and should constitute a current property right and will thereafter continuously exist as property for all purposes.

6. The Ongoing Financing Costs described in SCE's testimony and in this Financing Order constitute "financing costs" under § 850(b)(4) and as reviewed and approved by the Finance Team should be recoverable from the Fixed Recovery Charges.

7. The Recovery Bonds authorized by this Financing Order should not: (i) constitute a debt or liability of the State of California or any political subdivision thereof; (ii) constitute a pledge of the full faith and credit of the State or any political subdivision; or (iii) directly, indirectly, or contingently obligate the State or any political subdivision thereof to levy or to pledge any form of taxation to pay any obligations associated with the Recovery Bonds or to make any appropriations for their payment.

8. The Recovery Bonds should not require the Commission's approval pursuant to § 701.5 because SCE will not "issue any bond, note, lien, guarantee, or indebtedness of any kind pledging the utility assets or credit for or on behalf of any subsidiary or affiliate" under that provision.

9. The Recovery Bonds should not require approval pursuant to §§ 817-818 since the SPE, not SCE as a public utility, will be the issuer. Even if §§ 817-818

were to apply, issuance of the Recovery Bonds is consistent with those provisions.

10. The Commission should have full access to the books and records of the SPE. SCE should not make any profit from the SPE, except for an authorized return on SCE's capital contribution to the SPE, in an amount equal to the weighted average interest rate on the Recovery Bonds.

11. Upon the issuance of the Recovery Bonds, SCE should contribute equity to the SPE, as necessary, to satisfy the conditions for a Qualifying Securitization under IRS Rev. Proc. 2005-62; provided, however, that SCE has no obligation to pay the amounts owed by the SPE on the Recovery Bonds or to make any additional equity contributions to the SPE to facilitate the SPE's repayment of the Recovery Bonds and all other Ongoing Financing Costs.

12. SCE should sell the Recovery Property identified in the Issuance Advice Letter to the SPE identified in such Issuance Advice Letter. The SPE identified in the Issuance Advice Letter should constitute a Financing Entity for all purposes of Article 5.8.

13. The transfer of the Recovery Property by SCE to an SPE should be in accordance with § 850.4, and should be treated as an absolute transfer of all of SCE's right, title, and interest, as in a true sale, and not as a pledge or other financing, of the Recovery Property, other than for federal and state income tax and franchise tax purposes.

14. Once the Recovery Property is established as provided in this Financing Order, any protest, review, or correction should be limited as provided in the description of the True-Up Mechanism in this Financing Order.

15. The Recovery Bonds should be secured by the Recovery Property, SPE equity held by the Bond Trustee, and other Bond Collateral held by the Bond Trustee.

16. The SPE should transfer the Recovery Bond proceeds (net of Upfront Financing Costs) to SCE to purchase the Recovery Property.

17. The following should occur or exist as a matter of law upon the sale by SCE of Recovery Property to the SPE: (i) the SPE should have all of the rights originally held by SCE with respect to the Recovery Property, including the right to exercise any and all rights and remedies to collect any amounts payable by any Consumer in respect of the Recovery Property, including the Fixed Recovery Charges, notwithstanding any objection or direction to the contrary by SCE; (ii) any payment by any Consumer of owed Fixed Recovery Charges should discharge such Consumer's obligations in respect of the Recovery Property to the extent of such payment, notwithstanding any objection or direction to the contrary by SCE; and (iii) SCE should not be entitled to recover the Fixed Recovery Charge associated with the Recovery Property other than for the benefit of the SPE or of holders of the associated Recovery Bonds in accordance with SCE's duties as servicer with respect to such Recovery Bonds.

18. A separate and distinct statutory lien described in § 850.3(g) should exist on the Recovery Property then existing or thereafter arising that is described in an Issuance Advice Letter and should secure all obligations, then existing or subsequently arising, to the holders of the Recovery Bond described in such Issuance Advice Letter and the Bond Trustee for such holders. There should be no statutory liens of the type described in § 850.3(g) except as provided in this Conclusion of Law section.

19. To ensure that the SPE is legally separate and bankruptcy remote from SCE the SPE should be authorized to: (i) include restrictions in its organizational documents limiting the activities of the SPE to the issuance of the Recovery Bonds and related activities and eliminating the SPE's ability to voluntarily file for bankruptcy; (ii) provide for the appointment of one or more independent directors to the SPE board; and (iii) provide for the payment of servicing and administration fees adequate to compensate SCE or any successor servicer for their costs of providing service.

20. Any default under the documents relating to the Recovery Bonds will entitle the holders of Recovery Bonds, or the Bond Trustees or representatives for such holders, to exercise the rights or remedies such holders or such Bond Trustees or representatives therefore may have pursuant to any statutory or other lien on the Recovery Property.

21. The SPE should be authorized to provide credit enhancements for the Recovery Bonds as reviewed and approved by the Finance Team in addition to the True-Up Mechanism, but only if such credit enhancements are required by the rating agencies to receive the highest investment-grade rating or the all-in cost of the Recovery Bonds with the credit enhancements is less than without the credit enhancements. Such credit enhancements, if any, should be described in the Issuance Advice Letter.

22. Any revenue for credit enhancements that is collected as part of the Fixed Recovery Charges, in excess of total debt service on the Recovery Bonds and other Recovery Costs, should be the property of the SPE.

23. After the Recovery Bonds and all Ongoing Financing Costs are repaid, if a balance remains in the collection account, or any subaccount, that balance should be returned in the following order of priority: first, an amount equal to SCE's

initial equity contribution into the capital subaccount, together with the required rate of return should be paid to SCE, and second, all other amounts held by the Bond Trustee in any fund or account (including any over-collateralization account) should be returned to SCE, and such amounts, together with any Fixed Recovery Charges revenues thereafter received by SCE, should be credited to Consumers, as defined in § 850(b)(3), through normal ratemaking processes.

24. The Upfront Financing Costs described in the Application, including, inter alia, underwriters' fees and expenses, rating agency fees, § 1904 fees, accounting fees and expenses, SEC registration fees, printing/EDGARizing costs expenses, legal fees and expenses, Bond Trustee's fees and expenses, original issue discount, costs of the Commission, and other Upfront Financing Costs, as reviewed and approved by the Finance Team, are "financing costs" as defined in § 850(b)(4) and should be treated as Recovery Costs for purposes of § 850(b)(10) and recoverable from Recovery Bond proceeds or the Fixed Recovery Charges.

25. When the SPE issues the Recovery Bonds, the SPE should estimate the Upfront Financing Costs and provide that information to the Finance Team for its review and approval. After all Upfront Financing Costs are paid by the SPE, any Recovery Bond proceeds not used to purchase the Recovery Property or for the payment of Upfront Financing Costs should be used to offset the revenue requirement in the next Fixed Recovery Charge true-up calculation. In the event that the actual Upfront Financing Costs exceed the estimated amount, the short-fall amount may be recovered in the next Fixed Recovery Charge true-up calculation.

26. The SPE, not SCE, should "issue any bond, note, lien, guarantee, or indebtedness of any kind pledging the utility assets or credit for or on behalf of any subsidiary or affiliate" under § 701.5.

27. All Recovery Bonds should contain a legend to the following effect: "Neither the full faith and credit nor the taxing power of the State of California is pledged to the payment of the principal of, or interest on, this bond."

28. SCE should be authorized to use the proceeds from its sale of the Recovery Property to the SPE to reimburse itself for Third AB 1054 CapEx, Pre-Securitization Debt Financing Costs, and Upfront Financing Costs paid by, or on behalf of, SCE, as reviewed and approved by the Finance Team.

29. SCE should be authorized pursuant to Article 5.8 to bill and collect Fixed Recovery Charges that are designed to ensure the recovery of sufficient revenue to pay, on a timely basis, the principal and interest on the Recovery Bonds (as scheduled) together with all other Ongoing Financing Costs until all such costs are paid in full.

30. To implement the Fixed Recovery Charges for the Recovery Bonds, SCE should submit an Issuance Advice Letter based on the pro forma example contained in Attachment 2 to this Financing Order not later than one business day after the Recovery Bonds are priced. The Issuance Advice Letter should use the Cash Flow Model, described in Attachment 1 to this Financing Order along with the most-recent SCE sales forecast, to develop the initial Fixed Recovery Charges for the Recovery Bonds.

31. The initial Fixed Recovery Charges, as well as the Upfront Financing Costs and all Ongoing Financing Costs for the life of the Recovery Bonds, and the final terms of the Recovery Bonds set forth in the applicable Issuance Advice Letter should automatically be approved and become effective at noon on the fourth business day after pricing unless before noon on the fourth business day after pricing the Commission rejects the Issuance Advice Letter. Once established, the

Fixed Recovery Charge will constitute Fixed Recovery Charges subject to § 850.1(e).

32. The characterization of the sale, assignment, or transfer as an absolute transfer and true sale and the corresponding characterization of the property interest of the SPE should not be affected or impaired by, among other things: (i) commingling of Fixed Recovery Charge collections with other amounts; (ii) the retention by SCE of either of the following: (a) a partial or residual interest, including an equity interest, in the SPE or the Recovery Property, whether direct or indirect, subordinate or otherwise, or (b) the right to Recovery Costs associated with taxes, franchise fees, or license fees imposed on the collection of Fixed Recovery Charges; (iii) any recourse the SPE may have against SCE; (iv) any indemnification rights, obligations, or repurchase rights made or provided by SCE; (v) the obligation of SCE to collect Fixed Recovery Charges, as servicer, on behalf of the SPE; (vi) the treatment of the sale, assignment or transfer for tax, financial reporting, or other purposes; or (vii) the True-Up Mechanism as provided in this Financing Order.

33. The True-Up Mechanism to be used to establish and adjust the Fixed Recovery Charges, as described in SCE's testimony and as set forth in this Financing Order as required by § 850.1(b), is an "effective mechanism" that should help ensure the timely payment of the principal and interest on the Recovery Bonds and all associated Financing Costs.

34. The advice letters submitted as part of the True-Up Mechanism to adjust the Fixed Recovery Charges, as described in the body of this Financing Order, constitute "application[s] . . . to implement a true-up adjustment" pursuant to § 850.1(g).

35. The adjustments to the Fixed Recovery Charges in annual Routine True-Up Mechanism Advice Letters, semi-annual Routine True-Up Mechanism Advice Letters and more frequent interim Routine True-Up Mechanism Advice Letters should be acted upon within 20 days of submission provided that such Advice Letters should be submitted no later than 50 days before the Fixed Recovery Charge Annual Adjustment Date, in the case of annual Routine True-Up Mechanism Advice Letters and no later than 50 days before the proposed effective date, in the case of semi-annual Routine True-Up Mechanism Advice Letters and interim Routine True-Up Mechanism Advice Letters. These advice letters should be based on the pro forma example contained in Attachment 3 to this Financing Order.

36. The Routine True-Up Mechanism Advice Letters should calculate a revised Fixed Recovery Charge using: (i) the Cash Flow Model described in Attachment 1 of this Financing Order, as may be modified as described in the body of this Financing Order; (ii) the adjustments to the Cash Flow Model as may be listed in the body of this Financing Order; and (iii) the sales adjustments to the initial allocation factors. Protests, review, or correction to a Routine True-Up Mechanism Advice Letter or a Non-Routine True-Up Mechanism Advice Letter should only address mathematical errors.

37. SCE should be allowed to submit Non-Routine True-Up Mechanism Advice Letters based on the pro forma example contained in Attachment 4 to this Financing Order to revise the Cash Flow Model most recently approved by this Commission, subject to the terms found in the body of this Financing Order, to meet payments of principal and interest on the Recovery Bonds and all other Ongoing Costs. Such Non-Routine True-Up Mechanism Advice Letter should be Tier 2 ALs submitted no less than 90 days before the proposed effective date and

will be acted upon within 60 days. Absent a Commission resolution modifying or rejecting proposed changes to the Cash Flow Model, SCE or a successor servicer may implement Fixed Recovery Charge Adjustments proposed in a Non-Routine True-Up Mechanism Advice Letter on the effective date identified in the Non-Routine True-Up Mechanism Advice Letter if that date is at least 90 days after the date of submission.

38. Subject to the review and approval of the Finance Team, SCE's proposed mechanisms for establishing and adjusting the Fixed Recovery Charges, including the True-Up Mechanism, the Routine True-Up Mechanism Advice Letters, and the Non-Routine True-Up Mechanism Advice Letters, all as presented in the Application and as may be modified in this Financing Order, should be accepted.

39. SCE's proposal to address any potential tax implications through the recovery of the cost or credit as presented in the Application and as may be modified in this Financing Order, should be accepted.

40. The Fixed Recovery Charges should be: (i) nonbypassable; (ii) set for each Fixed Recovery Charge Consumer Class in accordance with the Cash Flow Model and in accordance with this Financing Order; and (iii) recovered from all existing and future Consumers in SCE's Service Territory as of the date of this Financing Order, except for those Consumers participating in the California Alternate Rates for Energy or Family Electric Rate Assistance programs pursuant to § 850.1(i). The Commission continues to have sole authority over Fixed Recovery Charge Consumer Class allocation issues and reserves the opportunity and intention to revisit the allocation methodology for future Fixed Recovery Charges related to additional recovery bonds that may be reviewed and approved in future proceedings.

41. SCE's monthly Consumer electric bill should disclose the amount of the Fixed Recovery Charges in a single line item identified on each Consumers' monthly bill as electric charges. A description of the Fixed Recovery Charge should contain the billing language found in the body of this Financing Order, and this description should appear in the "Things You Should Know" section at the bottom of each Consumer's bill. If the descriptions are not on the bill itself, SCE should also include the descriptions in an annual bill insert. Such bill presentation as described here is consistent with the requirement of § 850.1(g) that the Fixed Recovery Charge "appear on the Consumer bills" and should be approved, all in accordance with the provisions found in this Financing Order.

42. SCE and the SPE should account for Fixed Recovery Charges in the manner described in the body of this Financing Order.

43. SCE should act as the initial servicer for Fixed Recovery Charges on behalf of the SPE.

44. To the extent Consumers of electricity in SCE's Service Territory are billed by Third-Party Billers, SCE (as servicer for the Recovery Property) should bill such Consumers directly or may require these Third-Party Billers to bill for the Fixed Recovery Charges and to remit the Fixed Recovery Charge collections to SCE on behalf of such Consumers.

45. Third-Party Billers that bill and collect the Fixed Recovery Charges from SCE's Consumers should satisfy the requirements set forth in the applicable SCE tariffs.

46. In the event that the Commission authorizes any future voluntary or involuntary change in ownership of assets from an electrical or gas corporation to a public entity (pursuant to §§ 851(a)-(b)(1) and 854.2(b)(1)(F)) and such an ownership change affects the payment of rates to SCE by any Consumers in

SCE's Service Territory, the new asset owner should either: (a) continue to bill and collect Fixed Recovery Charges from Consumers and remit such collections to SCE or a new servicer for the Recovery Bonds; or (b) ensure the upfront funding of the Fixed Recovery Charges that would otherwise be paid by Consumers where rate payment would be affected by the ownership change. The Commission's authorization of ownership terms will effectuate the State's pledge and agreement that the State should not limit nor alter the Fixed Recovery Charges, the Recovery Property, this Financing Order, or any rights under a financing order until the Recovery Bonds are fully paid and discharged (pursuant to § 850.1(e)).

47. SCE should remit the Fixed Recovery Charge collections in accordance with the procedures described in the body of this Financing Order and the following two Conclusions of Law.

48. SCE, as servicer, should remit Fixed Recovery Charge collections to the Bond Trustee on a daily basis to avoid an adverse impact on the Recovery Bond credit ratings. Over the life of the Recovery Bond, SCE should prepare a monthly servicing report for the Bond Trustee that shows the actual Fixed Recovery Charge collections by month over the life of the Recovery Bond.

49. Amounts collected that represent partial payments of a Consumer's bill should be allocated on a pro rata basis between the Bond Trustee and SCE based on the ratio of the billed amount for the Fixed Recovery Charges to the total billed amount. This allocation is an important bankruptcy consideration in determining the true sale nature of the transaction.

50. In the event of any default by the Servicer, the Bond Trustee should be entitled to receive a reconciliation of collections and remittances to the Bond Trustee (described above) and actual collections of the Fixed Recovery Charges,

including an allocation of partial payments based upon this pro rata allocation methodology.

51. In the event additional recovery bonds or other similar bonds are issued by the SPE or additional SPEs for recovery of costs or expenses under § 850(a)(2), the Fixed Recovery Charges or other similar charges should be allocated pro rata between the Bond Trustees for each additional series and any existing series.

52. The Bond Trustee should hold all Fixed Recovery Charge collections received from SCE in a collection account. The Bond Trustee should use the funds held in the collection account to pay the principal and interest on the Recovery Bonds and all other Financing Costs on a timely basis.

53. The Bond Trustee should invest all funds held in the collection account in investment-grade short-term securities that mature on or before the next Recovery Bond payment date. Investment earnings should be retained in the collection account to pay debt service and all other Financing Costs on a timely basis.

54. Subject to the review and approval of the Finance Team, SCE should be permitted to receive a rate of return on its equity contribution equal to the weighted average interest rate on the Recovery Bonds, which should be payable as an Ongoing Financing Cost from the Fixed Recovery Charge collections and be distributed to SCE on an annual basis, after payment of debt service on the Recovery Bonds and all other Financing Costs.

55. If funds remain in the collection account on any Recovery Bond payment date, they should be credited to the excess funds subaccount. All subaccount funds should be available to pay debt service on the Recovery Bonds or other Recovery Costs. At the time of the submission of the next Routine True-Up Mechanism Advice Letter, the excess funds subaccount balance should be used

to offset the revenue requirement for the Fixed Recovery Charges, including but not limited to replenishing the balance of the capital subaccount.

56. Upon payment in full of the principal and interest on the Recovery Bonds and the payment and discharge of all other Financing Costs, all remaining monies held by the Bond Trustee should be returned to Consumers in the following order of priority: first, an amount equal to SCE's initial equity contribution into the capital subaccount, together with any required rate of return should be paid to SCE, and second, all other amounts held by the Bond Trustee in any fund or account (including any over-collateralization account) would be returned to SCE, and such amounts, together with any Fixed Recovery Charge collections thereafter received by SCE, should be credited to Consumers through normal ratemaking processes.

57. Subject to the review and approval of the Finance Team, SCE should be authorized to charge an annual servicing fee.

58. Subject to the review and approval of the Finance Team, SCE should be authorized to charge an annual administration fee.

59. SCE should not resign as servicer without prior Commission approval.

60. If SCE fails to perform its servicing functions satisfactorily, as set forth in the Servicing Agreement, or is required to discontinue its billing and collecting functions, an alternate servicer nominated by the Bond Trustee and approved by the Commission should replace SCE. The new servicer should bill and collect only the Fixed Recovery Charges. The fees paid to the new servicer should be subject to the approval of the Finance Team and the Commission.

61. An alternative third-party servicer should not cause the then-current rating of any then outstanding Recovery Bonds to be withdrawn or downgraded.

62. SCE should serve a copy of the advice letters authorized by this Financing Order on this proceeding's Service List and on any entity that requests service.

63. SCE should remit to the Commission's Fiscal Office the required § 1904(b) fee of $392,216, which amount is subject to change based on the final principal amount of Recovery Bonds to be issued pursuant to this Financing Order as set forth in the Issuance Advice Letter, at the time and in the manner described in Ordering Paragraph 56. The SPE should reimburse SCE for this fee as an Upfront Financing Costs.

64. Notwithstanding § 1708 or any other provision of law, any requirement under Article 5.8 or this Financing Order that the Commission take action with respect to the subject matter of this Financing Order should be binding on any successor agency exercising functions similar to the Commission, and the Commission should have no authority to rescind, alter or amend that requirement in this Financing Order.

65. The Recovery Bonds should be excluded from SCE's ratemaking capital structure as the SPE will have the legal obligation to repay the Recovery Bonds from Fixed Recovery Charge collections.

66. This Financing Order should be irrevocable to the extent specified in § 850.1(e).

67. This Financing Order should be able to be supplemented upon the Commission's own motion or a petition by a party to this proceeding, so long as such supplements are not inconsistent with the terms and provisions herein.

68. SCE should be allowed to set its electric rates and charges excluding the Fixed Recovery Charges, at levels designed to allow SCE to recover franchise fees associated with, or imposed on the Fixed Recovery Charges, and SCE should pay such franchise fees.

69. GO 24-C and the Commission's Financing Rule should be applied to the Recovery Bonds.

70. SCE should be authorized to report, on behalf of the SPE, all information required by GO 24-C and the Commission's Financing Rule regarding the Recovery Bonds.

71. Pursuant to § 824 and GO 24-C, SCE should maintain records that: (i) identify the specific Recovery Bonds issued pursuant to this Financing Order; and (ii) demonstrate that the proceeds from the Recovery Bonds have been used only for the purposes authorized by this Financing Order.

72. Pursuant to § 850.1(d), this Financing Order should become effective in accordance with its terms only after SCE provides the Commission with SCE's written consent to all the terms and conditions of this Financing Order.

73. SCE should take all practicable measures, as expeditiously as possible, to recharacterize AB 1054-related fire risk mitigation CWIP expenditures as rate-based expenditures. If, after taking such measures, SCE has less than $730,438,000 million of non-CWIP Third AB 1054 CapEx at the time of issuance of the Recovery Bonds, SCE is authorized to finance AB 1054 capital expenditures temporarily recorded as CWIP.

74. § 8386.3(e) should be construed to refer to the first $5 billion of wildfire mitigation capital expenditures for electric utility distribution plant.

75. There is no need for an evidentiary hearing in this proceeding.

76. This Financing Order complies with the provisions of Article 5.8 that was enacted by SB 901, as amended by AB 1054 and AB 1513.

77. This Financing Order construes, applies, implements, and interprets the provisions of Article 5.8. Therefore, applications for rehearing and judicial review of this Financing Order are subject to §§ 1731 and 1756. These laws

provide that any application for rehearing of this Financing Order must be filed within 10 days after the date of issuance of this Financing Order. The Commission must issue its decision on any application for rehearing within 210 days of the filing for rehearing.

78. The following order should be effective immediately in order to comply with statutory deadlines mandated by Article 5.8.

79. This proceeding should be closed.

## ORDER

**IT IS ORDERED** that:

1. Southern California Edison Company (SCE) is granted authority pursuant to Division 1, Part 1, Chapter 4, Article 5.8 of the Public Utilities (Pub. Util.) Code, subject to the terms and conditions in this Financing Order, to do the following:

   a. Arrange for the issuance of Recovery Bonds, in up to two series, as defined by Pub. Util. Code Section 850(b)(9). The total principal amount of the Recovery Bonds shall be equal to the sum of: (i) $730,438,000, which reflects Section 850(a)(2) costs and expenses related in its Application, including $215,168,000 million of Track 1 AB 1054 CapEx and $515,270,000 of Track 3 AB 1054 CapEx included in the Issuance Advice Letter for such Recovery Bonds submitted in accordance with Ordering Paragraph 3; (ii) Pre-Securitization Debt Financing Costs in an amount estimated to be $35.3 million; and (iii) Upfront Financing Costs, in an estimated amount of $6.7 million (in total, approximately $772,432,000, the Authorized Amount). The final Authorized Amount, including the final calculation of the Pre-Securitization Debt Financing Costs and of the Upfront Financing Costs, will be calculated by SCE and reviewed and approved by the Finance Team (described below), certified to by SCE and the lead underwriter(s) as described in this Financing

Order, and approved by the California Public Utilities Commission (Commission) pursuant to the Issuance Advice Letter process as described in this Financing Order. Each series of Recovery Bonds will be subject to a separate Issuance Advice Letter, separate Finance Team review and approval process and separate SCE and lead underwriter(s) certification requirement.

b. Arrange for the issuance of the Recovery Bonds through one or more Financing Entities, as that term is defined by Pub. Util. Code Section 850(b)(5). The Financing Entity shall be a Special Purpose Entity (SPE) that is formed and wholly owned by SCE. The SPE may be the Existing SPE as provided in this Financing Order.

c. Apply the Recovery Bond proceeds to recover, finance, or refinance Recovery Costs as that term is defined by Pub. Util. Code Section 850(b)(10) consisting of the Third AB 1054 CapEx, the Pre-Securitization Debt Financing Costs, and the Upfront Financing Costs.

d. Arrange for the recovery, via nonbypassable rates and charges, of Fixed Recovery Charges as that term is defined by Pub. Util. Code Section 850(b)(7), and in accordance with the Consumer allocation described in the body of this Financing Order.

e. Impose and collect amounts sufficient to pay federal and State of California income and franchise taxes associated with the Fixed Recovery Charges but not approved as Financing Costs financed from the proceeds of the Recovery Bonds, the Fixed Recovery Charge, and establish a distribution sub-account in its Base Revenue Requirement Balancing Account to record costs and benefits for subsequent recovery from or credit to Consumers related to amounts needed to pay any taxes imposed on the Fixed Recovery Charges or the tax implications associated with the assets financed with the Recovery Bonds, as described in the body of this Financing Order.

f. Submit requests for the Commission to consider and issue future financing orders approving the recovery of additional SCE AB 1054 wildfire risk-mitigation expenditures via an application in the manner described in the body of this Financing Order.

2. Prior to the issuance of each series of Recovery Bonds, each Recovery Bond series and the associated Recovery Bond transactions shall be reviewed and approved by the California Public Utilities Commission's (Commission) Finance Team consisting of the Commission's General Counsel, the Deputy Executive Director for Energy and Climate Policy, other Commission Staff, outside bond counsel, and any other outside experts that the Finance Team deems necessary. The other outside expertise may include, for example, independent legal counsel and an independent financial advisor to assist the Finance Team in overseeing and reviewing the issuance of a series of Recovery Bonds. Any costs incurred by the Finance Team in connection with its review and approval of a series of Recovery Bonds shall be treated as an Upfront Financing Cost. The purpose of the Finance Team is to provide oversight over the structuring, marketing, and pricing of each Recovery Bond transaction and to review and approve the material terms of such transaction in light of the goal to reduce rates on a present value basis to the maximum extent possible pursuant to Assembly Bill 1054's directives.

3. In a pre-issuance review process, the Finance Team shall have the right to review all material terms of each series of Recovery Bonds and other items the Finance Team determines are appropriate to perform its role, which may include, without limitation: (1) the underwriter and syndication group size, selection process, participants, diverse bank inclusion, allocations, and economics; (2) the structure of each series of Recovery Bonds; (3) each series of Recovery Bonds'

credit rating agency application; (4) the underwriters' preparation, marketing, and syndication of each series of Recovery Bonds; (5) the pricing of the Recovery Bonds and certifications provided by Southern California Edison Company (SCE) and the lead underwriter(s) regarding pricing meeting statutory requirements; (6) all associated Recovery Bond costs (including Upfront Financing Costs and other Financing Costs), servicing and administrative fees and associated crediting; (7) maturities; (8) reporting templates; (9) the amount of SCE's equity contribution to the related Special Purpose Entity; (10) overcollateralization and other credit enhancements; and (11) the initial calculation of the related Fixed Recovery Charges. The foregoing and other items may be reviewed during the entire course of the Finance Team's process. SCE shall resolve material terms and structuring issues with the Finance Team prior to commencing marketing (subject to any modifications required as a result of such marketing process). This pre-issuance review process is intended to create Recovery Bonds with material terms that can meet the statutory requirements; in particular, that each series of Recovery Bonds reduce on a present value basis to the maximum extent possible, the rates that Consumers would pay as compared to the use of traditional utility financing mechanisms. The Finance Team's review shall continue until the related Issuance Advice Letter becomes effective as described in Ordering Paragraph 14. The Finance Team shall have the ability to be included and invited to participate in all calls, meetings, e-mails, and other communications relating to the structuring, marketing, pricing, and issuance of each series of Recovery Bonds.

4. The Finance Team's pre-issuance review and approval of the material terms and structure of a series of Recovery Bonds shall be evidenced by an approval letter from the Finance Team to Southern California Edison Company

(SCE) delivered on or before the date of the pricing of the relevant Recovery Bonds (subject to syndication and pricing). SCE shall be required to include such an approval letter as an attachment to the Issuance Advice Letter relating to such series of Recovery Bonds, or as a supplement to such Issuance Advice Letter. Such approval letter from the Finance Team to SCE shall be a condition precedent to the issuance of such a series of Recovery Bonds.

5. The Recovery Bonds may be amortized on a level, mortgage-style basis to be determined at the time of issuance in the Issuance Advice Letter. The scheduled final payment date of the latest maturing tranche of the Recovery Bonds shall be as reviewed and approved by the Finance Team as described in the body of this Financing Order.

6. Any offering of Recovery Bonds shall be structured to be a "Qualifying Securitization" under IRS Revenue Procedure 2005-62.

7. The Recovery Bonds issued pursuant to this Financing Order shall contain a legend to the following effect: "Neither the full faith and credit nor the taxing power of the State of California is pledged to the payment of principal of, or interest on, this bond."

8. In accordance with Public Utilities Code Section 850.1(h), Recovery Property established by this Financing Order and further identified in the Issuance Advice Letter shall be created simultaneously with the sale of such Recovery Property to the Special Purpose Entity, shall constitute a current property right, and shall thereafter continuously exist as property for all purposes.

9. Southern California Edison Company (SCE) shall sell the Recovery Property to the Special Purpose Entity (SPE), and upon such sale, the SPE shall have all of the rights originally held by SCE with respect to the Recovery

Property, including the right to exercise any and all rights and remedies to collect any amounts payable by any Consumer in respect of the Recovery Property, including the Fixed Recovery Charges, and to obtain true-up adjustments to the Fixed Recovery Charges pursuant to the True-Up Mechanism, notwithstanding any objection or direction to the contrary by SCE.

10. Acting as initial servicer for the Recovery Property, Southern California Edison Company shall recover the Fixed Recovery Charges on behalf of the Special Purpose Entity.

11. The Fixed Recovery Charges shall be nonbypassable and recovered from existing and future Consumers, as defined in Public Utilities (Pub. Util.) Code Section 850(b)(3), in Southern California Edison Company's Service Territory as of the date of this Financing Order, except for those Consumers participating in the California Alternate Rates for Energy or Family Electric Rate Assistance programs pursuant to Pub. Util. Code Section 850.1(i). The Fixed Recovery Charges shall be imposed on all non-exempt Fixed Recovery Charge Customer Classes in accordance with the Cash Flow Model as set forth in the body of this Financing Order.

12. Consumers who no longer take transmission and distribution retail service or that depart or reduce Southern California Edison Company (SCE) service after the date of the issuance of this Financing Order, or that meet the relevant criteria in the applicable tariff, shall be treated as departing load (DL) Consumers using applicable tariffs for DL Consumers, and shall be subject to pay the Fixed Recovery Charges. The Fixed Recovery Charges shall be applicable to current SCE Consumers that become DL Consumers after the date of the issuance of this Financing Order. These DL Consumers shall pay the Fixed Recovery Charge

based on an approach that is consistent with the method currently in place for recovery of nonbypassable charges for DL customers.

13. In the course of authorizing any future change in ownership of assets from Southern California Edison Company (SCE) to a public entity as described in Conclusion of Law 46, the California Public Utilities Commission shall establish conditions which either: (i) ensure the up-front funding of the Fixed Recovery Charges that would otherwise be paid by those Consumers whose rate payment would be affected by the ownership change; or (ii) establish procedures to ensure the continued billing and collection of Fixed Recovery Charges from Consumers and remittance of such collections to SCE.

14. To implement the Fixed Recovery Charges for the Recovery Bonds, Southern California Edison Company shall submit an Issuance Advice Letter in the form, timeframe, and manner described in the body of this Financing Order. The Issuance Advice Letter form identified in Attachment 2 to this Financing Order is approved. California Public Utilities Commission (Commission) Staff is given authority to reject the Issuance Advice Letter and stop the sale for a failure to adhere to the terms of this Financing Order. The Issuance Advice Letter and the Fixed Recovery Charges established by such Issuance Advice Letter shall become effective at noon on the fourth business day after pricing unless before noon on the fourth business day after pricing the Commission Staff rejects the Issuance Advice Letter. The Commission Staff's review of each Issuance Advice Letter shall include compliance with: (i) Public Utilities Code Article 5.8; (ii) this Financing Order; and (iii) the requirements of the Issuance Advice Letter (including the attached Finance Team approval letter).

15. The Special Purpose Entity identified in the Issuance Advice Letter shall constitute a Financing Entity for all purposes of Public Utilities Code Article 5.8.

16. Once Recovery Property is established pursuant to this Financing Order, the Recovery Property, Fixed Recovery Charges, and other terms and conditions as set in the Financing Order, shall not be adjusted in response to protests to the Issuance Advice Letter.

17. The Special Purpose Entity may obtain credit enhancement in the form of an over-collateralization account for the Recovery Bonds, but only if: (i) the credit enhancements are required by the rating agencies; or (ii) the all-in cost of the Recovery Bonds with the credit enhancements is expected to be less than without the credit enhancements. The over-collateralization amount, if required by the rating agencies, shall be decided in consultation with the Finance Team and: (i) set forth in the Issuance Advice Letter; and (ii) funded in equal amounts on each debt service payment date, or in other such amounts and in such a manner as required by the rating agencies.

18. Any credit enhancement costs collected through the Fixed Recovery Charges, in excess of total debt service on the Recovery Bonds and other Financing Costs, shall be the property of the Special Purpose Entity, subject to the terms set forth in the body of this Financing Order.

19. After the Recovery Bonds are repaid, if a balance remains in the collection account, or any subaccount, that balance shall be returned to Consumers in the following order of priority: first, an amount equal to Southern California Edison Company's (SCE) initial equity contribution into the capital subaccount, together with the required rate of return, would be paid to SCE, and second, all other amounts held by the Bond Trustee in any fund or account (including any over-collateralization account), would be returned to SCE, and such amounts, together with any Fixed Recovery Charge collections thereafter received by SCE, would be credited to Consumers through normal ratemaking processes.

20. Subject to compliance with the specific requirements of this Financing Order, including those requirements set forth in the body of this Financing Order and the accompanying Conclusions of Law, including Finance Team review and approval, and California Public Utilities Commission Staff review of the Issuance Advice Letter, Southern California Edison Company and the Special Purpose Entity may establish the terms and conditions of the Recovery Bonds, including repayment schedules, interest rates, number of tranches, scheduled and final maturity dates, payment dates, collateral, credit enhancement, and other Recovery Bond terms, and other Financing Costs.

21. The Special Purpose Entity shall transfer the Recovery Bond proceeds (net of Upfront Financing Costs) to Southern California Edison Company as payment of the purchase price of the Recovery Property.

22. The Special Purpose Entity, as the owner of the Recovery Property, shall pledge the Recovery Property as collateral to the Bond Trustee to secure payments of principal and interest on the Recovery Bonds and all other Ongoing Financing Costs payable under an indenture pursuant to which the Recovery Bonds are issued.

23. The Special Purpose Entity (SPE) shall: (i) include restrictions in its organizational documents limiting the activities of the SPE to the issuance of the Recovery Bonds and related activities and eliminating the SPE's ability to voluntarily file for bankruptcy; (ii) provide for the appointment of one or more independent directors to the SPE board; and (iii) provide for the payment of servicing and administration fees adequate to compensate Southern California Edison Company or any successor servicer for their costs of providing service.

24. After Southern California Edison Company (SCE) has sold, assigned, or otherwise transferred its interest in Recovery Property to the Special Purpose

Entity (SPE), SCE shall: (i) operate its system to provide service to its Consumers; (ii) act as initial servicer under the transaction documents associated with the related Recovery Bonds; and (iii) as initial servicer, bill and collect amounts in respect of the Fixed Recovery Charges for the benefit and account of the SPE and account for and remit these amounts to or for the account of the SPE.

25. Southern California Edison Company (SCE) may contribute equity to the Special Purpose Entity (SPE). The SPE equity shall be pledged to secure the Recovery Bonds and shall be deposited into an account held by the Bond Trustee. After payment of principal and interest on the Recovery Bonds and other Financing Costs for a particular payment period, SCE shall be permitted to receive a rate of return on its equity contribution equal to the weighted average interest rate on the Recovery Bonds.

26. The California Public Utilities Commission shall have full access to the books and records of the Special Purpose Entity (SPE). Southern California Edison Company (SCE) should not make any profit from the SPE, except for an authorized return on SCE's equity investment in the SPE in an amount equal to the weighted average interest rate on the Recovery Bonds. If the equity capital is drawn upon, it may be replenished via the Fixed Recovery Charges.

27. Southern California Edison Company shall use the amounts that it derives from the net Recovery Bond proceeds to pay or reimburse itself for the costs and expenses of the Track 1 Assembly Bill (AB) 1054 CapEx and Track 3 AB 1054 CapEx.

28. Because the Recovery Bonds do not require the approval of the California Public Utilities Commission (Commission) pursuant to Public Utilities Code Sections 701.5 or 817, as those provisions apply to the issuance of debt by a public utility, and the Special Purpose Entity, and not Southern California Edison

Company (SCE), will issue the Recovery Bonds, therefore SCE need not file any application for Commission approval pursuant to those Code sections.

29. The Fixed Recovery Charges shall be presented on the electric bill of each Consumer in Southern California Edison Company's Service Territory as electric charges as soon as practicable following the issuance of the first series of Recovery Bonds, but in all events no later than necessary to collect funds sufficient to pay principal, interest, and Ongoing Financing Costs payable on the first payment date of the Recovery Bonds.

30. Southern California Edison Company's (SCE) monthly Consumer electric bill shall disclose the amount of the Fixed Recovery Charges in a single line item identified on each Consumers' monthly bill (except for those customers participating in the California Alternate Rates for Energy or Family Electric Rate Assistance programs pursuant to Public Utilities (Pub. Util.) Code Section 850.1(i)) as electric charges titled "Wildfire Hardening Charge." A description of the Fixed Recovery Charges should reflect that the Fixed Recovery Charges, which do not belong to SCE, have been transferred to the Special Purpose Entity (SPE), which does not belong to SCE, and that SCE is collecting the Fixed Recovery Charges on behalf of the SPE, all in accordance with the body of this Financing Order, and this description shall appear in the "Things You Should Know" section at the bottom of each Consumer's bill. If the descriptions are not on the bill, SCE shall also include the descriptions in an annual insert. Such bill presentation as described here is consistent with the requirement of Pub. Util. Code Section 850.1(g) that the Fixed Recovery Charge "appear on the Consumer bills" as further described in the body of this Financing Order and Conclusion of Law 41.

31. In the event of any default by the servicer, the Trustee shall be entitled to receive a reconciliation of actual collections of the Fixed Recovery Charge, including an allocation of partial payments, which allocates any partial payments by Consumers based upon a pro rata allocation methodology among the Fixed Recovery Charges, and other rates and charges as described in Conclusion of Law 50.

32. If a Southern California Edison Company (SCE) Consumer fails to pay the Fixed Recovery Charge, SCE may shut-off power to such Consumer in accordance with shut-off policies approved by the California Public Utilities Commission; provided, that temporary changes in utility shut-off procedures due to emergencies shall be permitted in accordance with state law.

33. The True-Up Mechanism for adjusting the Fixed Recovery Charge that is described in the body of this Financing Order and the accompanying Conclusions of Law, including the use of an advice letter process, is approved. Southern California Edison Company is authorized to and shall submit annual Routine True-Up Mechanism Advice Letters (and at least quarterly beginning 12 months prior to the last scheduled final payment date of the last maturing tranche of a series of Recovery Bonds) and more frequent, if necessary, semi-annual and interim Routine True-Up Mechanism Advice Letters in the form, timeframe, and manner described in the body of this Financing Order and the accompanying Conclusions of Law, until all Recovery Bonds and all associated Financings Costs are paid in full. The adjustments to the Fixed Recovery Charges specified in these advice letters shall go into effect automatically in the timeframes addressed in this Financing Order and the advice letter(s).

34. Southern California Edison Company may submit Non-Routine True-Up Mechanism Advice Letters in the manner described in the body of this Financing Order and the accompanying Conclusions of Law based on the pro forma example contained in Attachment 4 to this Financing Order to reflect any revisions to be adopted in any future related proceeding.

35. Southern California Edison Company shall not resign as servicer without prior approval from the California Public Utilities Commission.

36. Subject to the review and approval of the Finance Team in the pre-issuance approval letter described in Ordering Paragraph 4, the Bond Trustee shall pay an annual servicing fee to Southern California Edison Company or any successor servicer.

37. Subject to the review and approval of the Finance Team in the pre-issuance approval letter described in Ordering Paragraph 4, an annual administration fee shall be paid to Southern California Edison Company as administrator of the Special Purpose Entity.

38. If Consumers of electricity in Southern California Edison Company's (SCE) Service Territory are billed by Third-Party Billers, SCE or a successor servicer shall bill the Consumer directly or may require these Third-Party Billers to bill for the Fixed Recovery Charges and to remit the Fixed Recovery Charge collections on behalf of such Consumers.

39. Third-Party Billers that bill and collect the Fixed Recovery Charges from Southern California Edison Company's (SCE) Consumers shall satisfy the requirements set forth in SCE's applicable tariffs.

40. The appointment of any third-party servicer of Recovery Property shall not be approved without first determining that: (i) such approval will not cause any then-current credit rating of any then outstanding Recovery Bonds to be

withdrawn or downgraded; and (ii) the servicing fee paid to the third-party servicer is reasonable. A servicing fee payable to a third-party Servicer shall be as reviewed and approved by the Finance Team and the California Public Utilities Commission.

41. Southern California Edison Company shall remit Fixed Recovery Charge collections to the Bond Trustee, on behalf of the Special Purpose Entity, in accordance with the procedures described in the body of this Financing Order and the accompanying Conclusions of Law.

42. The Bond Trustee shall: (i) account for all funds as described in the body of this Financing Order and the associated Conclusions of Law; (ii) invest all funds in investment-grade short-term debt securities; and (iii) make principal and interest payments to Recovery Bond investors and pay other Financing Costs.

43. In the event of a default by Southern California Edison Company in transferring the Fixed Recovery Charge collections to the Bond Trustee, on behalf of the Special Purpose Entity (SPE), the following parties may petition the California Public Utilities Commission to order the sequestration and payment to the Bond Trustee for the benefit of the SPE of revenues arising from the Recovery Property: (a) the holders of the Recovery Bond(s) and the Bond Trustees or representatives thereof as beneficiaries of any statutory or other lien permitted by the Public Utilities Code; (b) the SPE or its assignees; and (c) pledgees or transferees, including transferees under Public Utilities Code Section 850.4, of the Recovery Property.

44. Recovery Bonds shall be excluded from Southern California Edison Company's ratemaking capital structure.

45. Southern California Edison Company shall establish the Fixed Recovery Charge and a distribution sub-account in its Base Revenue Requirement Balancing Account to record costs and benefits for subsequent recovery from or credit to Consumers as described in the body of this Financing Order and the accompanying Conclusions of Law.

46. Southern California Edison Company (SCE) shall take all practicable measures, as expeditiously as possible, to recharacterize Assembly Bill (AB) 1054-related fire risk mitigation Construction Work In Progress (CWIP) expenditures as rate-based expenditures. If, after taking such measures, SCE has less than $730.4 million of non-CWIP AB 1054 capital expenditures at the time of issuance of the Recovery Bonds, SCE is authorized to securitize AB 1054 capital expenditures temporarily recorded as CWIP.

47. All regulatory approvals within the jurisdiction of the California Public Utilities Commission that are necessary for the securitization of the Fixed Recovery Charges associated with Recovery Costs that are the subject of the Application, and the issuance of the Recovery Bonds and all related transactions contemplated in the Application, are hereby granted.

48. Pursuant to Public Utilities Code Section 824 and General Order 24-C, Southern California Edison Company shall maintain records that: (i) identify the specific Recovery Bonds issued pursuant to this Financing Order; and (ii) demonstrate that the proceeds from the Recovery Bonds have been used only for the purposes authorized by this Financing Order.

49. Southern California Edison Company shall report on behalf of the Special Purpose Entity, all information required by General Order 24-C and the California Public Utility Commission's Financing Rule regarding all Recovery Bonds.

50. This Financing Order shall become effective in accordance with its terms and conditions only when Southern California Edison Company (SCE) provides its written consent to all terms and conditions of this Financing Order. This Financing Order shall be void and of no force or effect if SCE does not provide its written consent to all terms and conditions of this Financing Order.

51. Southern California Edison Company (SCE) shall file and serve within 10 days from the date the Financing Order is mailed a written statement that either: (i) SCE consents to all terms and conditions of this Financing Order; or (ii) SCE does not consent to all terms and conditions of this Financing Order. If the latter, SCE's written statement shall identify the specific terms and conditions it does not consent to and explain why it does not consent to these terms and conditions.

52. Following Southern California Edison Company's (SCE) written consent, this Financing Order, together with the Fixed Recovery Charges authorized by this Financing Order, shall become irrevocable to the extent specified in Public Utilities Code Section 850.1(e) and binding upon SCE and any successor to SCE that provides electric distribution service directly to Consumers of electricity within SCE's Service Territory.

53. On or after the effective date of this Financing Order, upon the request of Southern California Edison Company (SCE), the Special Purpose Entity (SPE), the Bond Trustee, or all of them, the California Public Utilities Commission's (Commission) General Counsel shall execute and deliver the following to SCE, the SPE, and/or the Bond Trustee: (i) a certificate that attaches a true, correct, and complete copy of this Financing Order and certifies such copy to be the act and deed of this Commission; (ii) a certificate that states this Financing Order has not been altered, rescinded, amended, modified, revoked, or supplemented as of

the date of the closing of the Recovery Bonds authorized by the Financing Order; and (if timely) (iii) a certificate that states the Commission has reviewed and approved the Recovery Bonds in accordance with the Financing Order.

54. Within 10 days from the date when all conditions precedent to the issuance of the Recovery Bonds have been satisfied, and in any event prior to the issuance of the first series of Recovery Bonds, Southern California Edison Company (SCE) shall remit by wire transfer to the California Public Utilities Commission's Fiscal Office the Public Utilities Code Section 1904 fee amount of $392,216, which amount is subject to change based on the final principal amount of Recovery Bonds to be issued pursuant to this Financing Order as set forth in the Issuance Advice Letter, and the Special Purpose Entity shall reimburse SCE for such payment. This Financing Order decision number shall be referenced in connection with the wire transfer.

55. Southern California Edison Company (SCE) will periodically credit back to customers though SCE's Base Revenue Requirement Balancing Account all periodic servicing and administration fees in excess of SCE's incremental cost of performing the servicer and administration functions until its next general rate case when the costs and revenues associated with the servicing and administrative fees will be included in the cost of service.

56. The Application is granted and denied to the extent set forth in the previous Ordering Paragraphs.

57. Southern California Edison Company may submit requests for the California Public Utilities Commission to consider and issue future financing orders approving issuance of Additional Recovery Bonds pursuant to Public Utilities Code § 850 *et seq*., including securitization of its remaining Total

Assembly Bill 1054 CapEx, in the manner described in the body of this Financing Order.

58. This proceeding is closed.

This order is effective today.

Dated February 23, 2023, at San Francisco, California.

ALICE REYNOLDS
President
GENEVIEVE SHIROMA
DARCIE L. HOUCK
JOHN REYNOLDS
KAREN DOUGLAS
Commissioners

# ATTACHMENT 1

## Description of Cash Flow Model

# ATTACHMENT 2

## Form of Issuance Advice Letter

# ATTACHMENT 3

## Form of Routine True-Up Mechanism Advice Letter

# ATTACHMENT 4

## Form of Non-Routine True-Up Mechanism Advice Letter

# ATTACHMENT 5

## Estimated Upfront Financing Costs

**GLOSSARY OF TERMS**

AB 1054: Assembly Bill 1054, enacted in 2019 to address fire risks.

Authorized Amount: The total of the Third AB 1054 CapEx, the Pre-Securitization Debt Financing Costs, and the Upfront Financing Costs (*i.e.*, the total amount of the Recovery Bonds).

Bond Collateral: The Recovery Property as well as all other rights and assets of the SPE.

BRRBA: SCE's Base Revenue Requirement Balancing Account.

CARE: California Alternate Rates for Energy program.

CGDL-CRS: Customer Generation Departing Load Cost Responsibility Surcharge.

Consumers: Electricity customers in SCE's Service Territory.

DL Consumers: Departing Load Consumers.

EDGARization: The process of converting original documents (*e.g.*, Microsoft Word, Microsoft Excel, Adobe PDF, *etc.*) into acceptable SEC format.

ESP: Electric Service Provider.

Equity Rate Base Exclusion: Certain large electrical utility expenditures are directed by the Legislature to be excluded from their Consumer rate base.

Exempt Fixed Recovery Charge Customer Classes: This collectively refers to customers enrolled in the CARE and FERA programs. Section 850.1(i) expressly provides that fixed recovery charges shall not be imposed on customers that receive either the CARE or the FERA programs discount pursuant to Section 739.1.

FERA: Family Electric Rate Assistance.

Fixed Recovery Charge: The nonbypassable charge allocated to Consumers to pay for the Recovery Bonds' debt service and other Ongoing Financing Costs.

GSRP: Grid Safety and Resiliency Program; SCE's wildfire risk mitigation program.

Initial AB 1054 CapEx: SCE's Application's initial tranche of its Total AB 1054 CapEx, which is $326,981,000 in fire risk mitigation capital expenditures and wildfire-related costs and expenditures approved in D.20-11-007.

Initial AB 1054 CapEx Financing Order: The financing order issued in D.20-11-007.

Issuance Advice Letter: Document detailing the final proposed terms for the Recovery Bonds.

NMDL: New Municipal Departing Load.

Ongoing Financing Costs: Financing Costs, defined in Section 850(b)(4), that are associated with servicing the Recovery Bonds and supporting the operations of the SPE.

Pre-Securitization Debt Financing Costs: The cost of the debt that SCE is incurring on the Third AB 1054 CapEx, until the Recovery Bonds are sold on the financial market.

Recovery Bonds: Financial instrument approved in AB 1054 for securitizing approved fire risk mitigation plan capital expenditures and wildfire-related costs and expenditures.

Recovery Property: The nonbypassable Fixed Recovery Charge.

Second AB 1054 CapEx: SCE's Application's second tranche of its Total AB 1054 CapEx, which is $517,581,000 in fire risk mitigation capital expenditures and wildfire-related costs and expenditures approved in D.21-10-025.

Second AB 1054 CapEx Financing Order: The financing order issued in D.21-10-025, as modified by D.21-12-020.

SPE: Special Purpose Entity; SCE's proposed wholly owned yet legally separate subsidiary, which would exist solely to issue Recovery Bonds.

Third-Party Billers: ESPs or other utilities in SCE's Service Territory.

Third AB 1054 CapEx: SCE's Application's third tranche of its Total AB 1054 CapEx, represented by the instant Application.

TMDL: Transferred Municipal Departing Load.

Total AB 1054 CapEx: SCE's $1.575 billion share of fire risk mitigation capital expenditures and wildfire-related costs and expenditures subject to Equity Rate Base Exclusion.

True-Up Mechanism: The various adjustments that can be made to the Fixed Recovery Charge to ensure adequate recovery to support the Recovery Bonds.

Upfront Financing Costs: The cost of all acts and services related to issuing the Bonds.

WRR: SCE's Wildfire-related revenue requirements.